UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

HASSAN MOHAMED,

                                        Plaintiff,

                                                          9:14-CV-01389
v.                                                        (TJM/TWD)

D. PHELIX,

                                        Defendant.

_____

APPEARANCES:                            OF COUNSEL:

HASSAN MOHAMED
94-A-0677
Plaintiff, pro se
Fishkill Correctional Facility
P.O. Box 1245
Beacon, NY 12508


HON. ERIC T. SCHNEIDERMAN              NICOLE E. HAIMSON, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**ORDER AND REPORT-RECOMMENDATION**</u>

## I.    INTRODUCTION

*Pro se* Plaintiff Hassan Mohammed submitted his original complaint in this civil rights

action under 42 U.S.C. § 1983 for filing on November 17, 2014.  (Dkt. No. 1.)  Named as

Defendants were M. Powers, a Sergeant at Bare Hill Correctional Facility ("Bare Hill"), and D.

Phelix, Deputy Superintendent of Security at Bare Hill.  *Id*.  By Decision and Order filed on

January 21, 2015, the District Court determined that Plaintiff's claims were barred by the three-year statute of limitations applicable to actions under § 1983 and therefore subject to dismissal on initial review conducted pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A.  (Dkt. No. 7 at 8-9.[1])  Plaintiff was granted leave to amend to plead facts showing why his claims were timely or why the District Court should toll the applicable limitations period.  *Id*.  Plaintiff filed an amended complaint (Dkt. No. 8), and the District Court, in a Decision and Order filed on April 6, 2015, thereafter dismissed the action as time-barred.  (Dkt. No. 9.)

Plaintiff appealed to the Second Circuit from the Judgment dismissing the amended complaint. (Dkt. Nos. 10, 12.)  On August 13, 2015, the Second Circuit vacated the dismissal and remanded the matter to the District Court for "factual findings on the length of the administrative exhaustion period, its effect on the applicable statute of limitations, and such further action as may be appropriate." (Dkt. No. 15.)  On September 23, 2015, the District Court issued an Order directing Plaintiff to file a second amended complaint with "facts sufficient for the Court to determine the period during which the statute of limitations on Plaintiff's claims was tolled as he exhausted his administrative remedies." (Dkt. No. 17.)

Plaintiff filed a second amended complaint on October 28, 2015.  (Dkt. No. 18.)  Upon initial review of the second amended complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, the District Court found that Plaintiff's Fourteenth Amendment due process claim against Defendant Phelix arising out a Tier III disciplinary hearing in August 2011was not time-barred and that the due process claim survived initial review.  (Dkt. No. 20 at 5, 9.)  The District

---

[1]    Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

Court dismissed with prejudice claims against Defendant Powers for filing a false misbehavior report and giving false testimony for failure to state a claim. (Dkt. No. 20 at 13.) Also dismissed, but without prejudice, were Plaintiff's equal protection and Eighth Amendment conditions of confinement claims, and his due process claim against Powers. *Id.* According to the Clerk's Office docket, Plaintiff has not filed a further amended complaint.

Discovery ensued and remaining Defendant Phelix now moves for summary judgment on Plaintiff's due process claim against him, the sole remaining claim in the case. (Dkt. No. 32.) Plaintiff has filed papers in opposition to the motion. (Dkt. No. 34.) For reasons explained below, the Court recommends that Defendant's summary judgment motion be granted.

## II.    FACTUAL BACKGROUND

### A.    The August 4, 2011, Inmate Misbehavior Report

On August 4, 2011, Bare Hill Sergeant Powers issued an Inmate Misbehavior Report ("IMR") to Plaintiff, who was housed at Bare Hill at the time, charging him with violating Rule 104.12   Demonstration. (Dkt. Nos. 8 at ¶ 3[2]; 32-4 at 9.) The IMR described the incident for which it was issued as follows:

> Upon completion of a thorough Security investigation and with the help of several confidential informants, I have determined that on 08/03/11, you, inmate Mohamed, Hassan, #94A0677 persuaded several members of the Muslim Community to refuse participation in the Ramadan evening services of 08/03/11. Your actions put's (sic) you in violation of rule 104.12 that states "you shall not lead, organize or urge others to participate in any action which may be

---

[2]   Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs.

3

detrimental to the order of the facility."[3]

(Dkt. No. 32-4 at 9.)  The IMR was served on Plaintiff on August 5, 2011, *id*., and Plaintiff

subsequently plead not guilty.  *Id*. at 13.

**B.    Plaintiff's Assistant on the Tier III Disciplinary Hearing**

Plaintiff was given an opportunity to select an assistant for the Tier III disciplinary

hearing on the IMR, and met with the his chosen assistant on August 5, 2011, at 7:40pm.  *Id*. at

76.  Plaintiff requested that the assistant interview inmates Ali, McNair, Sullivan, and Johnson as

potential witnesses at Plaintiff's Tier III disciplinary hearing.  *Id*.  All four agreed to testify.  *Id*.

The assistant was also asked by Plaintiff to interview Corrections Officers Barnes and Rice,

Chaplain Smith, and Sgt. Powers as potential witnesses.  *Id.*  In addition, Plaintiff requested that

the assistant obtain copies of the August 3 and 4, 2011, sign-out sheets for Dorm B-2, and the

Unusual Incident Report prepared on the incident.  *Id.*

The Assistant Form signed by both Plaintiff and the assistant on August 9, 2011, indicates

that the assistant had interviewed the potential witnesses, assisted as requested with regard to

documents, and reported the results to Plaintiff.  *Id.*  The assistant noted on the form that he did

not receive all of the documents requested by Plaintiff because there was no Unusual Incident

Report filed and there was no call-out sheet dated August 3, 2011, and it could not be determined

with certainty whether one of the undated sheets was for August 3, 2011.  *Id.*

---

[3] Under Inmate Rule 104.12, "[a]n inmate shall not lead, organize, participate, or urge other inmates to participate, in a work-stoppage, sit-in, lock-in, or other actions which may be detrimental to the order of the facility."  N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 7, § 270.2.B.5.iii; *see also* (Dkt. No. 32-4 at ¶ 8.)

**C.     The Disciplinary Hearing**

Plaintiff's Tier III disciplinary hearing was convened by Deputy Superintendent of

Security Phelix on August 10, 2011, and ended on August 17, 2011.  (Dkt. No. 32-4 at 11, 73.)

Phelix has been employed by the New York Department of Corrections and Community

Supervision ("DOCCS") for approximately thirty-four years, and one of his duties as Deputy

Superintendent of Security is to conduct disciplinary hearings.  (Dkt. No. 32-4 at ¶¶ 1, 5.)

1.     Preliminary Matters

At the commencement of the hearing, Phelix informed Plaintiff of his right to call

witnesses and present oral or documentary evidence and acknowledged that Plaintiff had asked

for inmates Ali, McNair, Sullivan, and Johnston, as well as staff members Barnes, Rice, Smith,

and Powers, as witnesses.[4]  (Dkt. No. 32-4 at 11.)  Plaintiff explained to Phelix that his assistant

did not obtain the August 3, 2011, sign-out sheet he had requested, and Phelix responded that he

would attempt to ascertain why the assistant had been unable to locate it.  *Id*. at 12.  Plaintiff

acknowledged the August 3rd sign-out sheet for Dorm B-2 was the only thing he had requested

that his assistant did not provide to him.  *Id*.  When asked if he had any documentary evidence to

give Phelix, Plaintiff handed him the August 4, 2011, sign-out sheet for Dorm B-2.  *Id*. at 13-14.

When the hearing reconvened the following morning, Phelix explained to Plaintiff that

there was no Unusual Incident Report filed, and he had searched unsuccessfully for the August

3rd sign-out sheet for Dorm B-2.  *Id*. at 11,16.  According to Phelix, the file drawer in the

---

[4]  Plaintiff rescinded his request for Rice's testimony during the disciplinary hearing.
(Dkt. No. 32-4 at 59.)

officer's desk in Dorm B-2, where the sign-out sheets are required to be kept for thirty days, contained signed sheets for August 1, 2, 4, 5, and 7, but no sheet for August 3rd. *Id.* at 16. There were a number of undated sign-out sheets in the drawer, but because Phelix would be unable to determine with sufficient certainty which, if any, of the undated sheets was for August 3rd, he would not be able to rely on any of them. *Id.*

2.    Testimony of Hearing Witnesses Requested by Plaintiff[5]

a.    Ali

Inmate Ali testified that he recalled meeting with Plaintiff and Chaplain Smith prior to Ramadan services on August 3, 2011. (Dkt. No. 32-4 at 18.)  The meeting was at least in part regarding members of the Muslim community not being allowed to go to the Mosque after meal time. *Id.* at 19. Ali went to the Mosque at around 4:10pm after they had called the Ramadan run. *Id.* at 20. There were about fifteen to twenty inmates there when he arrived, and he then left. *Id.* Plaintiff was still at the Mosque when Ali left. *Id.*  According to Ali, Plaintiff did not tell him, nor did he hear Plaintiff tell any other inmates not to go to the Mosque, and while at the Mosque he did not hear any inmates talking about why they should not be there. *Id.* at 19, 21.

b.    McNair

McNair testified that he was locking down in the same dorm as Plaintiff on August 3, 2011, and Plaintiff did not tell him not to go the Mosque, nor did he hear or see Plaintiff speaking with anyone else about not going to the Mosque that day.  (Dkt. No. 32-4 at 22.) According to McNair, as a member of the Muslim community, he heard Plaintiff urging members

---

[5] The testimony of Powers, whose testimony was requested by Plaintiff and directed by Phelix, is addressed separately.

of the community to go to the Mosque to pray and practice their religion.  *Id*.  When questioned

by Phelix, McNair testified that he had been living at Dorm B-2 for four months and worked as a

morning porter.  *Id*. at 23.  McNair did not go to the Mosque on August 3, 2011, because he did

not feel like going that day.  *Id*.  McNair testified to seeing Plaintiff on August 3, 2011.  *Id*. at 24.

          c.       Sullivan

Sullivan also locked down with Plaintiff in Dorm B-2.  (Dkt. No. 32-4 at 25.)  Plaintiff

did not tell Sullivan, nor did Sullivan hear him tell anyone else not to go to the Mosque on

August 3, 2011.  *Id*.  Sullivan had been in Dorm B-2 for three months and worked in the mess

hall with Plaintiff.  *Id*. at 26.  They did not hang out together.  *Id*.  Sullivan is a registered Muslim

but stopped going to Ramadan after the second day and did not report to the Mosque on August

3, 2011, for personal reasons.  *Id*.  Sullivan saw Plaintiff in the morning and afternoon of August

3, 2011, but did not recall speaking with him.  *Id*. at 27.

          d.       Johnson

Johnson testified that Plaintiff did not tell him or anyone else he was aware of not to go to

the Mosque on August 3, 2011.  (Dkt. No. 32-4 at 28.)  Johnson is a registered Muslim who goes

to Jumna on a regular basis on Fridays.  *Id*.  When he was in the mess hall on August 2, 2011,

Sullivan did not hear any inmates discussing not going to the Mosque on August 3, 2011.  *Id*.  He

did not go to the Mosque on August 3, 2011, because of timing issues with going to the mess

hall.  *Id*.  He resumed attending Mosque again after August 3rd.  *Id*.  According to Johnson, he

had recently been going to the Mosque after mess hall, but there were a few people who had not

been going to the Mosque because they did not like that "(inaudible)" was trying to throw

Plaintiff under the bus.  *Id*. at 29.  When Phelix asked Johnson if he liked Plaintiff he said he did

because he could learn from him. *Id*. at 30.

   e. Chaplain Smith

   Chaplain Smith was the head chaplain at Bare Hill and because there had been no facility Imam at Bare Hill for quite some time, Smith was charged with supervising and overseeing the Muslim community at the facility . (Dkt. No. 32-4 at 37, 40.) When asked about the meeting with Plaintiff and Ali on August 3, 2011, Smith said it was to discuss some issues of concern to the Muslim community that they wanted to bring to the attention of the authorities at the facility. *Id.* at 38. Smith could not remember the specific issues discussed. *Id.* When asked, Smith testified that he was leaving for vacation the day after the meeting and had given some dates and videotapes to Plaintiff and Ali for Muslim community use while he was away. *Id.*

   Phelix asked Smith if he was aware that there was a certain faction of Muslims at Bare Hill who did not like Plaintiff, and Smith responded that he was not aware. *Id*. at 39-40. Smith was also unaware of instances where Plaintiff had taken people out of certain positions within the Muslim community because they did not carry themselves spiritually as prescribed by the Muslim faith. *Id*. at 40. Smith never heard Plaintiff urge other Muslims not to participate in Ramadan. *Id*. According to Smith, one of the major concerns (presumably at the meeting) had to do with the Muslim community wanting to go back to the Mosque after eating. *Id*. Smith had previously gone to the Captain's office because a memo that had been issued was not very specific on the issue. *Id*. The Captain decided definitively that if the Muslim inmates finished their meal by 9:30pm, they could go back to the Mosque for a final prayer, but if they finished after 9:30pm they could not go back. *Id.* at 39.

   Smith testified that he had to counsel Plaintiff to use only two channels to express his

grievances or concerns   either through Smith or the grievance office, because he was picking up on the fact that Plaintiff was considering other options to air his grievances.  *Id*.  He suspected Plaintiff was orchestrating some kind of power play.  *Id*. at 41.  However, when asked by Plaintiff, Smith testified Plaintiff had never openly communicated with him that he was seeking another avenue to address grievances.  *Id*.

Plaintiff explained to Phelix at the close of Smith's testimony that one of the issues at the August 3, 2011, meeting was the inmate's inability to return to the Mosque after mess hall.  *Id*. at 43.  Plaintiff also pointed out that he would not have asked for the tapes for the Ramadan curriculum if the plan was for no one to go to the Mosque.  *Id*.

> f.    Barnes

Steady shift dorm officer Barnes, who was working in Plaintiff's dorm on August 3, 2011, was unable to recall whether Plaintiff went anywhere other than work or stayed in his cube that day.  (Dkt. No. 32-4 at 60-61.)  Barnes did recall Plaintiff mentioning that he needed some guys to work in the mess hall.  *Id*. at 61.  Barnes did not hear or see Plaintiff telling anyone not to go to the Mosque on August 3rd.  *Id*.

> 3.    Communications Between Plaintiff and Phelix at the Hearing

On August 11, 2011, in response to questions by Phelix, Plaintiff stated at the hearing that somewhere over eighty inmates had gone to the Mosque on August 1, 2011, the first day of Ramadan, and that on August 3, 2011, there were roughly fifteen to twenty inmates when Plaintiff went into the Mosque.  (Dkt. No. 32-4 at 31, 33.)  Plaintiff  left when the Ramadan run was over because he was so disgusted at how few people were there.  *Id*. at 31.  Plaintiff did not see any inmates on the walkway going towards the Mosque when he left.  *Id*.  at 31-32.  Plaintiff

had gone with Ali to the meeting with Chaplain Smith because Ali was the facilitator for the

Muslim community and Plaintiff was Ali's assistant.  *Id*. at 32.  In addition, Plaintiff was a

teacher in the Mosque.  *Id*. at 36.

        a.      Note Sent to the Administrative Offices

Phelix showed Plaintiff a letter that had come into the administrative offices the morning

of August 3, 2011, from Dorm F-2, and read it into the record.  *Id*. at 34-35.  The letter said

> I am writing this note to notify you that the person who they have
> leading the Muslim community, Mohamed from B-1 dorm, either
> 15, 16, or 14 cube is a radical.  All he talks about is going against
> the administration in one way or another.  First, it was with us not
> being allowed Muslim classes then about how they don't tell us
> how to practice uh, religion, now when, now yesterday because the
> CO said we didn't have time to go back to the Magee to pray, he
> has told all the Muslims not to attend the Ramadan service
> tomorrow.  This man is going to end up starting a riot in this jail.
> He is telling people not (sic) listen to the CO's (sic) but to do what
> he says and I am not trying to get a new charge and end up in
> Clinton.   Uh, I think the word is maybe dead (sic) from being
> beaten with a club.  You have to do something about this guy
> leading the Muslim community into trouble.

Both Plaintiff and Phelix wanted the note entered on the record.  *Id*. at 35.  After Phelix read the

note, Plaintiff told Phelix that some of the inmates had expressed the sentiment that they did not

want to go to the Mosque, and Plaintiff's action in attending the meeting on August 3, 2011, was

to resolve the issue.  *Id*. at 36.  Plaintiff noted that he, in fact, signed up for and did go to the

Mosque on August 3rd.  *Id*.   Plaintiff also told Phelix that there were inmates within the Muslim

community who wanted him out of Bare Hill.  *Id*.

b.      Confidential Informants

On August 11, 2011, before Powers was called to testify, Phelix informed Plaintiff that

Powers had obtained information relevant to the charge against Plaintiff from a couple of

confidential informants, and the information received from them entered in part into Powers'

decision to confine Plaintiff.  *Id*. at 45.  The information was in a confidential memorandum

prepared by Powers and given to Phelix.  *Id*. at 49.  Phelix told Plaintiff that the information

would not be accessible to him because, given the nature of the correctional setting, it was

necessary to withhold the names and other identifying information of the individuals providing

the information.  *Id*. at 45-46.

Phelix told Plaintiff that in his role of hearing officer, he was responsible for relaying the

information provided by the informants to Plaintiff so it would give him an opportunity to ask

questions.  *Id.*  at 46.  According to Phelix, some individuals had come forth and indicated that

they had signed up to go to Ramadan, left the dorm, and come back minutes later and informed

the dorm officers they did not want to attend.  *Id*.  A dorm officer asked one inmate what was

going on and was told by the inmate that he did not want to go.  *Id*.  When pressed, the inmate

said that there were other Muslims saying that Mohamed was telling them not to go to Ramadan.

*Id*.

Phelix also told Plaintiff that Powers had been told by some inmates he interviewed that

Muslims were upset with Plaintiff because he was attempting to take control and refuse services

in protest for not being allowed to pray after the Ramadan meal.  *Id*. at 48.  One inmate came

forth with concerns of Plaintiff's interference among the Muslim community with the

11

recruitment of inmates to protest of the Ramadan services.  *Id.*

4.    Powers' Testimony

Powers testified by telephone from home on August 11, 2011.  (Dkt. No. 32-4 at 49, 52.)

Phelix began by questioning Powers regarding the reliability of the confidential information

given to him regarding the August 3, 2011, incident.  *Id*. at 50.  Powers testified that he felt the

individuals who provided him with information were candid and that the information was

accurate.  *Id.*  Powers testified that the confidential informants had provided reliable information

to him on numerous occasions in the past.  *Id*.

When questioned by Plaintiff, Powers testified that the IMR was based on a lengthy

investigation conducted on the evening of August 3, 2011, and the day of August 4, 2011,

involving many members of the Muslim community in addition to a confidential informant.  *Id.*

at 51.  Powers, when asked to describe the precise location of the violation charged in the IMR,

testified that while he could not pinpoint exactly where it had occurred, much of the information

he had received from staff members was that members of the Muslim community who had been

dropped from their houses to attend Ramadan services were turned around on the walkway and

sent back.  *Id* at 53-54.  According to Powers, based on the information he received it was very

clear that Plaintiff was the one directing the inmates to go back to their housing.  *Id.*  at 53.

Some of the information came from housing officers, other from informants.  *Id*. at 54.  Powers

did not personally witness Plaintiff telling anyone not to go to the Mosque.  *Id*.  at 56.  In issuing

the IMR, Powers did not give any consideration to having heard that Chaplain Smith had

counseled Plaintiff in the past not to try to handle things other than through him or the grievance

procedure.  *Id*. at 57.

5.    Plaintiff's Memoranda

Plaintiff stated at the hearing that he had sent two August 11, 2011, memoranda to Phelix

in connection with the IMR and hearing.  (Dkt. No. 32-4 at 65.)   One of the memoranda dealt

with the failure of the IMR to comply with the regulation requiring that the report contain the

date, time, place and nature of the allegation.  7 NYCRR § 251-3.1(c)(1) - (3) (1995).[6]  (Dkt. No.

18-1 at 5.)  According to Plaintiff the inconsistency between Powers' testimony that the incident

occurred on August 3, 2011, and the August 4, 2011, incident date on the IMR required that the

IMR be dismissed under the regulation.  *Id*.

After being provided a copy of the memorandum, Phelix recalled Powers, and Powers

testified that the incident occurred on August 3, 2011, and the August 4, 2011, date on the IMR

was the end of the investigation when it was determined that Plaintiff was the one who had told

members of the Muslim community not to go to the Mosque on August 3, 2011.  (Dkt. No. 32-4

at 68-69.)

The other memorandum dealt with Plaintiff's assistant's failure to obtain the August 3,

2012, sign-out sheet from Dorm B-2.  (Dkt. No. 18-1 at 4.)  Plaintiff cited 7 NYCRR § 251-4.2

(1997), regarding an inmate's entitlement to an assistant to assist in preparing for a disciplinary

hearing, including helping to obtain documents for the hearing.  (Dkt. No. 18-1 at 4.)  Plaintiff

argued that his due process rights were violated by his assistant's failure to obtain the sign-out

sheet for him, and as a result he was entitled to dismissal of the IMR.  *Id*.  Phelix explained to

---

    [6]  7 NYCRR § 251-3.1(c)(1)-(3) requires that a misbehavior report include: "(1) a written
specification of the particulars of the alleged incident of misbehavior involved; (2) a reference to
the inmate rule book number allegedly violated by the inmate, and a brief description of the rule;
[and] (3) the date, time and place of the incident."

Plaintiff that it was not that the assistant failed to do his duties, but that both the assistant and

Phelix had been unsuccessful in attempts to locate the document.  (Dkt. No. 32-4 at 66-67.)

       6.   <u>Hearing Determination</u>

At the completion of the hearing, Phelix read his disposition into the record.  (Dkt. No.

32-4 at 70-71.)  Phelix found Plaintiff guilty of the violation of Rule 104.4   Demonstration.  *Id*.

at 70, 79.  Phelix imposed a penalty of six months in the Special Housing Unit ("SHU"), with

one month suspended and deferred for six months, and no credit for time served.  *Id*. at 71, 80.

Phelix also imposed a six month loss of recreation, packages, commissary, and phones, as well as

six months loss good time, all with one month suspended.  *Id*.

The statement of items relied upon by Phelix in finding Plaintiff guilty included Powers'

IMR, verbal testimony, and confidential investigation memorandum, which Phelix found to be

credible and to substantiate the charge against Plaintiff.  *Id*. at 71, 78.  According to Phelix, he

also conducted an independent assessment of the reliability of the informants and deemed the

information to be reliable.  *Id*.  Phelix considered Smith's testimony that he had counseled

Plaintiff in the past about voicing grievances regarding Muslims through avenues other than the

Chaplain or the grievance office.  *Id*.  Phelix concluded that the foregoing, along with Plaintiff's

own statement he had left the Mosque on August 3, 2011, in dissatisfaction, outweighed

Plaintiff's witnesses and other defense evidence, thus leading to the guilty finding.  *Id*.

Plaintiff alleged in his second amended complaint and testified at his deposition that after

the disciplinary hearing, Phelix told Plaintiff that he could not afford to have him in general

population because he believed that Plaintiff had orchestrated the August 3, 2011, incident,

which constituted a failure on Phelix's part as security director.  (Dkt. Nos. 18 at ¶ 29; 32-5 at

14

21.)

### 7. Administrative Appeal

Plaintiff appealed from the determination at the Tier III disciplinary hearing. (Dkt. No. 32-6 at 9-15.) The grounds raised by Plaintiff on his appeal included: (1) a challenge to the accuracy of the IMR and its alleged failure to comply with 7 NYCRR § 251-3.1(c)(1)-(3); (2) a due process claim arising out of the failure to give him a copy of the August 3, 2011, sign-out sheet; and (3) a claim that Phelix erred in conducting off-the-record interviews of witnesses in violation of 7 NYCRR § 253.6(b). (Dkt. No. 32-6 at 9.)

The Superintendent's hearing was reviewed and reversed by D. Venettozzi, Acting Director, Special Housing/Inmate Disciplinary Program, on November 15, 2011. *Id*. at 17. The hearing was reversed on the grounds of "failure to maintain a complete electronic recording of the hearing confidential tapes." *Id*. at 18. According to Venettozzi, the reversal was not based upon any deficiency in the process received by Plaintiff during the hearing. *Id.* at 2, ¶ 9.

### D. Plaintiff's Time in SHU

According to Plaintiff, he was placed in SHU at Bare Hill for approximately fifty days before being transferred to SHU at Attica Correctional Facility ("Attica"). (Dkt. No. 32-5, 24.) Plaintiff claims that while he was at Bare Hill, he was targeted. *Id*. He was not given recreation; was never able to go to the SHU commissary; was given cold food and smaller food portions; was not given soap, toilet paper, or toothpaste; and did not receive fresh linens. *Id*. at 24-25. Plaintiff testified at his deposition that he thought things were pretty much okay at Attica. *Id*. at 25. Plaintiff was released from SHU at Attica on November 17, 2011, following the reversal of the determination. *Id.* at 22.

III.    STANDARD OF REVIEW

Pursuant to Rule 56, summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-52 (1986). Under those standards, the party seeking summary judgment bears the initial burden of showing, through the submission of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute is "genuine" if the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading," Fed. R. Civ. P. 56(e), or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining

16

whether material issues of fact exist . . . .") (citations omitted).  Plaintiff's second amended

complaint is verified.  (Dkt. No. 18 at 13.)

In determining whether a genuine issue of material fact exists, the court must resolve all

ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball*

*Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  Where a party is proceeding *pro*

*se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret

them to raise the strongest arguments that they suggest."  *Burgos v. Hopkins*, 14 F.3d 787, 790

(2d Cir. 1994); *see also Ruotolo v. IRS*, 28 F.3d 6, 8 (2d Cir. 1994) (district court "should have

afforded [*pro se* litigants] special solicitude before granting the . . . motion for summary

judgment.").  However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not

sufficient to overcome a motion for summary judgment."  *Cole v. Artuz*, No. 93 Civ. 5981

(WHP) JCF, 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999)[7] (citing *Carey v. Crescenzi*, 923

F.2d 18, 21 (2d Cir. 1991)).

## IV.    ANALYSIS

### A.    Deficiencies in Plaintiff's Opposition Papers

While courts are required to give due deference to a plaintiff's *pro se* status, that status

"does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a

summary judgment motion."  *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003);

*see also Liberati v. Gravelle*, No. 9:12-CV-00795 (MAD/DEP), 2013 WL 5372872, at * 6

(N.D.N.Y. Sept. 24, 2013) (while *pro se* prisoners are undeniably "entitled to some measure of

---

[7]  Plaintiff will be provided with copies of unpublished decisions cited herein in
accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

forbearance when defending against summary judgment motions, the deference owed to *pro se* litigants . . . does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules") (internal citation and punctuation omitted).

Plaintiff has failed to respond to Defendant's Statement of Material Facts (Dkt. No. 32-1) in the manner required under N.D.N.Y. L.R ("L.R.") 7.1(a)(3).[8]  Under the rule, the opposing party's response to the movant's statement of material facts "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs.  Each denial shall set forth a specific citation to the record where the factual issue arises." L.R. 7.1(a)(3).  Although in his opposition to Defendant's Motion for Summary Judgment (Dkt. No. 34), Plaintiff has referenced by item number each of the Defendants' assertions, his response does not mirror Defendant's statement of facts and respond in matching numbered paragraphs, and his response includes very few citations to the record where claimed factual issues arise.

L.R. 7.1(a)(3), provides that where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required, the movant's factual statements will be accepted as true (1) to the extent they are supported by evidence in the record,[9] provided (2)

---

[8]  The Second Circuit has recognized that district courts "have the authority to institute local rules governing summary judgment submissions, and have affirmed summary judgment rulings that enforce such rules.  Rules governing summary judgment practice are essential tools for district courts permitting them to efficiently decide summary judgment motions by relieving them of the onerous task of hunting through voluminous records without guidance from the parties." *N.Y. State Teamsters Confer, Pension and Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 647 (2d Cir. 2005) (citation and internal punctuation and quotation marks omitted).

[9]  L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically

18

the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[10]  *See Champion,v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement."  *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted).  In deference to Plaintiff's *pro se* status and his attempt, albeit inadequate, to respond to Defendants' statement of material facts, the Court has opted to review the entire summary judgment record.

### B.     Due Process Rights in a Prisoner Disciplinary Hearing

A prison inmate may not properly be deprived of a cognizable liberty interest without due process of law.  *See Wolff v. McDonnell*, 418 U.S. 539, 555-56 (1974).  A prison disciplinary hearing implicates a protected liberty interest if  "it imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."[11]  *Sandin v. Conner*, 515 U.S.

---

controvert." However, *see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts].  It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[10]  Defendants have complied with L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to their summary judgment motion.  (Dkt. No. 32 at 2.)

[11]  Inasmuch as Defendant has not addressed the question of whether Plaintiff's disciplinary hearing implicated a protected liberty, focusing instead solely on the question of due process, for purposes of this motion the Court will assume, without deciding, that Plaintiff was

472, 484 (1995); *see also Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004).

It is well-established that "[t]he due process protections afforded a prison inmate do not

equate to 'the full panoply of rights' due to a defendant in a criminal prosecution." *Sira v.*

*Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (quoting *Wolff*, 418 U.S. at 556). The Supreme Court

explained in *Wolff* that

> [p]rison disciplinary proceedings . . . take place in a closed, tightly
> controlled environment peopled by those who have chosen to
> violate the criminal law and who have been lawfully incarcerated
> for doing so. Some . . . have repeatedly employed illegal and often
> very violent means to attain their ends . . . [and] may have little
> regard for the safety of others or their property or for the rules
> designed to provide an orderly and reasonably safe prison life. . . .
> Guards and inmates co-exist in direct and intimate contact.
> Tension between them is unremitting. Frustration, resentment, and
> despair are commonplace. Relationships among the inmates are
> varied and complex and perhaps subject to the unwritten code that
> exhorts inmates not to inform on a fellow prisoner.
>
> It is against [that] background that disciplinary proceedings must
> be structured by prison authorities; and it is against [that]
> background that we must make our constitutional judgments. . . .

418 U.S. at 561-62. To comply with procedural due process, prison authorities must provide an

inmate charged with a violation in a disciplinary hearing with: (1) written notice of the charges;

(2) the opportunity to appear and be heard at a disciplinary hearing and to present witnesses and

evidence subject to legitimate safety and penological concerns; (3) a limited right to assistance in

preparing a defense; and (4) a written statement from the hearing officer explaining his or her

decision, and the reasons for the actions taken. *Id*. at 564-71.

A prison inmate is also entitled to a fair and impartial hearing officer, *Sira*, 380 F.3d at

---

deprived of a liberty interest.

69, and to a determination that is supported by "some evidence" in the record. *Superintendent v. Hill*, 472 U.S. 445, 455 (1985) (ascertaining whether the "some evidence" standard is satisfied, "does not require examination of the entire record, independent assessment of witness' credibility, or weighing of the evidence. . . . Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board."). The Second Circuit has held that "only reliable evidence can constitute 'some evidence.'" *Sira*, 380 F.3d at 76 (quoting *Luna v. Pico*, 356 F.3d 481, 488 (2d Cir. 2004)).

### C.    Plaintiff's Denial of Due Process Claim

Plaintiff claims that he was denied due process in the disciplinary hearing before Phelix as a result of: (1) deficient notice regarding the charge against him in the IMR; (2) his assistant's failure to provide him with a requested document; (3) Phelix's failure to conduct an independent assessment of the reliability of several alleged informants, to meet with the confidential informants, and to inform Plaintiff of their identity and what they said; and (4) Phelix's unfairness and partiality against Plaintiff. (*See generally* Dkt. Nos. 18; 32-5 at 18-19; 34-1.)

### 1.    Notice

In *Wolff*, the Supreme Court held that "written notice of the charges must be given to the disciplinary-action defendant in order to inform him of the charges and to enable him to marshal the facts and prepare a defense." 418 U.S. at 564. Due process requires that the written notice must be given twenty-four hours prior to conducting a disciplinary hearing. *Sira*, 380 F.3d at 70.

The notice requirement "serves to 'compel the charging officer to be [sufficiently] specific as to the misconduct with which the inmate is charged to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain

away vague charges set out in a misbehavior report.'" *Id.* (quoting *Taylor v. Rodriguez*, 238 F.3d 188, 192-93 (2d Cir. 2001)). An inmate must receive notice of at least some "specific facts" underlying the accusation. *Taylor*, 238 F.3d at 193; *see also Sira*, 380 F.3d at 72 ("[T]here must be sufficient factual specificity to permit a reasonable person to understand what conduct is at issue so he may identify relevant evidence and present a defense.").

The IMR Powers filed against Plaintiff, in satisfaction of the notice requirement set forth in *Taylor*, specifically stated in the incident description that Plaintiff was being charged with violation of Rule 104.12   Demonstration, as a result of his actions in "persuad[ing] several members of the Muslim community to refuse participation in the Ramadan evening services of 08/03/11." (Dkt. No. 18-1 at 2.)   Plaintiff contends that notice of the charge against him was deficient under 7 NYCRR § § 251-3.1(c)(1)-(3) because of the vagueness of the identification of the location of incident as the "Facility Compound," and an incident date of 08/04/11, which was the incorrect date, in the IMR heading.[12]  (Dkt. Nos. 18 at ¶ 13; 32-4 at 65; 32-6 at 9.)  The law is clear that the violation by prison officials of state regulations or DOCCS directives "does not in itself give rise to a due process claim." *O'Diah v. Artus*, 887 F. Supp. 2d 497, 501 (W.D.N.Y. 2012); *see Bolden v. Alston*, 810 F.2d 353, 358 (2d Cir. 1987) ("State procedural requirements do not establish federal constitutional rights."). Furthermore, the fact that a misbehavior report has an incorrect date, without more, has been found insufficient to establish a due process violation. *See Cepeda v. Urban*, No. 12-CV-00408(F) , 2014 WL 2587746, at * 6 (W.D.N.Y. June 10,

---

[12]  Powers testified at the disciplinary hearings that he used the date August 4, 2011, in the heading of the IMR because that was the date on which he completed his investigation.  (Dkt. No. 32-4 at 68-69.)  As noted above, the description of the incident in the IMR clearly states that the incident occurred on August 3, 2011.  (Dkt. No. 18-1 at 2.)

2014) (the mere fact that an IMR has an incorrect date of incident, without more, is insufficient to establish a due process violation).

As to the description of the location of the incident charged in the IMR as "facility compound," Powers testified at the hearing that he used that description because he could not pinpoint a single spot where inmates on their way to the Mosque on August 3, 2011, were turned around on the walk-way and sent back to their dorms at Plaintiff's direction.  (Dkt. No. 32-4 at 51, 53-54.)  Where prison officials lack precise information regarding the location of an inmate's misconduct, due process cannot demand that they provide notice of specific facts that are beyond their knowledge and providing general information that is known is sufficient.  *Sira*, 380 F.3d at 72.

Even if Powers arguably could or should have been more specific in identifying the location of the incident and did err on the date in the IMR heading, in order to establish a notice due process violation, Plaintiff must show that he was prejudiced by the notice deficiency.  *See Brennan v. United States*, 646 F. App'x 662, 666 (10th Cir. 2016) (concluding that the *Wolff* notice requirement is subject to harmless error review); *Proctor v. Kelly*, No. 9:05-CV-0692 (GTS/GJD), 2008 WL 5243925, at *2 (N.D.N.Y. Dec. 16, 2008) ("The Second Circuit has specifically held that prison disciplinary hearings are subject to a harmless error analysis").

The defense presented by Plaintiff at the hearing, and his deposition testimony, reveal that he had a clear understanding of the charge against him, thereby rendering the claimed notice deficiencies harmless error.  *See Ayers v. Selsky*, 467 F. App'x 45, 47 (2d Cir. 2012) (harmless error in giving date of incident as the date the IMR was filed rather than the date of the events giving rise to the IMR where inmate's written submissions demonstrated he suffered no actual

confusion as to the date of the incident in question).

Plaintiff requested inmate witnesses Ali, McNair, Sullivan, and Johnson and questioned each, *inter alia*, as to whether he told them, or they saw or heard him tell anyone else not to go to the Mosque on August 3, 2011. (Dkt. No. 32-4 at 19, 21-22, 25-26, and 28.) In addition, Plaintiff's questioning of Barnes, steady shift officer in his dorm, whether he went anywhere other than to work or his cube on August 3, 2011, and Plaintiff's persistence in seeking the August 3, 2011, sign-out sheet for his dorm, reveal that he was well aware of the date of the incident. *Id*. at 60-61, 66-67. Furthermore, Plaintiff testified at his deposition that he knew when he received it on August 5, 2011, that the IMR was about the issue with people not attending Ramadan services on the evening of August 3, 2011. (Dkt. No. 32-5 at 8-9.)

Based upon the foregoing, the Court finds with regard to notice that Plaintiff's due process rights were not violated, and that even if they arguably were, the error was harmless given Plaintiff's obvious knowledge and understanding of the charge made against him in the IMR.

> 2.     Inadequate Assistance in Obtaining Documentary Evidence

In *Eng v. Coughlin*, 858 F.2d 889, 897 (2d Cir. 1988), the Second Circuit held that "[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges." An assistant who has done nothing to assist an inmate has "failed to accord the prisoner his limited constitutional due process right of assistance." *Id*. at 898. However, "the scope of [DOCCS'] obligation in this regard is significantly limited, and . . . an inmate's right to assistance in connection with a disciplinary hearing  which arises under the Due Process Clause of the

Fourteenth Amendment . . . falls far short of the right to counsel that the Sixth Amendment guarantees to criminal defendants." *Crenshaw v. Sciandra*, 766 F. Supp. 2d 478, 483 (W.D.N.Y. 2011) (internal citation and quotation marks omitted); *see also Jermosen v. Coughlin*, No. 89-CV-1140E(M), 1993 WL 328482, at * 4 (W.D.N.Y. Aug. 9, 1993), *aff'd*, 29 F.3d 620 (2d Cir. 1994) (where assistant interviewed witnesses and reported to the inmate, nothing else was required of the assistant); *Fernandez v. Callens*, No. 06-CV-0506 (Sr), 2010WL 4320362, at * 10 (W.D.N.Y. Oct. 29, 2010) (assistance sufficient where the inmate requested seven inmates as potential witnesses, the assistant was unable to locate one, three refused to testify, two were rejected by the hearing officer, and the assistant issued several documents to the inmate on his request).

In this case, the assistant followed through on Plaintiff request to interview four inmates and was able to secure their testimony at the hearing. (Dkt. No. 32-4 at 76.) The assistant also attempted to interview the DOCCS personnel identified on the Assistant Form; attempted to obtain copies of the Unusual Incident Report Plaintiff believed would have been prepared on the inmates' failure to attend Mosque on August 3, 2011, and the August 3, 2011, sign-out sheet for Dorm B-2; and successfully provided Plaintiff with the August 4, 2011, Dorm B-2 sign-out sheet. *Id*. Moreover, inasmuch as Phelix personally attempted, albeit unsuccessfully, to find the documentary evidence for Plaintiff, the assistant's failure to provide the documents was at most harmless error. *See Murray v. Arquitt*, No. 9:10-CV-1440 (NAM/CFH), 2014 WL 4676569, at * 19 (N.D.N.Y. Sept. 18, 2014). Finally, while an inmate has a due process right to present documentary evidence at a disciplinary hearing, where the requested documents are found to be nonexistent, the inmate suffers no constitutional deprivation. *See Mays v. Mahoney*, No. 91 Civ.

3435 (MGC), 1994 WL 48831, at * 7 (S.D.N.Y. Feb. 14, 1994).

Based upon the foregoing, the Court finds that Plaintiff was not deprived of his due process rights to assistance in marshaling evidence and presenting a defense, or his due process right to present documentary evidence at a disciplinary hearing as a result of the unavailability of the August 3, 2011, sign-out sheet for Dorm B-2.

        3.     <u>Confidential Informants</u>

        a.     Plaintiff's Claim

In his second amended complaint, Plaintiff alleged with respect to Phelix's reliance on statements by confidential informants that

> 27.     Plaintiff Mohamed also objected to off record conversation, and investigation defendant Phelix had with alleged confidential informants. Defendant Phelix never established what information the confidential informants gave him against Plaintiff Mohamed. Without defendant Phelix, establishing what the confidential witnesses testified to, and how their testimony would implicate Plaintiff. Defendant Powers who had not witnessed, or heard the events of the MBR, used information of confidential informants who may have had high motive to see negative events happen to Plaintiff. . . . These informants reliability was never established other than pretextual/boilerplate language as to their reliability. Plaintiff was found guilty without some evidence.

(Dkt. No. 18 at ¶ 27.)

At his deposition, Plaintiff testified that Phelix failed to assess the credibility of the confidential informant and failed "to obtain a record of that to   not for me   demonstrate that, in fact, they are confidential informants who testified as to whatever they said." (Dkt. No. 32-5 at 18.)  In addition, Plaintiff testified that he was not told who the informant was and did not recall anything that was mentioned about what the informant had said. *Id*. Plaintiff also complained in

his deposition testimony that Phelix made no mention of meeting with any of the confidential

informants to assess their credibility. *Id.*

In his Memorandum of Law in opposition to Defendant's Motion for Summary Judgment,

Plaintiff argues that

> Phelix, avers to the Court, under penalty of perjury, that he
> [i]ndependently assessed the credibility of several confidential
> informants, some of whom "identified Plaintiff by name as
> someone they were upset with for trying to take control over, the
> Ramadan service" through the testimony of Sergeant Powers, and a
> memorandum summarizing Powers' investigation (DSP #1 ¶¶ 39-
> 43; PD at ¶¶ 23-27).
>
> However, Donald Vennettozzi (sic) avers under penalty of perjury
> that he received (sic) the August 17, 2011, Superintendent Hearing
> disposition finding Plaintiff, guilty of violating rule 104.12
> (Demonstration) based on Phelix's failure to record his interviews
> of the confidential informants in Plaintiff's absence (VD p. 1 ¶ 8).
> In light of this evidence, clearly there is an issue of materiel (sic)
> fact as to Phelix's violation of Plaintiff's Fourteenth Amendment
> due process right to call witnesses in his defense and to a hearing
> by a fair and impartial Hearing Officer.

(Dkt. No. 34-1 at 5.)

> b.    Law on Reliance on Information From Confidential Informants in
>       Disciplinary Proceedings

Because "the requirements of prison security are unique," in the context of prison

disciplinary hearings, prison officials are not compelled to divulge the identity of confidential

informants to an inmate, nor is an inmate entitled to have confidential informants testify as

witnesses at a disciplinary hearing. *Taylor*, 238 F.3d at 193-94 (citing *Giakoumelos v. Coughlin*,

88 F.3d 56, 61-62 (2d Cir. 1996)); *see also Sira*, 380 F.3d at 74-75 ("Courts have long

recognized . . . that the right to know evidence supporting prison disciplinary rulings is not

absolute.  As the Supreme Court has observed, prison disciplinary proceedings take place in tightly controlled environments peopled by those who have been unable to conduct themselves properly in a free society.  The risks of violence or intimidation directed at either other inmates or staff are real.  Thus, when the disclosure of evidence presents such risks, hearing officers may properly decline to inform an inmate of the adverse evidence.") (citations and internal quotation marks omitted).  Furthermore, the hearing officer is not required to personally interview or question confidential informants.  *Russell v. Scully*, 15 F.3d 219, 223 (2d Cir. 1993) ("Neither due process nor applicable precedent compels that a hearing officer . . . conduct personal interviews of confidential informants.").

The Second Circuit has held, however, that where a disciplinary finding is based in part on evidence from confidential informants, the hearing officer must independently assess the credibility of the informants, considering the totality of the circumstances.  *Sowell v. Weed*, No. 07-CV-6355(MAT), 2013 WL 3324049, at * 11 (W.D.N.Y. July 1, 2013) (citing *Sira*, 380 F.3d at 78; *Luna,* 356 F.3d at 488).  Even when the sole evidence is supplied by a confidential informant, the "some evidence" standard articulated in *Hill*, 472 U.S. at 455, may be satisfied, "as long as there has been some examination of indicia relevant [to the confidential informant's] credibility."  *Sowell*, 2013 WL 3324049 at * 11 (quoting *Giakoumelos,* 88 F.3d at 61); *see also Sira,* 380 F.3d at 79 ("[w]here good reasons justify withholding confidential evidence from the inmate, the hearing officer, of course, has the singular responsibility for ensuring that he has been provided with all the facts and circumstances necessary to make an informed assessment of reliability"); *Gaston v. Coughlin*, 249 F.3d 156, 163 (2d Cir. 2001) (the "some evidence" standard "may be met even where the only evidence was supplied by a confidential informant");

28

*Russell v. Scully*, 15 F.3d 219, 223 (2d Cir. 1993) ("if there is a due process right to an independent assessment of informants' credibility . . . that right would not entail more than some examination of indicia relevant to credibility rather than wholesale reliance upon a third party's evaluation of that credibility.").

c.    Analysis

Prior to Powers giving testimony at Plaintiff's disciplinary hearing, Phelix explained to Plaintiff that some of the information in Powers' confidential memorandum regarding his investigation had come from a couple of confidential informants, and that Powers had relied in part upon that information in confining Plaintiff.  (Dkt. No. 32-4 at 45.)  Phelix also explained to Plaintiff that the identity of the informants and the information they had given Powers would not be accessible to Plaintiff due to the need to protect the individual informants, as was necessary in a correctional setting.  *Id.  See Sira*, 380 F.3d at 75.  Contrary to Plaintiff's assertions (Dkt. Nos. 18 at ¶ 27; 32-5 at 18), Phelix did make Plaintiff aware of the nature of information in Powers' confidential memorandum, including: (1) information from dorm officers regarding Muslim inmates leaving for the Mosque on August 3, 2011, and turning around and returning to the dorm on what some inmates reported were Plaintiff's orders; and (2) information that some Muslims complained about being upset with Plaintiff for attempting to take control and have them refuse to go to services in protest for not being allowed to pray, including one specific individual who came forth with concerns regarding Plaintiff's interference among the Muslim community with the recruitment and protest of the Ramadan services.  (Dkt. No. 32-4 at 46-48.)

Plaintiff complains that Phelix never told him to what the confidential informants had testified when Phelix spoke with them or how it would implicate Plaintiff.  (Dkt. Nos. 18 at ¶ 27;

29

32-5 at 18; 34-1 at 5.)  Phelix has stated in his Declaration that he did not personally interview or question any of the confidential informants relied upon by Powers (Dkt. No. 32-4 at ¶ 26), nor did due process require him to do so.  *See Russell,* 15 F.3d at 219.  According to Phelix, he was able to independently assess the credibility of the confidential informants through Powers' testimony at the hearing.  (Dkt. No. 32-4 at ¶ 23.)

At the hearing, Phelix asked Powers if based on his twenty-one years with DOCCS, he felt that the individuals who provided him with information were candid and the information was accurate.  (Dkt. No. 32-4 at 50.)  Powers responded in the affirmative.  *Id*.  When Phelix asked Powers if he had been provided with information that had proven to be reliable by any of the individuals in the past, he responded that he had on numerous occasions.  *Id.; see Giakoumelos,* 88 F.3d at 61 (requirement that there has been some examination of indicia relevant to a confidential informant's credibility).

Powers also gave testimony at the hearing with regard to his investigation and disclosed that he had spoken to many individuals in the Muslim community in addition to the confidential informants.  (Dkt. No. 32-4 at 51.)  Powers explained that much of the information he received had been from staff members regarding inmates leaving for the Mosque and turning around and returning to their housing units, and that it was clear from his investigation that Plaintiff was the individual directing the inmates to return to their housing units.  *Id*. at 53.  In his written hearing determination, Phelix stated that he had conducted an independent assessment of the reliability of the informants and deemed the information they provided to be reliable.  *Id*. at 71, 78.

Based upon the foregoing, the Court finds that Phelix provided Plaintiff an adequate description of the information provided by the confidential informants and others to whom

30

Powers had spoken in the course of his investigation, and that he engaged in an adequate examination of indicia relevant to the confidential informant's credibility before reaching his own conclusion. *Giakoumelos,* 88 F.3d at 61. Therefore the Court concludes that Plaintiff received all of the process that was due him with regard to Phelix's reliance on information from confidential informants.

> d. Phelix's Alleged Lack of Fairness and Impartiality

Due process requires that prison disciplinary hearings be conducted by a "fair and impartial hearing officer." *Smith v. Graham,* ___ F. App'x. ___, 2017 WL 1103467, at *1 (March 22, 2017) (quoting *Kalwasinski v. Morse*, 201 F.3d 103, 108 (2d Cir. 1999)). An impartial hearing officer is one who "does not prejudge the evidence" or an inmate's guilt. *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990). Prison "adjudicators are presumed to be unbiased" and "[the] degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996).

Due process also requires that the findings of a prison disciplinary hearing officer be based on some "reliable evidence of the inmate's guilt." *Luna*, 356 F.3d at 488. The "some evidence" standard is extremely tolerant and is satisfied if "there is any evidence in the record that supports" the disciplinary ruling. *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000); *Scott v. Frederick*, No 9:13-CV-605 (TJM), 2015 WL 127864, at * 14 (N.D.N.Y. Jan. 8, 2015) (a hearing officer satisfies his duty of impartiality when "the record contains some evidence to support the officer's findings" and that evidence is reliable) (citing *Hill*, 472 U.S. at 455, *Sira*, 380 F.3d at 76-77). In order to defeat a motion for summary judgment based on lack of fairness and impartiality, a plaintiff-inmate must "be armed with [something] more than conclusory

allegations of bias and prejudgment." *Francis v. Coughlin*, 891 F.2d 43, 47 (2d Cir. 1989).

In his Memorandum of Law, Plaintiff has asserted that Phelix was unfair and partial "in light of the deficiencies in the Inmate Misbehavior Report (IMR); failing to provide Plaintiff MOHAMED with requested documentary evidence, and failing to conduct an independent assessment of the reliability of several alleged confidential informants." (Dkt. No. 34-1 at 4.) Plaintiff also alleged in his second amended complaint and testified at his deposition that Phelix made an off the record comment to Plaintiff after finding him guilty to the effect that he could not afford to leave him in general population. (Dkt. Nos. 18 at ¶ 29; 32-5 at 21.)

The Court has already concluded that Plaintiff received the process due him with respect to notice, assistance in hearing preparation, and Phelix's reliance, in part, on confidential informants. Even if Phelix made an off the record comment regarding his rationale for imposing a penalty of six months in SHU, there is no evidence of prejudgment in the case or bias on Phelix's part with regard to the conclusion he reached on the evidence.

Moreover, the Court concludes that the hearing record, as discussed above, contained "some evidence" to support Phelix's finding of guilt, establishing Phelix's impartiality. Finally, the Court finds Plaintiff's claim of unfairness and partiality on Phelix's part to be conclusory and, therefore inadequate to avoid summary judgment on unfairness and impartiality grounds.

## V.    CONCLUSION

The Court recommends that Defendant Phelix's motion for summary judgment (Dkt. No. 32) be granted.[13]

---

[13]    Inasmuch as the Court is recommending that Defendant's motion for summary judgment be granted, it finds it unnecessary to reach his qualified immunity argument.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendant Phelix's motion for summary judgment (Dkt. No. 32) be **GRANTED**; and it is

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[14] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.


Dated: June 13, 2017
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[14] If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. 6(a)(1)(C).

2014 WL 2587746
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Junior L. CEPEDA, Plaintiff,
v.
L. URBAN, and M. Jamalkowski, Defendants.

No. 12–CV–00408(F).
|
Signed June 10, 2014.

**Attorneys and Law Firms**

Junior L. Cepeda, Bronx, NY, pro se.

Eric T. Schneiderman, Attorney General, State of New
York, Buffalo, NY, for Defendants.

REPORT and RECOMMENDATION

DECISION and ORDER

LESLIE G. FOSCHIO, United States Magistrate Judge.

*JURISDICTION*

**\*1** This case was referred to the undersigned by
Honorable William M. Skretny on June 10, 2014, for
pretrial matters, including report and recommendation on
dispositive motions. The matter is presently before the
court on Defendants' motions to dismiss for failure to state
a claim (Docs. Nos. 11 and 21), respectively filed June 19,
and October 10, 2013, and Plaintiff's motion for leave to
file an amended complaint (Doc. No. 25), filed November
12, 2013. [1]

*BACKGROUND*

On May 4, 2012, Plaintiff Junior L. Cepeda ("Plaintiff"
or "Cepeda"), proceeding *pro se,* commenced this civil
rights action pursuant to 42 U.S.C. § 1983, alleging that
while incarcerated at Orleans Correctional Facility ("the
correctional facility" or "Orleans"), he was the subject
of a false misbehavior report ("the Misbehavior Report"

or "MR"), and subsequently was denied procedural due
process in connection with the administrative disciplinary
hearing held with regard to the Misbehavior Report.
Defendants to this action include the disciplinary hearing
officer L. Urban ("Urban"), and the assigned inmate
hearing assistant M. Jamalkowski ("Jamalkowski"), both
employees of New York Department of Corrections and
Community Supervision ("DOCCS").

On June 19, 2003, Defendant Jamalkowski filed a
motion to dismiss for failure to state a claim (Doc.
No. 11) ("Jamalkowski's Motion"), supported by the
attached Memorandum of Law in Support of Defendant's
Motion to Dismiss (Doc. No. 11–1) ("Jamalkowski's
Memorandum"). In opposition, Plaintiff filed on July 1,
2003, his Memorandum of Law in Support of Plaintiff's
Answer to Defendants' Motion to Dismiss (Doc. No. 14)
("Plaintiff's Response"). On October 10, 2013, Defendant
Urban filed a motion to dismiss for failure to state
a claim (Doc. No. 21) ("Urban's Motion"), supported
by the attached Memorandum of Law in Support of
Defendant Urban's Motion to Dismiss (Doc. No. 21–
1) ("Urban's Memorandum"). Plaintiff did not file any
papers in opposition to Urban's Motion.

On November 12, 2013, Plaintiff filed his Motion for
Leave to File an Amended Complaint (Doc. No. 25)
("Plaintiff's Motion"), attached to which is a copy of
the proposed amended complaint ("Proposed Amended
Complaint"). On December 16, 2013, Defendants'
filed the Memorandum of Law in Opposition to
Plaintiffs' Motion to Amend (Doc. No. 27) ("Defendants'
Response"). Oral argument was deemed unnecessary.

*FACTS* [2]

On April 11, 2012, while Plaintiff was incarcerated
at Orleans Correctional Facility ("the correctional
facility" or "Orleans"), Corrections Officer Moffatt
("C.O.Moffatt"), with the New York Department of
Corrections and Community Supervision ("DOCCS"),
conducted a frisk search of Plaintiff's cell, recovering
Uniform Commercial Code ("UCC") materials,
considered contraband under 7 NYCRR § 270.2[B][14]
[xx] [113.30] ("Inmate Rule 113.30"). The unauthorized
possession of certain UCC materials was banned by
DOCCS Commissioner after it was determined that
inmates often used UCC forms to file baseless and

Case 9:14-cv-01389-TJM-TWD   Document 35   Filed 06/13/17   Page 35 of 151
Cepeda v. Urban, Not Reported in F.Supp.3d (2014)
2014 WL 2587746

fraudulent liens or financing statements against DOCCS personnel and judicial officers for the sole purpose of harassing such individuals through credit impairment. *See Neree v. O'Hara,* 2011 WL 3841551 at * 1, 8 (N.D.N.Y. July 20, 2011), *adopted by* 2011 WL 3841553 (Aug. 29, 2011). On April 16, 2012, Plaintiff was served with the Misbehavior Report, charging Plaintiff with a violation of Inmate Rule 113.30 ("An inmate shall not possess any Uniform Commercial Code (UCC) Article 9 form...."). Although the contraband was found in Plaintiff's cell on April 11, 2012, the MR referred to the incident as having occurred on April 13, 2012. On April 17, 2012, Plaintiff met with Defendant M. Jamalkowski ("Jamalkowski"), who had been assigned, pursuant to 7 NYCRR § 254.5, to assist Plaintiff in preparing for the Tier III superintendent's hearing on the MR ("hearing"), scheduled for April 25, 2012. Plaintiff provided Jamalkowski with the names of witnesses for Jamalkowski to interview, along with a list of documents for Jamalkowski to retrieve for use in the hearing. According to Plaintiff, Jamalkowski did not interview any of the witnesses nor retrieve any of the documents, as Plaintiff had requested, in violation of relevant DOCCS Directives and Regulations.

**\*2** Defendant Hearing Officer L. Urban ("Urban"), presided over the hearing which commenced on April 25, 2012, at which time Plaintiff refuse to enter a plea of guilty or not guilty, instead contending the MR was defective because it incorrectly indicated the date of the search of Plaintiff's cell and subsequent seizure of the contraband as April 13, 2012, rather than April 11, 2012. Urban advised Plaintiff the disciplinary hearing could continue in Plaintiff's absence, but Plaintiff was not removed from the room in which the hearing was conducted. Urban then called as a witness Sgt. M. Ritter ("Ritter"), of Greene Correctional Facility ("Greene"), who testified he had previously confiscated UCC materials from Plaintiff when Plaintiff was housed in Greene's SHU, placing the materials in Plaintiff's property bag. Plaintiff maintains that after the UCC material was confiscated from him at Greene, because Plaintiff was confined in SHU, he was unable to access his property bag to remove the UCC materials, and instead was again in possession of the materials on March 27, 2012, when Plaintiff received his property bag from an unidentified corrections officer upon being transferred to Orleans. According to Plaintiff, because the UCC materials were considered contraband, upon their confiscation at Greene, the materials never

should have been placed in Plaintiff's property bag. Urban then adjourned the hearing for one day to review the evidence.

On April 26, 2012, the hearing reconvened with Urban entering a not guilty plea for Plaintiff over Plaintiff's objections, and informed Plaintiff Urban had placed a telephone call to Ulster Correctional Facility ("Ulster"), the correctional facility where Plaintiff was initially housed in DOCCS custody, and confirmed that upon being admitted to DOCCS custody, Plaintiff had received a copy of Inmate Rule 113.30. Plaintiff objected to Urban's investigation into the matter, requesting Urban to dismiss the MR for insufficient evidence. Urban, however, denied the request, found Plaintiff guilty of possession of contraband in violation of Inmate Rule 113.30, and imposed a prison disciplinary sentence of 18 months in SHU with corresponding loss of privileges.

On April 26, 2012, Plaintiff filed an appeal of the hearing disposition, which was affirmed on June 21, 2012, by Acting Director of SHU D. Venettozzi, who modified Plaintiff's prison disciplinary sentence, reducing the SHU confinement and loss of privileges to 14 months.

### *DISCUSSION*

#### 1. Dismissal for Failure to State a Claim

Both Defendants move pursuant to Fed.R.Civ.P. 12(b) (6) ("Rule 12(b)(6)") to dismiss the Complaint for failing to state a claim for which relief can be granted. In particular, both Defendants Jamalkowski and Urban assert the Complaint must be dismissed because Plaintiff has admitted he is guilty of the disputed disciplinary charge, and the Complaint alleges only violations of New York regulations which are insufficient to support a § 1983 claim, Jamalkowski's Memorandum at 2; Urban's Memorandum at 2. Jamalkowski also moves to dismiss the Complaint because Plaintiff failed to exhaust his administrative remedies. Jamalkowski's Memorandum at 2. A review of the papers establishes Defendant Jamalkowski's Motion should be GRANTED in part and DENIED in part, and Defendant Urban's Motion should be GRANTED.

**\*3** On a motion to dismiss under Fed.R.Civ.P. 12(b)(6) ("Rule 12(b) (6)"), the court looks to the four corners of the complaint and is required to accept the plaintiff's

allegations as true and to construe those allegations in the light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974); *Johnson v. Rowley,* 569 F.3d 40, 43 (2d Cir.2009) (accepting as true all factual allegations in the complaint and drawing all reasonable inferences in plaintiff's favor). Two recent Supreme Court cases require application of "a 'plausibility standard,' which is guided by '[t]wo working principles.' " *Harris v. Mills,* 572 F.3d 66, 71–72 (2d Cir.2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), and quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)).

"First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' " *Harris,* 572 F.3d at 72 (quoting *Iqbal,* 556 U.S. at 678). " 'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss,' and '[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.' " *Id.* (quoting *Iqbal,* 556 U.S. at 679). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570). The factual allegations of the complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Twombly,* 550 U.S. at 570. Consideration is given only to facts stated on the face of the complaint, as well as to those facts appearing "in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Israel Discount Bank of New York,* 199 F.3d 99, 107 (2d Cir.1999). Further, the court is obligated to liberally construe a complaint alleging a § 1983 claim. *Leonard Partnership v. Town of Chenango,* 779 F.Supp. 223, 234 (N.D.N.Y.1991) (construing allegation by plaintiff, represented by counsel, that defendant town denied building permit as a due process violation even though § 1983 was not mentioned in the complaint where such construction did not prejudice town given that defendant itself had construed complaint as based on § 1983 and accordingly addressed claim).

Here, Plaintiff seeks monetary damages pursuant to 42 U.S.C. § 1983 (" § 1983"), for alleged civil rights violations. Section 1983, "allows an action against a 'person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.' " *Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 225 (2d Cir.2004) (quoting 42 U.S.C. § 1983). Section 1983, however, " 'is not itself a source of substantive rights.' " *Patterson,* 375 F.3d at 225 (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)). Rather, § 1983 "merely provides 'a method for vindicating federal rights elsewhere conferred'...." *Id.* The elements of a § 1983 claim include (1) the deprivation of a federal constitutional or statutory right, and (2) by a person acting under color of state law. *Velez v. Levy,* 401 F.3d 75, 84 (2d Cir.2005) (citing *Gomez v. Taylor,* 466 U.S. 635, 640 (1980)). In the instant case, that Defendants were acting under color of state law in connection with the Superintendent's hearing on the MR charging Plaintiff with possession of contraband, is undisputed, thus satisfying the second element. The court thus considers whether the Complaint states a claim for relief based on an alleged violation of procedural due process.

**\*4** "To prove a violation of due process, a plaintiff must establish that (1) he possessed a liberty interest and (2) defendants deprived him of that interest without sufficient process." *Walker v. Fisher,* 523 Fed.Appx. 43, 44 (2d Cir.2013) (citing *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)); *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (quoting *Giano,* 238 F.3d at 225). An inmate's protected liberty interest is implicated only where the conduct at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995). Here, insofar as Plaintiff challenges the disciplinary sentence imposed in connection with the guilty disposition of the MR, specifically, 18 months confinement in SHU and concomitant loss of privileges, later reduced following appeal to 14 months, as in violation of his constitutional rights, it is settled that "[a]lthough prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as ... special confinement that imposes

2014 WL 2587746

an atypical hardship." *Wolff v. McDonnell,* 418 U.S. 539, 555–56 (1974)). *See J.S. v. T'Kach,* 714 F.3d 99, 106 (2d Cir.2013) ("a prisoner has a liberty interest that is implicated by SHU confinement if it 'imposes [an] atypical and significant hardship in relation to the ordinary incidents of prison life.' " (quoting *Sandin,* 515 U.S at 484)). "In the absence of factual findings to the contrary, confinement of 188 days is a significant enough hardship to trigger *Sandin." J.S.,* 714 F.3d at 106 (citing *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) ("in the absence of a detailed factual record, we have affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short—less than [ ] 30 days....")). Here, as the matter is before the court on motions by both Defendants seeking to dismiss the action, there are no factual findings to the contrary. Accordingly, Plaintiff's allegation of 14 months of SHU confinement "is sufficient to implicate *Sandin*-type liberty interests." *J.S.,* 714 F.3d at 106.

### A. Exhaustion of Administrative Remedies

Defendant Jamalkowski argues for dismissal of the Complaint based on Plaintiff's failure to exhaust administrative remedies prior to commencing this action. Jamalkowski Memorandum at 5–6. According to Jamalkowski, that Plaintiff filed his appeal of the hearing decision on April 26, 2012, the same day Plaintiff filed the Complaint in this action, establishes Plaintiff did not exhaust his administrative remedies prior to commencing the instant action, such that it is impossible to know the results of the appeal, including whether Plaintiff's appeal was successful, overturning the guilty disposition or reducing the disciplinary sentence to a point where the sentence is not considered an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 6 (quoting *Sandin,* 515 U.S. at 484). In opposition to Jamalkowski's motion, Plaintiff asserts that he exhausted the relevant administrative remedies merely by filing his appeal of the hearing disposition, Plaintiff's Response at 3, and advises that on June 21, 2012, D. Venettozzi, the Acting Director of SHU, reduced the MR hearing sanction imposed by Urban from 18 months to 14 months, which is sufficiently long to constitute an atypical and significant hardship. *Id.* at 4. Jamalkowski offers no argument in further support of his motion on this ground.

**\*5** The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), provides that a prison inmate may not

bring an action challenging prison conditions under § 1983 "until such administrative remedies as are available are exhausted." The exhaustion requirement gives DOCCS "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court." *Woodford v. Ngo,* 548 U.S. 81, 89 (2006) (internal quotation marks and citation omitted). Requiring inmate claims challenging prison conditions to be administratively exhausted promotes efficiency when the administrative grievance procedure obviates the need for parties to further pursue matters in federal court. *Id.* In New York, the administrative process is pursuant to DOCCS's Inmate Grievance Program ("IGP"), a three tier process, requiring the inmate first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). 7 NYCRR § 701.5(a)(1) and (b). An adverse IGRC decision is appealable to the correctional facility's superintendent. 7 NYCRR § 701.5(c). Finally, a superintendent's adverse decision may be appealed to the Central Office Review Committee ("CORC"). 7 NYCRR § 701.5(d).

It is settled that the phrase "prison conditions" as used in the PLRA refers to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). Where, however, the conditions of confinement do not present the basis on which the inmate alleges he suffered harm, the inmate's failure to exhaust administrative procedures is not pursuant to New York DOCCS IGP; rather, because Plaintiff is challenging Defendants' conduct in connection with the hearing on the MR, Plaintiff's April 26, 2012, filing of the administrative appeal of the hearing decision was sufficient for purposes of PLRA exhaustion requirements. *Davis v. Barrett,* 576 F.3d 129, 133 (2d Cir.2009) (vacating district court's grant of summary judgment for failure to exhaust administrative remedies where plaintiff inmate alleged violations of due process rights in connection with prison disciplinary hearing, holding PLRA's exhaustion of administrative remedies was satisfied by inmate's filing of administrative appeal of hearing decision, which is a separate administrative appeals process pertaining to disciplinary actions).

Accordingly, Jamalkowski's motion to dismiss based on Plaintiff's failure to exhaust should be DENIED.

### B. New York Regulations

2014 WL 2587746

Both Jamalkowski and Urban argue in support of their respective motions to dismiss that insofar as Plaintiff seeks relief based on a violation of a New York prison regulation, a violation of a state prison regulation does not give rise to liability under § 1983. Jamalkowski Memorandum at 6–7; Urban's Memorandum at 5. In opposition, Plaintiff argues that Defendants' actions were in violation of 7 NYCRR §§ 251–3.1(c)(3), 251–4.2, 254.1, and 254–6, [3] as well as New York's Constitution and, thus, the United States Constitution giving rise to liability under § 1983. Plaintiff's Response at 4–5. Neither Defendant has further responded in support of dismissal on this point.

### 1. Date on Inmate Misbehavior Report—7 NYCRR § 251–3.1(c)(3)

**\*6** Plaintiff alleges he was denied procedural due process because the MR incorrectly indicated the date of the incident as April 13, 2012, rather than April 11, 2012. Complaint at 5. Defendants maintain an incorrect date on the MR is insufficient to state a § 1983 claim based on a denial of due process. Jamalkowski's Memorandum 6–7; Urban's Memorandum at 5. In opposition to dismissal, Plaintiff asserts that because of the incorrect date on the MR in violation of 7 NYCRR §§ 251–3.1(c)(3), Plaintiff did not receive proper notice of the disciplinary charges lodged against him, in violation of his constitutional right to procedural due process. Plaintiff's Response at 3–4.

Under 7 NYCRR § 251–3.1(c)(3), an inmate misbehavior report must include "the date, time and place of the incident." Nevertheless, a violation of this regulation, without more, does not necessarily result in liability under § 1983. *See Patterson v. Coughlin,* 761 F.2d 886, 891 (2d Cir.1985) ("state employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983). In particular, "a state employee's failure to conform to state law does not itself violate the Constitution and is not alone actionable under § 1983," unless the violated state regulation "merely reiterated what was already *required* by the Constitution." *Id.* (italics in original). Rather, in the context of a prison disciplinary hearing, procedural due process requirements are minimal, including "a notice that is something more than a mere formality." *Taylor v. Rodriguez,* 238 F.3d 188, 192 (2d Cir.2001) (citing *Benitez v. Wolff,* 985 F .2d 662, 665 (2d Cir.1993)). "The effect of the notice should be to compel 'the charging officer to be [sufficiently] specific as to the misconduct with which the inmate is charged' to

inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report." *Id.* (quoting *McKinnon v. Patterson,* 568 F.2d 930, 940 n. 11 (2d Cir.1977)). In the instant case, the allegations of the Complaint establish the MR was sufficiently specific as to inform Plaintiff of the misconduct with which he was charged to permit Plaintiff to defendant against the charge.

In particular, Plaintiff's allegation alone that the MR refers to the incident as occurring on April 13, 2012, rather than on April 11, 2012, Complaint at 5 ("Claimant read the [misbehavior] report and noticed that the incident date was wrong. It stated a date of April 13, 2012 when in fact the incident occurred on April 11, 2012 with (UCC) material being confiscated at 9:50/AM"), establishes Plaintiff was aware on the incident to which the MR pertains. Further, that Plaintiff provided the inmate assistant with the names of inmate witnesses to interview, along with a list of documents to be retrieved, Complaint at 6, establishes Plaintiff sufficiently understood the nature of the disciplinary violation with which he was charged in the MR so as to determine what evidence Plaintiff needed to present in defending against the MR charge. Significantly, Plaintiff does not contend how, as a practical matter, the two day discrepancy conceivably could have compromised his ability to defend against the MR. For example, Plaintiff's whereabouts on whatever date the contraband was discovered would seem irrelevant to the possession of contraband charge. Accordingly, the mere fact that the MR contained an incorrect date of the incident is, without more, insufficient to establish a due process violation, and Defendants' Motions should be GRANTED as to this claim.

### 2. Inmate Assistant—7 NYCRR § 251–4.2

**\*7** Plaintiff alleges he was essentially denied an inmate assistant in connection with the disciplinary hearing because Jamalkowski, who was assigned to assist Plaintiff, failed to interview the witnesses identified by Plaintiff or to retrieve any of the documents Plaintiff had requested. Complaint at 5–6. According to Plaintiff, Jamalkowski's alleged failure to comply with Plaintiff's requests was in violation of DOCCS Directive # 4932 and 7 NYCRR § 251–4.2. *Id.* at 6. Jamalkowski argues such claim should be dismissed because Plaintiff's "bare assertion that Jamalkowski 'did not comply with his request' does not contain sufficient factual matter to state a claim

2014 WL 2587746

to relief that is plausible on its face." Jamalkowski's Memorandum at 7 (citing *Iqbal,* at 678). According to Jamalowski, because Plaintiff does not specify whether Jamalkowski contacted any witnesses or retrieved any of the requested documents, "we only know that the plaintiff was dissatisfied with his assistance, probably because he was found guilty." *Id.* at 7. In opposition to Jamalkowski's Motion, Plaintiff asserts that because he was then being held in SHU, he was unable to pursue the witnesses and documents and depended on the inmate assistant to prepare his defense. Plaintiff's Response at 5–6.

Among the procedural due process protections afforded a prison inmate with regard to a prison disciplinary proceeding are "advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citing *Wolff,* 418 U.S. at 563–67). Further, "[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges.... When the inmate is disabled ... by being confined full-time to SHU, ... the duty of assistance is greater because the inmate's ability to help himself is reduced." *Eng v. Coughlin,* 858 F.2d 889, 897 (2d Cir.1998) (citing *Aikens v. Lash,* 514 F.2d 55, 59 (7th Cir.1975), *vacated on other grounds,* 425 U.S. 947 (1976)). Significantly, an inmate assistant's failure to obtain testimony of witnesses requested by the inmate, or other evidence is a violation of the inmate's due process rights. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (holding plaintiff inmate's due process rights were violated when defendant undertook to act as inmate's assistant, and then provided no assistance).

In the instant case, in support of dismissing this claim, Defendant Jamalkowski argues that Plaintiff's right to an inmate assistant is limited such that the assigned assistant " 'is not obliged to go beyond the specific instructions of the inmate.' " Jamalkowski's Memorandum at 7 (quoting *Silva v. Casey,* 992 F.3d 20, 22 (2d Cir.1993)). *Silva,* however, is factually distinguishable insofar as the inmate assistant in *Silva* failed to advise the inmate plaintiff until the day of the hearing that the inmate witnesses the plaintiff had requested were refusing to testify at the plaintiff's disciplinary hearing. *See Silva v. Coughlin,*

1992 WL 116744, at * 6 (S.D.N.Y. May 18, 1992). The court held that because the inmate assistant did interview the inmates the plaintiff had identified as witnesses, obtaining from the witnesses signed statements indicating they refused to testify on the plaintiff's behalf at his disciplinary, and despite the plaintiff's protestation that had he received earlier notice from the inmate assistant of the witnesses' refusal to testify, the plaintiff would have requested the inmate assistant to make an effort to find other witnesses who would testify, the inmate assistant's failure to go beyond the plaintiff's request to secure information favoring the plaintiff did not violate any constitutional right of the plaintiff. *Id.* at * 7. To require such action by the inmate assistant would be akin to recognizing an inmate plaintiff has the right to a private investigator in preparing for a prison disciplinary hearing, a degree of assistance not mandated by due process. *Id.* In contrast, Plaintiff alleged in the instant case that Defendant Jamalkowski, after being assigned as Plaintiff's inmate assistant in connection with the superintendent's hearing, did not attempt to interview any of the witnesses Plaintiff named, or to retrieve any of the documents. Further, insofar as Jamalkowski characterizes Plaintiff's claim that Jamalkowski "did not comply with said request (list) given to him," Complaint at 7, as a "bare assertion" that fails to advise whether Jamalkowski contacted any of the witnesses or retrieved any of the documents Plaintiff identified, Jamalkowski's Memorandum at 7, a plain reading of the Complaint's allegation establishes that Plaintiff is not alleging Jamalkowski failed to go above and beyond what Plaintiff had requested, but only that Jamalkowski did not provide Plaintiff with the requested assistance as required, or a reason why such compliance was not possible. *See Russell v. Selsky,* 35 F.3d 55, 58 (2d Cir.1994) (citing *Ponte v. Real,* 471 U.S. 491, 499 (1985) (holding some explanation must be provided either at the time of the disciplinary hearing or subsequently in court, even if only *in camera,* establishing why requested inmates would not be testifying), and *Scott v. Kelly,* 962 F.2d 145, 146–47 (2d Cir.1992) (observing that for due process purposes "a prisoner's request for a witness can be denied on the basis of irrelevant or lack of necessity.")).

**\*8** The adverse consequences of Jamalkowski's failure to provide Plaintiff with effective assistance in connection with the hearing on the MR are illustrated by a liberal construction of the Complaint, as Plaintiff's *pro se* status requires, *Haines v. Kerner,* 404 U.S. 519, 520 (1972) (allegations of *pro se* litigant's complaint are held "to

2014 WL 2587746

less stringent standards than formal pleadings drafted by lawyers."), that strongly suggests Plaintiff is alleging the MR was fraudulently issued. *See* Complaint at 8 (alleging after Greene Sergeant Ritter confiscated UCC materials from Plaintiff, Ritter placed the materials in Plaintiff's property bag which, as Plaintiff was being held in SHU, Plaintiff was not able to inspect prior to his transfer to Orleans, where the documents were returned to Plaintiff "along with [Plaintiff's] allowable property," and the same UCC materials were confiscated from Plaintiff on April 11, 2012). "[I]t is well settled that a 'prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.' " *Williams v. Dubray,* ––– Fed.Appx. –––; 2014 WL 715653, at *2 (2d Cir.2014) (quoting *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). "Instead, the inmate must show something more, such as that he was deprived of due process during the resulting disciplinary hearing, or that the misbehavior report was filed in retaliation for the inmate's exercise of his constitutional rights." *Id.* (citing *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997); and *Freeman,* 808 F.2d at 951). In the instant case, had Plaintiff been provided with effective inmate assistance, it is reasonably plausible that Plaintiff may have successfully defended the MR on the basis that by placing the UCC materials confiscated from Plaintiff at Greene in Plaintiff's property bag, to which Plaintiff, by virtue of his confinement in Greene's SHU, was prevented access, Plaintiff was set up for the subsequent confiscation of the same contraband upon his transfer to Orleans, leading to the issuance of a false misbehavior report. *See Livingston v. Kelly,* 561 F.Supp.2d 329, 331 (W.D.N.Y.2008) ("an inmate's allegation that he has been found guilty of false disciplinary charges may support a constitutional claim if he also alleged that he was denied the minimum procedural due process protections guaranteed by the Fourteenth Amendment." (citing cases)).

In short, Jamalkowski, according to the Complaint, failed to act as Plaintiff's "surrogate—to do what the inmate would have done were he able," but no more, *Silva v. Casey,* 992 F.3d at 22, and Jamalkowski's alleged failure to do so states a plausible denial of due process claim under the Fourteenth Amendment. Plaintiff has thus stated a claim for relief against Jamalkowski which should not be dismissed for failure to state a claim.

### 3. Hearing Officer–7 NYCRR §§ 254.1 and 254.6

*\*9* Plaintiff alleges he was denied due process when Defendant Urban, who served as the hearing officer at the hearing on the MR, failed to abide by relevant prison disciplinary proceeding regulations including conducting the proceeding despite Plaintiff's refusal to participate and failing to electronically record the proceeding, in violation of 7 NYCRR § 254.6 (§ 254.6"), and conducted his own investigation into the incident by taking testimony from DOCCS Sergeant Ritter at Greene Correctional Facility, and failed to recuse himself upon Plaintiff's request, in violation of 7 NYCRR § 254.1 (" § 254.1"). Complaint at 8–9. In support of dismissal, Urban argues that the alleged violation of a DOCCS regulation does not give rise to liability under § 1983, Urban's Memorandum at 5; the Complaint fails to allege any violation of the constitutionally mandated due process standard for prison discipline, *id.* at 6–8; and that factual allegations in the Complaint establish Plaintiff is guilty of the disciplinary charge for which he was sentenced to SHU and lost privileges. *Id.* at 8–10. Plaintiff did not respond in opposition to Urban's Motion.

State statutes and regulations do not create federally protected due process rights to specific state-mandated procedures; rather, the only process due an inmate is that minimal process guaranteed by the Constitution, as outlined in *Wolff,* 418 U.S. at 561–70. *Shakur v. Selsky,* 391 F.3d 106, 118–19 (2d Cir.2004). Nor do "[s]tate procedures designed to protect substantive liberty interests entitled to protection under the federal constitution [ ] themselves give rise to additional substantive liberty interests." *Blouin v. Spitzer,* 356 F.3d 348, 363 (2d Cir.2004) (citing cases). Simply put, "federal law, not state regulations, determines the procedures necessary to protect that liberty interest ." *Id.* As such, "the *only* relevant inquiry [is] whether constitutional 'minimal procedures' [for the loss of a protected liberty interest] were met, not whether state procedures were followed." *Shakur,* 391 F.3d at 119 (italics in original).

With regard to Plaintiff's claim that Defendant Urban, by contacting, on his own initiative, Sergeant Ritter at Greene, to ascertain whether Ritter had previously confiscated contraband UCC materials from Plaintiff while Plaintiff was housed in SHU at Greene, conducted his own investigation into the incident, in violation of § 254.1, which provides that a person who has investigated the incident on which an inmate's misbehavior report is predicated may not be appointed to conduct the

superintendent's hearing relative to that misbehavior report, and thus was disqualified to serve as the hearing officer at the hearing on the MR. Complaint at 8. Plaintiff further claims that Urban further violated § 254.1 when he subsequently contacted Ulster Correctional Facility ("Ulster"), where Plaintiff commenced his incarceration with DOCCS, to ascertain whether, upon entering Ulster, Plaintiff had received a copy of the inmates' rulebook, including Inmate Rule 113.30, pursuant to which, as of April 11, 2009, UCC materials were considered contraband such that inmates found in possession of such materials would be subject to discipline. *Id.*

**\*10** "An inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citing cases). Nevertheless, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts," and "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* (citing cases). Relevantly, in addition to the greater flexibility accorded prison disciplinary hearing officers, the due process impartiality standard is satisfied if "some evidence" in the record supports the decision of the prison disciplinary proceeding. *Superintendent v. Hill,* 472 U.S. 445, 455–56 (1985).

Here, Defendant Urban's determination that Plaintiff was guilty of the charged prison infraction—possession of contraband, specifically, UCC materials in violation of Inmate Rule 113.30—is amply supported by evidence in the record. In particular, Plaintiff does not dispute that the UCC material was found in his cell, nor does Plaintiff argue the UCC material does not qualify as contraband under Inmate Rule 113.30. Significantly, Urban's asserted investigation into the incident did not bear on whether Plaintiff was, in fact, in possession of the contraband UCC materials at Orleans but, rather, the facts as alleged by Plaintiff establish that UCC materials had previously been confiscated from Plaintiff as contraband when Plaintiff was housed at Greene and should have been aware of their illegal nature. Thus, given that sufficient evidence supports Plaintiff's guilt as Urban determined, that Urban investigated two matters having only tangential relevant to the MR, Urban's impartiality was not compromised to the extent that Plaintiff was denied fundamental due process in the conduct of the hearing. Accordingly, because some evidence in the record supports Urban's

determination that Plaintiff was in possession of UCC material in violation of Inmate Rule 113.30, Plaintiff fails to state a due process claim based on the alleged violation of § 254.1. *See Allred v. Knowles,* 2010 WL 3911414, at \* 5 (W.D.N.Y. Oct. 5, 2010) (holding violation of § 254.1 insufficient to state a claim for a deprivation of federal due process based on the hearing officer's investigation into incident for which inmate was subjected to prison disciplinary measures including 12 months confinement in SHU with simultaneous loss of privileges).

As relevant to this case, § 254.6(a)(2) provides that a prison hearing officer, upon receiving a misbehavior report from the review officer, is required to electronically record the entire hearing, at which the inmate shall be present unless he refuses or is excluded for reasons of institutional safety or correctional goals. 7 NYCRR § 254.6(a)(2). Insofar as Plaintiff challenges Defendants' failure to record the hearing, § 254.6(a)(2) provides a procedural requirement in excess of that required by federal due process such that the failure to abide by § 254.6(a)(2) does not run afoul of the basic federal due process required for an inmate disciplinary proceeding. *See Proctor v. Kelly,* 2008 WL 5243925, at \* 8 (N.D.N.Y. Dec. 16, 2008) (holding violations of state regulations, including 7 NYCRR § 254.6(a)(2), by failing to record prison disciplinary proceeding, does not give rise to any constitutional violations).

**\*11** Furthermore, insofar as Plaintiff alleges that Urban's proceeding with the hearing despite Plaintiff's refusal to participate was tantamount to conducting the hearing in Plaintiff's absence in violation of § 254.6(a)(2), the regulation provides "[t]he inmate shall be present at the hearing unless he or she refuses to attend, or is excluded for reasons of institutional safety or correctional goals." 7 NYCSS § 254.6(a)(2). As stated in the Complaint, Plaintiff maintains that because he did not refuse to attend the hearing, did not pose any threat to institutional safety or correctional goals, and was not removed from the hearing, Urban erroneously conducted the hearing despite Plaintiff's refusal to participate on the basis that the incorrect date on the MR rendered it, as well as the ensuing disciplinary proceeding, invalid. Complaint at 7–8. There is, however, no merit to this argument because although Plaintiff was present at the disciplinary proceeding, his refusal to participate in the proceeding was properly construed by Urban as tantamount to a refusal to attend the proceeding. Moreover, Plaintiff fails

to explain why the minor discrepancy as to the correct date of the violation adversely affected his ability to dispute the charge and the court is unable to perceive any such reason.

Defendant Jamalkowski's motion is thus GRANTED in part and DENIED in part; Defendant Urban's motion is GRANTED. Furthermore, although dismissal for failure to state a claim is often without prejudice to the filing of an amended complaint curing the deficiencies of the dismissed claims, because the claims that are being dismissed here are all being dismissed for the same reason, *i.e.,* that a failure to follow state regulations in conducting prison disciplinary proceedings does not give rise to a § 1983 due process violation so long as the proceedings provided minimal due process under the Constitution, there is no conceivable basis on which the claims which are recommended to be dismissed could be repleaded so as to avoid future dismissal. *See Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (finding leave to replead would be futile where even liberal construction of complaint established the problem with the cause of action pleaded in the *pro se* complaint "is substantive; better pleading will not cure it. Repleading would thus be futile."). Accordingly, all claims should be DISMISSED for failure to state a claim, except insofar as Plaintiff has alleged that Plaintiff was set up to be charged with violating Inmate Rule 113.30, for which Plaintiff was subsequently denied due process at the ensuing disciplinary hearing when his assigned inmate assistant failed to comply with Plaintiff's requests, and no reason for such noncompliance was placed on the record.

**2. Motion to Amend**

Instead of filing a response in opposition to Urban's motion, Plaintiff moved for leave to file an amended complaint which purportedly remedies some of the deficiencies of the claims asserted in the original Complaint against Urban and Jamalkowski, most notably, replacing the factual allegations in which Plaintiff concedes that on April 11, 2012, C.O. Moffat seized contraband UCC materials from Plaintiff's cell at Orleans, with allegations that the seized materials were "assumed" to be contraband UCC materials, *see, e.g.,* Proposed Amended Complaint,[4] ¶ 3 ("Plaintiff's cell was frisked by a CO Moffat on April 11, 2013 *[sic]* in search of Uniform Commercial Code (UCC). CO Moffat found what he assumed was Uniform Commercial Code [ ] materials."), and to assert as an additional claim that the

prison disciplinary sentence imposed for the possession of UCC materials was in violation of the Eighth Amendment's ban on cruel and unusual punishment. *Id.* ¶ 15 (alleging the prison disciplinary sentence of 18 months in SHU caused Plaintiff "pain, suffering, physical injury and emotions distress."). Defendants argue in opposition that Plaintiff's motion should be denied as futile, Defendants' Memorandum at 3–4, insofar as the allegations of the Proposed Amended Complaint do not cure the deficiencies of Plaintiff's due process claims, *id.* at 4–7, and the length of time to which Plaintiff was sentenced to SHU for possessing the contraband UCC materials is not so long as to be considered totally without penological justification, grossly disproportionate to the prison infraction, or involving unnecessary infliction of pain so as to constitute cruel and unusual punishment in violation of the Eighth Amendment. *Id.* at 8–9.

**\*12** Fed.R.Civ.P. 15 provides that leave to amend a pleading "shall be freely granted when justice so requires." An amended pleading may be filed pursuant to Fed.R.Civ.P. 15(a) where the new allegations do not unduly prejudice an opponent, are not the result of undue delay or bad faith, and are not futile. *Foman v. Davis,* 371 U.S. 178, 181 (1962). Absent a showing that significant additional discovery burdens will be incurred or that the trial of the matter will be significantly delayed, amendment should be permitted. *Block v. First Blood Associates,* 988 F.2d 344, 350 (2d Cir.1993). Where, however, a requested pleading amendment is futile, "it is not an abuse of discretion to deny leave to amend" to the moving party. *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993). An amendment is futile "if the proposed amended [pleading] would be subject to 'immediate dismissal' for failure to state a claim or on some other ground." *Jones v. New York Div. of Military & Naval Affairs,* 166 F.3d 45, 55 (2d Cir.1999). In the instant case, Plaintiff's motion to amend is DENIED as futile.

Specifically, insofar as Plaintiff seeks leave to replead the factual allegations regarding the seizure of the UCC materials so as to not be construed as conceding the materials were contraband, in appealing the hearing decision, Plaintiff failed to challenge the nature of the seized materials, such that any challenge Plaintiff could raise regarding whether the materials were contraband UCC materials has not been exhausted. Nor did Plaintiff challenge the prison disciplinary sentence of 18 months in SHU with attendant loss of privileges as in violation

of the Eighth Amendment, and such claim also is unexhausted. Because the claims in Plaintiff's Proposed Amended Complaint would be subject to dismissal for failure to exhaust, they are futile. *See Dolce v. Suffolk County,* 2014 WL 655371, at * 6 (E.D.N.Y. Feb. 20, 2014) (denying to grant pro se inmate plaintiff leave to file amended complaint where "any amended complaint would fail because plaintiff did not exhaust administrative remedies." (citing *Jones v. Bock,* 549 U.S. 199, 211 (2007)). Plaintiff's motion to amend is, accordingly, DENIED.

### CONCLUSION

Based on the foregoing, Defendant Jamalkowski's motion to dismiss (Doc. No. 11), should be GRANTED in part and DENIED in part; Defendant Urban's motion to dismiss (Doc. No. 21), should be GRANTED; Plaintiff's motion for leave to file an amended complaint (Doc. No. 25), is DENIED.

SO ORDERED, as to Plaintiff's motion for leave to file an amended complaint.

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**\*13** *Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* Thomas v. Arn, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 2587746

---

Footnotes

1    Although Defendants' motions to dismiss are dispositive, whereas Plaintiff's motion seeking leave to file an amended complaint is nondispositive, all three motions are addressed in this combined Report and Recommendation/Decision and Order in the interests of judicial economy and clarity.

2    Taken from the pleadings and motion papers filed in this action.

3    Although Plaintiff references 7 NYCRR § 253.6, that regulation pertains to procedures for disciplinary hearings, rather than procedures for superintendent's hearings, which are set forth under 7 NYCRR § 254.6. Because the disciplinary hearing challenged by Plaintiff in this action was a superintendent's hearing, rather than a disciplinary hearing, the court substitutes the correct regulation, which is essentially identical to the regulation Plaintiff erroneously references.

4    A copy of the Proposed Amended Complaint is attached to Plaintiff's Motion.

---

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

**\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*' s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

### B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent prisoners posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

### *Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with

1999 WL 983876

the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

Footnotes

1    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

---

**End of Document**    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.    4

2010 WL 4320362
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
W.D. New York.

Francisco FERNANDEZ, Plaintiff,

v.

Corrections Officer J. CALLENS, et al., Defendants.

No. 06–CV–0506(Sr).
|
Oct. 29, 2010.

**Attorneys and Law Firms**

Francisco Fernandez, Carreteras Jaya, Dom. Rep., pro se.

Michael A. Siragusa, Attorney General's Office, Buffalo, NY, for Defendants.

## DECISION AND ORDER

H. KENNETH SCHROEDER, JR., United States Magistrate Judge.

**\*1** Pursuant to 28 U.S.C. § 636(c), the parties have consented to the assignment of this case to the undersigned to conduct all proceedings in this case, including the entry of final judgment (Dkt.# 21).

## PRELIMINARY STATEMENT

Currently before the Court is the defendants' motion for summary judgment (Dkt.# 31).

Plaintiff commenced this *pro se* action on or about July 27, 2006 pursuant to 42 U.S.C. § 1983 (Dkt.# 1). Plaintiff's amended complaint alleges various violations of the Eighth and Fourteenth Amendments to the United States Constitution (Dkt.# 6). At all times relevant to the allegations in plaintiff's complaint, plaintiff was incarcerated at Wende Correctional Facility ("Wende"). Defendants were all employees of the New York State Department of Correctional

Services ("DOCS"). Defendant Correctional Officers James Callens ("Callens") and Christopher Czarnecki, ("Czarnecki"), Sergeant Scott Lambert ("Lambert"), Hearing Officer Thomas Schoellkopf ("Schoellkopf"), Dr. Jacqueline Levitt ("Levitt"), and Robert Stachowski, R.N. ("Stachowski"), were assigned to Wende. Defendant Donald Selsky ("Selsky"), Director of Special Housing/ Inmate Disciplinary Programs, was assigned to DOCS office in Albany, New York.

Plaintiff has asserted four causes of action, sub-divided into the following claims: (1) Correctional Officers Callens and Czarnecki assaulted plaintiff without provocation in violation of the Eighth Amendment; (2) Callens and Czarnecki deprived petitioner of his due process rights when they denied plaintiff recreation and withheld his property; (3) Sergeant Lambert failed to supervise Callens and Czarnecki; (4) Dr. Levitt and R.N. Stachowski failed to provide plaintiff with adequate and appropriate medical treatment in violation of the Eighth Amendment; (5) Schoellkopf violated plaintiff's due process rights at a disciplinary hearing; and (6) Selsky violated plaintiff's due process rights by refusing to reverse the disciplinary hearing disposition. Plaintiff seeks compensatory and punitive damages. Dkt. # 6, ¶ 56–62.

Since filing his opposition to the instant motion for summary judgment (Dkt. 46–48), the plaintiff has been deported from the United States to the Dominican Republic.

For the reasons that follow, defendants' motion for summary judgment is granted in part, and denied in part.

## FACTS

The following facts are undisputed unless otherwise noted.

### A. Plaintiff's arrival at Wende; Incident of August 9, 2004

On August 2, 2004, plaintiff arrived at Wende from Upstate Correctional Facility ("Upstate"). He was in keep-lock status from August 2 through August 8. Dkt. # 32, ¶¶ 44–45. During that time, plaintiff did not receive his personal property from Upstate. *Id.* at ¶ 46. On August 12, 2004, plaintiff filed a grievance requesting the return of his personal property. The grievance was reviewed

2010 WL 4320362

by the Inmate Grievance Review Committee ("IGRC"), which informed plaintiff that his property arrived and was reviewed and processed on August 14, and was issued to him that same day. Plaintiff appealed the response of the IGRC to the Superintendent, who affirmed the response on August 27, 2004. Plaintiff then appealed the decision of the Superintendent to the Central Office Review Committee ("CORC"), alleging that he was called out to receive his property on August 7, 2004, but that his property was intentionally withheld from him. The CORC observed that there was no record of plaintiff being called out to receive his property on August 7, and that his property did not arrive until August 14, 2004. *Id.* at ¶ 47–48.

**\*2** On August 9, 2004, Correctional Officer Callens received information that an inmate in 11 Company, Cell 2, may be in possession of a weapon. Dkt. # 32, ¶ 9. After receiving authorization to search plaintiff's cell, Callens ordered plaintiff out of his cell. According to defendants, as plaintiff exited the cell, he raised his fist at Callens, who then grabbed plaintiff's right arm while Czarnecki assisted in restraining plaintiff. *Id.* at ¶ 10–12. Plaintiff has disputed this fact, alleging that he was assaulted by the two officers without provocation. Dkt. # 48, ¶¶ 13, 15. The two Correctional Officers then placed plaintiff's hands behind his back and escorted him to the second floor lobby. Dkt. # 32, ¶¶ 10–13. Sergeant Lambert heard the commotion and responded to the second-floor lobby. Callens explained the situation, and Lambert placed mechanical restraints on the plaintiff. *Id.* at ¶ 14.

Arrangements were then made for the plaintiff to be moved to the Special Housing Unit ("SHU") at Wende. *Id.* at ¶ 8. Plaintiff did not attend recreation the day of the incident. *Id.* at ¶¶ 49–50.

Callens returned to plaintiff's cell and, in searching it, he recovered a plastic, sharpened object concealed in a cardboard sheath. The object was taken to Lambert, who placed it in the Captain's Evidence Locker. *Id.* at ¶ 21. Plaintiff was thereafter charged with violating DOCS Rule 100.11 (Assault on Staff) and Rule 113.10 (Weapon Possession) and a Misbehavior Report was issued by Callens. *Id.* at ¶ 22. As a result of the August 9, 2004 incident, plaintiff was moved to SHU. *Id.* at ¶ 8.

**B. Medical Treatment**

Shortly after the incident of August 9, 2004, plaintiff was examined by R.N. Robert Stachowski. Plaintiff complained of pain to his nose, left shoulder, and left wrist. Stachowski observed a small avulsion to the nose, approximately three millimeters in length, and documented the results of his exam on a Use of Force Report and Inmate Injury Report, in accordance with DOCS procedure. He determined that there was no evidence of any additional injury and that plaintiff did not require further medical treatment. *Id.* at ¶¶ 9, 16–17; Dkt. # 35, Ex. B–C.

On August 11, 2004 Dr. Jacqueline Levitt examined plaintiff after he complained of pain to his left wrist and nose. Levitt observed a small bruise on the bridge of plaintiff's nose with no deformities, and no deformity to his wrist. In her medical judgment, Dr. Levitt determined that plaintiff had suffered a soft tissue injury and that no further treatment was needed at that time. Dkt. # 32, ¶ 54. On August 18, 2004, plaintiff complained of pain in his left wrist and left shoulder, and decreased flexion of the fifth digit on his left hand. Levitt's examination revealed that his wrist showed no swelling and had a normal range of motion. Plaintiff also had a normal grip. She did observe some decreased flexion of his left fifth digit, and normal range of motion of his left shoulder. Levitt determined that no treatment was needed for those injuries at that time. *Id.* at ¶ 56. One week later, plaintiff again complained of pain in his left wrist and shoulder and requested x-rays. Levitt saw no deformities to his shoulder, wrist, or left fifth digit and determined that there was no bony injury and thus no need for x-rays at that time. Her assessment had not changed when she saw plaintiff again on September 1, 2004. *Id.* at ¶ 59–60. On September 8, 2004, plaintiff again complained of wrist and shoulder pain and decreased range of motion of his fifth left digit. Dr. Levitt examined plaintiff and observed decreased flexion but no deformity in the fifth left digit. She determined that the decreased flexion of plaintiff's finger was not clinically significant. *Id.* at ¶ 62.

**\*3** On September 15, plaintiff was examined by another physician following complaints of poor flexion of the left fifth finger. That doctor noted that plaintiff had persisting left upper extremity complaints and ordered an x-ray of his left finger, and indicated that he would follow-up with an orthopedic consultation if necessary. Dr. Levitt agreed with that plan of care. *Id.* at ¶ 64.

Fernandez v. Callens, Not Reported in F.Supp.2d (2010)

2010 WL 4320362

Plaintiff was transferred out of Wende on September 23, 2004. *Id.* at ¶ 68. Upon his transfer to Upstate Correctional Facility, plaintiff was examined by a physician and it was determined that his left fifth digit had full range of motion and no treatment was needed. The finger was again examined at Upstate on October 18, 2004. The nurse noticed decreased flexion, but that it did not warrant any treatment. *Id.* at ¶¶ 69–70. Finally, an orthopedist consulted with plaintiff on May 26, 2005, and concluded that there was decreased flexion of plaintiff's left fifth digit but that there was no "long term problem." *Id.* at ¶ 71. Due to plaintiff's chronic complaints of pain in his shoulder and ulnar and failed conservative treatment, a diagnostic study of his left shoulder was completed at Clinton Correctional facility. An MRI did not reveal any injuries, therefore an arthoscopic surgery was required to diagnose and treat the affected shoulder. That surgery was performed on December 21, 2006. *Id.* at ¶ 73.

### C. Misbehavior Report and Disciplinary Hearing

In preparation for the Tier III Superintendent's Hearing arising from the Misbehavior Report dated August 9, 2004, plaintiff was assigned an employee assistant pursuant to 7 N.Y.C.R.R. § 251.4. *Id.* at ¶ 23. Plaintiff requested that seven inmates be interviewed as potential witnesses. The employee assistant was unable to locate one of the witnesses, three refused to testify, and two were denied as witnesses by Hearing Officer Schoellkopf. The remaining witness agreed to testify at the hearing. *Id.* at ¶ 24. The hearing was then conducted before Shoellkopf on August 11, 2004. *Id.* at ¶ 25.

At the commencement of the hearing, plaintiff complained that his employee assistance was inadequate, and requested additional witnesses. He also requested that another Hearing Officer complete the hearing. *Id.* at ¶ 26. Schoellkopf adjourned the hearing and proceeded to locate and interview four witnesses based on the plaintiff's requests. That testimony was recorded and played for the plaintiff at the SHU hearing room on August 31, 2004. *Id.* at ¶ 27–28. Testimony was also given by Correctional Officers Callens and Sergeant Lambert. Schoellkopf denied plaintiff's requests for additional witnesses, determining that further testimony would be redundant pursuant to 7 N.Y.C.R.R. § 253.5. *Id* . Plaintiff objected to the proceedings, claiming that he did not have the opportunity to question witnesses and did not receive certain documentary evidence. He also claimed that he

was denied the right to a fair and impartial hearing officer. *Id.* at ¶ 29.

**\*4** After hearing and considering the evidence, Schoellkopf found plaintiff guilty of assault on staff and weapons possession and sentenced him to one year in SHU, and one year loss of packages, commissary, phone, personal television, and good time. *Id.* at ¶ 31. Plaintiff appealed the hearing disposition to the Commissioner of DOCS. Upon review, Donald Selsky, Director of Special Housing/Inmate Disciplinary Programs, affirmed the hearing disposition on November 18, 2004. *Id.* at ¶ 35. Plaintiff then brought a proceeding pursuant to N.Y. C.P.L.R. Article 78 to review the Commissioner's determination. The Appellate Division, Third Department, dismissed the weapon possession charge for insufficient evidence and directed that all references thereto be expunged from plaintiff's record. *Id.* at ¶ 37; *see Fernandez v. Goord,* 27 A.D.3d 806, 809 N.Y.S.2d 685 (3rd Dept.2006). The Appellate Division further determined that plaintiff was afforded meaningful assistance from his employee assistant and that there was no merit to the assertions that Hearing Officer Schoellkopf was biased and improperly denied plaintiff the right to call witnesses. *Id.*

In accordance with the Appellate Division's determination, Director Selsky modified the hearing disposition by removing the guilty finding pertaining to the weapon possession charge. [1] Dkt. # 32, ¶ 40.

### D. Grievance Relating to the August 9, 2004 Incident

On August 12, 2004, plaintiff filed a grievance alleging that Callens slammed plaintiff's face and body into a wall and hit his left shoulder with a baton. He further alleged that Czarnecki and Callens spun him around and again slammed him into a wall. *Id.* at ¶ 41, 809 N.Y.S.2d 685. Following an investigation, the Superintendent concluded that the use of force was consistent with the manner prescribed by DOCS rules. Plaintiff's grievance was denied, and an appeal was taken to CORC, which unanimously upheld the determination of the Superintendent denying the grievance, observing that the medical records and documentation of the Use of Force Report did not substantiate plaintiff's allegation that he was struck with a baton. *Id.* at ¶¶ 42–43, 809 N.Y.S.2d 685.

2010 WL 4320362

## DISCUSSION AND ANALYSIS

### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a pro se plaintiff." *Thomas v. Irvin,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see Bryant v. Maffucci,* 923 F.2d 979 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

**\*5** Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant,* 923 F.2d at 982. A party seeking to defeat a motion for summary judgment must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

Pursuant to Fed.R.Civ.P. 56(e), affidavits in support of or in opposition to a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Thus, affidavits "must be

admissible themselves or must contain evidence that will be presented in an admissible form at trial." *Santos v. Murdock,* 243 F.3d 681, 683 (2d Cir.2001) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also H. Sand & Co. v. Airtemp Corp.,* 934 F.2d 450, 454–55 (2d Cir.1991) (hearsay testimony that would not be admissible if testified to at trial may not properly be set forth in an affidavit).

### B. Plaintiff's Claims

#### 1. First Cause of Action: Excessive Force

##### a. Defendants Callens and Czarnecki
Plaintiff first claims that Correctional Officers Callens and Czarnecki used excessive force against him in violation of the Eighth Amendment prohibition against cruel and unusual punishment. Dkt. # 6, ¶ 56.

A claim of cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution has both a subjective and objective component. To satisfy the subjective component, a plaintiff must demonstrate that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the circumstances surrounding the challenged conduct." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (quoting *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999); *Wilson v. Seiter,* 501 U.S. 294, 299, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Whether conduct of prison officials can be characterized by "wantonness" is determined by "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wright,* 554 F.3d at 268 (quoting *Hudson v. McMillian,* 503 U.S. 1, 7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). The objective component of a claim of cruel and unusual punishment concentrates on the harm done in light of "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8).

"Where a prisoners' allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that Correctional Officers used force maliciously and sadistically, our Court has reversed summary dismissals of Eighth Amendment claims of excessive force even where the plaintiff's evidence of injury was slight and the proof of excessive force was weak." *Wright,* 554 F.3d at 269 (citing *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) ("reversing summary dismissal of prisoner's

complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was 'thin' as to his claim that a Correctional Officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the 'medical records after the ... incident with [that officer] indicated only a slight injury' "); *Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999) ("vacating district court's sua sponte dismissal of prisoner's complaint, though characterizing his 'excessive force claim [a]s weak and his evidence [as] extremely thin' where prisoner alleged that he was hit by prison guards 'after he was handcuffed' but 'the only injuries he suffered were a bruised shin and swelling over his left knee' ")). Notwithstanding the foregoing, "de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind," is not proscribed by the Eighth Amendment's prohibition against cruel and unusual punishment. *Hudson,* 503 U .S. at 10. Indeed, the Supreme Court has further elaborated, "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Id.* at 9.

**\*6** Plaintiff has alleged that Callens and Czarnecki assaulted him without provocation, causing injury to his nose, pinky finger, wrist, arm, shoulder, and back. Dkt. # 6, ¶¶ 24–28, 42, 56. Defendants contend that "plaintiff came out of his cell with a clenched fist, and he attempted to strike [ ] Callens." According to defendants, the Correctional Officers then applied a reasonable use of force to protect themselves and others. Dkt. # 33, pp. 24–25. Plaintiff's "Answer to Defendants' Statement of Undisputed Facts" states that plaintiff's attempt to strike Officer Callens "never happened" and therefore the defendants' use of force was not justified. Dkt. # 48, ¶ 13. He also maintained this position during his disciplinary hearing. Dkt. # 46, Ex. 3 at 38. The parties thus dispute whether the Correctional Officers had a "wanton" state of mind and whether the degree of force involved under the circumstances was reasonable.

As noted below [2], plaintiff has not adduced any evidence demonstrating that his alleged injuries were serious. However, it is disputed whether "force was applied in a good faith effort to maintain or restore discipline ...." *Hudson,* 503 U.S. at 6–7. Hence, a material fact is in dispute as to the subjective component of plaintiff's excessive force claim. *See Griffen,* 193 F.3d at 91 ("Although [prisoner] appellant's excessive force claim is

weak and his evidence extremely thin, dismissal of the excessive force claim was inappropriate because there are genuine issues of material fact concerning what transpired ...."); *Ali v. Szabo,* 81 F.Supp.2d 447, 458 (S.D.N.Y.2000) ( "[B]ecause there is a material issue of fact as to whether any force was needed, the Court cannot determine whether the force allegedly used ... reasonably correlates to the need for the application of force."); *Johnson v. Doherty,* 713 F.Supp. 69, 72 (S.D.N.Y.1989) (summary judgment on an excessive force claim is inappropriate where there are disputed facts as to the context in which the incident occurred and the signs of provocation).

Accordingly, defendants' motion for summary judgment with respect to plaintiff's excessive force claim is denied.

### b. Supervisory Liability

Plaintiff also contends that Sgt. Lambert failed to properly supervise Callens and Czarnecki with regard to the alleged assault against plaintiff. Dkt. # 6, ¶ 57.

"Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (May 18, 2009). Thus, it is well settled that the personal involvement of defendants in an alleged constitutional deprivation is a prerequisite to an award of damages under § 1983. *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *AlJundi v. Estate of Rockefeller,* 885 F.2d 1060,1065 (2d Cir.1989). Personal involvement may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created or permitted the continuation of a policy or custom under which unconstitutional practices occurred; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating unconstitutional acts were occurring. *Colon,* 58 F.3d at 873. [3]

**\*7** Plaintiff has not alleged that Lambert participated in any of the alleged conduct of Callens or Czarnecki, or that he created a policy or custom that effectively sanctioned their conduct. His allegation that Lambert was made aware of the complained of conduct but did nothing to remedy or protect could implicate categories two (2), four (4) or five (5) under *Colon*. However, plaintiff presents no evidence that Lambert failed to remedy a wrong after being informed through a report or appeal or failed to act on information indicating that unconstitutional acts were occurring. Rather, the only evidence plaintiff proffers is that he vaguely testified at his disciplinary hearing that he had informed Lambert about the alleged assault while in Lambert's office, and Lambert reacted by ordering plaintiff to SHU. Dkt. # 46, Ex. 3 at 41. Such conclusory allegations are clearly insufficient to create a question of fact regarding Lambert's personal involvement with the alleged actions of his co-defendants. Further, plaintiff has presented no evidence concerning Lambert's management or training of any of the co-defendants. Hence, there is no evidence from which a factfinder could evaluate or construe gross negligence. In sum, plaintiff has not established Lambert's personal involvement in a constitutional violation.

With respect to plaintiff's first cause of action, defendants' motion for summary judgment is granted, except as to plaintiff's excessive force claim against Callens and Czarnecki.

### 2. Second Cause of Action: Deliberate Indifference

Plaintiff next contends that R.N. Stachowski and Dr. Levitt failed to provide adequate treatment to plaintiff, in violation of his Eighth Amendment right to be free from cruel and unusual punishment. Dkt. # 6, ¶ 58.

The Eighth Amendment not only prohibits "physically barbarous punishments," but also "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency ... 'against which we must evaluate penal measures." *Estelle v. Gamble*, 429 U.S. 97,102 (1976) (quoting *Jackson v. Bishop*, 404 F.2d 571, 579 (8th Cir.1968)). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Id.* at 103. The *Estelle* court concluded that an unconstitutional denial of medical care occurs when there is a "deliberate indifference to serious medical needs of prisoners." *Id.* at 104. The deliberate indifference standard "incorporates both objective and subjective elements. The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir.2003) (citations and internal quotations omitted).

With respect to the objective component, the alleged deprivation must be "sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir.1998). A serious medical condition exists where the "failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Chance v. Armstrong*, 143 F.3d 698, 701–02 (2d Cir.1998).

**\*8** After the August 9, 2004 incident, plaintiff complained of pain to his nose, left shoulder, and left wrist. Stachowski examined plaintiff and noted that the only apparent injury to plaintiff was a small avulsion to his nose, approximately 3 millimeters in length. Dkt. # 32, ¶ 17. Dr. Levitt then examined plaintiff when he complained of pain to his left wrist and nose. She observed a small bruise on the bridge of his nose with no deformities and no deformity to his wrist. In her medical judgment, Levitt determined that plaintiff had suffered a soft-tissue injury and that no further treatment was needed at that time. Dkt. # 32, ¶ 54. These types of injuries cannot be said to be "sufficiently serious", nor are they a condition of urgency, one that may produce death, degeneration, or extreme pain. *See, e.g., Davidson v. Scully*, 914 F.Supp. 1011, 1015–16 (S.D.N.Y.1996) (holding that a plaintiff's "allergy condition, his podiatric condition, his post-surgery hernia condition, his knee condition, his urological problems, his dermatological problems, and his cardiological problems do not present urgent medical conditions the maltreatment of which amounts to cruel and unusual punishment in violation of the Eighth Amendment."); *Pabon v. Goord*, No. 99 Civ. 5869(THK), 2003 WL 1787268, \*4 (S.D.N.Y. March 28, 2003) (clival lesion at the base of the inmate's skull not sufficiently serious); *Rodriguez v. Mercado*, No. 00 CIV. 8588 JSRFM, 2002 WL 1997885, \*8 (S.D.N.Y. Aug.28, 2002) (bruises to head, back, and wrists not sufficiently serious); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F .Supp.2d 303, 311 (S.D.N.Y.2001) (bleeding finger not a severe injury); *Henderson v. Doe*, No. 98 Civ. 5011,

1999 WL 378333, *2 (S.D.N.Y. June 10, 1999) (broken finger not severe).

Even if plaintiff had demonstrated injuries severe enough to rise to the level of a serious medical need, he still has not raised a material issue of fact that named medical professionals at Wende were deliberately indifferent to that need.

To satisfy the subjective element of the deliberate indifference standard, an inmate must demonstrate that the prison official's conduct was more than negligent, but he need not show that it was "undertaken for the very purpose of causing harm." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Rather, it must be established that the prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Stated another way, "[a] showing of medical malpractice is therefore insufficient to support an Eighth Amendment claim." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003).

Plaintiff encountered defendant Stachowski immediately following the incident on August 9, 2004. Stachowski examined plaintiff, and, in his medical judgment, determined that plaintiff did not require medical treatment at that time. Dkt. # 32, ¶ 17. An issue of medical judgment is "precisely the sort of issue that cannot form the basis of a deliberate indifference claim." *Hernandez,* 341 F.3d at 147. Following Stachowski's initial examination, medical staff saw the plaintiff a total of seventeen times from the date of the incident to September 23, 2004 when he was transferred out of Wende. Dkt. # 32, ¶ 72. During the exams at Wende, plaintiff complained of pain to his left wrist, shoulder, and pinky finger seven times. Plaintiff contends that Levitt provided inadequate medical treatment because she did not order x-rays or order a specialist consultation, *see* Dkt. # 6, ¶¶ 40–41. However "[t]he failure to perform an X-ray or to use additional diagnostic techniques does not constitute cruel and unusual punishment but is, at most, medical malpractice cognizable in the state courts." *Estelle,* 429 U.S. at 107; *see also Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) (The fact that a plaintiff might have preferred an alternative treatment or believes that he did

not get the medical attention he desired does not rise to the level of a constitutional violation); *see also Sonds,* 151 F.Supp.2d at 312 (holding that disagreements over medications, diagnostic techniques (e.g., the need for x-rays), forms of treatment or the need for specialists are not adequate grounds for a § 1983 claim).

**\*9** Furthermore, in the brief period of time that plaintiff was in defendant Levitt's care, both defendants concluded that plaintiff did not warrant extensive radiological studies and/or orthopedic consultation. Dkt. # 32, ¶ 75. Both Stachowski and Levitt examined plaintiff and made their own independent medical judgments to determine the best course of treatment for him. Plaintiff has not presented any evidence to raise a material issue of fact of negligence, much less deliberate indifference. On this basis, plaintiff's claims are dismissed and the defendants' summary judgment motion is granted on the second cause of action.

### 3. Third Cause of Action: Due Process–Disciplinary Proceedings

#### a. Inadequate Assistance

Plaintiff contends that he was denied his right to employee assistance at his Tier III disciplinary hearing. Dkt. # 6, ¶¶ 46, 59.[4]

In *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court recognized that prisoners retain a liberty interest and may not be deprived of that interest without due process of law. 418 U.S. at 556. Thus, an inmate facing disciplinary charges that could result in punitive segregation is entitled, at a minimum, to receive advance written notice of the charges against him and of the evidence available to the factfinder. *Id.* at 563–64. The purpose of this notice is to give the inmate an opportunity to marshal the facts and prepare his defense. *Id.* at 564. Due process further requires that a written record of the proceedings be kept, along with a written statement by the factfinder as to the evidence relied upon and reasons for the disciplinary action imposed. *Id.; see also Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985). In addition, the inmate is entitled to call witnesses and present documentary evidence in his defense "when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." 418 U.S. at 566; see also *McCann v. Coughlin,* 698 F.2d 112, 122 (2d Cir.1983).

The Second Circuit has elaborated on the minimum due process requirements set forth in *Wolff* that pertain to an inmate facing disciplinary charges. In *Eng v. Coughlin,* 858 F.2d 889 (2d Cir.1988), for instance, the Second Circuit held that "prison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges." 858 F.2d at 897. In *McCann v. Coughlin,* 698 F.2d 112 (2d Cir.1983), the Second Circuit recognized that the factfinder presiding over the disciplinary hearing must be fair and impartial. 698 F.2d at 122 (citing *Crooks v. Warne,* 516 F.2d 837 (2d Cir.1975)).

New York's regulations entitle a prisoner to an employee assistant to help him prepare for a disciplinary hearing. *See* 7 N.Y.C.R.R. §§ 251–4.1, 251–4.2. The Supreme Court has held that a prisoner's right to assistance as a matter of federal constitutional law is more limited, determining that the institutional concerns implicated in prison administration would not be furthered by entitling inmates to legal counsel in the form of a retained or assigned attorney. *See Wolff,* 418 U.S. at 570 ("The insertion of counsel into the disciplinary process would inevitably give the proceedings a more adversary cast and tend to reduce their utility as a means to further correctional goals. There would also be delay and very practical problems in providing counsel in sufficient numbers at the time and place where hearings are to be held. At this stage of the development of these procedures we are not prepared to hold that inmates have a right to either retained or appointed counsel in disciplinary proceedings."); *accord Silva v. Casey,* 992 F.2d 20, 21 (2d Cir.1993).

**\*10** It is undisputed that plaintiff was assigned an employee assistant pursuant to 7 N.Y.C.R.R. § 251–4.1. Dkt. # 32, ¶ 23. Plaintiff contends, however, that the employee assistant assigned to him failed to interview witnesses and supply him with documents to assist in his defense. The record before the Court indicates that after meeting with the assistant, plaintiff requested that seven inmates be interviewed as potential witnesses. The assistant was unable to locate one of the requested witnesses, three refused to testify, and two were rejected by the hearing officer. *Id.* at ¶ 24; Dkt. # 39, Ex. B–C. Moreover, the Assistant Form indicates that several documents were issued to plaintiff upon his request. Dkt.

# 39, Ex. B. When given the chance at the disciplinary hearing to elaborate on his claim that his assistance was "incomplete," plaintiff was unable to identify the documents that he claimed to be entitled to but did not receive. He also re-stated his assertion that his assistant failed to interview potential inmate witnesses. Dkt. # 46, Ex. 3 at 7; Dkt. # 39, Ex. D. Hearing Officer Schoellkopf informed plaintiff that certain requested documents were not available for "security reasons" and that plaintiff would be able to request witnesses at the hearing. *Id.* at 7–11.

Under *Eng,* an assigned assistant who does nothing to assist an inmate "has failed to accord the prisoner his limited constitutional due process right of assistance." *Eng,* 858 F.2d at 898. Such is not the case here. The employee assistant did reach out to each of the requested witnesses, and thus did not fall short of the required level of employee assistance. *See Jermosen v. Coughlin,* No. 89 CV 1140, 1993 WL 328482, at \*4 (W.D.N.Y. Aug.9, 1993), *aff'd,* 29 F.3d 620 (1994) (where an employee assistant interviewed witnesses and reported to the inmate, nothing else was required of the assistant). Accordingly plaintiff's claim of inadequate employee assistance does not rise to a due process violation.

### b. Denial of Request for Witnesses

Plaintiff next avers that Hearing Officer Schoellkopf denied him of his right to call witnesses on his behalf and confront witnesses against him at his disciplinary hearing. Dkt. # 6, ¶ 46.

Although a New York inmate has a due process right to call witnesses, *see* 7 N.Y.C.R.R. § 254.5(b), that right is not absolute. *See Ponte v. Real,* 471 U.S. 491, 495, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985); *Wolff,* 418 U.S. at 566. (1974). "Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority ...." *Ponte,* 471 U.S. at 496 (quoting *Wolff,* 418 U.S. at 566). A hearing officer may also refuse to call a witness "on the basis of irrelevance or lack of necessity." *Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991); *see also Scott v. Kelly,* 962 F.2d 145, 146–47 (2d Cir.1992) ("It is well settled that an official may refuse to call witnesses as long as the refusal is justifiable"). To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors,

in the sense that the errors affected the outcome of the hearing. *See Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991).

**\*11** In the case at bar, Hearing Officer Schoellkopf adjourned the hearing so the plaintiff's requested witnesses could be located and interviewed. Ultimately, only four inmates agreed to testify. That testimony was recorded and played for the plaintiff when the hearing resumed on August 31, 2004. Dkt. # 32, ¶ 28.[5] Testimony was also given by Sergeant Lambert and Correctional Officer Callens. Following their testimony, Schoellkopf determined that any further testimony would be redundant, and denied plaintiff's requests for "all staff" to testify pursuant to 7 N.Y.C.R.R. § 253.5(a)[6]. *Id.*

The record indicates that Schoellkopf did not deny plaintiff the opportunity to call witnesses on his behalf. He did, however, deny plaintiff's request that two additional officers testify on the grounds that plaintiff could not call an unlimited number of witnesses and because any further testimony would be redundant. A hearing officer in a prison disciplinary proceeding does not violate due process by excluding irrelevant or unnecessary testimony. *Kalwasinski v. Morse,* 201 F.3d 103,109 (2d Cir.1999). Rather, all that is required to satisfy due process is that the hearing officer prove he had a rational basis for denying the witness. *Fox v. Coughlin,* 893 F.2d 475, 478 (2d Cir.1990). Here, plaintiff had six witnesses at his disciplinary hearing, four inmates and two Correctional Officers. In light of the testimony already given, Schoellkopf refused to interview the additional Correctional Officer because he believed such testimony would be redundant. The denial was thus not a violation of plaintiff's right to due process. *See Afrika v. Selsky,* 750 F.Supp. 595, 600–601 (S.D.N.Y.1990) (refusal to call some witnesses whose testimony was not believed to be relevant, after hearing testimony of several requested eyewitnesses, did not violate due process); *see generally Russell v. Selsky,* 35 F.3d 55, 59 (2d Cir.1994) (a prison disciplinary hearing officer may refuse to allow willing witnesses to testify where their testimony would be cumulative).

Finally, it is well settled that "[a]n inmate does not possess a constitutional right to confront or cross-examine witnesses in prison disciplinary hearings. *Wolff,* 418 U.S. at 567–68; *Kalwasinski,* 201 F.3d at 109. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993). To that end, plaintiff's

complaint that the inmate testimony was taken outside of his presence and tape-recorded does not pose a due process violation. In any event, Schoellkopf did give plaintiff the opportunity to present questions to the inmate-witnesses, but plaintiff did not provide any. Dkt. # 46, Ex. 3 at 19–20. Plaintiff has thus not established a due process violation.

### c. Denial of Fair Hearing

Plaintiff alleges that Hearing Officer Schoellkopf was not fair and impartial, thereby depriving him of due process. Dkt. # 6, ¶ 46. Specifically, plaintiff complains that Schoellkopf pre-judged the case against plaintiff. Dkt. # 46 at 11–12, 15.

**\*12** "An inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996); *see Wolff,* 418 U.S. at 570–71; *Russell v. Selsky,* 35 F.3d 55, 59 (2d Cir.1994). An impartial hearing officer "is one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990); *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

It is well recognized, however, "that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen,* 100 F.3d at 259. For example, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Allen,* 100 F.3d at 259; *see Francis,* 891 F.2d at 46. A hearing officer may satisfy the standard of impartiality if there is "some evidence in the record" to support the findings of the hearing. *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). The Second Circuit has explained that, "[a]lthough the Court in *Hill* stated that the question is whether there is 'any evidence' that 'could' support the disciplinary decision, this Court has not construed the phrase 'any evidence' literally. Rather, we have looked to see whether there was 'reliable evidence' of the inmate's guilt." *Luna v. Pico,* 356 F.3d 481, 488 (2d Cir.2004) (quoting *Hill,* 472 U.S. at 455–56).

Plaintiff's argument that defendant Schoellkopf had pre-determined plaintiff's guilt is belied by the evidence in the record before this Court. The disciplinary hearing

spanned several days to allow for each of plaintiff's witnesses to be interviewed and testify. In addition to the plaintiff's four witnesses, two Correctional Officers also provided testimony in front of plaintiff, who was permitted to question them. As reflected in the disciplinary hearing transcript, defendant Schoellkopf permitted plaintiff to voice his objections during the hearing, afforded plaintiff the opportunity to testify or to present evidence in his defense. Moreover, Schoellkopf set forth sufficient evidence in his disposition to support his determination of guilt of assault on staff and weapon possession, stating that he relied on the testimony of Officer Callens, who was personally involved in the altercation and completed a Misbehavior Report dated August 9, 2004; the Unusual Incident Report; the weapon recovery Unusual Incident data sheet; a "to/from memo" of Sgt. Lambert as well as his testimony; a Use of Force Report; the Watch Commander's log; the Captain's log; and the chain of custody log entry. Dkt. # 46, Ex. 3 at 45. After finding plaintiff guilty, Schoellkopf imposed the following penalty: one year SHU, one year loss of package, commissary and phone, one year loss of TV, and one year loss of good time. The hearing officer noted, "[t]he reasons for disposition is because of the serious nature of attempting to strike an officer as well as this being your second 113.10 weapon violation. The last two dispositions haven't deterred you, therefore this stronger disposition is given to emphasize to you and others to refrain from this behavior in the future." *Id.* at 46.

**\*13** Plaintiff's bare allegations of bias and prejudgment, without more, are insufficient to defeat defendant's motion for summary judgment. As reflected in the hearing transcript, defendant Schoellkopf based his determination on the Misbehavior Report, the testimony of plaintiff, testimony of witnesses present during the incident, and the documentary evidence. Thus, the record before this Court establishes that defendant Schoellkopf was neither biased nor prejudged the evidence. To the contrary, Schoellkopf based his finding of guilt on the credible evidence presented during the hearing and made an objectively reasonable determination based on the evidence. Thus, the Court agrees with defendant Schoellkopf that plaintiff has failed to meet his burden of demonstrating that defendant Schoellkopf was so partial so as to violate plaintiff's due process rights.

#### d. Director Selsky

In a related claim, plaintiff avers that Director Selsky refused to reverse Schoellkopf's disposition against plaintiff and thus deprived plaintiff of his due process rights. Dkt. # 33, ¶ 40. As stated earlier, there is nothing in the record to support the conclusion that Schoellkopf denied plaintiff his due process rights at the Tier III disciplinary hearing. Selsky's decision affirming (and later modifying) the hearing officer's determination does not, standing alone, establish a federal constitutional violation. *See Eleby v. Selsky,* 682 F.Supp.2d 289, 293 (W.D.N.Y.2010) ("Thus, plaintiff cannot show that his constitutional rights were violated during the disciplinary proceedings or hearing. Selsky's affirmance of the hearing officer's decision therefore cannot give rise to a § 1983 claim.") (citing *Loving v. Selsky,* No. 07–CV–6393, 2009 WL 87452, at *4 (W.D.N.Y. Jan.12, 2009)); *see also Chavis v. vonHagn,* No. 02–CV0119(Sr), 2009 WL 236060, *6, (W.D.N.Y. Jan.30, 2009) (citing *Hameed v. Mann,* 57 F.3d 217, 224 (2d Cir.1995) (Selsky entitled to dismissal of claims where plaintiff failed to establish constitutional violations at disciplinary hearing)). Accordingly, plaintiff's claim against Selsky is dismissed.

With respect to plaintiff's third cause of action, defendants' motion for summary judgment is granted.

#### 4. Fourth Cause of Action: Due Process–Property and Recreation

##### a. Deprivation of Recreation

Plaintiff contends that a one-day denial of recreation denied him his right to due process. Dkt. # 6, ¶ 61.

In *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court held that the failure to comply with every state or prison regulation does not necessarily create a protected liberty interest for prisoners. *Sandin,* 515 U.S. at 483–484. Instead, to create a protected liberty interest, a state must implement a regulation or other provision providing for restraints that impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484.

**\*14** At the outset, plaintiff acknowledges that he was unable to go to recreation because the incident of August 9, 2004 occurred during the scheduled time for recreation. Dkt. # 48, ¶ 49; *Id.* at Ex. 2, Line 19. Similarly, defendants

Callens and Czarnecki state that they did not deny plaintiff recreation on August 9, 2004 to punish him. Rather, if plaintiff was unable to go to recreation that day, it "may have been because of the use of force incident that occurred and the necessary procedures that had to be followed." Dkt. # 32, ¶ 49.

In any event, a one-day deprivation of recreation is insufficient to give rise to a "significant hardship" as contemplated by *Sandin. See Husbands v. McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y.1998) ("The temporary loss of the various privileges alleged in this casei.e., telephone, package, commissary, and recreation privileges-does not represent the type of deprivation which could reasonably be viewed as imposing an atypical and significant hardship on an inmate."); *Ford v. Phillips,* No. 05 CIV. 6646, 2007 WL 946703, at * 10 (S.D.N.Y. Mar. 27, 2007) (granting summary judgment on inmate's claim that he was denied recreation, showers, and a special meal on four occasions; "These minor and temporary denials clearly do not constitute significant hardships implicating a constitutionally protected liberty interest"); *Ragland v. Crawford,* No. 95 Civ. 10069, 1997 WL 53279, *3 (S.D.N.Y., Feb.7, 1997), ("In light of the Court's holding in *Sandin,* neither Ragland's loss of one hour daily recreation time for one week, nor his alleged confinement to keeplock on October 13, 1995, constitutes an atypical, significant hardship implicating a protected liberty interest."). Consequently, plaintiff has failed to allege any facts that his deprivation of one day of recreation resulted in an "atypical" or "significant hardship."

### b. Deprivation of Property

Next, plaintiff alleges that Callens and Czarnecki, withheld his personal property from August 2 to August 9, 2004. Dkt. # 6, ¶ 61. Although plaintiff arrived at Wende on August 2, his property did not arrive until August 14, 2004 for reasons unbeknownst to defendants. Plaintiff's property was issued to him the same day it was received. Dkt. # 48, ¶¶ 46, 48. Defendants Callens and Czarnecki argue that they had no involvement with the delay in petiitoner's property arriving at Wende. Dkt. # 33 at 4.

Plaintiff has pointed to no evidence, or even provided a factual allegation, to support a conclusion that Callens or Czarnecki had any involvement with the delay in the receipt of plaintiff's property. Absent evidence of personal involvement by any of the relevant *Colon* methods

(e.g. direct involvement, deliberate indifference), plaintiff cannot prevail against the defendants. *See Colon,* 58 F.3d at 873.

### c. Supervisory Liability

Plaintiff next contends that Sgt. Lambert failed to properly supervise Callens and Czarnecki with respect to the delivery of his personal property and the alleged denial of recreation time. Dkt. # 6, ¶ 62. This conclusory allegation is insufficient to establish personal involvement. *See Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (to hold a prison official liable under § 1983 "requires a showing of more than the linkage in the prison chain of command"); *Sash v. United States,* 674 F.Supp.2d 531, 543 (S.D.N.Y.2009) (holding that "[i]t is not enough to show that a defendant 'ultimately supervised those who allegedly violated plaintiff's Constitutional rights.' " (quoting *Mallard v. Menifee,* No. 99 Civ. 0923, 2000 WL 557262, at *3 (S.D.N.Y. May 8, 2000)). Plaintiff fails to establish personal involvement under the Colon factors, especially in light of the undisputed fact that the defendants he allegedly failed to supervise had no knowledge of the delay in the arrival of plaintiff's property from Upstate to Wende, and did not deny him recreation time.

**\*15** For the foregoing reasons, defendants' motion for summary insofar as it relates to plaintiff's fourth cause of action is granted.

### IV. Conclusion

For the reasons set forth above, the defendants' motion for summary judgment should be granted, except insofar as plaintiff claims that defendants Callens and Czarnecki used excessive force against him in violation of the Eighth Amendment. A telephone conference is scheduled for November 12, 2010 at 10:00a.m. for purposes of setting a trial date on plaintiff's first cause of action against defendants Callens and Czarnecki alleging excessive use of force. Defendants' counsel shall arrange for plaintiff's telephonic appearance and provide the court with a telephone number where he can be contacted. The court will initiate the call.

### SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 4320362

Footnotes

1    Plaintiff also received a reduction in his other sanctions to 330 days to SHU and 330 days loss of packages, phone, and
     personal television. *See* Dkt. # 32 at ¶ 40.

2    See discussion at B.2.

3    At least one district court in this Circuit has opined that the holding in *Iqbal* substantially limited the *Colon* categories.
     *See Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801, 2009 W L 1835939, at *6 (S.D.N.Y. June 26, 2009) ("Only the
     first and part of the third *Colon* categories pass *Iqbal'* s muster .... The other *Colon* categories impose the exact types of
     supervisory liability that *Iqbal* eliminated."); *but see D'Olimpio v. Crisafi,* Nos. 09 Civ. 7283, 09 Civ. 9952, 718 F.Supp.2d
     340, 2010 WL 2428128, at *4–*5 (S.D.N.Y. June 15, 2010) ("[T]he five *Colon* categories for personal liability of supervisors
     may still apply as long as they are consistent with the requirements applicable to the particular constitutional provision
     alleged to have been violated."). Even when examined under the broader *Colon* approach, plaintiff cannot establish the
     personal involvement of Lambert.

4    The Court notes that plaintiff has not sued the employee assistant. In any event, the record belies plaintiff's complaint
     that he was denied meaningful assistance.

5    Plaintiff was being held in the SHU, and the hearing was conducted there. The inmates that plaintiff had sought to testify
     were located in the general population. The hearing officer thus recorded the inmates' testimony in the general population
     hearing room, to be played for plaintiff once the hearing was resumed in the SHU hearing room. *See* Dkt. # 32, ¶ 27;
     *see* 7 N.Y.C.R.R. § 253.5(b).

6    7 N.Y.C.R.R. § 253.5(a) reads, "[t]he inmate may call witnesses on his behalf provided their testimony is material, is
     not redundant, and doing so does not jeopardize institutional safety or correctional goals. If permission to call a witness
     is denied, the hearing officer shall give the inmate a written statement stating the reasons for the denial, including the
     specific threat to institutional safety or correctional goals presented."

---

**End of Document**                                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:14-cv-01389-TJM-TWD    Document 35    Filed 06/13/17    Page 60 of 151

Jermosen v. Coughlin, Not Reported in F.Supp. (1993)

1993 WL 328482

1993 WL 328482
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Donald R. JERMOSEN, Plaintiff,

v.

Thomas A. COUGHLIN, Bert Ross, Stephen
Norris, C. Page, Chester Clark, Donna
Taylor, David Post, T. Meagher, D. Smith, D.
Selsky, W. Lepknowski, R. Joyce Carver, C.
Homrighouse and M. Barnes, Defendants.

No. 89–CV–1140E(M).
|
Aug. 9, 1993.

**Attorneys and Law Firms**

Donald R. Jermosen, pro se.

Mark R. Walling, Asst. Atty. Gen., Buffalo, NY for
defendants.

MEMORANDUM and ORDER

ELFVIN, District Judge.

**\*1** The plaintiff, acting *pro se,* alleges that he was
deprived of his constitutional right to due process when
he was placed in "keeplock"—confinement to his own
cell—June 6, 1989 at the Elmira Correctional Facility
and of his constitutional right to attend religious services
while in keeplock. By Memorandum and Order dated
January 28, 1990 this Court dismissed the Complaint as
against defendants Norris, Page, Clark, Smith, Carver,
Homrighouse and Barnes. Presently the remaining
defendants move for summary judgment and the plaintiff
moves for summary judgment as to liability.

On June 6, 1989 the plaintiff was charged in an Inmate
Misbehavior Report with an infraction of the facility's
rules. Such was filed by David R. Post and described the
alleged infraction as follows:

"On the above date and time, I[,] D. Post Senior
Correction Counselor, received a letter from D.
Jermosen 79A0421 which contained various serious
threats. Included in the letter were statements such as

'I will get a transfer out of Elmira C.F. or someone
had to die' and 'I will be going to start a riot.' He did
also make threats such as 'I will be going to expose
my private parts to each women [sic] that I meet at the
facility.' I feel that these threats represent a threat to
the orderly running of this facility. (Please see attached
letter.)" *See* Affidavit of Thomas Meagher (sworn to
August 14, 1990), Exh. E.

As a result of such incident the plaintiff was "keeplocked."
The misbehavior report was reviewed by defendant
Lepknowski to determine if it was correctly filled out. The
decision to place the plaintiff in keeplock was reviewed by
Lt. Kordyl.

The plaintiff was served with such misbehavior report
June 7, 1989. He alleges that the referenced letter was not
attached to that which was served on him. At such time,
the plaintiff noted on a list of "employee assistants" his
three choices for an assistant and acknowledged that he
had received a copy of the report. *See* Meagher's Affidavit,
Exh. F. The plaintiff's first choice was E. Gene Callihan.
The facility's policy in effect during June 1989 was that
an employee who had served as an assistant three times
during a month was exempted from further such service
for one week. On such basis, Callihan was unavailable
until June 12th. The other two assistants chosen by
the plaintiff were also unavailable pursuant to such
policy. Because of this unavailability, Judy Symonds, who
processes requests by inmates for employee assistants,
requested an extension of time in which to conduct the
plaintiff's hearing until twenty-four hours after Callihan
had seen the plaintiff. Such request was approved June
9th by the Special Housing/Inmate Disciplinary Program
Office of the Department of Correctional Services. *See*
Affidavit of Judy Symonds (sworn to July 26, 1990),
Exh. B. The unavailability of an employee assistant is a
common basis for an extension of time in which to conduct
an inmate disciplinary hearing. *See* Affidavit of Donald
Selsky (sworn to August 6, 1990), ¶ 6.

**\*2** Callihan interviewed the plaintiff at approximately
10:35 a.m. June 12th. The plaintiff requested him to obtain
the names of any witnesses who might have been in the
Guidance Unit where the incident had occurred and to
get a copy of the letter which had been referenced in but
not attached to the served copy of the misbehavior report.
Callihan went to the Guidance Unit and asked Post, the
writer of the report, and five or six other Guidance Unit
employees whether they had been in the unit at 3:00

Case 9:14-cv-01389-TJM-TWD    Document 35    Filed 06/13/17    Page 61 of 151

Jermosen v. Coughlin, Not Reported in F.Supp. (1993)
1993 WL 328482

p.m. on June 6, 1989. Each of such other Guidance Unit employees said that he did not know if he had been and did not know that a misbehavior report had been written at such time. Callihan reported to the plaintiff that he had been unable to ascertain the names of any witnesses. The plaintiff claims that Callihan never reported to him the results of his investigation. Callihan also told the plaintiff that he could not help him obtain documents and that such needed to be obtained through requests under the Freedom of Information Law (New York's Public Officers Law, §§ 84–90). The plaintiff requested that another assistant be assigned to help him.

A disciplinary hearing regarding the June 6th misbehavior report was held before Lt. Meagher June 13th commencing at 10:45 a.m. At the beginning of the hearing the plaintiff complained that a copy of the referenced letter had not been attached to the misbehavior report as served on him. He also complained that Callihan had not reported back to him. Meagher told the plaintiff he would stop the hearing so that Callihan could report. He offered the plaintiff a copy of the letter which the plaintiff claimed not to have received. The plaintiff said he did not want a copy because he was supposed to have been provided with it twenty-four hours before the hearing. The hearing was adjourned.

The hearing recommenced June 16th at 10:40 a.m. Meagher began by noting that Corrections Officer Erickson had brought a copy of the letter that was attached to the original misbehavior report to the plaintiff June 13th and that the plaintiff had refused it. Erickson has submitted an affidavit (sworn to August 1, 1990) to such effect. At this point Meagher, after warning the plaintiff to stop interrupting him, excluded the plaintiff from the hearing. He then adjourned the hearing at 10:42 a.m. At 12.10 p.m. he read into the record the plaintiff's letter and his disposition of the matter, finding that the letter contained the same signature as the one written by the plaintiff on the Assistance Form, that the letter contained threats and that, for such infraction, the plaintiff should be placed in keeplock for thirty days, to run from June 6th through July 5th. He also noted that the plaintiff had requested witnesses from the Guidance Unit and that such request had been denied because the threat was contained in a letter addressed to Mr. Post and therefore there could be no witnesses of any relevance. Finally he noted that the plaintiff had submitted a letter dated June 12, 1989 stating his defense to the charges

and that he had read such letter before reaching his disposition.

**\*3** The plaintiff wrote a letter dated June 16th appealing the result of the disciplinary hearing. Such was received by Superintendent Ross's office June 20th and forwarded to First Deputy Superintendent Norris. Norris forwarded it to Deputy Superintendent for Security Page. On June 21st defendant Taylor received a request dated June 16th from the plaintiff that he be provided with the name of the employee assistant who had been assigned to assist him prior to the hearing. Taylor replied that the documents that would provide his requested information would be forwarded to him upon payment of seventy-five cents, the copying cost for the three pages. A disbursement form was never returned by the plaintiff. There not having been any determination of his appeal from the June 16th disciplinary hearing, the plaintiff wrote a second letter dated August 6th. Ross forwarded such to Capt. Homrighouse who affirmed the hearing officer's determination August 23rd.

In order to be entitled to summary judgment the defendants must show that there is no dispute as to any issue of material fact and that they are entitled to judgment as a matter of law. *See* Fed.R.Civ.P. rule 56(c). In making its determination, this Court must view the facts in the light most favorable to the plaintiff and resolve any doubts in his favor. *See Brady v. Town of Colchester,* 862 F.2d 205, 210 (2d Cir.1988).

The plaintiff argues that he had been keeplocked without an opportunity to be heard, that he had not received adequate notice of the charges against him, that he had not received adequate assistance from his employee assistant, that he had been threatened at the hearing, that he had been excluded from the hearing, that he had not been allowed to call witnesses and not been given the reasons therefor, that the hearing officer was not impartial, that his Freedom of Information Law requests had not been answered and that his appeal had not been decided until two months after the conclusion of his hearing, all in violation of his due process rights. The plaintiff also argues that he had been denied his First Amendment right to attend church services during the period in which he was in keeplock.

The plaintiff was confined to keeplock pursuant to 7 NYCRR § 251–1.6 which allows such confinement "where

Case 9:14-cv-01389-TJM-TWD   Document 35   Filed 06/13/17   Page 62 of 151

Jermosen v. Coughlin, Not Reported in F.Supp. (1993)

1993 WL 328482

an officer has reasonable grounds to believe that an inmate * * * represents an immediate threat to the safety, security or order of the facility." Such a threat exists where an officer reasonably believes that a rule of the facility has been violated. *See Gittens v. Lefevre,* 891 F.2d 38, 40 (2d Cir.1989). The plaintiff alleges that such confinement was violative of his right to due process because he had not received notice of the charge or an opportunity to give a statement in opposition.

In *Gittens v. Lefevre* it was held that "[a]n inmate confined to administrative keeplock must be afforded 'some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation.' " *Id.* at 40–41. The Court held that New York's regulations governing keeplock did not satisfy such requirement because they did not have "an adequate procedure for inmates to challenge keeplock until adjudication of the underlying disciplinary charge.' " *Id.* at 42.

**\*4** *Gittens v. Lefevre* does support the plaintiff's claim that he was denied due process because he was not given an opportunity to present his opposition. The case also held, however, that the officials therein were entitled to qualified immunity because at the time "no case had ever marked the boundaries of reasonableness [of the time between confinement and an opportunity to be heard] with sufficient clarity to say that the defendant's reliance on state law providing for a hearing within seven days was clearly in violation of Gittens' rights." *Id.* at 43. Thus, while an opportunity to be heard is required under *Hewitt v. Helms,* 459 U.S. 460 (1983), that such opportunity had to be given before the hearing on the merits in order to satisfy due process was not clearly established until *Gittens v. Lefevre* in November of 1989, five months after the instant plaintiff had been confined. Consequently, the defendants are entitled to qualified immunity as to such claim.

The plaintiff received his misbehavior report twenty-four hours before his hearing but claims that it was incomplete because it did not have attached to it the referenced letter and therefore was violative of due process. Under the circumstances the plaintiff was given adequate notice of the charges against him. The misbehavior report itself is clear as to the charges against the plaintiff, including the relevant passages from the letter, so that he could adequately defend himself. When the hearing officer was

made aware that the plaintiff claimed to not have a copy of the letter, he offered one to him, which offer was refused. The officer then adjourned the hearing. A corrections officer attempted to deliver a copy of the letter to the plaintiff, who again refused it. Thus, any prejudice that might be said to have occurred was occasioned by the plaintiff's refusals to accept a copy of the letter.

The plaintiff claims that he received inadequate assistance because Callihan did not interview witnesses and did not obtain a copy of the letter for him. An assistant who does nothing to assist the segregated inmate in the preparation of a defense fails to accord such inmate his limited constitutional due process right of assistance. *See Eng v. Coughlin,* 858 F.2d 889, 898 (2d Cir.1988). Thus a refusal to obtain necessary and available documentary evidence for an inmate would violate his due process rights. *See Giano v. Sullivan,* 709 F.Supp. 1209, 1215 (S.D.N.Y.1989). Callihan, the assistant chosen by the plaintiff, states that he saw the plaintiff June 12th at 10:35 a.m. At such time the plaintiff requested that Callihan seek out all witnesses to the incident. Callihan states that there were no other requests by the plaintiff. *See* Affidavit of E. Gene Callihan (sworn to July 26, 1990), ¶ 4. Such is also indicated on the Assistant Form. *See* Meagher Affidavit, Exh. F. Callihan states that he had gone to the Guidance Unit and asked for witnesses and that everyone to whom he spoke said that he did not know of the misbehavior report. He also states that he had reported such back to the plaintiff. *Ibid.* Given the circumstances of this case—that the incident was a receipt by Post of a threatening letter from the plaintiff— Callihan could not be expected to have done more. There would most likely be no witness because the letter would have been received and opened by Post. Any prejudice that might have resulted from Callihan's not giving the plaintiff the requested copy of the letter is cured upon the hearing officer's offering a copy of such to the plaintiff. If, as the plaintiff claims, Callihan did not report to the plaintiff the results of his trip to the Guidance Unit, any prejudice was cured by the hearing officer's adjournment of the hearing so that Callihan could report to the plaintiff. The responsibility of the assistant was to help the plaintiff prepare a defense. The plaintiff was given an opportunity and, in fact, did present a defense—by a letter which the hearing officer read into the record.

**\*5** Next, the plaintiff complains about the hearing he received. He argues that the hearing officer threatened him, wrongly excluded him from the hearing, did not allow

1993 WL 328482

him to call witnesses and had prejudged the matter. A reading of the hearing transcript shows these claims to be baseless. The hearing officer told the plaintiff to stop being disruptive or he would be excluded. The plaintiff never requested witnesses and the hearing officer, nevertheless, gave his reasons why he himself did not call witnesses from the Guidance Unit. There is no evidence that the hearing officer had reached his decision before looking at and considering the evidence.

The plaintiff complains that his appeal was not decided within the 15–day time limit required by 7 NYCRR § 253.8. Inasmuch as the plaintiff's sentence was affirmed upon appeal, the plaintiff has suffered no damages as a result of any such delay.

The plaintiff alleges that his Freedom of Information Law requests were ignored. As indicated in a memorandum to the plaintiff—*see* Affidavit of Donna Taylor (sworn to July 25, 1990), Exh. C—, his requests were not ignored and were to be filled upon his payment of the photocopying cost. He never paid such and thus never received that which he had requested.

As to the plaintiff's First Amendment claim, there is no indication that he had requested, at the time, to attend religious services and had been denied such. Thus there can be no issue before this Court as to whether he had been denied such access and, if so, whether such denial was proper. *See Matiyn v. Henderson,* 841 F.2d 31, 37 (2d Cir.1988) (inmate can be prevented from attending religious services for legitimate penalogical objectives). Furthermore, such claim was not presented in the Complaint.

This Court has examined all of the other contentions raised by the plaintiff and finds them without merit.

Accordingly, it is hereby ORDERED that the plaintiff's motion for summary judgment is denied, that the defendants' motion for summary judgment is granted and that the Complaint is dismissed with prejudice.

**All Citations**

Not Reported in F.Supp., 1993 WL 328482

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5372872
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Aldo Contreras LIBERATI, Plaintiff,

v.

GRAVELLE, Sgt., Clinton County Jail, Defendant.

No. 9:12–CV–00795 (MAD/DEP).
|
Sept. 24, 2013.

**Attorneys and Law Firms**

Aldo Contreras Liberati, Philipsburg, PA, pro se.

Lemire, Johnson Law Firm, Gregg T. johnson, Esq, Mary E. Kissane, Esq, of Counsel, Malta, NY, for Defendant.

## ORDER

MAE A. D'AGOSTINO, District Judge.

**\*1** On May 14, 2012, Plaintiff commenced this civil rights action pursuant to 42 U.S.C. § 1983, alleging that upon arrival at Clinton County Correctional Facility, Defendant used excessive force against Plaintiff, causing him injury. See Dkt. No. 1. On December 28, 2012, Defendant moved for summary judgment seeking dismissal of Plaintiff's claim pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Dkt. No. 22–7 at 5. Defendant argues that dismissal is appropriate based on (1) plaintiff's failure to exhaust the available administrative remedies at Clinton before commencing suit; (2) the record evidence, from which no reasonable factfinder could conclude that he used force that violated Plaintiff's constitutional rights; and (3) his entitlement to qualified immunity from suit. See generally Dkt. No. 22–7. Plaintiff failed to oppose Defendant's motion for summary judgment. See Dkt. No. 31 at 6.

In a Report–Recommendation and Order dated August 9, 2013, Magistrate Judge Peebles recommended that the Court grant Defendant's motion for summary judgment and dismiss Plaintiff's complaint. See Dkt. No. 31 at 2. Specifically, although Magistrate Judge Peebles found that questions of fact preclude granting the motion on

exhaustion grounds, he found that the motion should be granted on the merits because no reasonable factfinder could conclude that Defendant violated Plaintiff's Eighth Amendment rights. See id. at 21. Neither party objected to Magistrate Judge Peebles Report–Recommendation and Order.

On February 5, 2012, Plaintiff was transferred to Clinton Correctional Facility ("Clinton") located in Dannemora, New York. See Dkt. No. 22–2 at 3. During the transfer, the corrections officers escorting Plaintiff called Clinton to notify them that Plaintiff was difficult and combative. See id. Upon arrival, the staff at Clinton prepared Plaintiff for housing by performing the routine intake and booking procedures. See id. at 4. Part of the normal procedure was to conduct a patdown search to detect any contraband that was not detected by the "BOSS" chair. See id. at 3. During the pat-down, Plaintiff disobeyed orders on at least two occasions when he refused to face and keep his hands on the wall. See id. at 4.

When the Clinton officers realized that Plaintiff had a second layer of pants underneath his jeans, they instructed him to remove them in a private changeout room. See id. at 4. After removal of the pants Plaintiff refused to remain on the wall, so they attempted to physically restrain him. See id. at 5. Upon hearing this commotion, Defendant entered the changeout room to assist with the situation. See id. He observed Plaintiff resisting the officers that were trying to restrain him. See id. Defendant administered "a single, one second, application of O.C. spray towards other officers to continue to gain control over Plaintiff and secure his hands." Id . After he administered the spray, Defendant placed it back in his holster and retreated to allow the other officers to gain control of Plaintiff. See id. Although Defendant remained in the room, he used no further force against him other than to place his feet near the Plaintiff to prevent him from putting his hands under his body. See id. at 5–6. When the Plaintiff was fully secured, Defendant left the room. See id. at 6. Plaintiff was then escorted to a holding cell to provide him an opportunity to calm down, decontaminate his eyes with eye wash and see medical staff at the facility. See id.

**\*2** Plaintiff's verified complaint alleges that Defendant punched him in the head twice and that he did not file a grievance regarding these allegations because the corrections officers at Clinton refused to provide him with the necessary form. See id. at 2.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.    1

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendation made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Morever, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(c)(e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2502, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' *"Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. See id. at 295 (citing *Showers v. Eastmond,* No. 00 CIV. 3725, 2001 WL 527484, *1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidenced" is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Cary v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

**\*3** Upon review of Magistrate Judge Peebles' Report–Recommendation and Order, the Court finds that the report correctly determined that Defendant's motion for summary judgment should be granted. In support of the motion for summary judgment, Defendant argues that he did not violate Plaintiff's Eighth Amendment rights because there is no record evidence that he punched Plaintiff in the head or used excessive force. *See* Dkt. No. 22–7 at 8–11. To state a claim for excessive force, a plaintiff must show defendant's acts are "incompatible with 'the evolving standards of decency that mark the process of a maturing society,' or involve[s] the unnecessary and wanton infliction of pain[.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01 (1958); *Gregg v. Georgia,* 428 U.S. 153, 169–73 (1976) (internal citations omitted)). Even though the Eighth Amendment does not mandate that prisons be comfortable, they must be sufficiently humane. *See Farmer v. Brennan,* 511 U.S. 825, 832 (1994).

"A claim of cruel and unusual punishment in violation of the Eighth Amendment has two componentsone subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson v. McMillian,* 503 U.S. 1, 7–8 (1992); *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). The

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

subjective element is satisfied when plaintiff demonstrates that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the alleged conduct." *Wright,* 554 F.3d at 268 (internal quotation marks omitted). This inquiry looks at "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson,* 503 U.S. at 6 (quoting *Whitley v. Albers,* 475 U.S. 312, 320 (1986)).

The objective element examines the harm inflicted in relation to "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8). Malicious or sadistic harm caused by prison officials, notwithstanding the extent of injury, always violates the "contemporary standards of decency." *Wright,* 554 F.3d at 268–69 (quoting *Hudson,* 503 U.S. at 9). The amount of force is examined in proportion to the need reasonably perceived by prison officials and what, if anything, did they do to limit such force. *See Hudson,* 503 U.S. at 7; *Whitley,* 475 U.S. at 321; *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993).

In the present matter, no evidence in the record suggests that Defendant, Gravelle used force maliciously or sadistically against Plaintiff. The record reveals that action was initiated against Plaintiff in response to his repeated failures to obey orders to keep his hands on the wall during the pat-down search. Defendant administered a single O.C. spray to assist the corrections officers and then moved away from Plaintiff, using no more force or spray than was necessary to control Plaintiff. The undisputed material facts make clear that no reasonable factfinder could conclude that Defendant used malicious or sadistic force against Plaintiff because such actions were taken in response to Plaintiff's failure to obey orders and the need to restore order. Although Plaintiff's claim that Defendant punched him in the head would constitute malicious or sadistic force in violation of Plaintiff's Eighth Amendment rights, there is no evidence in the record to support such claim. Therefore, Plaintiff fails to state a claim that Defendant violated his Eighth Amendment rights.

**\*4** After careful review of Magistrate Judge Peebles' Report–Recommendation and Order, the parties' parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Peebles' August 9, 2013 Report–Recommendation and Order is **ADOPTED in its entirety;** and the Court further

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 22) is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

*Pro se* plaintiff Aldo Conteras Liberati has commenced this action pursuant to 42 U.S.C. § 1983, alleging the deprivation of his rights under the United States Constitution. In his complaint, plaintiff alleges that, upon his arrival at the Clinton County Correctional Facility ("Clinton"), he suffered injuries arising from the use of excessive force by defendant Gravelle, a sergeant corrections officer stationed at Clinton at the times relevant to this action.

Currently pending before the court is defendant's motion for summary judgment on the merits, and based also on plaintiff's failure to exhaust the available administrative remedies and defendant's assertion that he is entitled to qualified immunity from suit. For the reasons set forth below, I recommend that defendant's motion be granted, and plaintiff's complaint be dismissed.

I. *BACKGROUND* [1]
On February 5, 2012, plaintiff was transported to Clinton, located in Dannemora, New York, by United States immigration officers. Gravelle Decl. (Dkt. No. 22–2) at ¶ 8. Prior to his arrival at Clinton, immigration officers called Clinton to notify staff that, during the transport,

plaintiff was difficult and combative. *Id.* Upon arriving at Clinton, facility staff began to prepare plaintiff for housing by subjecting him to routine intake and booking procedures. *Id.* at ¶ 10. This process included scanning plaintiff using a "BOSS" chair, which is designed to detect any metal contraband, as well as pat-searching him in a private room called the "changeout room" for any contraband not detected by the BOSS chair.[2] Id. at ¶¶ 3, 10.

During the pat-search, plaintiff was directed by Clinton corrections officers to face and keep his hands on the wall. Gravelle Decl. (Dkt. No. 22–2) at ¶ 11. On at least two occasions, however, plaintiff disobeyed this order, and turned toward the officer conducting the search. Gravelle Decl. Exh. A (traditionally filed) at 0:33, 1:05. At some point during the search, the officer performing the pat-down discovered that plaintiff was wearing a second layer of pants underneath his jeans. Gravelle Decl. (Dkt. No. 22–2) at ¶ 12. Plaintiff was then directed to move into a more private part of the changeout room and remove his jeans. *Id.* When plaintiff refused to remain on the wall after he removed his jeans, several Clinton corrections officers attempted to take physical control of the plaintiff to restrain him. *Id.;* Gravelle Decl. Exh. A (traditionally filed) at 1:11.

**\*5** Moments after the pat-search began, defendant Gravelle, whose office is located nearby the changeout room, heard the commotion arising from plaintiff's search, and went to assist the other officers. Gravelle Decl. (Dkt. No. 22–2) at ¶ 13; Gravelle Decl. Exh. A (traditionally filed) at 1:15. Upon entering the changeout room, defendant observed plaintiff resisting the officers attempting to restrain plaintiff. Gravelle Decl. (Dkt. No. 22–2) at ¶ 13. Defendant immediately directed one, single application of "O.C. spray" to regain control of plaintiff.[3] Gravelle Decl. (Dkt. No. 22–2) at ¶¶ 13, 14; Gravelle Decl. Exh. A (traditionally filed) at 1:17. Defendant then moved back away from Liberati and allowed the other corrections officers to secure plaintiff's hands. Gravelle Decl. (Dkt. No. 22–2) at ¶ 13; Gravelle Decl. Exh. A (traditionally filed) at 1:18. Although defendant remained in the changeout room until plaintiff was secured, he did not use any further force against him. Gravelle Exh. A (traditionally filed) at 1:18–2:16. After plaintiff was secured, Clinton corrections officers escorted him to a holding cell to provide him opportunity to clam down, following which his eyes were decontaminated with

eye wash and he was seen by medical staff at the facility. Gravelle Dec. (Dkt. No. 22–2) at ¶ 15.

In plaintiff's verified complaint, he alleges that defendant punched him twice in the head. Compl. (Dkt. No. 1) at 8. He also contends that he did not file a grievance regarding these allegations due to the refusal of corrections officers at Clinton to provide him with the necessary form. *Id.* at 2.

## II. *PROCEDURAL HISTORY:*

Plaintiff commenced this action on May 14, 2012, by the filing of a complaint, motion to stay deportation, and application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1–3. Plaintiff's complaint is comprised of eight claims, and names six defendants, including defendant Gravelle. *See generally* Compl. (Dkt. No. 1). On August 27, 2012, District Judge Mae A. D'Agostino issued a decision and order granting plaintiff's request to proceed IFP, denying his motion to stay deportation, and dismissing all claims with the exception of plaintiff's Eighth Amendment excessive force cause of action asserted solely against defendant Gravelle. Dkt. No. 9.

Now that discovery in this matter is closed, the remaining defendant, Sergeant Gravelle, has moved for the entry of summary judgment, dismissing plaintiff's remaining claim, pursuant to Rule 56 of the Federal Rules of Civil Procedure. Dkt. No. 22. Defendant argues that dismissal is appropriate based on (1) plaintiff's failure to exhaust the available administrative remedies at Clinton before commencing suit; (2) the record evidence, from which no reasonable factfinder could conclude that he used force that violated plaintiff's constitutional rights; and (3) his entitlement to qualified immunity from suit. *See generally* Def.'s Memo. of Law (Dkt. No. 22–7).

**\*6** Defendant's motion, which plaintiff has not opposed, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Plaintiff's Failure to Oppose Defendant's Motion*
The court's local rules require that a party seeking summary judgment must submit a statement of material

facts that it contends are undisputed by the record evidence. N.D.N.Y. L.R. 7.1(a)(3). The local rules also instruct the non-moving party to respond to the moving party's statement of material facts by specifically admitting or denying each of the facts listed in the moving party's statement. *Id.* The purpose underlying this rule is to assist the court in framing the issues and determining whether there exist any triable issues of fact that would preclude the entry of summary judgment. *Anderson v. Dolgencorp of N.Y.,* Nos. 09–CV0360, 09–CV–0363, 2011 WL 1770301, at *1 n. 2 (N.D.N.Y. May 9, 2011) (Sharpe, J.).[4] To meaningfully fulfill this purpose, it is essential for the court to have the benefit of both the moving party's statement and an opposition statement from the non-moving party.

In this instance, defendant Gravelle has complied with local rule 7.1(a)(3), providing a statement setting forth twenty-three facts as to which, he contends, there is no genuine triable issue. Def.'s L.R. 7.1(a)(3) Statement (Dkt. No. 22–6). Plaintiff, however, has failed to respond either to that statement, or to defendant's motion generally.[5] See *generally* Docket Sheet.

By its terms, local rule 7.1 provides, in part, that *"[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this provision in cases where a non-movant fails to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Svc. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, C.J.). The deference owed to *pro se* litigants, however does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado,* No. 96–CV0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a *pro se* litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins,* No. 09–CV–0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, C.J.).

**\*7** Here, because plaintiff was warned of the consequences of failing to properly respond to defendant's rule 7.1(a)(3) statement, Dkt. Nos. 22–1, 24–1, but has nonetheless failed to do so, I have construed defendant's facts contained therein as true to the extent they are supported by accurate record citations. *See, e.g., Latouche,* 2011 WL 1103045, at *1; *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). As to any facts not contained in defendant's rule 7.1(a)(3) statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry,* 336 F.3d at 137.

### B. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F .3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only

in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also* Anderson, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### C. *Exhaustion of Available Administrative Remedies*

**\*8** In his motion, defendant Gravelle argues that, because plaintiff did not file a grievance addressing the issues now raised in this action before commencing suit and pursue that grievance through the administrative grievance procedure available at Clinton, he is procedurally barred from pursuing this action. Def.'s Memo of Law (Dkt. No. 22–7) at 11–12.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04–CV–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002).

The requirement that inmates exhaust administrative remedies before filing a lawsuit, however, is not a jurisdictional requirement. *Richardson v. Goord,* 347 F.3d 431, 434 (2d Cir.2003). Instead, failure to exhaust is an affirmative defense under the PLRA, and "inmates are not required to specifically plead or demonstrate exhaustion in their complaints." [6] *Jones v. Bock,* 549 U.S. 199, 216 (2007). In the event a defendant establishes that the inmate-plaintiff failed to complete the administrative review process prior to commencing the action, the

plaintiff's complaint is subject to dismissal. *See Woodford,* 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). [7]

There are grievance procedures in place and available to any Clinton inmate who desires to complain regarding prison conditions at the facility. Gravelle Decl. (Dkt. No. 22–2) at ¶ 17; Johnson Decl. Exh. B (Dkt. No. 22–5). In this case plaintiff's complaint, which is signed under penalty of perjury, and thus has the same force and effect as an affidavit, [8] alleges that he requested a grievance form from Clinton corrections officers but they refused to provide one to him. Compl. (Dkt. No. 1) at 4, 8. In support of his motion, defendant Gravelle avers that plaintiff did not file a grievance regarding the events giving rise to this action while at Clinton. Gravelle Decl. (Dkt. No. 22–2) at ¶ 17.

**\*9** Although it is clear from the record that plaintiff failed to avail himself of the administrative remedies available to him, his failure to do so does not warrant dismissal of plaintiff's complaint without further inquiry. In a series of decisions rendered since enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See, e.g., Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Macias,* 495 F.3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id.*

In this instance, although there is no record evidence to suggest that grievance procedures at Clinton were not fully available to plaintiff while he was at the facility, plaintiff does allege that corrections officers stationed at the facility refused to provide him with a grievance form. Under ordinary circumstances, this could justify a recommendation to the assigned district judge that she hold a hearing to develop plaintiff's allegation regarding special circumstances pursuant to *Messa v. Goord,* 652 F.3d 305 (2d Cir.2011). However, as is discussed more fully below, because I recommend that defendant's motion be granted based on a finding that no reasonable factfinder could conclude that defendant violated plaintiff's rights, a determination of whether plaintiff should be precluded from bringing this action based on a failure to exhaust administrative remedies is not necessary.

### D. *Plaintiff's Excessive Force Claim*
In support of defendant's motion, defendant Gravelle argues that there is no record evidence to support the allegation that he punched plaintiff, and that the record instead supports a finding that defendant's use of force against plaintiff did not violate his Eighth Amendment rights. Def.'s Memo. of Law (Dkt. No. 22–7) at 8–11.

Plaintiff's excessive force claim is grounded in the Eighth Amendment, which prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society,' or 'involve[s] the unnecessary and wanton infliction of pain[.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01 (1958) and *Gregg v. Georgia,* 428 U.S. 153, 169–73 (1976) (internal citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v.. Chapman,* 452 U.S. 337, 349 (1981)).

**\*10** A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 319 (internal quotation marks omitted); *Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and

the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson,* 503 U.S. at 7–8 and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). To satisfy the subjective requirement in an excessive force case, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright,* 554 F.3d at 268 (internal quotation marks omitted). This inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6 (1992) (internal quotation marks omitted), accord, *Blyden,* 186 F.3d at 262. The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases—not "whether a certain quantum of injury was sustained." *Wilkins v. Gaddy,* 559 U.S. 34, 37 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness. *Wilkins,* 559 U.S. at 37; *Hudson,* 503 U.S. at 9.

Additionally, courts must bear in mind that "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993) (internal quotation marks omitted); *see also Griffin,* 193 F.3d at 91. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (internal quotation marks omitted).

"The objective component [of the excessive force analysis] ... focuses on the harm done, in light of 'contemporary standards of decency.' " *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8); *see also Blyden,* 186 F.3d at 263 (finding the objective component "context specific, turning upon 'contemporary standards of decency'). In assessing this component, a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation. *Wilson v. Seiter,* 501 U.S. 294, 303 (1991), *accord Hudson,* 503 U.S. at 8; *see also Wright,* 554 F.3d at 268. "But when

Case 9:14-cv-01389-TJM-TWD   Document 35   Filed 06/13/17   Page 71 of 151
Liberati v. Gravelle, Not Reported in F.Supp.2d (2013)

2013 WL 5372872

prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated. This is true whether or not significant injury is evident.' *Wright,* 554 F.3d at 268–69 (quoting *Hudson,* 503 U.S. (alterations omitted)). The extent of an inmate's injury is but one of the factors to be considered in determining whether a prison official's use of force was "unnecessary and wanton" because "injury and force ... are imperfectly correlated[.]" *Wilkins,* 559 U.S. at 38. In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson,* 503 U.S. at 7; *Whitley,* 475 U.S. at 321; *Romano,* 998 F.2d at 105.

**\*11** Finally, on a motion for summary judgment, where the record evidence could reasonably permit a rational factfinder to find that corrections officers used force maliciously and sadistically, dismissal of an excessive force claim is inappropriate. *Wright,* 554 F.3d at 269 (citing *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (reversing summary dismissal the plaintiff's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the ... incident with [that officer] indicated only a slight injury")).

In this case, although plaintiff's complaint alleges that defendant Gravelle punched him twice in the head, there is no record evidence to support his claim. Compl. (Dkt. No. 1) at 8. Instead, the record reveals that defendant used O.C. spray against plaintiff on one occasion during the course of an altercation with corrections officers, while those officers attempted to gain control over him. The video recording submitted in support of defendant's motion shows defendant coming into the changeout room after plaintiff was already on the ground with several officers trying to restrain him. Defendant quickly applied the O.C. spray to plaintiff's face, and then moved away from plaintiff and the other officers. According to defendant, corrections officers initiated the use of force against plaintiff as a result of his failure to obey orders to keep his hands on the wall during the pat-search. Defendant's use of force lasted a matter of seconds, and he sprayed plaintiff only to assist corrections officers in restraining him. In addition, although defendant states that plaintiff was seen by medical staff at Clinton

following the incident, nothing in the record, including plaintiff's complaint, indicates that plaintiff suffered a physical injury as a result of the incident. In light of all of this record evidence, I find that no reasonable factfinder could conclude that defendant used force against plaintiff maliciously or sadistically, or for any other purpose than restoring order. *See Kopy v. Howard,* No. 07–CV0417, 2010 WL 3808677, at \*3 (N.D.N.Y. Aug. 11, 2010) (Treece, M.J.), *report and recommendation adopted by* 2010 WL 3807166 (N.D .N.Y. Sept. 21, 2010) (Hurd, J.) (granting summary judgment where the record evidence demonstrated that the defendants used pepper spray on the plaintiff only once after plaintiff was repeatedly ordered to return to his cell and plaintiff suffered no injuries). Accordingly, I recommend that defendant's motion be granted. [9]

## IV. *SUMMARY AND RECOMMENDATION*
In defendant's motion, he challenges the legal sufficiency of plaintiff's excessive force claim. Because the record contains a dispute of material fact as to whether plaintiff's failure to exhaust available administrative remedies may be excused, defendant is not entitled to dismissal on that basis. However, after a careful review of the record evidence, including a video recording of defendant's use of force, I find that no reasonable factfinder could conclude that defendant violated plaintiff's Eighth Amendment rights.

**\*12** Based upon the foregoing, it is hereby respectfully

RECOMMENDED that defendant's motion for summary judgment (Dkt. No. 22–7) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 86 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

2013 WL 5372872

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5372872

---

Footnotes

1    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

2    A camera is installed in the changeout room. *Id.* at ¶ 10. In support of his motion, defendant submitted, as Exhibit A to his declaration, a copy of the recording from plaintiff's intake during the pat-search on February 5, 2012. Gravelle Decl. Exh. A (traditionally filed).

3    The term "O.C. spray" is not defined in defendant's motion papers. *See,* e.g., Gravelle Decl. (Dkt. No. 22–2); Def.'s L.R. 7 .1(a)(3) Statement (Dkt. No. 22–6).

4    Copies of all unreported decisions cited have been appended to this report for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

5    Plaintiff's response was due on January 22, 2013. Notice to Plaintiff (Dkt. No. 24). On July 24, 2013, the court received a letter from plaintiff requesting leave to file a response in opposition to the pending motion. Dkt. No. 29. Because plaintiff's request was over six-months late, and he was adequately put on notice previously of the consequences of failing to respond to defendant's motion, and in light of the unfair prejudice that defendant would incur as a result of such a delayed response, I denied that motion. Text Order Dated July 24, 2013.

6    In this case, defendant Gravelle raised failure to exhaust administrative remedies as a defense in his answer to plaintiff's complaint. Dkt. No. 14 at ¶ 14.

7    While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir.2004) (emphasis omitted)).

8    18 U.S.C. § 1746; *see also Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes[.]").

9    Because I recommend dismissal of plaintiff's complaint based on the merits, I have not considered defendant's qualified immunity argument.

---

**End of Document**                                           © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:14-cv-01389-TJM-TWD    Document 35    Filed 06/13/17    Page 73 of 151

Mays v. Mahoney, Not Reported in F.Supp. (1994)

1994 WL 48831

1994 WL 48831
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Michael MAYS, Plaintiff,

v.

John MAHONEY, Hearing Officer for
Disciplinary Hearing at the Sing Sing Correctional
Facility; Sergeant Kelly, Officer at the Sing
Sing Correctional Facility, Defendants.

No. 91 Civ. 3435 (MGC).
|
Feb. 14, 1994.

**Attorneys and Law Firms**

Michael Mays, plaintiff pro se.

Robert Abrams, Atty. Gen. of the State of New York by
Frederic L. Lieberman, New York City, for defendant.

MEMORANDUM OPINION AND ORDER

CEDARBAUM, District Judge.

 *1 Michael Mays, a state prisoner, sues under 42
U.S.C. § 1983 for alleged deprivation of his due process
rights by correction officials at a disciplinary hearing at
Sing Sing Correctional Facility in 1990. Both sides have
moved for summary judgment pursuant to Rule 56 of
the Federal Rules of Civil Procedure. In a Report and
Recommendation dated November 23, 1993, Magistrate
Judge Francis found that defendants were entitled to
qualified immunity and recommended that plaintiff's
motion should be denied and that summary judgment
should be granted to defendants. None of the parties
objected to that section of the report, and I accept the
Magistrate Judge's findings and recommendation that
summary judgment be entered for defendants. 28 U.S.C.
§ 636.

Defendants objected to the portion of the Magistrate
Judge's report which addresses whether administrative
reversal cured any alleged deprivation of due process in
connection with the disciplinary hearing. In light of the
Second Circuit opinions in *Russell v. Scully,* —— F.3d
——, No. 92–2057, slip op. 3717 (2d Cir. June 4, 1993)

(*Russell I* ) and *Russell v. Scully,* —— F.3d ——, No. 92–
2057, slip op. 7297 (2d Cir. Jan. 3, 1994) (*Russell II* ) I do
not accept that section of the Magistrate Judge's report.

Accordingly, the clerk is directed to enter judgment for
defendants.

SO ORDERED.

REPORT AND RECOMMENDATION

To the Honorable Miriam G. Cedarbaum, District
Judge.

FRANCIS, United States Magistrate Judge.

Plaintiff Michael Mays, a prison inmate, brings this action
pursuant to 42 U.S.C. § 1983, alleging that his procedural
due process rights were violated by defendant correction
officials John Mahoney and Sandra Kelly in the course of
a Tier III disciplinary hearing conducted at the Sing Sing
Correctional Facility. All parties now move for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendants' motion be granted and the plaintiff's
motion be denied.

*Background*

The incident which was the subject of the hearing at issue
took place on October 17, 1990. (Plaintiff's Complaint
(hereafter "Complaint"), IV, ¶ 1; Defendants' Notice of
Motion (hereafter "Motion"), Exh. 1). The defendants
maintain that on this date the plaintiff was observed
speaking to Correction Officer Enceneat in an aggressive
manner. (Motion, Exh. 1). He was subsequently charged
with verbally harassing and threatening the officer and
was confined to his cell pending a disciplinary hearing.
(Motion, Exh. 7).

A Misbehavior Report was served on the plaintiff by
Correction Officer Taylor on October 19, 1990, at which
time Officer Taylor also alerted the plaintiff to his right to
an employee assistant. (Complaint, Attached Sheets, p. 1,
¶¶ 2–3; Motion, Exh. 2). Mr. Mays identified three persons
from a Department of Corrections Assistant List as his
choices to aid him in preparing a defense for the hearing.
(Motion, Exh. 2).

Mays v. Mahoney, Not Reported in F.Supp. (1994)

1994 WL 48831

Case 9:14-cv-01389-TJM-TWD   Document 35   Filed 06/13/17   Page 74 of 151

However, defendant Kelly, who not was among those chosen by Mr. Mays, was designated as the plaintiff's employee assistant, and on October 20, she interviewed him in preparation for the Tier III hearing. (Complaint, Attached Sheets, p. 1, ¶ 4; Motion, Exh. 3). At that time, Mr. Mays informed defendant Kelly of the materials he believed he needed for his defense: HBA (Housing Block A) Log Book entries for October 17, 1990 between 8 and 9 p.m.; a copy of a Misbehavior Report written by Correction Officer Cappara for September 14, 1990; a copy of an injury report to Correction Officer Torres in M–Gallery South for October 17, 1990; and a use of force report in HBA on October 17, 1990 between 8 and 9 p.m. (Motion, Exh. 4).

**\*2** The Tier III hearing was conducted on October 22 and 23 before Hearing Officer John Mahoney. (Plaintiff's Statement of Facts (hereafter "Facts"), Intro; Motion, Exh. 5, p. 1). At the outset of the hearing the plaintiff informed Officer Mahoney that the officer was named in another civil rights suit brought by Mr. Mays. (Facts, ¶ 1; Motion, Exh. 5, pp. 1–2). The plaintiff alleges that the hearing was halted at this time and that he was asked to leave the room temporarily. (Facts, ¶ 1). The transcript of the hearing reveals only that Officer Mahoney indicated that he had no prior knowledge of the suit against him. (Motion, Exh. 5, pp. 1–2).

The plaintiff requested that testimony be given by five witnesses: inmates Thomas, Morgan, Slaughter, Gonzalez, and Mathis. (Facts, ¶ 3; Motion, Exh. 5, p. 20). Defendant Mahoney heard testimony from the first four but refused to allow inmate Mathis (referred to by the defendants as "N–517") to testify on the ground that his testimony would be redundant and unhelpful. (Motion, Exh. 5, pp. 19–20). Mr. Mays did not refute this reasoning. (Motion, Exh. 5, pp. 19–20). Defendant Mahoney also called Correction Lieutenant Enceneat to testify. (Motion, Exh. 5, pp. 37–42).

Following the testimony of inmate Gonzalez, defendant Mahoney reviewed the document requests which the plaintiff had made to his employee assistant, Officer Kelly, on October 19, 1990. (Motion, Exh. 5, pp. 27–36). As Officer Kelly had never given the materials to Mr. Mays, defendant Mahoney attempted to ascertain the nature and whereabouts of the documents. (Motion, Exh. 5, pp. 27–36). Upon investigation, Officer Mahoney learned that no log book entries or use of force reports had been

made on October 17, 1990 between 8 and 9 p.m. (Motion, Exh. 5, p. 36). He informed the plaintiff that he would therefore be unable to provide him with these documents. (Motion, Exh. 5, p. 36). Officer Mahoney then denied the plaintiff's requests for a copy of a Misbehavior Report dated September 14, 1990 written by Correction Officer Cappara and for a copy of an injury report to Correction Officer Torres in M–Gallery South on October 17, 1990. (Motion, Exh. 5, pp. 28–34). He declared that neither document was relevant to the charges at issue. (Motion, Exh. 5, pp. 28–34).

Hearing Officer Mahoney found the plaintiff guilty of all three charges and sentenced him to sixty days in keeplock and sixty days loss of package, commissary, and telephone privileges from October 17, 1990 until December 17, 1990. (Motion, Exh. 7). Defendant Mahoney based his decision on the Misbehavior Report and the testimony of Lieutenant Enceneat.

Mr. Mays appealed from the Tier III decision on November 10, 1990. (Memorandum in Support of Defendants' Motion (hereafter "Memo"), p. 9, ¶ 2). In his appeal, the plaintiff alleged that the hearing violated his constitutional rights to due process. (Facts, ¶¶ 1–3). Specifically, he stated that his disciplinary hearing was defective because he was denied the right to call witnesses on his behalf, to have the charges against him adjudicated before a fair and impartial officer, and to be aided by an assistant of his choice. (Facts, ¶¶ 1–3).

**\*3** On January 7, 1991, Donald Selsky, the Director of Special Housing Inmate Discipline, advised the plaintiff that the hearing decision had been reversed and the records expunged. (Motion, Exh. 11). The reason for the reversal was stated as follows: "Assistant provided to inmate was not any of the one's [sic] he selected. Inmate is entitled pursuant to Chapter V to select an assistant from the established list." (Motion, Exh. 10).

Following the reversal, Mr. Mays filed this action for damages pursuant to 42 U.S.C. § 1983. The defendants then filed a motion for summary judgment arguing that even if they had denied the plaintiff due process at his hearing, the administrative reversal relieved them of any liability. Furthermore, the defendants claim that they are entitled to qualified immunity since their conduct was reasonable under the circumstances and they did not

Case 9:14-cv-01389-TJM-TWD    Document 35    Filed 06/13/17    Page 75 of 151

Mays v. Mahoney, Not Reported in F.Supp. (1994)

1994 WL 48831

knowingly violate the plaintiff's constitutional rights. The plaintiff has filed a cross motion for summary judgment.

*Discussion*

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "a motion for summary judgment should be granted only 'when, viewing the record in the light most favorable to the nonmoving party, the evidence offered demonstrates that there is no genuine issue of fact and that the moving party is entitled to judgment as a matter of law.' " *Pension Benefit Guaranty Corp. v. LTV Corp.,* 875 F.2d 1008, 1015 (2d Cir.1989) (quoting *Cinema North Corp. v. Plaza at Latham Associates,* 867 F.2d 135, 138 (2d Cir.1989)), *rev'd on other grounds,* 496 U.S. 633 (1990). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986) (emphasis in original). Furthermore,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). Thus, disagreement about nonmaterial facts or controversy over the legal significance of undisputed facts will not impede summary judgment. In making its determination, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.), *cert. denied,* 474 U.S. 829 (1985).

B. *Effect of Administrative Reversal*

**\*4** The defendants argue that even if the plaintiff's procedural due process rights were violated at his

disciplinary hearing, the administrative reversal cured any alleged violations.[1]

According to the Second Circuit, the occurrence of a due process violation at an inmate's disciplinary hearing does not necessarily create a cause of action under § 1983. In *Young v. Hoffman,* 970 F.2d 1154, 1156 (2d Cir.1992), *cert. denied,* 510 U.S. 837, 114 S.Ct. 115 (1993), the court held that administrative review is part of the due process protection provided to an inmate, and administrative reversal cures any defect which may have occurred at the hearing. Accordingly, the court noted, no damage action may be brought when a decision adverse to the inmate is reversed upon appeal.

In *Young,* the disciplinary charges had been reversed prior to the imposition of sanctions and the inmate suffered no adverse consequences. Nevertheless, the court in *Russell v. Scully,* No. 92–2057, 1993 WL 188677, at *2 (2d Cir. June 4, 1993), held that even though the plaintiff inmate had served his full term of 323 days in confinement prior to administrative reversal, his due process rights had not been violated. The court reasoned that since an appeal is part of an inmate's procedural due process, the period during which a prisoner is administratively confined prior to the appeals decision cannot be alleged to violate due process rights.[2] Given this ruling, the defendants in the instant case claim that the holding in *Russell* leaves no doubt that the court meant to extend *Young* to cases in which an inmate's hearing disposition was reversed even after he had been subject to punishment.

However, *Russell* simply held that transfer "to less amenable and more restrictive [administrative] quarters for nonpunitive reasons did not violate rights established under federal due process." *Russell,* 1993 WL 188677, at *2; (quoting *Hewitt v. Helms,* 459 U.S. 460, 468 (1983) (alteration in original)). The court thus addressed only the situation where inmates have been administratively confined, not where they have been subjected to punitive confinement. A prisoner who is confined to SHU in New York for disciplinary reasons is deprived of a liberty interest. *Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984). In determining whether a disciplinary hearing's procedural defects were cured when an inmate suffered confinement, the nature of the confinement must therefore be examined closely.

Case 9:14-cv-01389-TJM-TWD    Document 35    Filed 06/13/17    Page 76 of 151

Mays v. Mahoney, Not Reported in F.Supp. (1994)
1994 WL 48831

The court found this distinction critical in *Moye v. Selsky,* 826 F.Supp. 712 (S.D.N.Y.1993):

> [D]efendants note that the *Russell* court found that administrative confinement pending appeal is not a deprivation of liberty. *See Russell v. Scully,* 1993 WL 188677, at *2. Defendants claim that Moye's 323 days in the SHU were administrative, not punitive, confinement and therefore assert that Moye suffered no deprivation of liberty under § 1983. [citation omitted]

> **\*5** Plaintiff argues that the confinement was punitive, inasmuch as there is no administrative justification for Moye's loss of other privileges such as access to the telephone, commissary or packages. In addition, plaintiff points to the fact that there was no periodic review of plaintiff's segregation, as required in the case of administrative confinement.

> For the reasons stated by plaintiff, the court finds that Moye's confinement was punitive.

*Id.* at 724 n. 13.

Similarly, in *Parris v. Coughlin,* No. 90–414, 1993 WL 328199, at *9 (N.D.N.Y. Aug. 24, 1993), the court interpreted *Russell* to govern only in instances where inmates are confined for administrative reasons including the inmate's safety and the well-being of the prison at large. The court denied the defendants' motion for summary judgment, noting that "the subsequent administrative reversal of a prison disciplinary hearing did not retroactively provide an inmate with all the process that he was due since he served a portion of the disciplinary sentence as a result of a defective hearing." *Parris,* 1993 WL 328199, at *11.

Therefore, whether Mr. Mays was subject to administrative or punitive confinement pending his reversal on appeal is significant. If the confinement was of an administrative nature, reversal would cure any due process violation. However, if Mr. Mays was punitively confined, his rights may indeed have been violated notwithstanding the ultimate reversal, and the defendants would potentially be liable for damages.

Furthermore, even if Mr. Mays' detention were labelled administrative, it could still constitute a due process violation because of its duration, an issue not addressed in *Russell.* The Second Circuit in *Gittens v. LeFevre,* 891 F.2d 38, 40 (2d Cir.1989), held that New York law creates a liberty interest for inmates to remain out of keeplock. The relevant state regulation provides that "[k]eeplock shall be imposed only where an officer has reasonable grounds to believe that an inmate ... represents an immediate threat to the safety, security or order of the facility or ... immediate danger to other persons...." 7 N.Y.C.R.R. § 251–1.6(a). The court concluded that confining an inmate in keeplock for seven days without granting him the opportunity to challenge his status was a violation of due process.

> The sole opportunity to be heard on an inmate's administrative confinement is at a disciplinary hearing, where the ultimate issue of guilt or innocence will be determined. *See* 7 N.Y.C.R.R. § 253.1–253.9. The result ... is that inmates may be held in keeplock only to find, after 7 days, that their confinement was not justified.

*Gittens,* 891 F.2d at 41. Accordingly, the court found that in order to meet due process requirements, the inmate must be provided the right to challenge his confinement promptly. *Id.* He must be granted a hearing "as soon as is reasonably practicable following [an] inmate's initial confinement ... but in no event may [the hearing] be commenced beyond seven days of said confinement." 7 N.Y.C.R.R. § 251–5.1(a).

**\*6** The rule that a hearing must occur within a "reasonably practicable" time must therefore apply to an administrative appeal as long as such appeals are considered part of the due process provided to inmates. Here, the defendants have come forward with no evidence demonstrating why the entire due process proceeding, including the administrative appeal, cannot be completed in far less than ninety days.

The defendants, then, should not be entitled to summary judgment based solely on the administrative reversal of the plaintiff's disciplinary hearing decision.

### C. Qualified Immunity

Mr. Mays contends that the defendants violated his due process rights in conducting his disciplinary hearing because (1) he was denied the right to call witnesses on his behalf; (2) his hearing was not conducted by an impartial

Mays v. Mahoney, Not Reported in F.Supp. (1994)

Case 9:14-cv-01389-TJM-TWD    Document 35    Filed 06/13/17    Page 77 of 151

1994 WL 48831

correction officer; and (3) he was denied meaningful assistance in preparing for the hearing. The defendants argue that Mr. Mays received all of the procedural protection to which he was entitled. Furthermore, even if the plaintiff's rights were violated, the defendants maintain that they are entitled to qualified immunity from liability.

Qualified immunity protects government officials from liability as long as their actions are discretionary in nature and do not violate clearly established statutory or constitutional rights of which a reasonable person should have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). An official may prove as a matter of law that he is entitled to qualified immunity if he can show that it was objectively reasonable for him to believe his actions did not violate an inmate's "clearly established" rights. *Robison v. Via,* 821 F.2d 913, 920–21 (2d Cir.1987).

The Second Circuit has looked at three factors in order to determine whether a right was "clearly established" at the time of a defendant's action:

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the appropriate circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts are unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565 (1992); *see also McCormack v. Cheers,* 818 F.Supp. 584, 599 (S.D.N.Y.1993).

In the context of a prison disciplinary hearing, inmates possess due process rights under the Fourteenth Amendment, but "the full panoply of rights" due a defendant in a criminal proceeding does not apply. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974); *Zavaro v. Coughlin,* 970 F.2d 1148, 1152 (2d Cir.1992). An inmate has the right to advance written notice at least twenty-four hours prior to a disciplinary hearing, he has a right to be advised of the facts relied upon by prison officials in bringing charges, he has the right to call witnesses and

to present documentary evidence, *Wolff,* 418 U.S. at 563–66, and he has the right to an assistant to aid him in the preparation of his defense. *Eng v. Coughlin,* 858 F.2d 889, 898 (2d Cir.1988). Furthermore, an inmate is entitled to a fair and unbiased hearing officer. *McCann v. Coughlin,* 698 F.2d 112, 122 (2d Cir.1983).

### 1. *Defendant Kelly*

**\*7** Mr. Mays alleges that the employee assistance provided to him by Sergeant Kelly was inadequate and therefore constituted a violation of his due process rights. The defendants maintain that the assistance provided was adequate and, even if it was not, Sergeant Kelly is immune from liability under § 1983.

Because confinement in the SHU makes it nearly impossible for an inmate to formulate a defense, prisoners have the right to receive assistance in gathering evidence and interviewing witnesses. *Eng,* 858 F.2d at 897. Employee assistants must act in good faith and in the best interests of the prisoner. *Id.* at 898.

According to Mr. Mays, Sergeant Kelly presented herself at his cell on October 20, said that she was his assistant, and inquired how she might help him. (Complaint, Attached Sheets, p. 1, ¶ 4). The plaintiff gave her a form with a list of documents he would need to prepare for his hearing. (Complaint, Attached Sheets, p. 1, ¶ 4). Mr. Mays claims that Sergeant Kelly "left with this form but never returned." (Complaint, Attached Sheets, p. 1, ¶¶ 5–6). The plaintiff contends that he learned nothing of the whereabouts of these materials until he inquired about them at the outset of his disciplinary hearing. (Facts, ¶ 2).

The refusal of an employee assistant to obtain necessary and available documentation evidence for inmates violates due process rights. *Giano v. Sullivan,* 709 F.Supp. 1209, 1215 (S.D.N.Y.1989). Here, however, the requested documents were found to be nonexistent or irrelevant to Mr. Mays' hearing (Motion, Exh. 5, pp. 19–20), and the plaintiff therefore suffered no constitutional deprivation. Accordingly, summary judgment should be granted in favor of this defendant.

### 2. *Defendant Mahoney*

Mays v. Mahoney, Not Reported in F.Supp. (1994)

1994 WL 48831

The plaintiff charges that Hearing Officer Mahoney denied him his due process rights to call witnesses at his disciplinary hearing, to proceed before an impartial official, and to choose an assistant to aid him in preparing for his hearing.

### a. *Denial of the Right to Call Witnesses*

Although inmates have the right to call witnesses at disciplinary hearings, this right is not absolute and is subject to the discretion of the officer presiding over the case. *Wolff,* 418 U.S. at 566; *see also Ponte v. Real,* 471 U.S. 491, 495–96 (1985). Prison officials may refuse to call witnesses "whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases." *Wolff,* 418 U.S. at 566. Due process, however, requires that the hearing officer's reason for denial of testimony be logically related to safety or correctional goals. Explanations of these grounds must be provided to inmates at the hearing or at a later time. *Ponte,* 471 U.S. at 497. Prison officials must bear the burden of proving the rationality of their decision to exclude witnesses. *Move,* 826 F.Supp. at 717.

In the instant case, defendant Mahoney furnished the plaintiff with a logical written explanation for refusing to allow his fifth witness to testify. He wrote, "N–517 was not called to testify as his testimony was considered to be redundant ... [as] all witnesses ... were in the same general area when the incident occurred." (Superintendent's Disciplinary Hearings—Witness Interview Form). The plaintiff does not rebut this reasoning. Instead, testimony from the hearing shows that Mr. Mays indicated assent to Mr. Mahoney's determination with regard to N–517. (Motion, Exh. 5, p. 46).

### b. *Bias of the Hearing Officer*

**\*8** Mr. Mays next alleges that defendant Mahoney denied him his due process right to an impartial hearing. He bases this contention on the fact that Hearing Officer Mahoney refused to allow a witness to testify at his hearing and because Mr. Mahoney was named as a defendant in another civil rights suit recently brought by the plaintiff.

An impartial hearing officer is an integral requirement of a prisoner's due process rights. *McCann,* 698 F.2d at 122. Generally, however, "only those officials who have a direct personal or otherwise substantial involvement, such as major participation in a judgmental or decision-making role, in the circumstances underlying the charge [would be found biased and subsequently disqualified] from sitting on the disciplinary body'." *Rhodes v. Robinson,* 612 F.2d 766, 773 (3d Cir.1979) (quoting *Meyers v. Alldredge,* 492 F.2d 296, 306 (3d Cir.1974)).

The plaintiff's claim that defendant Mahoney's bias was evidenced by his denial of witness N–517 lacks merit. As discussed above, Mr. Mahoney's discretionary refusal to allow this witness to testify was clearly not a denial of Mr. Mays' rights, and so was no evidence of bias.

Mr. Mays' second rationale for his claim that Hearing Officer Mahoney was not impartial is based on the fact that Officer Mahoney was named as a defendant in another suit brought by the plaintiff. It appears, however, that since the law in this area has not been defined by the Supreme Court or the Second Circuit with reasonable specificity, defendant Mahoney is entitled to qualified immunity.

In his concurring opinion in *Wolff,* Justice Marshall stated that "due process is satisfied as long as no member of the disciplinary board has been involved in the investigation or prosecution of the particular case, or has had any other personal involvement in the case." 418 U.S. at 592. The Third Circuit has relied on this language to hold that only those who were personally involved with the plaintiff's case must be disqualified from acting as hearing officers. *Rhodes,* 612 F.2d at 773. The Seventh Circuit elaborated on this reasoning in holding that an inmate's due process right to a fair hearing was not necessarily violated where a member of a disciplinary board was also a named defendant in an unrelated civil suit. *Redding v. Fairman,* 717 F.2d 1105, 1113 (7th Cir.1983), *cert. denied,* 465 U.S. 1025 (1984). The court noted that mandatory disqualification of every member of a disciplinary committee who was also a named defendant in a suit by the prisoner would be overly burdensome to prison staff. In addition, such a rule would create the potential for abuse by encouraging prisoners to file multiple lawsuits in order to control the composition of a hearing board. The court did, however, remand the disqualification issue with instructions that the district court proceed on a case-by-case basis to determine the extent of each committee member's personal involvement

Mays v. Mahoney, Not Reported in F.Supp. (1994)

1994 WL 48831

Case 9:14-cv-01389-TJM-TWD    Document 35    Filed 06/13/17    Page 79 of 151

in unrelated civil lawsuits and whether he should be disqualified. *Id.; see also Rizzo v. Bureau of Prisons,* No. 84–1884, 1985 WL 550, at *3 (S.D.N.Y. Apr. 25, 1985), (prison official named as defendant by plaintiff in another suit not disqualified as hearing officer).

**\*9** Thus, no court has ruled decisively that it is a prison official's responsibility to step down as a hearing officer when he is a named defendant in another case brought by an inmate. Accordingly, Officer Mahoney could not have reasonably understood that his actions were unlawful, and he is entitled to qualified immunity on this issue.

### c. *Failure to Grant Employee Assistant of Plaintiff's Choice*

Finally, the plaintiff claims that his constitutional rights were violated when an employee assistant whom he did not choose was assigned to assist him with his disciplinary hearing. However, again, neither the Supreme Court nor the Second Circuit has clearly ruled that there is a due process right to choose an assistant for a prison disciplinary hearing. 7 N.Y.C.R.R. § 251–4.1(c) does state that inmates shall select an employee assistant from a list if they are keeplocked and unable to prepare their own defense. *See James v. Scully,* No. 87–6005, 1988 WL 34814, at *1, *5 (S.D.N.Y. Apr. 5, 1988). However, *Wolff* and its progeny do not accord an inmate a due process

right to an assistant of one's choice. *Eng v. Coughlin,* for example, holds only that an inmate has a right to assistance in preparing a defense for a hearing, not that he has a right to choose the person who will provide such aid. 858 F.2d at 898. Accordingly, while Officer Mahoney may have contravened a state regulation in failing to provide Mr. Mays with his assistant of choice, this has not been held to rise to the level of constitutional deprivation.

Summary judgment, therefore, should be granted to defendant Mahoney on this issue as well.

### *Conclusion*

For the reasons set forth above, the defendants' motion for summary judgment should be granted and the plaintiff's motion should be denied. Pursuant to 28 U.S.C. § 636(b) (1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Miriam G. Cedarbaum, Room 604, and to the chambers of the undersigned, Room 633. Failure to file timely objections will preclude appellate review.

### All Citations

Not Reported in F.Supp., 1994 WL 48831

### Footnotes

1   In a separate action brought by this plaintiff, Judge Cedarbaum held that under similar circumstances a due process violation was cured by administrative reversal of a hearing decision. *Mays v. Mahoney,* 90 Civ. 6380 (MGC) (S.D.N.Y. Oct. 22, 1993). However, because that decision was rendered in a different lawsuit, the law of the case doctrine does not apply, and the plaintiff is entitled to plenary consideration of his claims in the instant action.

2   The Court in *Young* reasoned that "[the] possibility of cure through the administrative appeals process will encourage prison administrators to correct errors as an alternative to forcing inmates to seek relief in state or federal court." 970 F.2d at 1156. Unfortunately, however, there may be an equally strong incentive for the state to provide administrative review to an inmate only after he has served his sentence, thus both exacting punishment and insulating any constitutional defects from scrutiny by the federal courts.

2014 WL 4676569
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

James O. MURRAY, III, Plaintiff,

v.

T. ARQUITT, Correction Officer, Upstate
Correctional Facility; Norman Bezio, Director
Special Housing, Inmate Disciplinary Programs,
New York State Department of Correctional
Services; B. Bogett, Correction Officer, Upstate
Correctional Facility; B. Clark, Correction
Officer, Upstate Correctional Facility; B. Fischer,
Commissioner, New York State Department
of Correctional Services; B. Grant, Correction
Officer, Upstate Correctional Facility; J. Herbert,
Sergeant, Upstate Correctional Facility; J. Laramay,
Lieutenant, Upstate Correctional Facility; F.
Manley; J. McGaw, Correction Officer, Upstate
Correctional Facility; Albert Prack, Acting Director
Special Housing, Inmate Disciplinary Program,
New York State Department of Correctional
Services; T. Ramsdell, Correction Officer, Upstate
Correctional Facility; D. Rock, Superintendent,
Upstate Correctional Facility; C. Rowe, Correction
Officer, Upstate Correctional Facility; Stanley
Tulip, Correction Officer, Upstate Correctional
Facility; Uhler, Deputy Supt. of Sec. Serv., all in
their Individual and Official Capacities, Defendants.

No. 9:10–CV–1440 (NAM/CFH).
|
Signed Sept. 17, 2014.
|
Filed Sept. 18, 2014.

**Attorneys and Law Firms**

James O. Murray, III, Malone, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Colleen D. Galligan, Esq., Assistant
Attorney General, Albany, NY, for Defendants.

## MEMORANDUM–DECISION AND ORDER

Hon. NORMAN A. MORDUE, Senior District Judge.

### INTRODUCTION

**\*1** Plaintiff, an inmate in the custody of the New
York State Department of Corrections and Community
Supervision ("DOCCS"), brought this *pro se* action under
42 U.S.C. § 1983. Defendants' motion for partial summary
judgment (Dkt. No. 103) was referred to United States
Magistrate Judge Christian F. Hummell for a report and
recommendation pursuant to 28 U.S.C. § 636(b)(1)(B)
and Local Rule 72.3(c). In his Report–Recommendation
and Order (Dkt. No. 117) Magistrate Judge Hummel
recommends that the motion be granted.

Plaintiff has filed objections to the Report–
Recommendation and Order (Dkt. No. 124). Pursuant to
28 U.S.C. § 636(b)(1)(C), this Court reviews *de novo* those
parts of a report and recommendation to which a party
specifically objects. Where a party interposes only general
objections to a report and recommendation, the Court
reviews for clear error or manifest injustice. *See Davis v.
Chapple,* 2010 WL 145298, *2 (N.D.N.Y. Jan. 8, 2010),
*Brown v. Peters,* 1997 WL 599355,*2–*3 (N.D.N.Y.), *aff'd
without op.,* 175 F.3d 1007 (2d Cir.1999). As set forth
below, the Court accepts the Report–Recommendation
and Order and grants the motion.

### STANDARD ON SUMMARY JUDGMENT MOTION

Summary judgment is appropriate when there is no
genuine issue with regard to any material fact, and the
moving party is entitled to judgment as a matter of law.
*See Celotex Corp. v.Catrett,* 477 U.S. 317, 322 (1986).
Stated otherwise, summary judgment is appropriate
"[w]here the record taken as a whole could not lead a
rational trier of fact to find for the non-moving party [.]"
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475
U.S. 574, 587 (1986). When deciding a summary judgment
motion, the Court must "resolve all ambiguities and draw
all factual inferences in favor of the party opposing the
motion." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d
Cir.1999). Where, as here, the nonmovant is proceeding
pro se, the Court must read that party's papers liberally

2014 WL 4676569

and interpret them "to raise the strongest arguments that they suggest." *Id.* (citation omitted).

## DISCUSSION

Plaintiff raises two objections to the Report–Recommendation and Order. First, he objects to dismissal of the Eighth Amendment claims against Corrections Officer T. Ramsdell on the ground of lack of personal involvement. Officer Ramsdell testified at the Tier III hearing that when he arrived at the scene of the altercation in the infirmary, the use of force was over and all he did was "relieve the officers that were holding [plaintiff]." Officer Ramsdell further stated that plaintiff was then placed in a cell with no additional use of force. Officer Ramsdell's testimony is consistent with that of other corrections officers and the various reports of the incident. The Court agrees with Magistrate Judge Hummel that plaintiff's single conclusory statement at the Tier III hearing that at some point during the incident he saw Officer Ramsdell is insufficient under all the circumstances to raise a question of fact on excessive force or failure to intervene, particularly in light of plaintiff's deposition testimony that he named Officer Ramsdell as a defendant solely because his name appeared on the use of force report. Plaintiff's objection cites to no other evidence supporting his claim against Officer Ramsdell. On *de novo* review, reading plaintiff's papers liberally, interpreting them to raise the strongest arguments that they suggest, and resolving all ambiguities and drawing all factual inferences in plaintiff's favor, the Court grants summary judgment dismissing the Eighth Amendment claims against Officer Ramsdell for lack of personal involvement.

**\*2** Plaintiff's second specific objection to the Report–Recommendation and Order concerns the recommendation that summary judgment be granted dismissing the due process claims against the following defendants: Deputy Superintendent Uhler, who conducted the Tier III hearing; Director of Special Housing/Inmate Discipline Bezio; Acting Director of Special Housing/Inmate Discipline Albert Prack; Superintendent Rock; and Commissioner Brian Fischer. In his objection, plaintiff argues that his due process rights were violated at the Tier III hearing because Deputy Superintendent Uhler should have considered a videotape of plaintiff's medical examination on the day following the

alleged incident, and because the following people should have been called as witnesses: Lt. Laramy; Corrections Officers Ramsdell, Manley, and Bogett; Dr. Weisman; Inmates Robertson and Gillard. On *de novo* review, after reading the transcript of the Tier III hearing and reviewing the record, and giving plaintiff all the deference to which he is entitled as a *pro se* litigant, the Court finds as a matter of law that plaintiff was afforded due process at the Tier III hearing. Further, there is no basis to find personal involvement in any infringement of plaintiff's rights on the part of Director Prack, Superintendent Rock, or Commissioner Fischer.

In addition to the two above-discussed objections, plaintiff merely states that he "objects to the Report–Recommendation and Order in its entirety." In response to this general objection, the Court reviews the remaining issues for clear error or manifest injustice. There is no error or manifest injustice, and the Report–Recommendation and Order is accepted in its entirety.

It is therefore

ORDERED that the Report–Recommendation and Order (Dkt. No. 117) is accepted; and it is further

ORDERED that defendants' motion for partial summary judgment (Dkt. No. 103) is granted; and it is further

ORDERED that summary judgment is granted dismissing all claims against the following defendants: Corrections Officer T. Ramsdell; Director Norman Bezio; Commissioner Fischer; Director Albert Prack; Superintendent Rock; and Deputy Superintendent Uhler; and it is further

ORDERED that summary judgment is granted dismissing the claims against Officer Tulip and Sergeant Herbert for allegedly filing false misbehavior reports against plaintiff; and it is further

ORDERED that all claims against all defendants in their official capacities are dismissed; and it is further

ORDERED that the Clerk of the Court is directed to serve copies of this MemorandumDecision and Order in accordance with the Local Rules of the Northern District of New York.

IT IS SO ORDERED.

JAMES O. MURRAY, III,

Plaintiff,

v.

T. ARQUITT, Correction Officer, Upstate Correctional Facility; NORMAN BEZIO, Director Special Housing, Inmate Disciplinary Programs, New York State Department of Correctional Services; B. BOGETT, Correction Officer, Upstate Correctional Facility; B. CLARK, Correction Officer, Upstate Correctional Facility; B. FISCHER, Commissioner, New York State Department of Correctional Services; B. GRANT, Correction Officer, Upstate Correctional Facility; J. HERBERT, Sergeant, Upstate Correctional Facility; J. LARAMAY, Lieutenant, Upstate Correctional Facility; F. MANLEY; J. McGAW, Correction Officer, Upstate Correctional Facility; ALBERT PRACK, Acting Director Special Housing, Inmate Disciplinary Program, New York State Department of Correctional Services; T. RAMSDELL, Correction Officer, Upstate Correctional Facility; D. ROCK, Superintendent, Upstate Correctional Facility; C. ROWE, Correction Officer, Upstate Correctional Facility; STANLEY TULIP, Correction Officer, Upstate Correctional Facility; UHLER, Deputy Supt. of Sec. Serv., all in their Individual and Official Capacities,

**\*3** Defendants. [1]

## REPORT–RECOMMENDATION AND ORDER [2]

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* James O. Murray, III ("Murray"), an inmate currently in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, sixteen DOCCS employees, violated his rights under the Eighth and Fourteenth Amendments. Compl. (Dkt. No. 1). Presently pending is defendants' motion for partial summary judgment pursuant to Fed.R.Civ.P. 56. Dkt. No. 103. Murray opposes. Dkt. No. 116. For the following reasons, it is recommended that defendants' motion be granted.

### I. Background

The facts are related herein in the light most favorable to Murray as the non-moving party. *See* subsection II(A) *infra.* At all relevant times, Murray was an inmate at the Upstate Correctional Facility ("Upstate").

#### A. Assault—Plaintiff's Account

On December 3, 2009, Murray was experiencing chest pains and requested emergency call out. Murray Dep. (Dkt. No. 103–15) at 12–13. Non-party Nurse Travers brought Murray to the infirmary for an EKG. Murray Dep. at 14–18; Dkt. No. 103–11 at 15–16. At the infirmary, medical personnel gave Murray an EKG and concluded that Murray's symptoms resulted from indigestion. Murray Dep. at 24–25; Dkt. No. 103–11 at 20. Non-party Dr. Weissman examined Murray and concluded that there was nothing wrong with Murray. Murray Dep. at 32.

Defendants and Corrections Officers Arquitt and Tulip escorted Murray back to the cellblock. Murray Dep. at 32–33. Murray was handcuffed in the front and had on a waist chain. *Id.* at 23; Dkt. No. 103–11 at 28; *see* Compl. §§ 1–2. Tulip walked behind Murray and Arquitt walked in front of Murray. Dkt. No. 103–11 at 63, 72; *see* Dkt. No. 103–11 at 21. Murray contends that while Arquitt was opening a door, Tulip hit him on the back the head. Murray Dep. at 34–35; *see* Compl. §§ 1–2. Murray believes Tulip then tackled him. Murray Dep. at 53. Murray thought to go through the door because that area was visible to a video camera. *Id.* at 35, 55; Dkt. No. 103–11 at 21. Several corrections officers arrived and proceeded to assault Murray. Murray Dep. at 36. Specifically, Arquitt twisted Murray's ankle. Dkt. No. 103–11 at 21.

Murray was then escorted to the infirmary holding pen. Murray Dep. at 53–54. Murray alleged that, while still in a waist chain and handcuffed, defendants assaulted him in the holding pen. *Id.* at 51–52, 55; Dkt. No. 103–11 at 22. Specifically, Grant pressed down on Murray to the point that Murray could not breathe. Murray Dep. at 52–53. Murray reacted by trying to bite Grant's hand. *Id.* at 66. The officers stood Murray up against a wall. Dkt. No. 103–11 at 23. An unidentified officer ran a finger

down Murray's back, hit Murray in the kidney area, spun Murray around, and attempted to hit Murray with his knee. Murray Dep. at 57, 59–60. Murray brought his own knee upward to block his groin area. *Id.* at 60. The officer attempted to hit Murray a few times before Murray fell to the ground. *Id.* at 60–61. The officers proceeded to kick and hit Murray on the floor while calling Murray racial slurs. *Id.* at 63. Defendant Laramay told the officers to knock out Murray's teeth because of Murray's grievance activities. *Id.* at 67. The officers then sat Murray on a bench. *Id.* at 64. Defendant and Sergeant Hebert arrived, called Murray racial and religious slurs, stated "we'll kill you," and complained about the lawsuits and grievances that Murray had filed. *Id.* Hebert did not use force against Murray. *Id.* at 65.

**\*4**  On December 4, 2009, Murray requested sick call. Murray Dep. at 72–73. On December 8, 2009, Murray was taken to the Alice Hyde Medical Center ("Alice Hyde") for medical treatment. *Id.* at 73. Murray alleged that at Alice Hyde, he received surgery, had a tube inserted into him to "suck[ ] the blood out," was prescribed pain medication, and was admitted for three to four days. *Id.* at 73–74. As a result of the assaults, Murray alleges that he sustained broken ribs, a collapsed lung, cuts, bruises, swelling, extreme pain in the back, neck, hip, shoulder, head, mental distress, fear of death, nightmares, flashbacks, sleeping problems, and depression. [3] Compl. ¶¶ 5–6.

### B. Assault—Defendants' Account

Defendants proffer a different account of the use of force incidents. Arquitt and Tulip were escorting Murray from the infirmary and as they approached the fire door, Murray turned around and kicked Tulip in the groin area. Dkt. Nos. 103–7 at 7 (misbehavior report), 8 (unusual incident report), 11 (use of force report), 20, 103–11 at 55, 75. Arquitt had turned his head slightly and saw Murray kicking Tulip. Dkt. No. 103–11 at 75. Murray continued kicking and the three men fell through the door and onto the ground. Dkt. No. 103–7 at 20. Tulip fell onto Murray in an attempt to control Murray's feet but became "incapacitated" and rolled on the ground. Dkt. No. 103–7 at 17; *see* Dkt. No. 103–11 at 55, 65–66. Murray attempted to bite Arquitt, who was at that point positioned around Murray's head and shoulder area. Dkt. No. 103–11 at 76.

Arquitt, along with defendants and Corrections Officers Bogett, Clark, and Grant, forced Murray to the floor using body holds. Dkt. No. 103–7 at 8, 11. Arquitt held down Murray's head with his left hand and applied pressure to Murray's left shoulder with his right hand. *Id.* at 8, 11, 20. Bogett controlled Murray's waist chain with his left hand and placed his left knee on Murray's back. *Id.* at 8, 11, 15. Clark bent Murray's left leg across the back side of the right leg then bent the right leg up into a figure four leg hold. *Id.* at 8, 11, 17.

Hebert arrived and ordered the officers to carry Murray into the infirmary holding pen because Murray was non-complaint. Dkt. No. 103–7 at 8, 11. Bogett grabbed Murray's shirt with his left hand and controlled Murray's right arm with his right hand. *Id.* at 8, 11, 15. Grant took control of Murray's left arm with both hands to carry him while Arquitt took Murray's legs in his left arms. *Id.* at 8, 11, 20–21. Clark attended to Tulip. *Id.* at 17.

Hebert was in the infirmary holding pen with Murray. Dkt. No. 103–7 at 6 (misbehavior report). Murray refused to comply with staff and attempted to bite and kick Grant. Dkt. Nos. 103–7 at 6, 8, 11, 21, 103–11 at 114. Hebert gave several direct orders to Murray but Murray refused to comply. Dkt. No. 103–7 at 6. Hebert ordered Bogett and Grant to take Murray to the ground and Grant pushed on Murray's upper body while Bogett held onto Murray's legs. Dkt. Nos. 103–7 at 11, 21, 103–11 at 97. Once Murray became complaint, Hebert ordered non-party Corrections Officer McGaw to videotape Murray in the holding pen. Dkt. Nos. 103–7 at 11, 103–11 at 106–07.

**\*5**  Defendants and Corrections Officers Manley and Ramsdell responded to the incident, relieved Bogett and Grant, and escorted Murray to see medical personnel. Dkt. No. 103–7 at 18–19. Murray refused to remove his clothing. *Id.* at 8. Medical personnel examined Murray fully-clothed, and noted discoloration at the base of Murray's neck and minor lacerations over the right clavicular area, on and above the bridge of the nose and left eye, to the mid-lower lip, above and below the left eye, and on the anterior of the left ear. *Id.* at 8, 12–13. Defendant and Sergeant Rowe supervised Manley and Ramsdell escorting Murray to his cell block. *Id.* at 14, 18–19. Photographs were taken of Murray's injuries on December 3 and 4, 2009. Dkt. Nos. 103–7 at 8, 14, 27–29, 103–10. [4]

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.                4

Grant and Tulip were transported to Alice Hyde. Dkt. No. 103–7 at 8, 103–9 at 19. Tulip had an injury to the groin and Grant had swelling in the left hand. Dkt. No. 103–7 at 8. Grant and Tulip were out of work for four days. Dkt. Nos. 103–7 at 14, 103–11 at 56. Tulip considered his injury was moderate to severe. Dkt. No. 103–11 at 56. Arquitt had pain in the middle finger and remained on duty. Dkt. Nos. 103–7 at 14, 103–9 at 18.

### C. Tier III Disciplinary Hearing and Appeals

On December 4, 2009, Murray received misbehavior reports from Hebert and Tulip. Compl. ¶ 8. Hebert charged Murray with violent conduct, interference with employee, and refusing direct orders. Dkt. No. 103–7 at 3. Tulip charged Murray with violent conduct, assault on staff, and interference with employee. [5] *Id.*

Murray was provided with non-party Corrections Officer Fish as an inmate assistant. Dkt. No. 103–7 at 5, 66. Fish met Murray on December 7, 2009. Dkt. No. 103–11 at 4. Fish denied Murray the videotape of the holding pen area for December 4, 2009. Dkt. No. 103–7 at 5. Murray's witness request list included: non-party Inmate Bonaparte; non-party Inmate Robertson; Arquitt; Clark; Grant; Hebert; Tulip; non-party Nurse Administrator Smith; and Travers. *Id.*

On December 17, 2009, defendant Captain Uhler commenced a Tier III disciplinary hearing that concluded on December 30, 2009. Dkt. Nos. 103–11 at 2, 103–12 at 88. Uhler stated that all documents generated from the use of force incidents were provided to Murray. Dkt. No. 103–11 at 9. Such documents included: unusual incident reports; use of force reports; to-and-from memoranda; log book entries; watch commander's log; and misbehavior reports. *Id.*

On December 21, 2009, Murray submitted a written complaint to Uhler. Dkt. No. 103–7 at 33–51. Murray asserts that he received inadequate inmate assistance, was denied the opportunity to present documentary evidence, and Uhler should not have conducted the hearing because Uhler had issued a restraint order against Murray and conducted the investigation. *Id.* at 33; Murray Dep. at 77. Uhler stated that he was not involved in the investigation of the charges. Dkt. No. 103–12 at 87.

#### i. Documentary Evidence

**\*6** At the disciplinary hearing's inception, Murray asked for a copy of Directive # 4940, which provides that when an anticipated use of force incident occurs, a video camera would be dispatched to record the incident. Dkt. No. 103–11 at 6. Uhler explained that despite language in the Directive, the area sergeant was first obligated to secure and move Murray to an area that did not jeopardize the safety and security of the facility. *Id.* at 7.

Uhler explained that he would use his discretion in producing any grievances, complaints, and lawsuit correspondences that Murray has filed with respect to the assault incidents as well as medical reports of corrections personnel. Dkt. No. 103–11 at 4–6. Uhler stated there was a video recording of the area outside the infirmary but no recording of the area inside the door. *Id.* at 6. There was handheld camera footage of the escort to the holding pen then back to the prison block, which could be introduced. *Id.*

Uhler stated that the non-audio video recording of the infirmary shows a door abruptly opening with Tulip at one side of the door, bent over on his hands and knees. Dkt. No. 103–11 at 23–24. An officer assisted Tulip. *Id.* at 24. Four staff members tried to force Murray to the ground. *Id.* at 25. Uhler watched the video several times with Murray. *Id.;* Dkt. No. 103–12 at 73–74. Murray contends that Tulip was not in pain before coming out of that door. Dkt. No. 103–11 at 24. It is undisputed that the officers used force against Murray in the hallway but Uhler did not see anyone kicking or punching Murray. *Id.* at 25, 27. This incident lasted approximately one minute. *Id.* at 27–28.

Uhler denied Murray's videotape request of a medical exam that took place on December 4, 2009 because the videotape contained no evidence of the December 3, 2009 incidents. Dkt. No. 103–7 at 59.

#### ii. Witnesses

Uhler proceeded to allow ten witnesses to testify. Arquitt, Grant, Hebert, and Smith testified. Dkt. Nos. 103–11 at 71, 96, 103–12 at 5–6, 65.

2014 WL 4676569

Bogett testified that he was walking to the infirmary area when he witnessed Murray kicking Tulip. Dkt. No. 103–12 at 43. Murray was on the ground when Bogett responded and Bogett assisted in controlling Murray by holding the waist chain. *Id.* Murray was removed from the area because it was not secure. *Id.* at 44. Bogett assisted in moving Murray to the holding pen and stood him up against a wall. *Id.* at 44–45. Murray attempted to bite Grant and struggled. *Id.* at 45. Hebert ordered Bogett to take down Murray and shortly thereafter Bogett was relieved. *Id.* at 45.

Bonaparte testified that before the December 3, 2009 incidents, he heard Gettman and other nurses talk to Murray, insinuating that Murray would be assaulted. Dkt. No. 103–12 at 48–50.

Clark testified that when he responded to the scene, Murray and other officers were on the ground, Murray was kicking his feet, and an officer was lying across Murray's legs. Dkt. No. 103–12 at 28. Clark did not carry Murray to the holding pen. *Id.* at 29. Clark testified that Murray was removed from that area, which was considered unsecured. *Id.* at 31, 35.

**\*7** Ramsdell testified that he did not use force on Murray. Dkt. No. 103–12 at 81. When Ramsdell arrived at the scene, the use of force incident was completed and he relieved the officers who held Murray. *Id.* at 82. Ramsdell did not witness the incident itself. *Id.*

Nurse Travers testified that based on Murray's complaints and symptoms on December 3, 2009, she ordered an EKG for Murray. Dkt. No. 103–11 at 39. Travers advised Murray that the nurse at the infirmary would give him an EKG and take a full set of his vital signs. *Id.* at 42. Travers did not speak with Tulip in the infirmary. *Id.* Tulip testified that he did not have a conversation with Travers in the infirmary where Travers stated, "I'd like to get a car started for this [Murray]." *Id.* at 53.

Uhler denied Murray's witness request for: (1) Laramay because he only responded to the first incident and assisted Tulip, was not present during the use of force incident, and did not give any orders to staff; (2) Manley because he was not present at either incident and was only directed to escort Murray following the incidents; (3) Dr. Weissman because she had retired, attempts to contact her were futile, and she was not present during the incidents; (4)

Robertson because he was on parole and stated that he did not want to testify; (5) non-party Inmate Gillard because he was contacted and declined to testify. [6] Dkt. Nos. 103–7 at 12, 14, 56–58, 103–12 at 58, 62–64. Uhler indicated he would allow Murray's request to question Rowe; however, Rowe was not produced. Dkt. No. 103–12 at 61–62.

### iii. Warnings

At the disciplinary hearing's inception, Murray asked to call his lawyer as a witness and Uhler denied that request, warning that "[o]utbursts and continued outbursts by yourself are going to result in me giving you a final warning and the next step will be I will remove you from this hearing." Dkt. No. 103–11 at 7–8. However, Uhler stated that his intent was not to remove Murray from the hearing. *Id.* at 8.

At one point, because Murray was having difficulty asking cogent questions, Uhler offered Murray additional time to formulate questions. Dkt. No. 103–11 at 68. Uhler explained that Murray "needed to prepare a defense" as Murray was "badgering" witnesses. *Id.* However, Murray declined the offer. *Id.* at 69–70. At another point, Uhler stated,

> I warned you on all three days that, do not state policy that's not true. And you expect me to ask the witness about a policy that doesn't exist. I'm not going to discredit staff, and belittle staff based on some makeup believe policy that you believe exists when I ruled on it already telling you it doesn't exist.

Dkt. No. 103–12 at 39.

During the inception of Bogett's testimony, Uhler ejected Murray, stating, "I am not going to continue you to stare down and try to intimate the witnesses of this hearing. I've explained this to you in detail, in detail, alright? So I'll have you removed from this hearing at this time." Dkt. No. 103–12 at 40. After Bogett's testimony, Uhler spoke with Murray and returned Murray to the hearing. *Id.* at 46.

#### iv. Disposition and Appeals

**\*8**  On December 30, 2009, Uhler issued a hearing disposition. Dkt. No. 103–7 at 4. Uhler relied on: reports written by Hebert and Tulip; testimony of two unusual incident reports; testimony from eight staff members and one inmate; and a video tape of the infirmary door area showing staff tackling Murray to the floor. *Id.* Uhler concluded that all staff testimony was consistent with each other and the video evidence. *Id.* Uhler considered Tulip's testimony that he had moderate to serious injuries from Murray's kicking and was out of work for four days per a doctor's order. *Id.* at 4, 14. Grant was out of work for four days as well. *Id.* at 14. Travers and Smith testified that care given was appropriate. *Id.* at 4. Further, Uhler considered testimonies that Murray had attacked staff. *Id.* Uhler wrote, "[t]his type of behavior will not be allowed. Inmate caused serious harm to staff and placed many others in grave danger." *Id.* A copy of the disposition was given to Murray. *Id.* Uhler ordered that Murray be placed in the Special Housing Unit ("SHU") [7] for sixty months. Compl. ¶ 9; Dkt. Nos. 103–7 at 3, 103–12 at 90–91. Uhler also gave Murray sixty months loss of privileges for packages, commissary, phone, and good time credits. Dkt. Nos. 103–7 at 3, 103–12 at 90–91.

On March 8, 2010, defendant Director of SHU/Inmate Discipline Bezio modified Murray's sentence to twenty-four months in SHU, to begin on June 28, 2014. Dkt. No. 103–6 at 2–3; Murray Dep. at 12. [8] By letter dated June 3, 2010, Murray's attorney at Prisoners' Legal Services sought reconsideration of the disciplinary hearing disposition. Dkt. No. 103–14 at 9–12. By letter dated August 18, 2010, defendant Acting Director of SHU/Inmate Disciplinary Programs Prack denied reconsideration. *Id.* at 13.

As of February 17, 2012, Murray has approximately seventeen years of prison time left to serve in SHU from other misbehavior reports. Murray Dep. at 11. Murray alleges that SHU confinement causes him mental distress. Compl. ¶ 15; Murray Dep. at 76. Murray does not seek reinstatement of good time credits. Compl. ¶ 16.

#### II. Discussion

Murray alleges that his Eighth Amendment rights were violated when: (1) defendants Arquitt, Bogett, Clark, Grant, Hebert, Laramay, Manley, McGaw, Ramsdell, Rowe, and Tulip either used excessive force against him and failed to intervene on his behalf; (2) defendants Bezio and Prack exhibited deliberate indifference to his safety in denying his appeals; and (3) defendants Fischer and Rock exhibited deliberate indifference in failing to train subordinates. Compl. ¶¶ 2–7, at 27. Murray further alleges that his Fourteenth Amendment rights were violated when: (1) defendants Hebert and Tulip issued false misbehavior reports against him; (2) defendants Bezio, Prack, and Rock denied his appeals and failed to remedy the alleged constitutional violations; and (3) defendant Uhler failed to provide him with due process. *Id.* ¶¶ 8–13, 17, at 27. Murray seeks monetary damages and injunctive and declaratory relief. *Id.* at 28.

**\*9**  Defendants seek summary judgment of certain claims, contending that Murray's: (1) claims against them in their official capacities for monetary damages are barred by the Eleventh Amendment; (2) Eighth Amendment claims against Ramsdell and Fourteenth Amendment claims against defendants Fischer, Prack, and Rock must fail because they were not personally involved in the alleged constitutional violations; (3) Fourteenth Amendment procedural due process claim against defendants Bezio, Fischer, Prack, Rock, and Uhler must fail because Murray received all process that was due; (4) Fourteenth Amendment claims against defendants Hebert and Tulip based on the filing of false misbehavior reports must fail; and (5) defendants Bezio, Fischer, Prack, Rock, and Uhler are entitled to qualified immunity. Defs.' Mem. of Law (Dkt. No. 103–16) at 4–5.

#### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242,

248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by *pro se* litigants," ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law ...."

**\*10** *Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

**B. Eleventh Amendment**

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State ." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (*citing Edelman v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). Here, because Murray seeks monetary damages against defendants for acts occurring within the scope of their duties, the Eleventh Amendment bar applies and serves to prohibit claims for monetary damages against them in their official capacity.

Accordingly, defendants' motion on this ground should be granted.

**C. Personal Involvement**

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74

(2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

**\*11** (1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [9]

### 1. Ramsdell

Murray has failed to establish the personal involvement of Ramsdell for the claims of excessive force and failure to protect. Murray believes that Ramsdell was present and assaulted him during the second incident on December 3, 2009 but does not know if Ramsdell had struck him. Contrary to Murray's assertion, Ramsdell testified that his involvement did not commence until he arrived at the scene after Bogett and Grant used force on Murray. Further, Ramsdell only escorted Murray to seek medical attention. Ramsdell's version of the events is consistent with use of force reports, unusual incident reports, and internal memoranda. *See* Dkt. Nos. 103–7 at 14, 18–19, 103–8, 103–9 at 1–5.

While "an [inmate']s 'inability to positively identify those who allegedly violated his rights is not *per se* fatal to his claims" Murray does not point to any record evidence establishing that Ramsdell was at scene of Murray's assault either before or during the time of the alleged use of excessive force. *De Michele v. City of New York,* No. 09–CV–9334 (PGG), 2012 WL 4354763, at \*16 (S.D.N.Y. Sept. 24, 2012) (citations omitted). [10] Despite Murray's conclusory and speculative assertions, it is fair to conclude that a rational factfinder could not find in

favor of Murray as the record is devoid of any evidence indicating that Ramsdell was present at either assault. *See, e.g., Coleman v. Hauck,* No. 09–CV–1391 (GTS) (GHL), 2012 WL 4480684, at \*9 (N.D.N.Y. Sept. 26, 2012) (granting summary judgment for certain defendants on personal involvement grounds where plaintiff argued that "[a]ll named Defendants responded to the scene where Plaintiff was repeatedly struck and kicked in the face" but failed to point to record evidence establishing that those defendants arrived at the scene before the use of force was applied).

Furthermore, Murray failed to proffer any evidence showing that Ramsdell had "a realistic opportunity to intervene to prevent the harm from occurring." *De Michele,* 2012 WL 4354763, at \*17 (citing *inter alia Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994)) (internal quotation marks omitted). As Murray does not provide even a scintilla of evidence that Ramsdell was present at the time of the alleged assaults, Murray cannot show that Ramsdell had directly participated in the assaults or failed to intervene in the misconduct. Moreover, Murray does not allege, and the record does not reflect the contrary, that Ramsdell had created a policy or custom under which unconstitutional practices occurred or was grossly negligent in his supervision. *Colon,* 58 F.3d at 873. Therefore, Murray cannot establish the personal involvement of Ramsdell in the alleged unconstitutional actions.

**\*12** Accordingly, defendants' motion on this ground should be granted.

### 2. Fischer

Murray claims that Commissioner Fischer was negligent in managing his subordinates. The gravamen of Fischer's complaints against Fischer is that he was in a position of power, thus always involved with anything occurring in conjunction with Murray's incarceration. However, attempts to establish personal involvement based upon the supervisory role this defendant occupied is inappropriate. *Wright,* 21 F.3d at 501 (holding that a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement).

Drawing every favorable inference in Murray's favor, Murray contends that he notified Fischer of the alleged constitutional violations through letters and grievances. However, merely writing letters and grievances to a defendant is insufficient to establish notice and personal involvement. *Smart v. Goord,* 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) ("Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] ...."). Similarly, receipt of a letter or grievance, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement. *See, e.g., Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009) (citing cases); *Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability ... [p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.").

The only correspondence which referenced any involvement by Fischer was a letter addressed to Fischer from Murray for an extension to appeal the Tier III hearing disposition. Dkt. No. 103–14 at 4–5. A letter from Bezio explained to Murray that the letter was received and Murray's letter request satisfied the thirty-day time period for submitting an appeal. *Id.* at 3. Here, it is within the purview of a superior officer to delegate responsibility to others. *See Vega v. Artus,* 610 F.Supp.2d 185, 198 (N.D.N.Y.2009) (finding no personal involvement where "the only involvement of the supervisory official was to refer the inmate's complaint to the appropriate staff for investigation.") (citing *Ortiz–Rodriguez v. N. Y. State Dep't of Corr. Servs.,* 491 F.Supp.2d 342, 347 (W.D.N.Y.2007)). Moreover, conclusory allegations about negligent supervision and a failure to train are insufficient to establish personal involvement.

Accordingly, defendants' motion on this ground should be granted.

### 3. Prack

Murray claims that Prack violated his Fourteenth Amendment rights by denying his appeals and failing to remedy the alleged constitutional violations. The only correspondence referencing Prack's involvement is a

letter denying reconsideration of Bezio's reduced penalty for the disciplinary hearing. The affirmation of an allegedly unconstitutional disciplinary hearing appears to establish personal involvement. *See Thomas v. Calero,* 824 F.Supp.2d 488, 505–11 (S.D.N.Y.2011) (discussing cases and concluding that affirming or modifying, as opposed to vacating and remedying, an allegedly constitutionally infirm disciplinary proceeding can satisfy various prongs of *Colon* and, regardless of *Iqbal's* impact on the *Colon* factors, results in a constitutional violation of which the defendant had knowledge, failed to remedy, and allowed to continue). However, as discussed *infra,* Murray's disciplinary hearing passes constitutional muster. As such, Murray cannot establish Fourteenth Amendment due process claims against Prack based on the affirmance of a constitutional disciplinary hearing.

**\*13** Accordingly, defendants' motion on this ground should be granted.

### 4. Rock

Lastly, Murray contends that Superintendent Rock violated his Fourteenth Amendment by denying his appeals, failing to remedy the alleged constitutional violations, and failing to train subordinates. The record is devoid of any reference to Rock's personal involvement. Before the Court is a superintendent decision dated January 25, 2010 that denied Murray's grievance. Nevertheless, that decision was signed by Deputy Superintendent Otis, not Superintendent Rock. As previously discussed, it is within the purview of a superior officer to delegate responsibility to others. *See Vega,* 610 F.Supp.2d at 198 (citation omitted). As such, Murray has failed to establish Rock's personal involvement in the alleged due process violations. *Colon,* 58 F.3d at 873.

Accordingly, defendants' motion on this ground should be granted.

### D. Fourteenth Amendment

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall ... deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV § 1. It is important to emphasize

that due process "does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished without due process of the law." *Baker v. McCollan,* 443 U.S. 137, 145 (1979) (internal quotation and citations omitted). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (citations omitted). An inmate retains a protected liberty interest to remain free from segregated confinement if the prisoner can satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995).

### 1. Procedural Due Process

To state a claim for procedural due process, there must first be a liberty interest which requires protection. *See generally Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) ("[P]rocedural due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered. *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998). This standard requires a prisoner to establish that the confinement or condition was atypical and significant in relation to ordinary prison life. *See Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

**\*14** While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (citations omitted). The Second Circuit has not established "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (citations omitted). Instead, the Second Circuit has provided guidelines that "[w]here the plaintiff was confined for an intermediate duration-between 101 and 305 days-development of a detailed

record of the conditions of confinement relative to ordinary prison conditions is required." *Id.* at 64–65 (citing *Colon,* 215 F.3d at 232). In the absence of a dispute about the conditions of confinement, summary judgment may be issued "as a matter of law." *Id.* at 65 (citations omitted). Conversely, where an inmate is confined under normal SHU conditions for a duration in excess of an intermediate disposition, the length of the confinement itself is sufficient to establish atypicality. *Id.* (citing *Colon,* 215 F.3d at 231–32). Also, "[i]n the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short-e.g. 30 days-and there was no indication [of] ... unusual conditions." *Harvey v. Harder,* No. 09–CV–154 (TJM/ATB), 2012 WL 4093792, at \*6 (N.D.N.Y. July 31, 2012) (citing *inter alia Palmer,* 364 F .3d at 65–66).

Defendants contend that Murray has failed to show the deprivation of a liberty interest because he has yet to serve the assigned SHU time. Courts in this District have held that where the plaintiff had not yet served the sentence imposed at the time he filed his complaint, the Court is unable to determine whether the confinement conditions of SHU were atypical or significant. *See, e.g., Chavis v. Kienert,* No. 03–CV–0039 (FJS/RFT), 2005 WL 2452150, at \*12 (N.D .N.Y. Sept. 30, 2005). However, Murray was sentenced to twenty-four months of SHU confinement, which amounts to 730 days. This length of confinement is sufficient to establish atypicality. *Palmer,* 364 F.3d at 64. Even though Murray has yet to serve the penalty, he is scheduled to serve it on June 28, 2014, and there is no evidence before the Court indicating otherwise. Given the length of the sentence and the imminent date for commencement of that sentence, the Court is not persuaded that Murray has failed to establish a liberty interest for purposes of his procedural due process claims. *Cf. Benitez v. Mailloux,* No. 05–CV–1160, 2009 WL 1953847, at \*10–11 (N.D.N.Y. Mar. 25, 2005), *report and recommendation adopted in part, rejected in part on other grounds,* No. 05–CV–1160 (NAM/RFT), 2009 WL 1953752 (N.D.N.Y. July 2, 2009) (concluding no liberty interest in 2009 when sentence was to be served in 2012). As such, the Court proceeds with the understanding that Murray has in fact established a liberty interest.

**\*15** Defendants alternatively argue that Murray's procedural due process claims against defendants Bezio, Fischer, Prack, Rock, and Uhler should be dismissed

2014 WL 4676569

because Murray was given all process that was due. While inmates are not given "the full panoply of [due process] rights," they are still afforded procedural process. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). A prisoner is "entitled to advance written notice ...; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira v.. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citations omitted).

### a. Written Notice

In this case, the issue of a written notice is undisputed. An inmate must be provided advance written notice at least twenty-four hours before the hearing commences. *Wolff,* 418 U.S. at 563–64. Murray was provided with a written notice of the Tier III disciplinary hearing. On December 4, 2009, Murray received the misbehavior reports authored by Hebert and Tulip. Those reports charged Murray with violent conduct, interference with employee, and refusing direct order, and assault on staff for the December 3, 2009 incidents. The disciplinary hearing commenced on December 17, 2009. As such, Murray was provided with written advance notice. *Sira,* 380 F.3d at 69.

### b. Opportunity to Call Witnesses and Present Documentary Evidence

Murray contends that he was deprived of an opportunity to call all witnesses and present certain documentary evidence. However, "[i]t is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] ... on the basis of irrelevance or lack of necessity." *Scott v. Kelly,* 962 F.2d 145, 146–47 (2d Cir.1992) (internal quotations and citations omitted). Uhler permitted ten individuals to testify at Murray's disciplinary hearing. Gillard and Robertson did not testify because they declined to do so and Murray has not alleged, and the record does not reflect the contrary, that intimidation by prison officials resulted in the witnesses' refusals. *Webb v. Selsky,* No. 01–CV–149S, 2008 WL 796179, at *6 (W.D.N.Y. Mar. 24, 2008) ("A failure to summon the testimony of a witness who has refused to testify, in the absence of evidence that the refusal was linked to intimidation on

the part of prison officials, does not violate due process because calling a witness who refuses to speak upon questioning would be futile.") (citing *Johnson v. Doling,* No. 05–CV–376 (TJM/RFT), 2007 WL 3046701, at *7 (N.D.N.Y.Oct.17, 2007)). There is nothing in the record indicating that either Gillard or Robertson would have provided evidence favorable to Murray beyond what was given by Bonaparte. *Livingston v. Kelly,* 423 F. App'x 37, 40 (2d Cir.2011) (citation omitted). Furthermore, while Laramay, Manley, Weissman, and Rowe did not testify, they did not observe what transpired during the use of force incidents on December 3, 2009. Thus, their testimonies would not assist Uhler in arriving at a decision regarding the appropriateness of the misbehavior reports.

**\*16** The same is true for the evidence which was denied. Uhler denied Murray's request to watch footage of Murray on December 4, 2009 because it was irrelevant to the events on December 3, 2009. Further, Murray was provided all documents generated from the use of force incidents as well as review of a video recording showing what occurred after Arquitt, Murray, and Tulip fell through the door. Moreover, Uhler ultimately granted Murray the opportunity to watch handheld footage of his escort from the examination room to his cell. "Courts have long recognized ... that the right to know evidence supporting prison disciplinary rulings is not absolute." *Sira,* 380 F.3d at 74 (citations omitted). Accordingly, in light of all documentary evidence that was provided to Murray, discovery of irrelevant documents regarding medical records and video surveillance would be of no value in determining the validity of the disciplinary tickets.

Murray was provided with an opportunity to extensively question his witnesses through Uhler. "While inmate do have the right to question witnesses at their disciplinary hearings, that right is not unlimited and its contours are under the discretion of prison officials." *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 125 (S.D.N .Y.2002). Thus, Uhler retained the authority and discretion to administer the questioning in a manner he saw fit. While Uhler did not permit Murray to ask every question, a review of the hearing transcript shows that he did permit Murray to question the witnesses rather extensively. Moreover, when Uhler denied Murray's questions he provided reasoning regarding the denial, such as the lack of relevance to the ultimate issue of the validity of the misbehavior report.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Accordingly, Murray was provided with an opportunity to call witnesses and present documentary evidence. *Sira, 380 F.3d at 69.*

**c. Fair and Impartial Hearing Officer**

Murray contends that Ulher was not an impartial hearing officer because Uhler had personally investigated the matter, already decided on the credibility of witnesses, and ejected Murray from the hearing during Bogett's testimony. Prisoners have a constitutional right to a fair and impartial hearing officer. *See, e.g., Sira v. Morton, 380 F.3d 57, 69 (2d Cir.2004).* However, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges ... [as i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo, 100 F.3d 253, 259 (2d Cir.1996)* (citations omitted). The Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer]." and the Second Circuit has held that the test is whether there was " 'reliable evidence' of the inmate's guilt." *Luna v. Pico, 356 F.3d 481, 487–88 (2d Cir.2004); see also Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455 (1985).*

**\*17** It was clear that Uhler was objective and carefully listened to the testimony and arguments presented by Murray as Uhler reversed his prior decision about allowing Bonaparte to testify as well as offering Murray an opportunity to adjourn the hearing so that Murray may formulate more cogent questions to support and present his defense. Throughout the hearing, Uhler reiterated that he had yet to determine whether Murray was guilty of the prison violations charged. *See, e.g.,* Dkt. No. 103–12 at 83. Moreover, Uhler offered to make personal inquiries as to certain witnesses to confirm their intention to decline appearing at the disciplinary hearing.

Murray specifically claims that Uhler had stated Traver's credibility was not at issue. However, this assertion is misplaced. In context, Uhler stated, "[h]er credibility is not on[,] here's the problem[,] it is my job to determine the credibility of any witness whether it is employee or inmate is good or bad at this hearing." Dkt. No. 103–11 at 45. Uhler continued, explaining that in order to show a witness was providing false allegations, Murray should submit evidence to substantiate his position. *Id.* at 49.

Murray asserts that Uhler should not have conducted the hearing because Uhler had investigated the charges against him and issued a restraint order for Murray after the alleged assault on staff. These conclusory assertions remain unsubstantiated. Uhler stated that he did not investigate the incidents. In fact, Uhler further explained,

> you've stated that you were assaulted[.] I can tell you as the Dep. of Security at this facility[,] I am aware of those complaints prior to coming down here today to do this hearing. I am aware that you have made allegations of abuse. I have not been part of the investigation that is being done by someone else at this point ... and that's outside of this hearing room.

Dkt. No. 103–11 at 35. Moreover, Uhler explained that he had only signed a recommendation from a sergeant, which was recommended by the watch commander for full restraints based on allegations against Murray. Dkt. No. 1–3–12 at 87. There is no record evidence showing the contrary; thus, Murray's contention on this point is unsubstantiated and without merit.

Murray also asserts that Uhler violated his due process rights when Uhler removed him from the hearing during Bogett's testimony. However, "inmates do not possess a constitutional right to be present during the testimony of witnesses during a disciplinary proceeding." *Harmon v. Escrow,* No. 08–CV–6381 (CJS), 2012 WL 3560812, at *4 (W.D.N.Y. Aug. 16, 2012)* (citing *Francis v. Coughlin, 891 F.2d 43, 48 (2d Cir.1989), Hidalgo v. Hopin,* No. 01–CV–0057(Sr), 2009 WL 4803689 (W.D.N.Y. Dec. 9, 2009)* (stating inmates do not have "a constitutional right to confront or cross-examine witnesses in prison disciplinary hearings)). As such, Murray's due process rights were not violated when Uhler took Bogett's testimony in Murray's absence.

**\*18** Lastly, it is clear that Murray's disciplinary disposition was based on reliable evidence of his guilt. Arquitt and Tulip testified that they were escorting Murray from the infirmary when Murray turned around and kicked Tulip in the groin area. In response, Arquitt and Tulip tackled Murray to the ground and in doing so, fell through a door. Tulip denied having hit Murray in

2014 WL 4676569

the head prior to being kicked. Hebert testified that after Murray was placed in the holding pen, Murray continued to struggle with Bogett and attempted to bite Grant. Clark was working in the infirmary and responded a loud noise in the entrance where he found Murray on the ground with officers attempting to restrain him. Clark assisted Tulip, who appeared injured. These officers' testimonies are consistent with each others' account of the events, a video tape of the infirmary's entrance way, and are supported by internal memoranda and the use of force and usual incident reports. As for Bonaparte's testimony regarding Travers and other prison staff, these individuals are not parties to this action. Uhler carefully considered the competing evidence, namely the testimonies, reports, video recording, and injuries suffered by Tulip and Grant, with Murray's contention that he did not provoke the use of force incidents. Ultimately, Uhler reasoned that Murray's behavior caused harm to staff, and given the environment of prisons, such behavior should and would not be tolerated.

Accordingly, despite Murray's conclusory and unsupported contentions of bias, the record is clear that there is no question of material fact surrounding the process Murray was provided. As such, defendants' motion should be granted on this ground.

### d. Written Statement of Disposition

It is undisputed that Murray received a written statement of the hearing disposition. On December 30, 2009, Murray voluntarily left his disciplinary hearing before Uhler rendered his decision on the two misbehavior reports. Dkt. No. 103–12 at 88–89. The record indicates that Murray received a written statement of the evidence relied upon and reasons for the disciplinary action. Thus, Murray was provided with a written statement of the Tier III disciplinary hearing disposition. *Sira,* 380 F.3d at 69.

Accordingly, defendants' motion on this ground should be granted.

### e. Inmate Assistance

"An inmate's right to assistance with his disciplinary hearing is limited." *Neree v. O'Hara,* No. 09–CV–802 (MAD/ATB), 2011 WL 3841551, at *13 (N.D.N.Y. July 20, 2011) (*Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993)). This Circuit has held that an assistant is constitutionally necessary when the plaintiff is confined in SHU and unable to marshal evidence and present a defense. *Id.* (citation omitted). In such a case, the assistant need only perform what the plaintiff would have done but need not go beyond the inmate's instructions. *Lewis v. Johnson,* No. 08–CV–482 (TJM/ATB), 2010 WL 3785771, at *10 (N.D.N.Y. Aug. 5.2010) (citing *Silva,* 992 F.2d at 22). Furthermore, "any violations of this qualified right are reviewed for 'harmless error.' " *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437 (W.D.N.Y.2010) (citing *Pilgrim v. Luther,* 571 F.3d 201, 206 (2d Cir.2009)).

**\*19** Here, Murray was confined in SHU from December 3, 2009 onward and thus is entitled to an inmate assistant. Dkt. No. 103–5 at 3; *see also Murray v. Goord,* 668 F.Supp.2d 344, 350 (N.D.N.Y.2009) ("Upstate ... [is] a maximum security prison comprised of special housing unit ("SHU") cells in which inmates are confined ....") (citation omitted). Murray alleges that he was generally deprived of adequate inmate assistance. Murray first met with his Inmate Assistant Fish on December 7, 2009. Fish assisted Murray with completing the assistant form to identify witnesses and documentary evidence. Fish also assisted Murray with contacting potential witnesses to testify at the disciplinary hearing. Dkt. No. 103–11 at 5, 14. Fish denied Murray any complaints or legal correspondence with respect to Murray being assaulted in the infirmary area. Dkt. No. 103–11 at 5. However, Uhler stated at the disciplinary hearing that he may produce such records if during the hearing, he determines that those records are relevant. *Id.* As for video footage of what occurred on December 3, 2009 inside the door, Uhler explained that such footage did not exist. *Id.* Further, Uhler denied Murray video footage of him on December 4, 2009 because it was irrelevant to the December 3, 2009 incidents.

Even assuming Fish had provided inadequate assistance, such a deprivation was rendered harmless and a factfinder could not conclude that Murray was prejudiced as a result. *Gallo,* 22 F.3d at 1223–24. The record shows that Uhler took steps to provide Murray with the requested evidence. Uhler also offered Murray more time to prepare for the hearing, which Murray declined. There is no indication that the result of Murray's hearing would be different had Fish provided Murray with all requested evidence. *See Chavis v. vonHagn,* No. 02–CV–0119 (Sr), 2009

WL 236060, at *53 (W.D.N.Y. Jan. 30, 2009) (finding due process claim based on denied employee assistant to prepare for disciplinary hearings was without merit because the record showed that "plaintiff was indeed able to present evidence (and often did), both oral and documentary, in his own defense) (citation omitted). As such, Murray's due process claim based on inmate assistance must fail.

Accordingly, defendants' motion on this ground should be granted.

### 2. False Misbehavior Report

An inmate has a right not to be deprived of a liberty interest without due process. However, a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). "There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988)). Even so, a due process claim predicated upon a false misbehavior report issued in retaliation against an inmate still fails to state a claim if the inmate received all the procedural process protections that was due to him. *Livingston,* 423 F. App'x at 40 (citing *inter* alia *Freeman,* 808 F.2d at 952). Here, Murray alleges that defendants Hebert and Tulip filed false misbehavior reports against him in retaliation for Murray lodging grievances and complaints. *Boddie,* 105 F.3d at 862; *see* Murray Dep. 38–39. However, as discussed above, Murray received all the procedural process protections that he was due.

**\*20** Moreover, to allege a claim based on the issuance of false misbehavior reports as retaliatory conduct, a prisoner must establish by a preponderance of the evidence that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (internal quotation marks and citation omitted); *Tafari v. McCarthy,* 714 F.Supp.2d 317, 347 (N.D.N.Y.2010). Murray does not allege any facts going to establishing a causal connection. Murray does not proffer any

information with regard to grievances or complaints he filed against either Hebert or Tulip. Murray further testified that he believes Tulip retaliated against him because he insulted Tulip. Murray Dep. at 41. However, such insults do not constitute protected speech. *Doe v. Selsky,* No. 08–CV–6199L, 2013 WL 5311221, at *3 (W.D.N.Y. Sept. 20, 2013) (citing *Lockett v. Suardini,* 526 F.3d 866, 874 (6th Cir.2008) (finding inmate's insulting comments to a disciplinary hearing officer were not protected speech), *Chevalier v. Schmidt,* No. 11–CV–788(JTC), 2012 WL 6690313, at *3 (W.D.N.Y. Dec. 21, 2012) ("Vulgar, insulting, and threatening statements have been found not to be protected speech for purposes of the First Amendment")). As such, Murray has failed to allege a due process claim based on the issuance of false misbehavior reports as retaliatory conduct.

Accordingly, defendants' motion on this ground should be granted.

### E. Qualified Immunity

Defendants Bezio, Fischer, Prack, Rock, and Uhler contend that even if Murray's Fourteenth Amendment claims are substantiated, they are nevertheless entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 F. App'x 146 (2d Cir.2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be addressed

with respect to Murray's Fourteenth Amendment claims against these defendants because, as discussed *supra*, it has not been shown that defendants violated Murray's Fourteenth Amendment rights.

**\*21**  Accordingly, defendants' motion on this ground should be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for partial summary judgment (Dkt. No. 103) is **GRANTED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Filed April 22, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4676569

### Footnotes

1    In his acknowledgment of receipt of summons and complaint, defendant"Herbert" spelled his name as "Hebert." Dkt. No. 22. The Court notes the discrepancy as mere error on Murray's part and proceeds with the latter spelling in this Report–Recommendation.

2    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

3    In his deposition, Murray generally contends that defendants used excessive force against him as part of a conspiracy to retaliate against him for his filing of grievances and lawsuits against them. *See, e.g.,* Murray Dep. at 38–39, 44–46, 50–52. Retaliation and conspiracy claims were neither alleged in Murray's complaint nor response to defendants' motion for summary judgment. In any event, Murray's attempt to argue either claim has failed.

  To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (internal quotation marks and citation omitted); *Tafari v. McCarthy,* 714 F.Supp.2d 317, 347 (N.D.N.Y.2010). Here, Murray proffers only conclusory testimony that defendants had violated his constitutional rights in retaliation for the filing of grievances and lawsuits. Murray proffers nothing more going to when and against whom he filed such grievances and lawsuits, the results of the grievances and lawsuits, or his prior disciplinary history. *Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007) (citations omitted) ("Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives."). As such Murray has failed to assert a potential First Amendment retaliation claim against the defendants.

  In order to support a claim for conspiracy under §§ 1983 or 1985, there must be "(1) an agreement ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v.. Cnty. of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 468 (N.D.N.Y.2009). An agreement must be proven with specificity as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action is insufficient. *See Iqbal v. Hasty,* 490 F.3d 143,177 (2d Cir.2007); *see also Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999). Thus, plaintiffs must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted). Here, Murray fails to provide evidence sufficient to support a viable conspiracy claim among the defendants. There is nothing in the record to establish that defendants had any

type of agreement between them. There were no allegations outlining with specificity when, why, or how an alleged conspiracy occurred. *Warren,* 33 F.Supp.2d at 177. Murray fails to provide any plausible information which would lend credence to a claim of an explicit or implicit agreement between any or all of the defendants. *Anilao v. Spota,* 774 F.Supp.2d 457, 512–13 (E.D.N.Y.2011) (citations omitted). As such, Murray has failed to allege any potential conspiracy claims in this action.

Accordingly, Murray's potential conspiracy and retaliation claims must fail.

4   Photos taken by non-party Corrections Officer Gettman on December 4, 2009 of Murray indicate that Murray had red marks on his shoulder blades and neck and cuts between his eyebrows and on his nose. Dkt. No. 103–10 at 2–13.

5   The DOCCS "IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response; and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted). On December 6, 2009, Murray filed a grievance claiming the defendant corrections officers used excessive force against him while also failing to intervene on his behalf. Dkt. No. 103–13 at 6. On January 25, 2010, non-party Deputy Superintendent Otis denied Murray's grievance. *Id.* at 2. On March 10, 2010, CORC affirmed the superintendent's decision. *Id.* at 1.

6   Uhler stated that he would conduct a secondary inquiry into the reason behind Gillard's refusal. Dkt. No. 103–11 at 14.

7   SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. COMP. CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

8   Defendant Bezio also reduced the punishment from twenty-four months of other privileges and good time credits to begin on April 22, 2011. Dkt. No. 103–6 at 2–3.

9   Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five *Colon* factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five *Colon* factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N.Y.2010) (holding that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that *Iqbal* eliminated *Colon's* personal involvement standard).

10   All unpublished opinions cited to by the Court in this Report–Recommendation are, unless otherwise noted, attached to this Recommendation.

---

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:14-cv-01389-TJM-TWD    Document 35    Filed 06/13/17    Page 97 of 151
Proctor v. Kelly, Not Reported in F.Supp.2d (2008)
2008 WL 5243925

2008 WL 5243925
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Patrick PROCTOR, Plaintiff,
v.
Charles F. KELLY, Jr, Correctional Captain;
George Seyfert, Deputy Inspector General;
Robert T. Murphy, Acting Director, Inmate
Disciplinary Program; Lucien J. Leclaire, Jr., Deputy
Commissioner; Glenn S. Goord, Commissioner;
Gary Greene, Superintendent, Defendants.

No. 9:05-CV-0692 (GTS/GJD).
|
Dec. 16, 2008.

West KeySummary

**1**    **Constitutional Law**
👉 **Segregation**

**Prisons**
👉 **Segregation**

**Prisons**
👉 **Escape**

An inmate was not deprived of due process before he was placed in administrative segregation for an extended period of time. The inmate was completing a term of nine years and one month disciplinary confinement in a special housing unit. The inmate was placed in this unit due to a successful escape from another facility that involved an elaborate plan that involved four other people. One of the defendants filed a recommendation report urging that the inmate be placed in administrative segregation. The defendant listed fourteen specific allegations of misbehavior that were attributed to the inmate over a twenty-year period. Based upon these allegations, the defendant stated that the inmate was an extreme risk to the safety and security of any correctional facility. U.S.C.A. Const.Amend. 14.

7 Cases that cite this headnote

**Attorneys and Law Firms**

Patrick Proctor, Comstock, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Bruce J. Boivin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*MEMORANDUM-DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1**    Plaintiff Patrick Proctor ("Plaintiff"), a New York State prison inmate, filed this *pro se* civil rights action, pursuant to 42 U.S.C. § 1983, against six (6) correctional officials employed by the New York State Department of Correctional Services ("DOCS"). Generally, in his Amended Complaint, Plaintiff alleges that Defendants violated his rights under the Eighth and Fourteenth Amendments (and various state laws, rules and/or regulations). Currently before the Court are Defendants' motion for summary judgment, Plaintiff's cross-motion for summary judgment, a Report-Recommendation that Defendants' motion be granted in its entirety (and that Plaintiff's cross-motion be dismissed), and Plaintiff's Objections thereto. For the reasons set forth below, the Report-Recommendation is accepted, and Plaintiff's Amended Complaint is dismissed.

**I. BACKGROUND**

**A. Plaintiff's Claims**
Generally, Plaintiff's Amended Complaint alleges that six employees of DOCS-(1) Charles F. Kelly, Jr., Correctional Captain, (2) George Seyfert, Deputy Inspector General, (3) Robert T. Murphy, Acting Director, Inmate Disciplinary Program, (4) Lucien J. LeClaire, Jr., Deputy Commissioner, (5) Glenn S. Goord, Commissioner, (6) Gary Greene, Superintendent ("Defendants") violated his rights under the Eighth and Fourteenth Amendments (and various state laws, rules and/or regulations) between approximately December 20, 2003, and July 7, 2004, while he was placed in administrative segregation in the Special Housing

2008 WL 5243925

Unit ("S.H.U.") at Great Meadow Correctional Facility ("Great Meadow C.F."). (*See* Dkt. No. 19, Prelim. Stmt. and ¶¶ 9, 24, 41-46 [Plf.'s Am. Compl.].)

More specifically, Plaintiff alleges that Defendants (1) deprived him of his right to procedural and substantive due process under the Fourteenth Amendment by failing to conduct a fair and impartial hearing during the December 20, 2003, proceeding that resulted in his placement in administrative segregation, and by failing to conduct meaningful periodic reviews of his continued placement in administrative segregation, [1] (2) subjected him to cruel and unusual punishment under the Eighth Amendment by forcing him to live in the S.H.U., where the conditions were inhumane, and (3) deprived him of his liberty interests under New York State law, rules or regulations by conducting an administrative segregation hearing that was not impartial, and by failing to overturn the outcome of the hearing on appeal. (*Id.*)

### B. Magistrate Judge's Report-Recommendation

On December 18, 2007, Defendants moved for summary judgment, requesting the dismissal of Plaintiff's Amended Complaint in its entirety. (Dkt. No. 93.) The motion was referred to Magistrate Judge DiBianco for a Report-Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c). On February 7, 2008, Plaintiff cross-moved for summary judgment. (Dkt. No. 98.) On September 30, 2008, Magistrate Judge DiBianco issued a Report-Recommendation that the Court grant Defendants' motion and deny Plaintiff's cross-motion because of Plaintiff's failure to present an issue of material fact. (Dkt. No. 104, at 27-29, 31-33, 39.)

**\*2** Essentially, Magistrate Judge DiBianco's Report-Recommendation is based on two fundamental conclusions: (1) Plaintiff's due process claims should be dismissed because he has failed to adduce record evidence establishing that Defendants deprived him of any of the process he was due as an inmate facing administrative confinement for safety and security reasons (due to the fact that he had previously escaped from prison, among other reasons); and (2) Plaintiff's inadequate-prison-conditions claim should be dismissed because he has failed to adduce record evidence establishing that the conditions in S.H.U. denied him the minimal civilized measure of life's necessities, and that Defendants caused,

and acted with the requisite state of mind with regard to, those conditions. (*Id.*)

### C. Plaintiff's Objections

On October 10, 2008, Plaintiff filed Objections to the Report-Recommendation. (Dkt. No. 107.) The Objections, which are contained in twenty-five (25) single-spaced pages, present numerous arguments, some of which were never presented to Magistrate Judge DiBianco (and which are not accompanied by a showing of cause as to why the Court should excuse Plaintiff's failure to raise those arguments before Magistrate Judge DiBianco). (*Compare* Dkt. No. 107 [Plf.'s Obj.] *with* Dkt. No. 98, Part 4 [Plf.'s Memo. of Law] .) [2]

Among Plaintiff's arguments are the following. First, argues Plaintiff, Defendant Kelly conducted Plaintiff's administrative segregation hearing on December 20, 2003, in a biased and arbitrary manner because (a) at the beginning of the hearing Defendant Kelly stated, "I have career goals, I have to go along with the program," (b) in reaching his decision he wrongfully considered certain materials (such as an Unusual Incident Report regarding Plaintiff's possession of a "filed nail clipper"), and (c) after the hearing he tampered with the tape recording of the hearing. (*Id.*) Second, argues Plaintiff, he was wrongfully subjected to double jeopardy when, on December 20, 2003, Defendant Kelly essentially subjected Plaintiff to a second term of administrative segregation based on the same evidence on which Plaintiff's first term of administrative segregation had been based. (*Id.*) Third, argues Plaintiff, he enjoyed a substantive due process right in remaining free from administrative segregation. (*Id.*) Fourth, argues Plaintiff, he was deprived of his procedural due process right to receive periodic reviews of his placement in administrative segregation. (*Id.*) Fifth, argues Plaintiff, Defendant Goord was on constructive notice of the sort of problems that were occurring at the Great Meadow C.F. S.H.U. (due to various lawsuits and grievances that had been filed), and that his failure to correct those conditions constituted a violation of Plaintiff's Eighth Amendment rights. (*Id.*) Sixth, argues Plaintiff, Defendants are liable to him under New York State law, rules and/or regulations (which entitle him to a fair and impartial hearing officer, a recording of his administrative segregation hearing, and the expungement of certain material from his inmate record).

**\*3** In addition, Plaintiff requests that certain information be redacted from Magistrate Judge DiBianco's Report-Recommendation and/or the record on Defendants' motion for summary judgment. (*Id* . at 9, 16.)

## II. STANDARD OF REVIEW

When specific objections to a magistrate judge's Report-Recommendation are made, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C). [3] When only general objections are made (or the party merely reiterates his original allegations or arguments), the Court reviews for clear error or manifest injustice. *See Brown v. Peters,* 95-CV1641, 1997 WL 599355, at \*2-3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], *af'd without opinion,* 175 F.3d 1007 (2d Cir.1999). [4] Similarly, when a party makes no objection to a portion of a Report-Recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94-CV-2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

## III. LEGAL STANDARD ON MOTION FOR SUMMARY JUDGMENT

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must

come forward with "specific facts showing a genuine issue [of material fact] for trial." Fed.R.Civ.P. 56(e)(2).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson,* 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) [citation omitted]; *see also* Fed.R.Civ.P. 56(e)(2). As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts." [citations omitted]. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**\*4** As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* [citation omitted].

Finally, implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that nonmoving party is proceeding *pro se* . [5] This is because even *pro se* plaintiffs must obey the Court's procedural rules. [6] For example, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has failed to properly respond to that statement, [7] even where the nonmoving party was proceeding *pro se* in a civil rights case. [8]

## IV. ANALYSIS

### A. Plaintiff's Procedural Due Process Claim Regarding the Administrative Segregation Hearing

Plaintiff filed an Objection to Magistrate Judge DiBianco's Report-Recommendation with regard to his procedural due process claim. As a result, the Court reviews that portion of the Report-Recommendation *de novo.* After carefully reviewing all of the papers regarding Defendants' motion for summary judgment, including Magistrate Judge DiBianco's Report-Recommendation

and Plaintiff's Objections, the Court agrees with Magistrate Judge DiBianco, for the reasons stated in his Report-Recommendation, that Plaintiff has adduced no record evidence that his procedural due process rights were violated during the administrative segregation hearing. The Court would only add four points to Magistrate Judge DiBianco's thorough Report-Recommendation.

First, as Magistrate Judge DiBianco indicated in his Report-Recommendation, New York State law provides an inmate with more procedural protections than are required under the Fourteenth Amendment. (Dkt. No. 104, at 9-11.) *See also Withrow v. Taylor,* 9:05-CV-1129, 2007 WL 3274858, at *13 (N.D.N.Y. Nov.5, 2007) (Hurd, J.). However, as Magistrate Judge DiBianco also recognized, "the fact that New York law provides [an] inmate with a full disciplinary-style hearing does not raise the constitutional requirements for administrative placement." *Withrow,* 2007 WL 3274858, at * 13. For example, "Plaintiff has no federal right to the recording or electronic record of his disciplinary hearing." *Odom v. Kern,* 99-CV-10668, 2008 WL 2463890, at *10 (S.D.N.Y. June 18, 2008) [citations omitted].

Second, with regard to Plaintiff's assertion about the remark made by Defendant Kelly at the start of the hearing (i.e., "I have career goals, I have to go along with the program"), the remark is insufficient to create a genuine issue of material fact as to whether Plaintiff was denied the process he was due at the hearing. For the sake of brevity, the Court will set aside the fact that asserted remark is so ambiguous and lacking in contextual explanation as to diminish its materiality. (*See, e.g.,* Dkt. No. 98, Part 6, ¶¶ 12, 14, 28, 31 [Plf.'s Affid.].) [9] In addition, the Court will set aside the fact that the asserted remark is so self-serving and unsupported by the other record evidence as to give it a conclusory quality. [10] What is more important is that, despite the remark, Defendant Kelly afforded Plaintiff numerous procedural rights, which included, but were not limited to the following: (1) substantial notice of the hearing; (2) the right to choose an assistant before the hearing; (3) the ability to have two witnesses interviewed; (4) notice of his rights during the hearing; (5) the ability to be present for the entire hearing; (6) wide latitude to argue and object during the hearing; (7) the opportunity to question Defendant Seyfert and Deputy Superintendent Carpenter at the hearing; (8) the opportunity to challenge evidence

against him; (9) a deliberately and patiently conducted hearing; and (10) a written hearing determination that was supported by at least "some evidence." (Dkt. No. 104, at 14-28.) [11]

**\*5** Third, with regard to Plaintiff's assertion that Defendant Kelly tampered with the disciplinary hearing tape, as the Southern District found in *Odom v. Kern,* "[t]here is no evidence in the record ... of any tampering with the [disciplinary hearing] tape ." *Odom,* 2008 WL 2463890, at *11 [citations and internal quotations omitted]. At most, Plaintiff has adduced evidence that the portion of a hearing tape was blank. Plaintiff has offered nothing but conclusory allegations, conjecture and/or speculation in support of his claim that it was Defendant Kelly who caused the portion of the tape in question to be blank (or that, even if he did so, he was acting recklessly as opposed to acting merely negligently). [12]

Fourth, Plaintiff's double-jeopardy argument is that (1) he spent more than nine years in administrative segregation as punishment for various offenses, and (2) because he "did his time" for these offenses, they should not be further considered as a reason to keep him in administrative segregation indefinitely. However, as noted in *Wojtkiewicz v. Gunter,* "[t]he Double Jeopardy Clause is limited to criminal prosecutions." *Wojtkiewicz v. Gunter,* 91-CV-2270, 1992 WL 313120, at *2 (D.Colo. Oct. 23, 1992) [citation omitted]. Since "[p]rison disciplinary proceedings are not criminal prosecutions[,] the full panoply of rights due a defendant in criminal proceedings do not apply." *Wojtkiewicz,* 1992 WL 313120, at *2 [citation omitted]. As a result, "a rehearing is not actionable under the Double Jeopardy Clause." *Id.* [citation omitted].

For all of these reasons, the Court adopts this portion of the Report-Recommendation, granting Defendants' motion for summary judgment with regard to this claim, and denying Plaintiff's cross-motion for summary judgment with regard to this claim.

### B. Plaintiff's Substantive Due Process Claim Regarding the Administrative Segregation Hearing

Plaintiff filed an Objection to Magistrate Judge DiBianco's Report-Recommendation with regard to his substantive due process claim. As a result, the Court reviews that portion of the Report-Recommendation *de*

*novo.* Plaintiff contends that Magistrate Judge DiBianco failed to consider "the substantive level" of his due process claim, which would have entitled him to relief under the Fourteenth Amendment. (Dkt. No. 107, at 4 [Plf.'s Obj.].) Even though the Court finds no error in Magistrate Judge DiBianco's analysis of Plaintiff's substantive due process claim, the Court will further discuss that claim out of special solicitude to Plaintiff.

The Due Process Clause of the Fourteenth Amendment contains both a substantive component and a procedural component. *Zinernon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinernon,* 494 U.S. at 125 [internal quotations marks and citation omitted]. The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law." Id.* at 125-26 [internal quotations marks and citations omitted; emphasis in original]. One of the differences between the two claims is that a substantive due process violation "is complete when the wrongful action is taken," while a procedural due process violation "is not complete unless and until the State fails to provide due process" (which may occur *after* the wrongful action in question). *Id.* "Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) [internal quotations marks and citations omitted], *aff'g,* 91-CV-1196, Memorandum-Decision and Order (N.D.N.Y. Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action).

**\*6** As stated in *Lowrance,* "[t]he first step in substantive due process analysis is to identify the constitutional right at stake." *Lowrance,* 20 F.3d at 537 [citation omitted]. Here, as in *Lowrance,* "the right allegedly violated was [Plaintiff]'s liberty interest in remaining free from administrative confinement unless a correction officer has reasonable grounds to believe that he poses a threat to the order, safety or security of the correctional facility." *Id.* (citing 7 N.Y.C.R.R. § 251-1.6[a] ).

Once "the constitutional interest at stake" is identified, "[the Court] must ... consider whether the state action-administrative confinement-was arbitrary in the constitutional sense and therefore violative of substantive due process." *Id.* Based on the record before Magistrate Judge DiBianco, the Court can find no evidence from which a rational fact finder could conclude that Plaintiff's administrative confinement was arbitrary in the constitutional sense. Rather, as indicated by Magistrate Judge DiBianco, Plaintiff's administrative confinement was based on, among other factors, his violent history both in prison and out of prison. Certainly, a violent history, as well as a history for disobeying orders, creates "at least the potential for disruption of the order and security of the prison." *Id.* With Plaintiff "having thus created a threat to the security of the prison" by his conduct over the years, his subsequent administrative confinement resulting from the December 2003 proceeding "was not arbitrary or conscience-shocking in the constitutional sense." *Id.* [13]

For all of these reasons, the Court adopts this portion of the Report-Recommendation, granting Defendants' motion for summary judgment with regard to this claim, and denying Plaintiff's cross-motion for summary judgment with regard to this claim.

### C. Plaintiff's Procedural Due Process Claim Regarding Periodic Reviews

As an initial matter, the Court notes that Plaintiff appears to have asserted his procedural due process claim regarding periodic reviews for the first time in his Memorandum of Law dated February 7, 2008, nearly *two and a half years* after he filed an Amended Complaint on or about September 8, 2005, and nearly *one and a half years* after discovery closed in the action on October 30, 2006. (*Compare* Dkt. No. 98, Part 4, at 10, 27-28 [Plf.'s Memo. of Law] *with* Dkt. No. 19 [Plf.'s Am. Compl.] *and* Dkt. No. 31 [Pretrial Scheduling Order].) As a result, it appears that Defendants have conducted no discovery regarding the claim. For this reason alone, this claim is not properly before the Court, no matter how much special solicitude Plaintiff is afforded. [14] Nonetheless, in the interest of thoroughness, the Court will briefly address the merits of this claim.

As Magistrate Judge DiBianco explained his Report-Recommendation, in addition to being entitled to notice

and the opportunity to be heard before placement in administrative segregation, an inmate is also entitled to periodic reviews of his confinement so that administrative segregation is not used for indefinite confinement of the inmate. (Dkt. No. 104, at 33 [citation omitted].) As this Court has previously recognized, "The periodic review can be informal and non-adversarial. These reviews do not require the presence of the accused and do not require the reviewer to always consider new information, since the original reasons for placing the inmate in [administrative segregation] may continue to be compelling ." *Giano v. Selsky,* 91-CV-0166, 2002 WL 31002303, at *7 (N.D.N.Y. Sept.5, 2002) (Kahn, J.) [internal quotation marks and citation omitted].

**\*7** Of course, "if new relevant evidence becomes available following initial review of the inmate's administrative segregation, the decision-maker is obligated to consider that evidence during the periodic reviews." *Giano,* 2002 WL 31002303, at *7. In other words, if there is a *new* reason why the inmate is being kept in administrative segregation, "[t]he inmate is entitled to notice of the [changed] reason for his confinement and an opportunity to respond to that [changed] reason." *Giano,* 2002 WL 31002303, at *7 [citation omitted]. "If the reasons for his confinement do not change, however, the inmate need not be informed each time his confinement is reviewed." *Id.* Furthermore, an inadvertent denial of a periodic review does not give rise to a due process violation. [15] Nor does the mere violation of a New York State regulation or DOCS Directive requiring reviews with a specific frequency give rise to a due process violation. [16] Here, the Court can find no evidence in the record that Plaintiff continued to remain in administrative segregation as a result of a new reason that arose after the date on which he was originally placed in administrative segregation. Nor can the Court find any record evidence that Plaintiff's confinement is not being reviewed in some manner.

For all of these reasons, the Court adopts this portion of the Report-Recommendation, granting Defendants' motion for summary judgment with regard to this claim, and denying Plaintiff's cross-motion for summary judgment with regard to this claim.

**D. Plaintiff's Eighth Amendment Claim Regarding the Conditions in S.H.U.**

As indicated above, Plaintiff filed an Objection to Magistrate Judge DiBianco's Report-Recommendation with regard to his Eighth Amendment claim. As a result, this Court reviews that portion of the Report-Recommendation *de novo.* After carefully reviewing all of the papers regarding Defendants' motion for summary judgment, including Magistrate Judge DiBianco's Report-Recommendation and Plaintiff's Objections, the Court agrees with Magistrate Judge DiBianco, for the reasons stated in his Report-Recommendation, that Plaintiff has adduced no record evidence that his Eighth Amemdment rights were violated as a result of the conditions in S.H.U. The Court would only add two points to Magistrate Judge DiBianco's thorough Report-Recommendation.

First, even assuming that Plaintiff has adduced record evidence establishing that his prison conditions were (when viewed together) sufficiently serious for purposes of the Eighth Amendment, the Court can find no record evidence that Defendants acted with a sufficiently culpable state of mind with regard to those prison conditions. It must be remembered that "deliberate indifference describes a state of mind more blameworthy than negligence." [17] Rather, deliberate indifference is a state of mind akin to *criminal recklessness.* [18]

Second, Plaintiff's constructive-notice argument is unpersuasive. For example, neither of the two cases cited by Plaintiff (which were settled after the occurrence of the events giving rise to Plaintiff's Eighth Amendment claim in this case) conferred on Defendant Goord notice of the conditions in the S.H.U. at Great Meadow C.F. sufficient to personally involve him in the Eighth Amendment violation alleged by Plaintiff. *See Anderson v. Goord,* 87-CV-0041, Stipulation and Protective Order (N.D.N.Y. filed July 28, 2005) (McCurn, J.); *Disability Advocates, Inc. v. N .Y.S. Office of Mental Health,* 02-CV-4002, Settlement Agreement (S.D.N.Y. filed Apr. 30, 2007) (Lynch, J.). (Dkt. No. 107, at 17 [Plf.'s Obj.].)

**\*8** For all of these reasons, the Court adopts this portion of the Report-Recommendation, granting Defendants' motion for summary judgment with regard to this claim, and denying Plaintiff's cross-motion for summary judgment with regard to this claim.

**E. Plaintiff's State Law Claim**

2008 WL 5243925

Plaintiff appears to argue Magistrate Judge DiBianco also erred by failing to consider Plaintiff's separate state law claim. (Dkt. No. 107, at 2, 4, 5, 8 [Plf.'s Obj.].) Specifically, Plaintiff's state law claim appears to contain three related claims: (1) Defendants violated his right to a fair and impartial hearing officer under 7 N.Y.C.R.R. § 301.4(a); (2) Defendants violated his right to have his administrative segregation hearing recorded under 7 N.Y.C.R.R. §§ 254.5, 254.6(b); and (3) Defendants violated his right to have the reference to his possession of a filed nail clipper expunged from his inmate record, which right the Court should enforce pursuant to the doctrine of collateral estoppel. [19] (*Id.*)

To the extent that Plaintiff is arguing that these state law violations give rise to any constitutional violations, the Court has already considered and rejected those claims in this Memorandum-Decision and Order (and Magistrate Judge DiBianco's Report-Recommendation). To the extent that Plaintiff is arguing that these state law violations are themselves actionable in this proceeding, the Court declines to exercise supplemental jurisdiction over those claims under the circumstances. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Verley v. Goord,* 05-CV-1251, 2008 WL 4279498, at *16, n. 35 (N.D.N.Y. Sept.15, 2008) (Kahn, J., adopting Report-Recommendation) [citing cases]. [20]

As a result, the Court dismisses Plaintiff's state law claim without prejudice.

### F. Plaintiff's Request for Redaction

The Court denies Plaintiff's request that certain information be redacted from Magistrate Judge DiBianco's Report-Recommendation and/or the record on Defendants' motion for summary judgment, because that request is procedurally improper and unsupported by a showing of cause. (Dkt. No. 107, at 9, 16 [Plf.'s Obj.].)

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge DiBianco's Report-Recommendation (Dkt. No. 104) is *ADOPTED* in its *ENTIRETY;* and it is further

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 93) is *GRANTED;* and it is further

**ORDERED** that Plaintiff's Cross-Motion for Summary Judgment (Dkt. No. 98) is *DENIED;* and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 19) is *DISMISSED;* and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Order upon all parties and Magistrate Judge DiBianco.

PATRICK PROCTOR, Plaintiff,

vs.

CHARLES F. KELLY, JR; GEORGE SEYFERT; ROBERT J. MURPHY; LUCIEN J. LeCLAIRE, JR.; GLENN S. GOORD; GARY GREENE, Defendants.

### REPORT-RECOMMENDATION

GUSTAVE J. DiBIANCO, United States Magistrate Judge.

**\*9** This matter has been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In this amended civil rights complaint, plaintiff, an inmate in the custody of the New York Department of Correctional Services ("DOCS"), challenges "the deprivations caused by his placement in [A]dministrative [S]egregation" at Great Meadow Correctional Facility. (Amended Complaint ("AC") [1], ¶ 9 (Dkt. No. 19)). Plaintiff alleges that his due process rights were violated during the proceedings that resulted in his placement in administrative segregation and also claims that the conditions in administrative segregation violated plaintiff's right to be free from cruel and unusual punishment. *Id.* Plaintiff alleges Eighth, Fifth, and Fourteenth Amendment violations. Plaintiff seeks injunctive relief and compensatory and punitive damages. (AC at 17-18).

Presently before the court is defendants' motion for summary judgment in favor of all six defendants, pursuant to FED. R. CIV. P. 56. (Dkt. No. 93). Plaintiff opposes defendants' motion, and makes a cross-motion

for summary judgment. (Dkt. No. 98). For the following reasons, this court will recommend that the defendants' motion for summary judgment be **GRANTED** in favor of all defendants and that plaintiff's cross-motion for summary judgment be **DENIED**.

### DISCUSSION

#### 1. *Summary Judgment*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

#### 2. *Facts and Contentions*

Plaintiff states that on December 8, 2003, while incarcerated at Great Meadow, he was completing a term of nine years and one month disciplinary confinement in the Special Housing Unit (SHU). (AC ¶ 10). Plaintiff states that this term of disciplinary confinement was imposed for "various disciplinary infractions, including, but not limited to escape, weapon possession, assault, fighting, etc." *Id.* More specifically, in 1994, plaintiff successfully escaped from Shawangunk Correctional Facility, using an "elaborate" plan that involved three

other inmates and a parolee. Kelly Decl. Ex. C at p. 2; Proctor Deposition Transcript (Pl.Dep.) at 22-23. After plaintiff was captured, he received a disciplinary penalty that included ten years of confinement in SHU. Pl. Dep. at 33.

**\*10** In his complaint, plaintiff alleges that he was scheduled to be released from SHU on December 8, 2003, but was not released "as scheduled." (AC ¶ 11). Instead, plaintiff claims that on December 9, 2003, he was served with an "Administrative Segregation Recommendation," that was written by defendant Seyfert, and dated December 8, 2003. (AC ¶ 12).

Plaintiff states that in the recommendation, defendant Seyfert listed fourteen specific allegations of misbehavior as well as other "general" allegations of misbehavior that were attributed to plaintiff over a twenty year period. (AC ¶ 13). Based upon these allegations, defendant Seyfert stated that plaintiff had proven himself to be an escape risk as well as an "extreme risk to the safety and security of any correctional facility," including inmates as well as staff. (AC ¶ 14). For these reasons, defendant Seyfert recommended that plaintiff be placed in administrative segregation, rather than released into general population at the end of his disciplinary sentence.

Defendant Kelly was assigned to conduct plaintiff's administrative segregation hearing. (AC ¶ 15). Plaintiff states that the hearing began on December 20, 2003. (AC ¶ 15). Plaintiff alleges various defects in the hearing. (AC ¶¶ 15-30). Plaintiff claims that defendant Seyfert testified falsely and relied upon outdated or incorrect information. (AC ¶¶ 17-19). Plaintiff claims that defendant Kelly improperly failed to call certain witnesses requested by plaintiff that would have refuted defendant Seyfert's testimony. (AC ¶¶ 20-22). Plaintiff claims that defendant Kelly failed to review the Unusual Incident (UI) Reports and failed to perform an "independent assessment" of their reliability. (AC ¶ 23). Plaintiff also alleges that defendant Kelly was not impartial, based his final decision on false and inaccurate information, refused to reconstruct part of the audio-taped record that was destroyed, and relied on information that was not in the record. (AC ¶¶ 20-24, 27-31).

Plaintiff states that on December 24, 2003, defendant Kelly affirmed defendant Seyfert's recommendation and ordered plaintiff's placement in administrative

2008 WL 5243925

segregation. (AC ¶ 31). Plaintiff appealed this decision and filed grievances regarding the alleged due process violations. (AC ¶¶ 32-40). Plaintiff claims that he has "repeatedly requested" that the allegedly false and inaccurate information relied upon by Seyfert and Kelly be removed from plaintiff's institutional record, but defendants Seyfert, Kelly, Greene, Goord, LeClaire, and Murphy have all refused to do so. (AC ¶ 26). Plaintiff alleges that this false and inaccurate information "will be used in a constitutionally significant way to possibly deny plaintiff's parole release." (AC ¶ 25). Plaintiff also claims that defendants are using administrative segregation as an excuse to further "discipline" plaintiff. (AC ¶ 24).

Separate from plaintiff's claimed due process violations regarding his placement in administrative segregation, plaintiff also claims that the conditions in administrative segregation are cruel and inhuman, violating plaintiff's constitutional rights. (AC ¶¶ 41-46). Plaintiff claims that human waste is left "on the company" for up to a day at a time. (AC ¶¶ 43-46). Plaintiff claims that "these inhuman conditions continued for months." (AC ¶ 46). Plaintiff then compares the conditions in SHU, Protective Custody, and General Population. (AC ¶¶ 47-78). Within these paragraphs, plaintiff describes the differences in privileges, property, and restrictions imposed on all three forms of confinement. *Id.*

**\*11** Also within this section of the complaint, plaintiff alleges that in SHU, the plaintiff is subjected to "loud banging and smelling human waste on an almost daily basis" due to an alleged policy of defendants Greene and Goord to house administrative segregation inmates in the same unit as "mentally ill inmates confined to SHU for disciplinary reasons." (AC ¶ 59). Plaintiff alleges that due to the deplorable conditions in SHU, he suffers from severe headaches, physical deterioration, anxiety, stress, depression, paranoia, delusions, and other physical and psychological injuries. (AC ¶ 79).

Although the complaint contains ten causes of action, the first five are related to the alleged due process violations [2] committed by defendants Kelly and Seyfert at the administrative segregation hearing. (AC ¶¶ 80-84). Plaintiff's sixth cause of action alleges that defendants Murphy, LeClaire, Goord, and Greene, all supervisory officials, failed to reverse defendant Kelly's determination and therefore, became liable for the due process violations allegedly committed at the hearing and for the cruel and

unusual punishment allegedly suffered by plaintiff as a result. (AC ¶ 85).

Plaintiff's seventh, eighth, and ninth causes of action are related to the allegedly cruel and unusual conditions in SHU. (AC ¶¶ 86-88). Plaintiff claims that defendants Greene and Goord failed to act upon information regarding the inhumane conditions and that defendant Goord failed to train or supervise his staff and condoned the violations after having received complaints from "prisoners." (AC ¶¶ 86-87). Plaintiff also claims that defendants Greene and Goord authorized a "policy" of housing known severely mentally ill prisoners with "mentally healthy" inmates, knowing that these mentally ill inmates are the ones that cause the "filthy and dangerous" conditions on the unit. (AC ¶ 88).

Finally, plaintiff's tenth cause of action claims that defendants Kelly, Murphy, Seyfert, LeClaire, and Goord failed to properly maintain plaintiff's records, and used them "in an adverse way," causing plaintiff to be improperly placed and kept in administrative segregation. (AC ¶ 89).

### 3. *Due Process*

In order to begin a due process analysis, the court must determine whether Plaintiff had a protected liberty interest in remaining free from the confinement that he challenges and then determine whether the Defendants deprived Plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

**\*12** The Court in *Sandin* determined that the inmate's discipline in segregated confinement for 30 days did not present the type of atypical, significant deprivation in which the state might create a liberty interest. *Id.* The Second Circuit has discussed the duration element of the *Sandin* analysis. *Colon v. Howard,* 215 F.3d 227 (2d

Cir.2000). In *Colon,* the court discussed whether it was appropriate to have a "bright line" rule regarding the maximum length of confinement in the Special Housing Unit (SHU) before a liberty interest might be created. *Id.* The court concluded that 305 days in SHU would meet the standard. *Id.* at 231. Although Judge Newman believed that the court should articulate a bright line rule, holding that any SHU confinement less than 180 days would not create a liberty interest, the panel disagreed. *Id.* at 234. The court also noted that the longest confinement in SHU that did not meet the atypical requirement was 101 days. *Id.* at 231 (citing *Sealey v. Giltner,* 197 F.3d 578, 589-90 (2d Cir.1999)).

In this case, defendants assume for the purposes of this case that plaintiff had a liberty interest in remaining free from the potentially indefinite term of administrative confinement. Thus, the question to be determined is whether plaintiff was afforded the process he was due prior to his placement in administrative segregation.

In *Hewitt v. Helms,* 459 U.S. 460, 469-76, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the principal case discussing due process in relation to the placement in administrative segregation, the Supreme Court held that when a liberty interest is created, an inmate must be afforded procedural protections prior to being transferred into the more restrictive confinement. [3] Under *Hewitt,* an inmate placed in administrative segregation must receive some notice of the charges and an opportunity to present his views to the prison official charged with deciding whether to transfer the inmate to administrative segregation. 459 U.S. at 476. The constitutional requirements for placement in administrative segregation are much less strict than those that were articulated for disciplinary determinations set forth in *Wolff v. McDonnell,* 418 U.S. 539, 563-72, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). *See Soto v. Walker,* 44 F.3d 169, 172 n. 3 (2d Cir.1995). In the administrative context, plaintiff would not have a federal constitutional right to have assistance for his defense, to call witnesses, or to have either a hearing or a transcript of that hearing. *See Sweet v. Wende Correctional Facility,* 514 F.Supp.2d 411, 415 (S.D.N.Y.2007) (even in the disciplinary context, no right to a hearing transcript); *Smart v. Goord,* 441 F.Supp.2d 631, 641 (S.D.N.Y.2006); *Gomez v. Coughlin,* 685 F.Supp. 1291, 1297 (S.D.N.Y.1988) (no right to assistance, witnesses, or even the hearing itself).

Prison officials must conduct an "informal nonadversary evidentiary review" of the information supporting the inmate's administrative segregation, and this review must take place within "a reasonable time following an inmates' transfer." *Id.* at 486 & n. 8. *Hewitt* also requires that there be periodic reviews after an inmate's placement in administrative segregation, such that the placement is not "a pretext" for indefinite confinement. *Id* . at 477. A "pretextual" administrative confinement may be raised as a separate constitutional violation. *See Soto,* 44 F.3d at 173 n. 4 (citing *Hewitt,* 459 U.S. at 477 n. 9). The court understands that generally, "administrative" confinement as contemplated in *Hewitt* is used for temporary confinement of an individual prior to a disciplinary hearing, at which time the individual would have the full due process protections articulated in *Wolff. See Hewitt,* 459 U.S. at 476 (stating that the informal review is sufficient both to determine that the inmate is a security risk and for the decision to confine the inmate "pending the completion of an investigation into misconduct charges against him).

**\*13** The DOCS regulations provide that the substantive predicate for an inmate's transfer to administrative segregation is that the inmate's presence in the general population would pose a threat to the safety and security of the facility. NEW YORK CODE RULES & REGS. tit. 7, § 301.4(b) (N.Y.CRR). The regulations also require that administrative segregation inmates receive the ***same type of hearing as those inmates who are transferred to SHU for disciplinary reasons.*** 7 NYCRR 301.4(a). The hearing must take place within 14 days of the inmate's admission to SHU, after issuance of the administrative segregation recommendation "made by the employee who ascertained the facts or circumstances." *Id.*

There are several ***state law*** requirements for the hearing. The inmate must receive written notice of the reason for his confinement; he must be afforded an employee assistant if he is confined to SHU pending the hearing; the hearing officer must be impartial; the inmate must be allowed to attend the hearing; and he must be permitted to submit documents and call witnesses unless the hearing officer finds that they are redundant or irrelevant. 7 NYCRR §§ 254.1, 251-4.1, 254.5, 254.6(a)(3). The hearing must be electronically recorded and must be completed within 14 days. *Id.* §§ 251-5.1(b), 254.6(b). Finally, the hearing officer must render a written decision, setting forth the basis for his determination; the inmate must

2008 WL 5243925

receive a copy of the determination and must be told of his right to appeal. *Id.* §§ 254.7(a)(5), 254.8.

The constitutional standard for sufficiency of evidence even in the prison disciplinary context is "some" or "a modicum" of evidence to support the hearing officer's decision. *Johnson v. Goord,* 487 F.Supp.2d 377 (S.D.N.Y. March 28, 2007) (citing *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)). The state law standard for sufficiency of evidence is whether the hearing officer's determination is supported by "substantial evidence." *Foster v. Coughlin,* 76 N.Y.2d 964, 563 N.Y.S.2d 728, 565 N.E.2d 477 (1990). This stricter standard is *not* applicable to federal due process claims, and it has been held that the reversal of a disciplinary ruling on administrative appeal for insufficient evidence does not necessarily establish a plaintiff's federal due process claim. *See Sira v. Morton,* 380 F.3d 57, 76 n. 9 (2d Cir.2004).

In this case, on December 9, 2003, plaintiff was served with an administrative segregation recommendation, written by defendant Seyfert. Kelly Decl. ¶ 8 & Ex. A, B, P. The hearing began on December 20, 2003. Defendants Kelly and Seyfert have both submitted declarations regarding the due process issues in support of defendants' motion for summary judgment. With the above due process standards in mind, and also keeping in mind the length of plaintiff's time in restrictive confinement, the court will review plaintiff's claims that defendants did not afford him due process at his administrative segregation hearing.

**A. Seyfert Recommendation**

**\*14** Defendant Seyfert states that he is the former Deputy Inspector General for DOCS, and held this position from 1995 until his retirement in October of 2007. Seyfert Decl. ¶ 3. As part of defendant Seyfert's duties, he was in charge of overseeing the DOCS Central Monitoring Case (CMC) Unit. *Id.* ¶ 4. The CMC procedure identifies inmates who by the nature of their crime or status, require special evaluation and tracking of their movements through DOCS. *Id.* ¶ 5. The rules governing the CMC procedure are described in the New York State regulations. N.Y. COMP.CODES R. & REGS., tit. 7, § 1000.1 *et seq.*

Plaintiff has been classified as a CMC inmate, a classification that he does not challenge in this case. Seyfert Decl. ¶ 6. As part of defendant Seyfert's duties regarding CMC inmates, he was required to

track plaintiff's movements through DOCS and evaluate plaintiff's status upon his potential release from the SHU after serving his disciplinary sentence. *Id.* ¶ 8. Defendant Seyfert states that he was required to review the plaintiff's file and determine whether he could be safely released into the general population of Great Meadow or any other facility. *Id.* ¶ 8.

Defendant Seyfert states that plaintiff's CMC file contained all the relevant information necessary to make this determination. *Id* . ¶ 10. These documents include an inmate's criminal history, disciplinary history, involvement in unusual incidents, or any other relevant information. *Id.*

After a review of plaintiff's file, defendant Seyfert wrote the administrative segregation recommendation that was ultimately served on plaintiff. *Id.* ¶ 13. The recommendation is attached to defendant Seyfert's declaration as Ex. A. [4] The recommendation is dated December 8, 2003 and states first, that the reason that plaintiff was initially classified as a CMC inmate was that on February 23, 1984, he absconded from "a job search from the Edgecombe Correctional Facility." Seyfert Decl. Ex. A at 2.

Plaintiff was serving his third term of incarceration with DOCS at the time of the recommendation, and one of his convictions included another "attempted" escape. *Id.* The recommendation then outlined various other incidents in which plaintiff was involved, including an incident in 1990 in which plaintiff slipped out of his restraints. *Id.* Plaintiff subsequently commented to a Sergeant that he wanted to be "more famous than Willie Bosket." *Id.* The recommendation was also based upon the 1994 escape from Shawangunk for which plaintiff was finishing his term of disciplinary confinement and the 1990 stabbing of another inmate.

The court notes that some of the incidents apparently occurred while plaintiff was in SHU. In 1995, in the SHU of Sullivan Correctional Facility, plaintiff removed his handcuffs while confined to his cell. *Id.* at 3. There were several other incidents in 1995, including an incident in which plaintiff set fire to his cell and an incident in which plaintiff was found to have a razor secreted in his rectum. *Id.* In 1997, plaintiff stabbed another inmate in the SHU of Auburn Correctional Facility, and since 1997 had various disciplinary reports for disorderly conduct,

2008 WL 5243925

fighting, harassment, movement violations, refusing direct orders, and violent conduct. *Id.*

**\*15** Defendant Seyfert also stated that plaintiff had accumulated twenty one enemies, located at various correctional facilities. *Id.* Based on all the above information, defendant Seyfert determined that plaintiff was an escape risk as well as a risk to safety and security of *any* correctional facility. *Id.* Thus, defendant Seyfert recommended that plaintiff be kept in administrative segregation. *Id.* Defendant Seyfert states, however, that his recommendation is only a "recommendation," and that the final determination of administrative segregation placement is the responsibility of the hearing officer. Seyfert Decl. ¶ 15.

### B. Preliminary Procedures

The court notes that in accordance with the regulations in New York state, as stated above, plaintiff was afforded all the rights that are afforded to inmates facing disciplinary proceedings. Thus, he was afforded a substantial amount of time for notice. The recommendation was served on him on December 9, 2003, however, the hearing did not begin until December 20, 2003. He was also afforded the right to choose a hearing assistant prior to the hearing. Kelly Decl.¶ 9 & Exs. B, C. Plaintiff requested and received various documents so that he could prepare a response to the recommendation. [5] *Id.* ¶ 10 & Ex. E at 4-5. Plaintiff also requested that two witnesses be interviewed, which was accomplished by plaintiff's chosen employee assistant Sergeant Nabozny. Kelly Decl. ¶ 11 & Ex. E at 3.

### C. The Administrative Segregation Hearing

Both plaintiff and defendants have submitted a transcript of the Administrative Segregation Hearing. [6] (Plaintiff's Ex. P-2; Kelly Decl. Ex. P) (HT) [7]. Plaintiff was present for the entire hearing. A review of the hearing transcript shows that plaintiff was given very wide latitude and many opportunities to argue his contentions, argue oral objections to rulings; and submit written objections and summary statements. At the outset, plaintiff was told about his rights with respect to providing oral and documentary evidence [8] and witnesses, and was also told that nothing he said could be used against him in any later criminal proceedings. (HT at 2).

Plaintiff acknowledged that he had been served on December 9, 2003 with the recommendation by George Seyfert, approximately ten days before the hearing. Plaintiff immediately asserted objections to the hearing, and argued that Captain Kelly, the Hearing Officer, was under orders by his superiors to decide against plaintiff. (HT at 7). Plaintiff also argued that the events referred to in the Seyfert Memo of December 2003 were extremely old, some were thirteen years old, and some as old as nineteen years ago. (HT at 8-11). Plaintiff also argued that the events and incidents referred to in the Seyfert Memo should not be used since plaintiff had not been issued any "tickets," and did not have an opportunity to defend those incidents at the time. (HT 8-9, 14, 16, 36, 57, 74, 82, 83).

**\*16** During the hearing, plaintiff was given the opportunity to question George Seyfert, the author of the Administrative Segregation recommendation, and Deputy Superintendent Dave Carpenter, who monitored plaintiff's mail. (T. 54-55, 68-77). Plaintiff's arguments at the hearing and during his written submissions to the Hearing Officer were that several of the events specified in the Seyfert Recommendation never happened, and for the other events, which he admitted, they did not happen as described or there were severe mitigating circumstances.

For example, plaintiff admitted to his escape from Shawangunk Correctional Facility, a maximum security facility, during November 1994. (HT at 10; Pl. Dep. at 25-33). Plaintiff also admitted that he attempted an escape while in the custody of the Suffolk County authorities by kicking a door window, and breaking his handcuffs on a partition in the vehicle. (HT at 8; Pl. Dep. at 86-87). Plaintiff also admitted that during June 1995, he threw feces at a corrections officer and admitted that he made a telephone call to a citizen in which he urged the citizen to tell other individuals to firebomb a house because plaintiff believed that three individuals living in the house had killed his friend. (HT at 13; Pl. Dep. at 98, 99). *See also,* Plaintiff's Response to Defendants' Rule 7.1 Statement of Material Fact.

During the hearing and at his deposition, plaintiff admitted stabbing another inmate in February 1997. (HT at 15; Pl. Dep. at 108), but argued that the Seyfert Recommendation did not include all the facts. Plaintiff argued that he was under attack at the time by another inmate who was attempting to cut plaintiff's face with a piece of glass, and that he was simply defending himself.

(HT at 15). Plaintiff also admitted to setting a fire during May 1997, but claimed that it was a "get warm" fire since the heat in the facility had malfunctioned, all the windows were broken, and it was freezing cold. (HT at 16; Pl. Dep. at 109). With respect to another fire incident, plaintiff admitted that there was a fire in his cell, but argued that he had plexiglass on the front of his cell, and that guards gave him a "light" from the back of his cell, and that some papers caught fire. (Pl. Dep. at 106-107).

Plaintiff denied completely that several of the incidents in the Seyfert Recommendation actually occurred. Plaintiff denied that he ever removed his handcuffs while in his cell in SHU during June 1995. Plaintiff stated at the hearing that he did not recall exactly what happened, but that the staff removed his handcuffs and they were lost by staff. (HT at 12; Pl. Dep. at 93). Plaintiff denies that he removed his handcuffs. (Pl. Dep. at 93). Plaintiff denies that ever secreted a razor blade in his rectum. (HT at 14; Pl. Dep. at 104). Plaintiff's own exhibits, however, contain an Unusual Incident Report which refers to x-rays being taken of plaintiff which showed the location of the razor in his rectum. (Pl.Ex.P-4) (UI dated 9/15/95).

 **\*17**  A large portion of plaintiff's administrative segregation hearing was spent on plaintiff's challenge to his "enemy" list. The Seyfert Recommendation refers to 21 enemies, and plaintiff argued that the reference to 21 enemies was erroneous. The hearing officer accepted plaintiff's argument. Plaintiff argued on multiple occasions that some of the individuals listed as "enemies" were, in fact, friends, or were no longer in DOCS custody. (HT at 39-43, 63, 77-81; Pl. Dep. at 111-19).

Plaintiff challenged other aspects of the Seyfert Recommendation. Plaintiff challenged two memoranda prepared by separate sergeants on separate dates from two separate facilities. Plaintiff argued that he was never given an opportunity to challenge the allegations in these memos, and was never charged with any type of infraction. (HT at 33). Both sides have submitted copies of each memo, one from Sergeant Greene dated March 16, 1990, the other from Sergeant Sweeney just four days later on March 20, 1990. (Kelly Decl. Exs. M, N).

The first memo by Sergeants Greene and LaBombard to a Deputy Superintendent for Security states that plaintiff has demonstrated certain "characteristics and abilities not apparent in the average inmate." (Kelly Decl. Ex. M

at 2). According to Sergeants Greene and LaBombard, after having shackles applied, plaintiff "shook his wrists a couple of times and stepped out of his wrist chain." *Id* . The sergeants did not know how this occurred and did not rule out error by the corrections officers. The sergeants included various comments made by plaintiff, including that it would not be hard to "get out" of the facility, and "it is like you're asking me to do something." *Id.* The sergeants included comments the plaintiff made about distances, landmarks, and plaintiff's questions about the difference in the route to and from the hospital. *Id.*

The sergeants also stated that plaintiff was constantly flexing his wrists and legs, and was able to cross his legs while keeping one foot on the floor even though plaintiff was in restraints. The sergeants stated that plaintiff made a comment about a supervisor that was outside the facility while plaintiff was being transported back to the facility in the return from a hospital visit. Plaintiff said that he was "memorizing the license plate [of the supervisor's car] and when I see him, I'm going to fuck with him." *Id.* The sergeants concluded that "it is imperative that staff escorting this inmate never lose sight of this inmate's cunning abilities ..." They also stated that officers escorting this inmate must be "constantly on guard ..." *Id.* at 2.

A second memo from Sergeant Sweeney to a First Deputy Superintendent at Clinton Correctional Facility is dated March 20, 1990. (Kelly Decl. Ex. N). In this memo, Sergeant Sweeney stated that he heard Inmate Proctor make comments on the weapons worn by corrections officers, including the number and model of the weapons; that Inmate Proctor was very respectful and well-mannered, which "would cause staff to become complacent," and that Inmate Proctor was asking several questions about where he was going and why there was the amount of security which was present. *Id.* at 1.

 **\*18**  Sergeant Sweeney also believed that plaintiff was "quite knowledgeable of our radio communications systems, and made numerous remarks pertaining to the system." *Id.* Sergeant Sweeney believed that Inmate Proctor was "very attentive to his surroundings, asking many questions, and appeared to make many mental notes." Sergeant Sweeney believed that Inmate Proctor would utilize any opportunity that might arise to his advantage. *Id.* at 2.

Plaintiff argued that these memoranda were unreliable and simply represented "mind reading" and speculation by the sergeants who wrote them. He argued that no charges were brought and these two memoranda should be given little, if any, weight. (HT at 72-73). At his deposition, plaintiff stated that he had been denied the opportunity to present four witnesses. (Pl. Dep. at 125). Defendant Kelly gave specific reasons for that denial. Defendant Kelly stated that three of the requested witnesses were no longer in DOCS' custody, and the fourth witness did not have any testimony that was material to the issues in the hearing. The fourth witness was an inmate named Colon, and plaintiff wanted Colon to testify that Colon was not plaintiff's enemy.

The Hearing Officer's ruling is supported by the record since the Hearing Officer specifically corrected the "Enemies List," and reduced the number of enemies that plaintiff allegedly had. Plaintiff specifically went through each name on the "new" Enemies List, and argued that most of those names were either not enemies, or were completely unknown to plaintiff. (HT at 79, 80).

Plaintiff has clearly admitted to several very serious crimes, all of which are extremely significant to a correctional facility. *See* Plaintiff's Responses to Defendants' Rule 7.1 Statement; Plaintiff's Deposition (Boivin Decl. Ex. A), and Transcript of Administrative Segregation Hearing Kelly Decl. Ex. P. Plaintiff admitted to a very sophisticated planned and successful escape from Shawangunk Correctional Facility; has admitted that he escaped from Suffolk County authorities by violent behavior; has admitted that he physically assaulted two Nassau County corrections officers; has admitted that he threw feces on a New York State corrections sergeant; and has admitted that he has engaged in other violent behavior such as stabbing or assaulting other inmates.

Plaintiff attempts to minimize his extremely serious criminal and violent record by stating that he has only two escapes. (HT at 18), and that he has been well-behaved while in SHU for nine years, resulting in a reduction of his SHU sentence. Plaintiff claims that he now denounces escape and assaultive behavior, and has told Superintendent Greene of his new outlook. (HT at 19). All of plaintiff's claims do not change the basic facts in this case of plaintiff's absconding from a facility when he was 19 years old, escaping from the Suffolk County authorities five years later, and escaping from

Shawangunk Correctional Facility approximately five years after the Suffolk County escape.

**\*19** By calling Deputy Superintendent Carpenter, an individual who was responsible for monitoring plaintiff's mail, plaintiff attempted to show that his mail contained no suggestions or references to escapes and therefore proves that he has no thoughts of escaping. He also argues that he has personally "denounced" escapes and assaults and therefore everyone should realize that he does not present any risk of escape or violent behavior. (HT at 19).

### D. Defendant Kelly

Plaintiff's first four causes of action alleges that defendant Kelly violated plaintiff's right to due process during the administrative segregation hearing. This court has reviewed the entire hearing transcript, the exhibits attached to the Seyfert Declaration, and plaintiff's deposition. As stated above, all of the due process protections articulated in *Wolff* are not constitutionally required for placement in administrative segregation, however, in this recommendation, this court has carefully reviewed all the process that was afforded to plaintiff and finds that he received as many rights as an inmate would have received in a disciplinary hearing as required by New York State law.

In fact, this court finds that there was substantial evidence, which is more than the modicum of evidence constitutionally necessary, to support the Hearing Officer's finding that plaintiff presents an extreme risk of flight, and a risk of danger to other inmates and DOCS personnel. Plaintiff admitted most of the conduct relied upon by defendant Kelly, and defendant Kelly was justified in using plaintiff's past conduct in making his determination.

Although plaintiff complains that defendant Kelly refused to call a relevant witness, his failure to do so did not violate plaintiff's due process rights. Plaintiff states in the complaint that he wanted to call Inmate Colon "for the reasons stated in paragraph 20 ." (AC ¶ 21). Plaintiff also wished to call Inmate Colon so that Colon could testify that he was supposed to be a witness "several years ago," to state that corrections staff had been placing plaintiff's life in danger and that was the reason that plaintiff attempted to escape from Shawangunk in 1994. (AC ¶ 21).

By calling Inmate Colon, it appears that plaintiff was trying to justify his 1994 escape and perhaps try to show that he would not have escaped if the corrections staff had not put his "life in danger." Defendant Kelly's written reason for the denial of this witness was that Inmate Colon was listed as a "separatee". (Kelly Decl. Ex. G; HT at 64). Plaintiff claims that the refusal to call Inmate Colon had nothing to do with the reason that plaintiff wanted to call the inmate. (AC ¶ 22). Since plaintiff would not constitutionally have been entitled to witnesses at all, defendant Kelly's denial of Inmate Colon would not have been constitutionally relevant even if the reason was incorrect.

However, the court notes that plaintiff would not have been able to rehash the reasons for his attempted escape in 1994. If his reason for calling Inmate Colon was to justify plaintiff's attempted escape to show that he was no longer an escape risk, such testimony would have been properly denied in any event. The court notes that if calling Inmate Colon was an attempt to prove that plaintiff's enemies list was incorrect, defendant Kelly went over plaintiff's enemies list at the hearing and considered plaintiff's claim that the list was outdated. (HT at 76-80). In fact, defendant Kelly told plaintiff that he would consider some individuals only as "on the separation list" as opposed to being plaintiff's "enemies." (HT at 84-86). It is also clear that defendant Kelly accepted and considered evidence submitted by plaintiff. (HT at 83-84).

*20 Notwithstanding defendant Kelly's failure to call Inmate Colon, it is clear that plaintiff was able to present a defense to the recommendation. Plaintiff claims that defendant Kelly was not "impartial." Compl. ¶ 82. It is true that an inmate is entitled to an "impartial hearing officer." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). An "impartial" hearing officer is one who does not prejudice the evidence, and who could not say how he would assess evidence that he has not seen. *Patterson v. Coughlin,* 905 F.2d 564, 569-70 (2d Cir.1990). The court would point out, however, that disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts based on the "special characteristics" of the prison environment. *Allen,* 100 F.3d at 259; *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) (it is permissible for prison adjudicators to be encumbered by various conflicts of interest).

A careful review of the entire file shows that there is absolutely no evidence that defendant Kelly was not impartial. He conducted an exhaustive hearing, listening to plaintiff's defense, and when plaintiff challenged his enemies list, defendant Kelly did look into the matter, and agreed to consider plaintiff's position. *See generally* Hearing Transcript. *See also* Kelly Decl. ¶¶ 13-17. The record shows that defendant Kelly proceeded very deliberately and patiently, and gave plaintiff great latitude in allowing plaintiff to assert all of plaintiff's arguments and objections. He asked for two or three extensions to complete the hearing because of the issues raised and the time necessary for plaintiff to fully present all of his arguments, claims, theories, and excuses.

With respect to the claim that defendant Kelly was directed to reach a certain result, the declaration of defendant Seyfert clearly shows that this was not the case. Defendant Seyfert states in his declaration that he is not defendant Kelly's superior had no contact with defendant Kelly other than the telephonic testimony that defendant Seyfert provided at the hearing. Seyfert Decl. ¶¶ 39-44. Thus, defendant Kelly's impartiality cannot be questioned through a claim that defendant Seyfert was somehow defendant Kelly's superior, causing an impermissible conflict of interest.

Plaintiff also complains that defendant Kelly's refusal to reconstruct testimony after erasing part of the hearing tape somehow violated plaintiff's due process rights. The court would simply point out, as stated above, that an electronic recording of a hearing is not constitutionally required, and there is no constitutional right to a transcript even in the disciplinary context. *See Sweet,* 514 F.Supp.2d at 415 (even in the disciplinary context, no right to a hearing transcript). Thus, even if defendant Kelly did erase part of the hearing tape and refused to "reconstruct" the testimony, there is no due process violation.

*21 Finally, plaintiff claims that defendant Kelly relied upon false, expunged information in accepting defendant Seyfert's recommendation. Plaintiff also alleges that defendant Kelly failed to make an "independent assessment" of the information. Plaintiff is confusing the law that governs due process claims. The requirement of an "independent assessment" refers to a hearing officer being required to make an independent assessment of "confidential information" that he receives during a disciplinary hearing. *See Sira v. Morton,* 380 F.3d 57,

77 (2d Cir.2004). There was no confidential information relied upon by defendant Kelly in this case, thus, defendant Kelly did not have to make an "independent assessment" of the information utilized. Defendant Kelly did make an "independent assessment" of all the evidence when he considered the plaintiff's testimony and other evidence and defendant Seyfert's evidence and testimony. This was the "independent assessment" required of the hearing officer.

To the extent that plaintiff claims that defendant Kelly relied upon "false and expunged" information, it is unclear to what plaintiff is referring. Plaintiff has argued that he was never given misbehavior reports or "charged" with some of the conduct that was used against him. The fact that plaintiff was not "charged" with misbehavior does not indicate that the conduct did not occur. Plaintiff states that defendant Seyfert testified that UI reports are kept even if the allegations of misconduct were overturned and expunged. Defendant Seyfert did make that statement. (HT at 69). To the extent that UI reports were considered where misbehavior reports were not issued, the court does not find any error in their use.

There is one UI report in plaintiff's case that did result in a misbehavior report and subsequent disciplinary conviction. The incident involved a 1995 charge for contraband in the form of a sharpened nail clipper. Plaintiff later had the charges reversed and expunged. [9] *Proctor v. Coombe,* 233 A.D.2d 648, 649 N.Y.S.2d 832 (3d Dep't 1996). After the UI from this incident was considered in this administrative segregation proceeding, plaintiff brought a proceeding pursuant to 7 N.Y.C.R.R. § 5.51 to expunge *all* references to this incident from his prison record. When the Superintendent denied plaintiff's request, he filed an Article 78 proceeding in Supreme Court of Albany County. *Proctor v. Goord,* 10 Misc.3d 229, 801 N.Y.S.2d 517 (Sup.Ct.2005).

The Supreme Court in Albany County found that because the UI resulted in a misbehavior report and a disciplinary determination that was later expunged, the court found that all references to the UI in plaintiff's record should have been expunged. *Id.* 3 Misc.2d at 232-33, 801 N.Y.S.2d at 519-20. The court held only that references to the UI from the expunged determination should be removed from plaintiff's record. There is no indication, and this court finds none, that the other UI's in which

no misbehavior was charged were false or improperly considered.

***22** The Second Circuit has specifically held that prison disciplinary hearings are subject to a harmless error analysis. *See Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991). To the extent that defendant Kelly considered [10] the one incident involving the nail clipper, the court still finds that no due process violation occurred. Plaintiff had the opportunity to, and did, argue that it should not be considered. If it was error, the error was certainly not "prejudicial" to plaintiff. There were so many other incidents upon which defendant Kelly could base his decision. As stated above, the standard for administrative segregation is "some" or "a modicum" of evidence. Even if the court were to assume that defendant Kelly erred in considering the UI, and even if that error could rise to the level of a constitutional error, [11] the court would find the error harmless.

### E. Defendant Seyfert

Plaintiff has named George Seyfert, who was formerly the Deputy Inspector General of DOCS. Plaintiff claims that defendant Seyfert provided false information and "attested to the veracity of expunged information." Plaintiff claims, in essence, that defendant Seyfert used incomplete and erroneous information when Seyfert compiled the administrative segregation recommendation. Throughout the hearing, plaintiff claimed that Seyfert relied on an erroneous list of plaintiff's "enemies" and also relied on the two memos from correctional sergeants that made statements about plaintiff's actions and state of mind. Plaintiff also argues that Seyfert relied on Unusual Incident Reports, one of which was expunged from plaintiff's records (the nail clipper incident), and others which did not result in Misbehavior Reports. Plaintiff claims, in essence, that he was denied due process since the Unusual Incident Reports did not result in charges, and he was not able to challenge the facts and statements in the Unusual Incident Reports.

The court would point out that inmates are not constitutionally protected from false accusations as long as the hearing comports with due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988). In this case, the court has determined that plaintiff had

more than the constitutionally required due process at his hearing, thus, plaintiff's claims of false accusations against defendant Seyfert cannot stand.

Notwithstanding this finding, the court must note that plaintiff's claims of **false** accusations ring hollow. The plaintiff began the hearing by admitting most of the conduct that was in the recommendation. Plaintiff's claims of "false" evidence are basically his interpretation of how the incidents happened. Even the UI that the Supreme Court in Albany County ordered expunged was not necessarily "false." The court simply ruled that because the misbehavior charge was reversed and ordered to be expunged, the incident could not be considered. No court ruled that the allegations were "false."

**\*23** Plaintiff admitted at the administrative segregation hearing, during his deposition, and in his Response to Defendants' Statement of Material Facts in Support of the Summary Judgment Motion, that he escaped from Shawangunk; escaped from Nassau County authorities; admitted the two assaults, but claimed they were self-defense; admitted one of the "arson" incidents, admitted squirting feces onto a corrections officer; and admitted receiving disciplinary reports for disorderly conduct, fighting, harassment, and a movement violation. Thus, plaintiff's claims against defendant Seyfert may be dismissed.

### F. Defendants Goord, Greene, Murphy, and LeClaire

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were

grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)).

In plaintiff's sixth cause of action he claims that defendants Murphy, LeClaire, Goord, and Greene violated plaintiff's right to due process by failing to reverse defendant Kelly's determination. Compl. ¶ 85. In plaintiff's tenth cause of action, he states that defendants Kelly, Murphy, Seyfert, LeClaire, and Goord failed to maintain plaintiff's disciplinary records accurately and thus, relied upon false and inaccurate unusual incident records. Compl. ¶ 89. As stated above, only one of the unusual incident records was expunged. There is no indication that any of them were "false."

Since there has been no showing of a constitutional violation, to the extent that plaintiff alleges that the supervisory officers, Murphy, LeClaire, and Goord and Greene affirmed plaintiff's administrative segregation placement, there is also no constitutional violation. Additionally, there is **no indication** that defendants Murphy or Goord were personally involved in plaintiff's appeal or in the maintenance of plaintiff's records. Defendant Kelly was only the hearing officer in this case. There is no indication that he was in any way involved in the maintenance of plaintiff's records.

**\*24** In his amended complaint, plaintiff states that defendant Murphy is the Acting Director of the Inmate Disciplinary Program, whose "responsibility" it is to make sure that disciplinary and administrative segregation hearings comply with the law. However, there are no specific claims against this individual. Thus, there is no personal responsibility asserted for defendant Murphy.

Plaintiff has submitted a letter that he received from defendant LeClaire, stating that notwithstanding the questioned UI report, there was other evidence showing that plaintiff's placement in administrative segregation was proper. Pl.Ex. P-15 at 4. Even assuming that this letter would make defendant LeClaire personally responsible in some way for the "affirmance" of plaintiff's administrative segregation status, the letter shows that defendant LeClaire believed that plaintiff's placement in administrative segregation was proper, notwithstanding the allegedly inaccurate or "false" UI outlining the nail clipper incident. *Id.* Thus, as stated above, this UI was not

2008 WL 5243925

the only basis for plaintiff's placement in administrative segregation, and defendants did not rely on "false" evidence.

This court has examined the Declaration by former DOCS Commissioner Goord in support of defendants' motion for summary judgment. Goord Decl. (Dkt. No. 39). The Declaration is detailed and shows that former Commissioner Goord was required to delegate many separate duties because of the vast number of inmates and the large number of correctional facilities. Goord Decl. ¶¶ 7-10. Commissioner Goord confirms that he was never personally involved in the administrative segregation hearing, the appeals therefrom, or the grievances filed by plaintiff regarding the allegedly inhumane conditions in SHU. Goord Decl. ¶¶ 34-44, 58.

With respect to maintenance of records, defendant Goord states that DOCS tries to maintain inmate records accurately. Goord ¶ 62. If an inmate questions the accuracy of his records, he may file a challenge under 7 N.Y.C.R.R. § 5.50.[12] Defendant Goord states that he did not have any involvement in this procedure. Goord Decl. ¶ 62-64. Plaintiff makes no allegation that defendant Goord had any responsibility for any of the allegations that plaintiff makes. Basically defendant Goord is named in the complaint because he was the Commissioner of DOCS. As stated above, this essentially *respondeat superior* claim cannot survive. This court recommends, therefore, that Commissioner Goord be dismissed from this lawsuit.

The court has examined the Declaration by Superintendent Greene and all of the other records in this case, and finds that Superintendent Greene did not violate any of plaintiff's due process rights with respect to plaintiff's administrative segregation hearing. Superintendent Greene's statement that his only role in the administrative segregation determination was the assignment of Captain Kelly to conduct the hearing is supported by the records in this case.

**\*25** Superintendent Greene was *not* personally involved in the recommendation to put plaintiff into administrative segregation, was not personally involved in the hearing, and was not personally involved in the decision or the appeal. In addition, Superintendent Greene does not maintain inmate records, and has no responsibility for any incomplete or missing records pertaining to the plaintiff.

Greene Decl. ¶ 29. Defendant Greene states that inmate records are kept by the Central Office. *Id.* Thus plaintiff's due process claims may be dismissed as against defendant Greene.

### G. Periodic Reviews

In plaintiff's cross-motion for summary judgment, he *now* appears to be complaining about the periodic reviews that occur every sixty days when an individual is confined to administrative segregation. Pl. Mem. of Law at 10, 27-28. (Dkt. No. 98). It is true that in addition to the notice and opportunity to be heard prior to placement in administrative segregation, an inmate must be given periodic reviews of his confinement so that administrative segregation is not used for indefinite confinement of the inmate. *Hewitt,* 459 U.S. at 477 n. 9. Those periodic reviews must be meaningful. *See Doe v. Simon,* 221 F.3d 137, 139 (2d Cir.2000). The question of periodic review is a due process claim that is separate from the claim for the initial placement in administrative segregation. *See Blake v. Coughlin,* 92-CV-1351, 2006 U.S. Dist. LEXIS 55319, *14-17, 2006 WL 2270383 (N.D.N.Y. Aug. 8, 2006).

Plaintiff's motion for summary judgment, filed in 2008, is the *first time* in this case that plaintiff is complaining about his periodic reviews. There is absolutely *no* mention of periodic reviews in his amended complaint that was initially submitted as a motion to amend on September 8, 2005. Since plaintiff was placed in administrative segregation in 2003, by September of 2005, there would have been many of those periodic reviews to challenge if plaintiff wished to do so. Defendants are correct in arguing that the constitutionality of plaintiff's periodic reviews is not before the court.

### 4. *Conditions in SHU*

Plaintiff alleges that the conditions in SHU violated his right to be free from cruel and unusual punishment. Plaintiff's seventh, eighth, and ninth causes of action refer to these allegedly inhumane conditions. The Eighth Amendment does not mandate comfortable prisons, but does guarantee that the conditions in prison will be at least humane. *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001). In order to establish an Eighth Amendment violation, plaintiff must show that the deprivation was objectively, sufficiently serious to deprive plaintiff of the minimal civilized measure of life's necessities, and must show a sufficiently culpable state of mind on the part of

defendant. *Id.* That state of mind component is satisfied if defendant has shown deliberate indifference to plaintiff's health or safety. *Id.* (citations omitted).

**\*26** Plaintiff has submitted many grievances from other inmates that plaintiff believes support his claims that the conditions in SHU violated the Eighth Amendment ban against cruel and unusual punishment. Many of the exhibits show specific investigations and statements by sergeants in response to grievances. In one of plaintiff's exhibits, Sergeant Birrell filed a report stating that no inmates around the grieving inmate were plastering their walls with feces. Pl.Ex. P-21. In another of plaintiff's exhibits, Sergeant Birrell stated that his investigation did not verify flooding of an inmate's cell. Pl.Ex. P-22. In another response, Sergeant Murray stated that the inmate could request that mental health personnel examine him. Pl, Ex. P-24. *See also* Pl. Exs. P-25, P-26, P-28.

In his Eighth Amendment claims, plaintiff has named only supervisory personnel, defendants Greene and Goord. Plaintiff complains about two specific problems in SHU, human waste being left on the gallery, and mentally ill inmates. There is no indication that defendant Goord was involved in any of the grievances submitted by plaintiff or any other inmate. Defendant Goord was not at Great Meadow Correctional Facility. His office was in Albany, and he supervised the entire DOCS system. Goord Decl. ¶ 7.

As defendant Goord states in his declaration, he was *not* involved in grievances since they are handled through the Inmate Grievance Program in 7 N.Y.C.R.R. § 701, *et seq.* Goord Decl. ¶¶ 40-43. The court would also point out that even if defendant Goord had ignored letters of protest, this would not have made him personally responsible for the violations outlined in those letters. *Smart v. Goord,* 441 F.Supp.2d 631, 642-643 (S.D.N.Y.2006). The same is true if the only involvement of the supervisory official is to refer the inmate's complaint to the appropriate staff for investigation. *Ortiz-Rodriguez v. N. Y. State Dep't of Corr. Servs.,* 491 F.Supp.2d 342, 347 (W.D.N.Y.2007).

Plaintiff's bald assertion that defendant Goord condoned a policy of inhumane conditions in Great Meadow's SHU is completely unsupported by plaintiff's complaint or any of the multitude of exhibits [13] attached to his summary judgment motion.

Defendant Greene is the superintendent of Great Meadow. Defendants claim that there is no policy of condoning such behavior in SHU. Although plaintiff claims that mentally ill inmates are housed in SHU, and *those mentally ill inmates* are generally responsible for the human waste and noise problem, plaintiff seems to forget that he admitted placing feces in a toothpaste tube while in he was in SHU and squirting it onto a corrections officer. Plaintiff stated at his administrative segregation hearing that he understood that it was poor judgment, however, other inmates who are not mentally ill could exercise the same "poor judgment."

Defendant Greene states that unfortunately, there are instances in which inmates throw things, [14] flood their cells, start fires, and engage in generally unruly behavior. Greene Decl. ¶ 37. According to defendant Greene, and to the individuals who investigated the grievances cited above, these instances of improper behavior are dealt with "appropriately." Greene Decl. ¶ 38. It is clear from plaintiff's own exhibits that the subjects of these grievances were addressed. Although plaintiff complains that the SHU houses "mentally ill" inmates, plaintiff's opinion of whether an inmate is mentally ill does not raise a question of fact regarding this issue, particularly since plaintiff himself has engaged in some of the "offensive" behavior.

**\*27** Plaintiff has not alleged that he was denied the minimal civilized measure of life's necessities, he has alleged that he has had to suffer some unpleasant conditions caused by other inmates. The court would point out that in some of plaintiff's exhibits, the investigation into the grievance shows that the statements in the grievance were unsubstantiated. In response to a grievance stating that an inmate's jumpsuit was soiled by flooding, Sergeant Birrell reported that the jumpsuit was neither wet, nor soiled. *See* Pl.Ex. P-22 at 5.

Plaintiff has also submitted an SHU log for various dates. Pl.Ex. P-16. [15] A review of the log entries shows that generally the officers handled issues very quickly. The court also notes that there are notations that MHU (mental health unit) personnel made rounds frequently. *See e.g.* Pl.Ex. P-16 at 6, 9, 11, 14. The court would also point out that there is no indication that an individual who needs a mental health professional is "mentally ill." There are incidents of "banging" on the cells, [16] however, these appear to occur on an occasional basis.

Plaintiff filed a grievance, alleging that on May 31, 2004, an inmate flooded his toilet. Plaintiff himself states that a porter was mopping up the area at 2:00 p.m., but also states that at 11:30 p.m., the inmate in question had not been given the opportunity to clean his cell. Pl.Ex. P-23. A review of the log book entries shows that an inmate was throwing toilet water and feces on the floor at 12:55 p.m. and at 1:35 p.m. Pl.Ex. P-16 at 24. If plaintiff claims that the porter was cleaning the area at 2:00 p.m., this does not support his claims that this condition was allowed to exist for the entire day. Additionally, the court notes that the log book also shows that by 2:18 p.m., an inmate plumber was trying to unclog the toilet, and by 2:35 p.m., the toilet was "flushable." *Id.* at p. 24.

The court also notes that between May 9, 2004 and May 13, 2004, there was a plumber on the unit at least twice. Pl.Ex. P-16 at 14-16. On May 27, 2004, another individual was on the unit to fix and clean an inmate's toilet. *Id.* at 22. Shortly thereafter, a porter was "out to clean." *Id.* On one day, at 11:03, an inmate was observed throwing feces and water out of his cell and covering the plexiglass on the front of his cell with an unknown substance. Pl.Ex. P-16 at 26. The log book notes that a supervisor was "notified" immediately, and at 11:52, maintenance was called. At 11:55, the MHU was on the unit to attempt to "extract" the inmate. *Id.* On another day, the log book indicates that at 9:17 a.m. someone was "out cleaning the mess on odd side of F-Block." *Id.* at 34. At 10:15 a.m. C.O. Depalo came to take an inmate out of his cell "to clean cell," and the "cell extraction protocol" was in progress. *Id.*

On July 11, 2004, an inmate kept his food tray and was yelling and banging for approximately one hour. *Id.* at 68. The reason for the banging, however, was that his eye was bothering him, and the officer called the nurse, who informed him that the physician's assistant would check the inmate's eye on evening rounds. *Id.* There was some more "banging and hollering" noted for approximately one half hour on July 14, 2004. *Id.* at 73. On July 14, 2004, at 7:40 a.m., the officer noted that an inmate had smeared feces on the plexiglass covering the door of his cell and covered the door with paper. *Id.* at 72. At approximately

12:46 p.m., the plexiglass was being removed from a cell to clean the door and the bars. *Id.* at 75. At 2:00 p.m., the cell [17] was "completely clean" and the plexiglass was placed back on the cell. *Id.*

**\*28** The court will not discuss every entry in the log book and what it states, and the court does note that there are other instances of improper behavior noted in the log book. [18] In the entries cited, however, the hygiene issues were all addressed quickly, and the area cleaned within a short period of time. When there were plumbing issues on the unit, these too were addressed. These examples are only to indicate that plaintiff's conclusory assertions that there is some kind of "policy" to allow unhygienic conditions, caused by mentally ill or other inmates to exist on the SHU, or that defendants Greene and Goord condoned such behavior are meritless.

**WHEREFORE** it is hereby

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 93) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY AS AGAINST ALL DEFENDANTS,** and it is

**RECOMMENDED,** that plaintiff's cross-motion for summary judgment (Dkt. No. 98) be **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 5243925

---

Footnotes

1    The Court notes that Plaintiff's claim regarding periodic reviews was raised for the first time in his February 7, 2008 Memorandum of Law, more than two years after Plaintiff filed his Amended Complaint. (Dkt. No. 98, Plf.'s Mem. of Law, at 10, 27-28)

2008 WL 5243925

2    *Performance Autoplex II Ltd. v. Mid-Continent Cas. Co.,* 322 F,3d 847, 862 (5th Cir.2003) [citation omitted].

3    On *de novo* review, "[t]he judge may ... receive further evidence ...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g ., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

4    *See also Vargas v. Keane,* 93-CV-7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec.12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996).

5    *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13, 2004 WL 5477530 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4, 2006 WL 395269 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

6    *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Edwards v. I.N.S.,* 69 F.3d 5, 8 (2d Cir.1995) ("[W]hile a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them .") [citations omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[T]he right [to benefit from reasonable allowances as a *pro se* litigant] does not exempt [the *pro se* ] party from compliance with relevant rules of procedural and substantive law.") [internal quotation marks and citations omitted].

7    Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3).

8    *See, e.g., DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 & n. 1 (N.D.N.Y.1999) (McAvoy, C.J.) (*pro se* civil rights case); *Costello v. Norton,* 96-CV-1634, 1998 WL 743710, at *1, n. 1 (N.D.N.Y. Oct.21, 1998) (McAvoy, C.J.) (*pro se* civil rights case); *Squair v. O'Brien & Gere Eng'rs, Inc.,* 96-CV-1812, 1998 WL 566773, at *1, n. 2 (N.D.N.Y. Aug.21, 1998) (Scullin, J.) (*pro se* civil rights case); *see also Monahan v. N.Y. City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1[a][3], in *pro se* civil rights case).

9    *See Alicea v. Howell,* 387 F.Supp.2d 227, 235 (W.D.N.Y.2005) (deeming immaterial the fact that, at start of disciplinary hearing, hearing officer admitted to having had previous conversation with plaintiff's hearing assistant, which caused hearing assistant to communicate veiled threat to plaintiff about filing complaints about the assistance provided to him); *see also Alicea v. Howell,* 03-CV-0650, Ex. N to Declaration of Wade Howell, Submitted in Support of Defendants' Motion for Summary Judgment, at 2-5 (W.D.N.Y. filed Dec. 31, 2004).

10    *See Bunting v. Nagy,* 452 F.Supp.2d 447, 460-61 (S.D.N.Y.2006) (deeming "conclusory" plaintiff's affidavit testimony that hearing officer began hearing by stating, "You look familiar," giving plaintiff a "knowing glare," and then stating, off the record, that "he was going to find plaintiff guilty and going to impose a stiff penalty because he had the previous one modified.").

11    *Bunting,* 452 F.Supp.2d at 460-61 (finding no due process violation, despite assertedly biased remark by hearing officer, because "defendant made a substantial effort to locate [a witness] on plaintiff's behalf ... [and] plaintiff received notice of the charges against him and was allowed to present evidence and call witnesses in his defense. Defendant's finding of guilt is fully supported by 'some evidence' ....").

12    *See Daniels v. Williams,* 474 U.S. 327, 331-33 (1986) (stating that "injuries inflicted by governmental negligence are not addressed by the United States Constitution" and rejecting § 1983 claim based on alleged due process violation under Fourteenth Amendment); *Riddick v. Modeny,* No. 07-1645, 2007 WL 2980186, at *2 (3d Cir. Oct.9, 2007) ("The protections afforded prisoners by the Due Process Clause of the Fourteenth Amendment are not triggered by the mere negligence of prison officials.").

13    The Court notes that, even if it found record evidence of a substantive due process violation having occurred, it could not find any record evidence that Defendants had committed such a violation recklessly. *See Hudson v. Palmer,* 468 U.S. 517, 531, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) ("[T]he Due Process Clause of the Fourteenth Amendment is not violated when a state employee negligently deprives an individual of property ...."); *Pena v. Deprisco,* 432 F.3d 98, 112 (2d Cir.2005) ("In order to establish a violation of a right to substantive due process, a plaintiff must demonstrate not only government action but also that the government action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.... [N]egligently inflicted harm is categorically beneath the threshold of constitutional due process.") [internal quotation marks and citations omitted].

14    In addition, the Court notes that Plaintiff has not alleged (in his Memorandum of Law) any specific deprivation of his right to periodic reviews (much less a deprivation caused by Defendants); rather, he has alleged only an entitlement to receive periodic reviews.

15    As indicated above, negligence does not give rise to a procedural due process violation. *See, supra,* note 9 of this Memorandum-Decision and Order [citing cases].

16    This is because "[a] violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Cabassa v. Gummerson,* 01-CV-1039, 2008 WL 4416411, at *6, n. 24 (N.D.N.Y. Sept.24, 2008) (Hurd, J.) [citation omitted]. "Furthermore, the violation of a DOCS Directive, alone, is not even a violation of [a] New York State law or regulation (much less a violation of 42 U.S.C. § 1983)." *Cabassa,* 2008 WL 4416411, at *6, n. 24 [internal quotation marks and citations omitted]. "This is because [the use of] a DOCS Directive is merely a system the DOCS Commissioner has established to assist him in exercising his discretion, which he retains despite any violation of that Directive ." *Id.* [internal quotation marks and citation omitted].

17    *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence.").

18    *Farmer,* 511 U.S. at 827 ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for "deliberate indifference" under the Eighth Amendment."); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *accord, Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *17, n. 98 (N.D.N.Y. Sept.26, 2007) (Kahn, J.), *Richards v. Goord,* 04-CV1433, 2007 WL 201109, at *15, n. 124 (N.D.N.Y. Jan.23, 2007) (Kahn, J.), *Salaam v. Adams,* 03-CV-0517, 2006 WL 2827687, at *10, n. 59 (N.D.N.Y. Sept.29, 2006) (Kahn, J.).

19    *See Proctor v. Goord,* 10 Misc.3d 229, 801 N.Y.S.2d, 517 (N.Y.S. Sup.Ct., Albany County 2005) (holding that the DOCS Commissioner's decision not to expunge Unusual Incident Report regarding filed nail clipper and all references to the matter was arbitrary and capricious).

20    The Court would only note that the doctrine of collateral estoppel does not appear to apply under the circumstances. Among other things, Plaintiff sued Defendant Goord is his official capacity in his Article 78 proceeding, and he now sues Defendant Goord in his individual or personal capacity. *See Fletcher v. Goord,* 07-CV-707, 2008 WL 4426763, at *10 (N.D.N.Y. Sept.25, 2008) (Sharpe, J.).

1    The amended complaint is Docket Number 19. The court will cite the amended complaint as "AC." Plaintiff's motion to amend was filed in September 2005. (Dkt. No. 19). Plaintiff's motion was granted in February 2006, and rather than requiring plaintiff to submit a new amended complaint, the court allowed the filing of the proposed amended complaint that was originally attached to the motion. (Dkt. No. 26). Where the portion of the amended complaint is easily identified by numbered paragraphs, the court will refer to the paragraph number. Otherwise, the court will refer to the page.

2    The court notes that within these five causes of action, plaintiff also claims that the due process violations also resulted in Eighth Amendment violations. Plaintiff is confusing the "atypical and significant hardship" used to determine whether

a liberty interest exists for due process purposes, with cruel and unusual punishment for Eighth Amendment purposes. The court will discuss the difference below.

3   Although the standard for determining whether a liberty interest is created is now governed by *Sandin,* rather than by *Hewitt,* the standard for determining the process that is due after a liberty interest has been created remains the same. *See Wilkinson v. Austin,* 545 U.S. 209, 229, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005) (stating that although *Sandin* abrogated the methodology for establishing the liberty interest articulated in *Hewitt* and in *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), those cases "remain instructive for their discussion of the appropriate level of procedural safeguards").

4   The court must point out that there are many duplicate exhibits in this file. The same exhibit has often been submitted by both defendants and plaintiff. The court will be mindful to cite to the appropriate exhibit.

5   Kelly Decl. Ex. E at 4-5 is the list of plaintiff's requested documents. Plaintiff appears to have been denied some of his requested documents as evidenced by the notation "no" next to the request.

6   The hearing was conducted on several different days, but is numbered consecutively. Pages 61-66 are chronologically the final date of the hearing, but are included in the transcript out of chronological order.

7   The court is citing to the Hearing Transcript attached to defendant Kelly's declaration.

8   The court notes that it appears that the name of plaintiff's employee assistant was misspelled in the hearing transcript. The document showing plaintiff's choice of assistant states that he chose Sergeant Nobozny, however the hearing transcript states that plaintiff's assistant was Deblaise. (HT at 3). This fact is irrelevant to the decision, since it is clear that plaintiff did have an assistant assigned to him.

9   The court does note that the charges were "administratively reversed," causing the Appellate Division to dismiss the Article 78 proceeding as moot. *Proctor v. Coombe, supra.*

10  The court notes that at the hearing, when plaintiff was responding to each of the allegations in the report, he merely stated that this incident "never happened.... that's all I am going to say about that." (HT at 13). He later argued that he was found "innocent" of the charges and the records were expunged. (HT at 36-37). Plaintiff questioned why the information was being used against him. *Id.* Plaintiff did have the opportunity to argue that defendant Kelly should not consider the information. Plaintiff and the hearing officer had a lengthy discussion about incidents that did not result in misbehavior reports. (HT at 52-54). The hearing occurred in 2003, and the Supreme Court's decision stating that the information should have been expunged occurred in 2005.

11  The court makes no such finding in this case.

12  As stated above, plaintiff did challenge the **one** expunged misbehavior report and UI record and won in the Supreme Court. Plaintiff did not later challenge his "enemies" list.

13  Plaintiff has submitted 45 exhibits in support of his summary judgment motion. Pl. Exs. 1-45 (Dkt. No. 98). Some of them are duplicates of the defendants exhibits, such as the administrative hearing transcript and the two sergeants' memoranda. Pl. Exs. 1-3, 8. However, plaintiff's exhibits contain letters written by plaintiff to various officials. Pl. Exs. P-11-11-12, 14-15, 22-23. Some of the exhibits are grievances by other inmates regarding the conditions in SHU. Pl. Exs. 24-36. Other exhibits consist of newspaper articles discussing the confinement of mentally ill inmates as well as excerpts from other writings regarding correctional facilities. Pl. Exs. 39-41, 42-44. Plaintiff also submits a handwritten affidavit from an individual, stating that he believes plaintiff's statements to be accurate. Pl.Ex. 45. The court has reviewed and considered all of plaintiff's exhibits in conjunction with defendants' motion and plaintiff's cross-motion for summary judgment.

14  At one time, plaintiff also had a plexiglass shield placed over his cell. These shields are generally used when an inmate throws materials (feces or otherwise) out of his cell. Thus, it appears that "mentally ill" inmates are not only those that cause problems in the SHU.

15  The pages of plaintiff's Ex. P-16 are numbered in various places, but it appears that plaintiff has numbered the pages consecutively at the bottom right, and the court will cite to those page numbers.

16  *See e.g.* Pl.Ex. P-16 at 78, 88.

17  The court is assuming that this is the same cell, although the names of the inmates have been "blacked-out" from the log entries.

18  Plaintiff did not include all the pages from each day in this exhibit. The pages appear to also be stamped with numbers at the top right hand corner of the page. These numbers are not always consecutive, indicating that there are pages missing.

**End of Document**                                         © 2017 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Declined to Follow by Samuels v. Fischer, S.D.N.Y., March 2, 2016

2015 WL 127864

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Harold J. SCOTT, Plaintiff,

v.

Peter FREDERICK, Captain J.
Facteau, Mrs. Edna Aiken, Randy
Nichols, and Albert Prack, Defendants.

No. 9:13–CV–605.
|
Signed Jan. 8, 2015.

**Attorneys and Law Firms**

Harold J. Scott, Elmira, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, The Capitol, Colleen D. Galligan, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

### DECISION & ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* civil rights action pursuant to 42 U.S.C. § 1983, alleging violations of Plaintiff's due process rights under the Fourteenth Amendment of the United States Constitution during a prison disciplinary hearing, was referred to the Honorable Randolph F. Treece, United States Magistrate Judge, for a Report–Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

In the Report–Recommendation, dated August 28, 2014, Magistrate Judge Treece recommends that Defendants' motion to dismiss for failure to state a claim upon which relief can be granted, dkt. # 15, be granted in part and denied in part. Magistrate Judge Treece recommends that the motion be: granted with respect to Defendants Edna Aiken, Captain J. Facteau, and Randy Nichols; granted without prejudice with respect to Defendant Albert Prack; granted with respect to Plaintiff's claims that Defendant Peter Frederick violated his due

process rights by failing to provide sufficient notice of the disciplinary re-hearing, failing to record the entire hearing, and improperly re-starting the hearing; and denied with respect to Plaintiff's claims that Defendant Frederick denied him the opportunity to present a defense and for being biased.

Plaintiff filed a timely objection to the Report–Recommendation pursuant to 28 U.S.C. § 636(b) (1). When objections to a magistrate judge's Report–Recommendation are lodged, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which the objection is made." *See* 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

Having reviewed the record *de novo* and having considered the issues raised in the Plaintiff's objections, this Court has determined to accept the recommendation of Magistrate Judge Treece for the reasons stated in the Report–Recommendation.

It is therefore ordered that:

(1) Plaintiff's Objections, dkt. # 30, to the Report–Recommendation of Magistrate Judge Treece, dkt. # 25, are hereby OVERRULED;

(2) The Report–Recommendation is hereby ADOPTED;

(3) The Defendants' motion to dismiss, dkt. # 15, is hereby GRANTED in part and DENIED in part, as follows:

    a. the motion is GRANTED as to Plaintiff's claims against Defendants Aiken, Facteau and Nicholas and each of these Defendants are DISMISSED from the action;

    b. the motion is GRANTED without prejudice as to Plaintiff's claim against Defendant Prack;

    c. the motion is GRANTED with respect to Plaintiffs claims that Defendant Frederick violated his due process rights by failing to provide subsequent notice of the re-hearing, failing to record the entire hearing, and improperly re-starting the hearing; and

d. the motion is DENIED with respect to Plaintiffs claims that Defendant Frederick denied him the opportunity to present a defense and for being biased.

**\*2** Plaintiff may file an amended complaint within 30 days of the date of this Order.

IT IS SO ORDERED.

**HAROLD J. SCOTT,** Plaintiff,

—v—

**PETER FREDERICK,** *Senior Counsel /Hearing Officer Clinton Correctional Facility,* **CAPTAIN J. FACTEAU,** *Correctional Captain, Clinton Correctional Facility,* **MRS. EDNA AIKEN,** *Correction Counsel / Tier Assistant, Clinton Correctional Facility,* **RANDY NICHOLS,** *Correction Officer, Clinton Correctional Facility,* **ALBERT PRACK,** *Appeals Review Official, Department of Correctional Services and Community Supervision,* Defendants.

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Harold J. Scott brings this action, pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his due process rights in connection with a Tier III Superintendent's Hearing held at Clinton Correctional Facility ("CCF"). *See generally* Dkt. No. 1, Compl. Defendants move to dismiss Plaintiff's Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), on the grounds that Plaintiff fails to state a claim for which relief can be granted and that they are entitled to qualified immunity. *See generally* Dkt. No. 15–1, Defs.' Mem. of Law. Plaintiff opposes the Motion. Dkt. No. 19, Pl.'s Mem. of Law. For the reasons stated below, we recommend that the Defendants' Motion be **GRANTED** in part and **DENIED** in part.

### I. STANDARD OF REVIEW

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, ... matters to which the court may take judicial notice[,]" as well as documents incorporated by reference in the complaint. *Spence v. Senkowski,* 1997 WL 394667, at \*2 (N.D.N.Y. July 3, 1997) (*citing Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991) (citing Fed. R. C iv. P. 10(c)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint'* may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (quoting *Cortec Indus. ., Inc. v. Sum Holding L.P.,* 949 F.2d at 47). However, "even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir.2006). "It must also be clear that there exists no material disputed issues of fact regarding the relevance of the document." *Id.*

**\*3** The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Scherm3erhorn,* 373 U.S. 746, 754 n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963); *see also Arar v. Ashcroft,* 585 F.3d 559, 567 (2d Cir.2009). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

Scott v. Frederick, Not Reported in F.Supp.3d (2015)
Case 9:14-cv-01389-TJM-TWD    Document 35    Filed 06/13/17    Page 122 of 151
2015 WL 127864

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal,* 556 U.S. at 697 (citing *Twombly* ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. at 678. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* In this respect, to survive dismissal, a plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Bell Atl. Corp. v. Twombly,* 440 U.S. at 555). Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* 556 U.S. at 679–80.

With this standard in tow, we consider the plausibility of Plaintiff s Complaint.

## II. DISCUSSION

### A. Background

The following summary is taken from Plaintiff's Complaint. [1]

On May 5, 2010, while at CCF, Plaintiff was ordered to submit a urine specimen for drug testing. Compl. at ¶ 6–1. Two days later, on May 7, Defendant Randy Nichols, a Corrections Officer at Clinton Annex, tested Plaintiff's urine using a SYVA VIVA–JR Emit drug test. Plaintiff's urine twice tested positive for opiates. *Id.* at ¶ 6–3. Defendant Nichols verified with CCF's main clinic that none of Plaintiff's medications could issue a false urine result. *Id.* at ¶ 6–4. Defendant Nichols issued a Misbehavior Report and had Plaintiff confined to keeplock status. *Id.* at ¶ 6–6.

**\*4** On May 8, 2010, Plaintiff was served with a copy of the Misbehavior Report, however, it lacked a copy of Appendix C to Directive 4937. [2] *Id.* at ¶ 6–7. On May 12, Defendant Edna Aiken, who was appointed to act as Plaintiff's employee-assistant, met with Plaintiff. *Id.* at ¶ 6–11. Plaintiff requested that Defendant Aiken produce the following documents:

(a) a copy of the DOCS Leasing Contract for the urinalysis machine currently in use; (b) a copy of the operator's Manual for the urinalysis machine currently in use; (c) the name, make, model number and year of manufacture of the urinalysis machine currently in use; (d) a copy of all maintenance log entries for the urinalysis machine, including, a copy of all scheduled maintenance program(s); (e) a copy of the EMIT OPIATE ASSAY insert instructions, labeling detailing the instructions to be used in conducting the testing which lists limitations etc.; (f) a copy of all sections of the Operator's manual concerning or relating to the effects of operator's error(s) or false results; (g) a copy of the most recent Emit Cross–Activity List for opiates; (h) a copy of all freezer log entries regarding [his] urine; (i) a copy of the procedures for forwarding urine specimens recommended by Clinton Annex; (j) a copy of officer NICHOLS certificate stating he was trained to conduct the testing; and (k) any and all information regarding faulty testing in using the machine.
*Id.* at ¶ 6–12.

Defendant Aiken left and returned with "a copy of the DOCS computer entry stating that Officer Nichols[ ] had passed training on the SYVA/ETS System on September 23, 2008, and a copy of Directive No. 4937." *Id.* at ¶ 6–13. Defendant Aiken did not provide Plaintiff with any other requested document, but informed him that "her secretary was 'gathering the remaining documents on the list' and she would put them in the hearing officer's package to be given to him at the hearing." *Id.* at ¶¶ 6–14 & 6–15.
On May 13, 2010, Defendant Peter Frederick, a senior counselor at CCF, commenced a Tier III Superintendent's Hearing. *Id.* at ¶ 6–19. Plaintiff pled not guilty to drug

use, objected to the fact that he had not received certain documents as promised, and pointed out that Defendant Aiken claimed she would place certain documents in the Hearing package. *Id.* at ¶¶ 6–20 & 6–21. Upon reviewing the Hearing package, Defendant Frederick found a "Certificate of Training for Officer RANDY E. NICHOLS[,] dated September 23–24, 2008, on a[n] EMIT VIVA–JR SYSTEM, a maintenance record from Siemen's Healthcare Diagnostics [,] dated April 15, 2010, regarding repairs[,] and daily and weekly maintenance records, but nothing else." *Id.* at ¶ 6–23. Defendant Frederick did not provide copies of these documents to Plaintiff. *Id.* at ¶ 6–24. Defendant Frederick determined that the other documents Plaintiff requested were irrelevant and denied their production or introduction at the Hearing. *Id.* at ¶ 6–25.

 **\*5**  At some point, Defendant Frederick made an off-the-record phone call to an unidentified "senior urine testing officer" at Clinton Annex, who, according to Defendant Frederick, stated that "Officer NICHOLS[ ] was 'properly trained' and that the urinalysis machine was 'reliable.' " *Id.* at ¶¶ 6–31 & 6–32. Defendant Frederick neither recorded this telephone conversation nor noted the officer as a witness on the Hearing record sheet. *Id.* at ¶ 6–33. Instead, Defendant Frederick noted on the record that "he telephoned a more experienced officer at the annex and that the officer 'testified' that officer NICHOLS was properly trained and that the machine was 'reliable.' " *Id.* at ¶ 6–34. Plaintiff then stated that he intended to call the SYVA Company as a witness to "dispute the Certificate of training and manufacturing of the analyzer [;]" the Hearing was then adjourned. *Id.* at ¶ 6–37.

On May 17, 2010, the Hearing reconvened and Defendant Frederick provided Plaintiff with a copy of the CCF-main security urine log entries, but noted that the EMIT OPIATE ASSAY instruction sheet was irrelevant. *Id.* at ¶ 6–38. Plaintiff reinstated a previous objection regarding Defendant Frederick acting as both the hearing officer and his employee-assistant. *Id.* at ¶ 6–39. Defendant Frederick responded that "as long as he can go looking for the information, he can do both. [I]ts [his] prerogative to find out the information [he] need[s]; its [his] choice." *Id.* at ¶ 6–40. Plaintiff objected to not being able to question the officer who had given off-the-record testimony as to the reliability of the urinalysis machine, to which Defendant Frederick remarked that, "it was established that the machine is reliable." *Id.* at ¶¶ 6–41 through 6–44. Plaintiff

then asked about the formal procedure recommended by Clinton Annex for forwarding his urine specimen, and the Hearing was adjourned so that the testing officer could be called as a witness. *Id.* at ¶¶ 6–45 & 6–46.

On May 25, 2010, the Hearing was reconvened and Defendant Nichols testified over the phone. *Id.* at ¶ 6–47. Plaintiff sought to ask Defendant Nichols a series of questions regarding his training, at least some of which were designed to "expose weaknesses in his testing ability." *Id.* at ¶¶ 6–49 through 6–53. Defendant Frederick refused to allow Plaintiff to ask several questions on "relevancy grounds claiming that it was not necessary to answer 'because neither you nor I can understand the technical stuff, we don't have the skill and training to understand those things; what matters is that the machine is *reliable* and *was* working properly.' " *Id.* at ¶ 6–54 (emphasis in original).

In the middle of questioning Defendant Nichols, the tape recorder shut-off. *Id.* at ¶ 6–57. Defendant Frederick turned the cassette tape over and started recording over previously recorded testimony and objections, and then adjourned the Hearing for disposition. *Id.* at ¶ 6–59. Upon realizing this technical snafu, Defendant Frederick sought Plaintiff s permission to begin the Hearing anew, but Plaintiff refused to consent. *Id.* at ¶¶ 6–60 through 6–62. Defendant Frederick then claimed that Defendant Captain Facteau advised him to start the Hearing over. *Id.* at ¶ 6–63. Plaintiff objected claiming that Defendant Facteau had no authority to order or advise Frederick to begin a new hearing, but Defendant Frederick started the Hearing over anyway. *Id.* at ¶¶ 6–64 through 6–66. At that point, Defendant Frederick noted that a copy of Appendix C had not been provided to Plaintiff with his Misbehavior Report and was not in the Hearing package; he adjourned the Hearing, retrieved a copy of the Appendix and, after giving Plaintiff approximately twenty-one minutes to review the Appendix, reconvened the Hearing and reviewed the Appendix on the record. *Id.* at ¶¶ 6–67 through 6–71. Plaintiff once again pled not guilty to the charge of drug use. The Hearing Officer reused Defendant Nichols's testimony from the prior Hearing and allowed Plaintiff to restate some of his previous objections. *Id.* at ¶¶ 6–72 through 6–74.

 **\*6**  Plaintiff again requested that a witness from the SYVA Company be called and questioned as to whether they manufactured the Viva–Jr. drug testing system,

had vouched for its reliability, had certified Defendant Nichols, and if they certify the equipment of other companies. *Id.* at ¶ 6–76. Defendant Frederick refused to call such a witness on the grounds that such testimony "would only show or confirm that another company makes the Viva–Jr analyzer and would not show that the machine was not reliable." *Id.* at ¶ 6–77. Defendant Frederick refused to write or issue a written statement as to his reason for refusing to call this witness. *Id.* at ¶¶ 6–78 & 6–79.

The Hearing concluded on May 25, 2010, and Plaintiff was found guilty of drug use and assessed a penalty of five months in special housing unit ("SHU") confinement, with one month deferred for seven months. *Id.* at ¶¶ 6–92 & 6–93. "The statement of Evidence relied on clearly states the misbehavior report and testimony given by CO R. NICHOLS and inmate Scott's testimony. 'Reliability of testing done was main reason for finding of guilt. There was no proof offered regarding human or mechanical error.' " *Id.* at ¶ 6–83.

On May 26, 2010, Plaintiff wrote to Superintendent Thomas La Valley[3] "complaining about the illegal rehearing, particularly asking whether or not he authorized defendant FACTEAU to direct defendant FREDERICK to commence a *new* hearing." *Id.* at ¶ 6–95 (emphasis in original). On June 2, Defendant Facteau responded to Plaintiff's letter, informing him that " 'I advised SCC Frederick to *re-record* the *parts* of your Tier III hearing which was [sic] recorded over. This direction was proper.' " *Id .* at ¶ 6–96.

Plaintiff's cell location was changed to a "lockdown block," cell D–3–8, where each gallery is sealed off and recreation occurs in small single-man cages for one-hour a day. *Id.* at ¶ 6–98.[4] "D–3–8 was a filthy cell ... the sink and toilet [were] filthy and covered in black dirty stuff; the walls in the cell were covered in heavy phlegm/mucus (from someone's nose); the cell smelled badly and made your skin crawl[ ]." *Id.* at ¶ 6–99.

On June 10, 2010, Plaintiff was packed up for a transfer to Upstate Correctional Facility ("UCF"), which is composed entirely of SHU units, to finish out his SHU sentence. *Id.* at ¶ 6–102. Plaintiff arrived at UCF on June 11, 2010. *Id.* at ¶ 6–103. Upon arrival, Plaintiff's property was placed in storage, but later confiscated after he had a verbal altercation with an officer. *Id .* at ¶¶ 6–

105 through 6–107. Also, his legal mail was read, over his objection and mental health interviews were conducted within earshot of other inmates. *Id.* at ¶¶ 6–108 through 6–110. Plaintiff complained about being deprived writing materials so as to appeal his Disciplinary Hearing as well as the deprivation of "adequate soap to wash himself with and to wash his clothing with." *Id.* at ¶¶ 6–111 & 6–113.

**\*7** On June 18, 2010, Plaintiff filed an administrative appeal of his Disciplinary Hearing with Defendant Prack. *Id.* at ¶ 6–112. On July 22, 2010, Defendant Prack affirmed Defendant Nichols's Hearing determination. That same date, the "Disciplinary Review Committee (DRC) at Upstate granted plaintiff a three-week time-cut 'based on [his] positive adjustment' and recalculated his SHU release date to August 17, 2010. *Id.* at ¶ 6–115. Plaintiff was released from SHU on August 23, 2010. *Id.*

On March 11, 2011, Plaintiff initiated an Article 78 proceeding in State court challenging the May 25, 2010 disciplinary determination. *Id.* at ¶ 6–116. "On March 30, 2012, the defendant's [5] [sic] administratively reversed the Hearing determination, on the advise [sic] of the NYS Attorney General's Office and expunged the May 25, 2010 determination." *Id.* at ¶ 6–117. Thereafter, on July 5, 2010, the Appellate Division dismissed Plaintiff's Article 78 petition as moot.

**B. Plaintiffs Claims**

Plaintiff alleges that as a result of his May 2010 Disciplinary Hearing he was confined in keeplock and/ or SHU for 109 days. During this confinement, Plaintiff alleges that he was subjected to filthy and unhygienic conditions, including a dirty smelly cell at CCF, and while at UCF was deprived of his property, had his privacy invaded, and was denied adequate soap for washing himself and his clothing. He further expounds upon the isolating and restrictive conditions he endured during his time at UCF. Plaintiff asserts that in connection with his Disciplinary Hearing his due process rights were violated by the Defendants. Specifically, he claims that Defendant Aiken failed to provide adequate assistance by failing to provide him with all the documents he requested prior to his Disciplinary Hearing and also violated his confidentiality when instead of giving documents directly to him, she provided his list of requested documents to the Hearing Officer. Plaintiff claims that Defendant

Frederick violated his due process rights during the course of his Disciplinary Hearing when he prejudged his guilt, acted as both assistant and hearing officer, failed to obtain and consider documents requested by Plaintiff, questioned a witness off-the-record and outside of Plaintiff's presence, prevented Plaintiff from fully interrogating certain witnesses as well as refused to call certain witnesses on Plaintiff's behalf, failed to properly record the entire Hearing, and restarted the Hearing without providing adequate notice. Plaintiff further contends that Defendant Nichols testified falsely and that Defendant Facteau improperly authorized Defendant Frederick to restart Plaintiff's Hearing. Lastly, Plaintiff contends that Defendant Prack improperly affirmed Defendant Frederick's disciplinary determination.

### C. Due Process

The Due Process Clause of the Fourteenth Amendment protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner[.]" *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). To state a due process claim under § 1983, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). Inmates' liberty interests are derived from two sources: (1) the Due Process Clause of the Fourteenth Amendment; and (2) state statute or regulations. *Id.* With regard to liberty interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners[,]' " *Arce v. Walker,* 139 F.3d at 333 (quoting *Hewitt v. Helms,* 459 U.S. 460, 467, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)), and limited to freedom from restraint that "exceed[ ] the sentence in ... an unexpected manner[,]" *Sandin v. Conner,* 515 U.S. 472, 478, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

**\*8** Turning to liberty interests created by the state, the Supreme Court states that such liberty interests shall be limited solely to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. at 484; *see also Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (citing *Sandin*); *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999).

Factors relevant to an analysis of what constitutes an atypical and significant hardship include "(1) the effect of the confinement on the length of prison incarceration, (2) the extent to which the conditions of segregation differ from other routine prison conditions, and (3) the duration of the disciplinary segregation compared to discretionary confinement." *Spaight v. Cinchon,* 1998 WL 167297, at \*5 (N.D.N.Y. Apr.3, 1998) (citing *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)); *see also Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (stating that in assessing what constitutes an atypical and significant hardship, "[b]oth the conditions [of confinement] and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical (citation omitted)). Though the length of the confinement is one guiding factor in a *Sandin* analysis, the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999) (citations omitted). Nevertheless, the Court of Appeals has stated that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer v. Richards,* 364 F.3d at 64–65 (quoting *Colon v. Howard,* 215, F.3d 227, 232 (2d Cir.2000)); *see also Hanrahan v. Doling,* 331 F.3d 93, 97–98 (2d Cir.2003) ("[W]here the actual period of disciplinary confinement is insignificant or the restrictions imposed relatively minor, such confinement may not implicate a constitutionally protected liberty interest."); *Edmonson v. Coughlin,* 1996 WL 622626, at \*4–5 (W.D.N.Y. Oct.4, 1996) (citing cases for the proposition that courts within the Second Circuit tend to rule, as a matter of law, that "disciplinary keeplock or SHU confinement to 60 days or less in New York prisons is not an atypical or significant hardship in relation to the ordinary incidents of prison life"); *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (noting that segregative sentences of 125–288 days are "relatively long" and therefore necessitate "specific articulation of ... factual findings before the district court could properly term the confinement atypical or insignificant"). Accordingly, the court must "make a fact-intensive inquiry" that would examine the actual conditions of confinement within SHU. *Palmer v. Richards,* 364 F.3d at 65 (citations omitted); *see also Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d

46, 49 (2d Cir.1997). If the conditions of confinement are undisputed, a court may decide the *Sandin* issue as a matter of law. *Palmer v. Richards,* 364 F.3d at 65. If, however, normal conditions of SHU exist, but the period of confinement is longer than the intermediate duration, then it would constitute a significant departure from ordinary prison life requiring the protection of procedural due process under *Sandin. Id.*

**\*9** Once a prisoner makes a threshold showing of atypical and significant confinement, the court should determine whether that prisoner, prior to his confinement, was afforded the minimum requirements of due process. *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). A prisoner placed in disciplinary segregation must be provided (1) advanced written notice of the charges against them at least twenty-four hours prior to the hearing; (2) the opportunity to appear at the hearing, to call witnesses, and to present rebuttal evidence; and (3) written statement as to the evidence relied upon and the reasons for the disciplinary action. *Id.* at 564–66; *see also Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986); *Taylor v. Rodriguez,* 238 F.3d 188, 192 (2d Cir.2001) (quoting *Hewitt v. Helms,* 459 U.S. at 476). Additionally, inmates are entitled to be judged by a fair and impartial hearing officer and the disciplinary conviction should be supported by some evidence. *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999) (citing *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (some evidence to support conviction) & *McCann v. Coughlin,* 698 F.2d 112, 121–22 (2d Cir.1983) (fair and impartial hearing officer)).

### 1. Liberty Interest

As noted above, Plaintiff alleges that as a result of his Disciplinary Hearing he was confined in keeplock/SHU for approximately 109 days, during which time he was subjected to filthy and unhygienic conditions and was deprived of adequate soap and other property. In light of the Second Circuit's requirement that we make detailed factual findings of the conditions endured by Plaintiff, and in light of the record before us, we find that for purposes of the pending Motion, Plaintiff sufficiently alleges that he had a protected liberty interest in remaining free from the atypical and significant hardships he endured during his segregated disciplinary confinement. *See Samms v. Fischer,* 2013 WL 5310215, at \*7 (N.D.N.Y. Sept.20, 2013)

(noting that "[i]t is possible that 60 days in an unsanitary cell in SHU could ... constitute an atypical and significant hardship in relation to the ordinary incidents of prison life sufficient to convey on a prisoner a protected liberty interest under the due process clause") (citations omitted); *see also Palmer v. Richards,* 364 F.3d at 65–66 (surveying cases in support of the proposition that "[i]n the absence of a detailed factual record, we have affirmed dismissal of due process claims only in cases where the period of time spent SHU was exceedingly short—less than the 30 days that the *Sandin* plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions.") (citations omitted); *Gonzalez–Cifuentes v. Torres,* 2007 WL499620, at \*3 (N.D.N.Y. Feb. 13, 2007) (finding that for the purposes of a motion to dismiss, plaintiff's allegation that he spent ninety days in keeplock was sufficient to require the court to engage in detailed fact finding before dismissing his claim). Accepting the Complaint as true, Plaintiff has adequately pled a liberty interest, however, we reach no conclusion as to whether or not these claims will be sufficient to withstand a properly filed motion for summary judgment after the development of a more detailed factual record.

**\*10** Accordingly, we must now determine whether Plaintiff has plausibly alleged that any of the Defendants deprived him of one or more of the minimum requirements of due process to which he was entitled.

### 2. Defendant Aiken

Plaintiff alleges that Defendant Aiken provided constitutionally inadequate pre-hearing assistance because, *inter alia,* (1) she violated his duty to maintain inmate-employee-assistant confidentiality when she provided Defendant Frederick with a copy of the list of documents he had requested, and (2) she failed to provide Plaintiff with all of the documents he requested before the Hearing. *See* Compl. at ¶¶ 6–11 through 6–18, 6–21 through 6–24, 6–27 through 6–29, 7–2, & 7–4.

Plaintiff's claim that Defendant Aiken violated his purported right to inmate-employee-assistant confidentiality is completely meritless. While Plaintiff may have been entitled to prehearing assistance, he is not entitled to any sort of confidentiality by virtue of that arrangement. *Accord Loving v. Selsky,* 2009 WL 87452 at \*2 (W.D.N.Y.2009) (citing *Silva v. Casey,* 992 F.2d

Scott v. Frederick, Not Reported in F.Supp.3d (2015)
Case 9:14-cv-01389-TJM-TWD    Document 35    Filed 06/13/17    Page 127 of 151
2015 WL 127864

20, 22 (2d. Cir.1993), for the proposition that the duty to provide pre-hearing assistance "falls far short of the right to counsel that the Sixth Amendment guarantees to criminal defendants.' "); *see also Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) ("An assistant's role is to act as 'merely a surrogate for the inmate, not a legal adviser or advocate.").

Plaintiff also contends that Defendant Aiken provided constitutionally deficient assistance to him when she failed to provide him with all the requested documents. The Court acknowledges that Plaintiff had a right to receive some assistance prior to his Hearing, particularly in light of the fact that he was confined to keeplock status before the Hearing. *Eng v. Coughlin,* 858 F.2d 889, 897 (2d Cir.1988) ("Prison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges."). Indeed, this duty is of particular importance when, as here, the prisoner is in segregative confinement prior to the disciplinary hearing. *Id.* ("When the inmate is disabled, either by being confined full-time to SHU or transferred from the prison in which the incidents occurred, the duty of assistance is greater because the inmate's ability to help himself is reduced."); *Loving v. Selsky,* 2009 WL 87452, at *1 ("In particular, an inmate must be provided some assistance when circumstances hamper the inmate's ability to prepare a defense, such as when the inmate is confined to SHU prior to the hearing."); *see also Hernandez v. Selsky,* 572 F.Supp.2d 446, 453 (S.D.N.Y.2008) ("The obligation to provide assistance is greater as the inmates' ability to prepare a defense is reduced."); *Louis v. Ricks,* 2002 WL 31051633, *10 (S.D.N.Y. Sept.13, 2002) (holding that inmates in keeplock confinement are entitled to pre-hearing assistance).

 *11  "While the assigned assistant's precise role is not defined, it certainly should include gathering evidence, obtaining documents, and relevant papers, and interviewing witnesses." *Pilgrim v. Luther,* 2005 WL 6424703, at *8 (S.D.N.Y. Sept.12, 2005). Plaintiff's right to assistance, however, does not translate to a wholesale right to receive all of the documentary evidence requested. *Eng v. Coughlin,* 858 F.2d at 898 (noting that assistance "must be provided in good faith and in the best interests of the inmate" and finding that the employee-assistant who was requested to interview an onerous amount of witnesses "must attempt to determine

independently who the most relevant witnesses might be and to interview them"); *Shepard v. Coughlin,* 1993 WL 77385, at *5 (S.D.N.Y. Mar.16, 1993). Plaintiff has not alleged that Defendant Aiken failed to provide him with any assistance; indeed, Plaintiff acknowledges that Defendant Aiken provided him with some of the documents he requested prior to the Hearing and included others in Plaintiff's Hearing packet. Accordingly, Plaintiff has failed to state a Due Process claim against Defendant Aiken. Nonetheless, even if Defendant Aiken erred by not producing all of the documents requested and by divulging the list of documents to the Hearing Officer, we find that she is entitled to qualified immunity.

The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Eng v. Coughlin,* 858 F.2d 889, 895 (2d Cir.1988). Qualified immunity provides government officials "immunity from suit, rather than a mere defense to liability." *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). Whether an official protected by qualified immunity may be held liable for an alleged unlawful action turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time the action was taken. *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Lewis v. Cowan,* 165 F.3d 154, 166 (2d Cir.1999).

Qualified immunity is an affirmative defense that must be pled by the official claiming it. *Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984) (citing *Harlow v. Fitzgerald,* 457 U.S. at 815). The only pleading filed in the present case thus far is the Complaint. Defendants have not raised this affirmative defense in a responsive pleading, as set forth in Federal Rule of Civil Procedure 8(c), but rather in their Memorandum of Law in support of the Motion to Dismiss. Dkt. No. 15–1. Generally, "the defense of qualified immunity cannot support the grant of a ... 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir.1983); *see also McKenna v. Wright,* 386 F.3d 432, 435 (2d Cir.2004) (quoting *Green* ). An exception to this general rule exists where the complaint itself sets up,

2015 WL 127864

on its face, the qualified immunity defense; in such an occasion, dismissal for failure to state a claim would be appropriate. *Roniger v. McCall,* 22 F.Supp.2d 156, 162 (S.D.N.Y.1998) (citing *Green v. Maraio,* 722 F.2d at 1019); *see also McKenna v. Wright,* 386 F.3d at 435.

**\*12** Based upon the allegations of the Complaint, the Court finds that Defendant Aiken is entitled to qualified immunity because neither of the rights asserted by Plaintiff are clearly established and no reasonable person in Aiken's position would have believed that they were acting in such a way that violated Plaintiff's rights. To determine whether a right was clearly established for purposes of qualified immunity, courts must consider "whether the right was defined with reasonable specificity; whether decisional law of the Supreme Court and the [Second Circuit] supports its existence; and whether, under preexisting law, a defendant official would have reasonably understood that his [or her] actions were unlawful." *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *see also Reichle v. Howards,* ––– U.S. ––––, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012) ("To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." (citations, modifications, and internal quotation marks omitted)); *Nicholas v. Miller,* 189 F.3d 191, 195 (2d Cir.1999).

The Court is unable to find any Supreme Court or Second Circuit precedents clearly establishing that Defendant Aiken either owed a duty of confidentiality to Plaintiff or was required to provide Plaintiff with every document he requested. While attorney-client communications are protected by a privilege of confidentiality, it is clear that Plaintiff was not entitled to assistance from an attorney in order to help prepare a defense to the charges pending against him and that Defendant Aiken was not acting in such capacity. *Silva v. Casey,* 992 F.2d at 22 ("The assistant is not obliged to go beyond the specific instructions of the inmate because if he did so he would then be acting as counsel in a prison disciplinary proceeding, assistance to which a prisoner is not entitled."). Furthermore, the applicable State regulations that establish a New York State inmate's right to employee assistance do not extend a cloak of confidentiality to any discussion between the assistant and inmate, nor do the applicable rules place an obligation on the assistant to procure every item requested by an inmate. *See, e.g.,* N.Y. COMP.CODES R. & REGS. tit. 7, § 251–4.2.[6] Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Plaintiff's claims against Defendant Aiken because we find that no due process violation occurred by her actions and because she would nevertheless be entitled to qualified immunity.[7] Defendant Aiken should accordingly be **DISMISSED** from this action.

### 3. Defendant Nichols

Plaintiff alleges, *inter alia,*[8] that Defendant Nichols intentionally testified falsely "that SYVA was the manufacturer of the Viva–Jr analyzer [.]" Compl. at ¶ 7–18. However, the presentation of false testimony does not deprive an inmate of the minimum requirements of due process. *See Thomas v. Calero,* 824 F.Supp.2d 488, 499 (S.D.N.Y.2011) (citing *Mitchell v. Senkowski,* 158 F. App'x 346, 349 (2d Cir.2005) for the proposition that a prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest "extends as well to false testimony by corrections personnel at prison disciplinary hearings"). Plaintiff does not assert that Defendant Nichols testified falsely in retaliation for the exercise of some constitutional right, and in liberally construing Plaintiff's Complaint, the Court finds that no other plausible claim is stated against Defendant Nichols based upon his role in testing Plaintiff's urine and authoring the Misbehavior Report.

**\*13** Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Plaintiff's claim against Defendant Nichols and that Defendant Nichols be **DISMISSED** from this action.

### 4. Defendant Frederick

Plaintiff alleges that during the course of his Disciplinary Hearing and Re-hearing, Defendant Frederick violated his due process rights in a variety of ways. Specifically, Plaintiff alleges, *inter alia,*[9] that Defendant Frederick (1) took off-the-record testimony from an unidentified witness, Compl. at ¶¶ 6–31 through 6–34; (2) failed to record the entire Hearing, *id.* at ¶¶ 6–57, 6–59, 6–60, & 6–

75; (3) illegally re-started the Hearing, *id.* at ¶¶ 6–61, 6–63, 6–64, & 6–66; (4) failed to provide him with twenty-four hours notice of the Rehearing; (5) was biased, in that he had predetermined Plaintiff's guilt, *id.* at ¶¶ 6–86 & 6–87; and, (6) refused to provide certain documents, interrupted his attempts to question Officer Nichols, and refused to call a witness from the SYVA Company to testify as to the reliability and accuracy of the urinalysis tests conducted by Defendant Nichols, *id.* at ¶¶ 6–71, & 6–76 through 6–79.

As noted above, pursuant to *Wolff,* Plaintiff is entitled to minimum due process protections including (1) advanced written notice of the charges against them at least twenty-four hours prior to the hearing; (2) the opportunity to appear at the hearing, to call witnesses, and to present rebuttal evidence; and (3) written statement as to the evidence relied upon and the reasons for the disciplinary action.[10] *Wolff v. McDonnell,* 418 U.S. at 564–66. Additionally, Plaintiff was entitled to be judged by a fair and impartial hearing officer and his disciplinary conviction should be supported by some evidence. *Kalwasinski v. Morse,* 201 F.3d at 108. We consider each of Plaintiff's contentions within the framework of those constitutional protections to which he was entitled.

### a. Notice

"Notice" should be something more than a mere formality. *Benitez v. Wolff,* 985 F.2d 662, 665 (2d Cir.1993). "The effect of the notice should be to compel 'the charging officer to be [sufficiently] specific as to the misconduct with which the inmate is charged' to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report." *Taylor v. Rodriguez,* 238 F.3d at 192–93 (quoting *McKinnon v. Patterson,* 568 F.2d 930, 940 n. 11 (2d Cir.1977)) (alteration in original).

Plaintiff's claim that Defendant Frederick failed to give him adequate notice of the Rehearing falls short of stating a due process claim. In liberally construing Plaintiff's Complaint, it appears that once the decision was made to restart the Hearing, Plaintiff believed he was entitled to have the entire process begin anew, including the notion that he be provided with notice of the charges against him twenty-four hours in advance of the hearing. To be

clear, Plaintiff does not accuse the Defendants of failing to give proper notice of the charges against him prior to the commencement of the initial Hearing. Instead, he imposes an extra notice requirement on the Defendants at the point in the Hearing when Defendant Frederick determined that he needed to start the Hearing anew. Based upon the allegations in the Complaint, it is clear that Plaintiff received a copy of the Misbehavior Report at 8:30 a.m. on May 8, 2010, and that his Disciplinary Hearing initially began on May 13, 2010. Compl. at ¶¶ 6–7 & 6–19. Thus, it is clear that Plaintiff received constitutionally adequate notice well in advance of the twenty-four hour minimum. *See Sira v. Morton,* 380 F.3d 57, 70 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. at 564, for the proposition that "[d]ue process requires that prison officials give an accused inmate written notice of the charges against him twenty-four hours prior to conducting a disciplinary hearing"). Plaintiff does not challenge the sufficiency of that notice, and, indeed, his specific attempts to gather evidence and mount a defense belie any notion that the content of the initial notice failed to adequately apprise him of the charges against him and the factual basis for such charges. This Court finds no basis for Plaintiff's claim that upon restarting the Hearing, Defendant Frederick was constitutionally compelled to provide identical notice of which Plaintiff already received. Accordingly, we find that Plaintiff was provided with proper notice and has failed to state a due process violation.

### b. Opportunity to Present a Defense

**\*14** With regard to the second *Wolff* factor, a prisoner is entitled to an opportunity to present his defense by calling witnesses and presenting evidence. *See Wolff v. McDonnell,* 418 U.S. at 566 ("[A]n inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense[.]"). In the case at bar, Plaintiff asserts several violations of his right to call witnesses and present rebuttal evidence. Specifically, Plaintiff alleges that Defendant Frederick refused his request to call a witness from the SYVA Company to testify as to the reliability of the EMIT–Jr. machine, failed to provide written reasons for his denial of certain witnesses, refused to provide him with copies of documents without explanation, improperly denied requests for documents on grounds of relevancy, interfered with his ability to question

Defendant Nichols regarding his ability to properly test Plaintiff's urine sample by denying or rephrasing his questions, and took testimony from an unidentified officer off-the-record and outside the presence of Plaintiff. Such claims, as pled, are sufficient at this early stage to plausibly state a due process violation claim against Defendant Frederick. *See Kearney v. Goord,* 2011 WL 1260076, at *7 (W.D.N.Y. Mar.4, 2011) ("Plaintiff's allegation that C.H.O. Schoelkoff denied him due process by refusing to call witnesses requested by plaintiff, may refusing to ask witnesses questions proffered by plaintiff and denying plaintiff access to documents, resulting in four months SHU confinement, is sufficient to state a cause of action."); *Collins v. Ferguson,* 804 F.Supp.2d 134, 139 (W.D.N.Y.2011) (finding plaintiff had stated a due process violation where he alleged that "Ferguson refused to provide plaintiff with documents relating to the testing of plaintiff's urine sample, that he refused to ask witnesses certain 'vital' questions that had been requested by plaintiff, that he 'continually rephrased questions' to the officer witnesses in a way that was designed to elicit answers that were detrimental to plaintiff's defense, and that he accepted the officers' testimony at face value, without any corroborating documentary support"). And because Plaintiff's right to present a defense is clearly established, at this juncture, we cannot state that Defendant Frederick is entitled to qualified immunity. Thus, we recommend that Defendants' Motion be **denied** as to these claims for due process violations against Defendant Frederick.

### c. Hearing Officer Bias

Plaintiff asserts that Defendant Frederick prejudged his guilt and conducted the Hearing in a biased fashion. While an inmate is *not* entitled to a hearing officer with the same level of impartiality required by judges, he is entitled to a hearing untainted by arbitrary or pre-determined findings of guilt. *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989). Nonetheless, a hearing officer's limited impartiality requirements are satisfied where the record contains "some evidence" to support the officer's findings. *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the

record that could support the conclusion reached." *Id.* at 455–56 (citations omitted). That being said, only " 'reliable' evidence can constitute 'some evidence.' " *Sira v. Morton,* 380 F.3d at 76 (citing *Luna v. Pico,* 356 F.3d 481, 488 (2d. Cir.2004)).

**\*15** The Court is mindful that according to the Complaint, Defendant Frederick's Statement of Evidence relied upon referenced the drug tests conducted by Defendant Nichols and that results of such tests may satisfy the requirement of "some evidence." *Scott v. Nichols,* 2013 WL 2237840, at *10 (N.D.N.Y. May 21, 2013) (surveying cases for the proposition that drug test results are more than sufficient to meet the "some evidence" standard). However, at this early stage, in light of the Court's obligation to liberally construe Plaintiff's Complaint to raise the strongest claim suggested therein, especially considering Plaintiff's adamant challenge to the reliability of the test, and based upon the above recommendations regarding Defendant Frederick's alleged interference with Plaintiff's ability to mount a legitimate defense as it pertains to Plaintiff's attempts to contest the validity of the tests, the Court finds that Plaintiff has nudged his claim alleging hearing officer bias into the plausible realm and should be permitted to proceed. Thus, the Court recommends **denying** Defendants' Motion as it pertains to Plaintiff's allegations regarding Defendant Frederick's bias. As with the prior analysis, the Court finds it inappropriate to assess at this juncture whether Defendant Frederick would be entitled to qualified immunity as to Plaintiff's claims of bias.

### d. Other Due Process Allegations

Plaintiff alleges that Defendant Frederick violated his due process rights when he failed to record the entire Hearing improperly restarted the Hearing. Neither of these allegations rise to the level of a due process protection.

First, Defendant Frederick's failure to record the entire Hearing did not deprive Plaintiff of any minimum requirements of due process. *See Ramsey v. Goord,* 661 F.Supp.2d 370, 393 (W.D.N.Y.2009) (failure to record a portion of Plaintiff's disciplinary hearing did not rise to a due process violation). Indeed, "the *only* process due an inmate is that minimal process guaranteed by the

Case 9:14-cv-01389-TJM-TWD Document 35 Filed 06/13/17 Page 131 of 151
Scott v. Frederick, Not Reported in F.Supp.3d (2015)

2015 WL 127864

Constitution as outlined in *Wolff." Ramsey v. Goord,* 661 F.Supp.2d 370, 393 (W.D.N.Y.2009) (quoting *Shakur v. Selsky,* 391 F.3d 106, 119 (2d Cir.2004)). "Significantly, *Wolff* did not include electronic recording of a disciplinary hearing among the due process requirements." *Id.; see also Holcomb v. Lykens,* 337 F.3d 217, 224 (2d Cir.2003) (cited in *Ramsey* for the proposition that New York State's regulation requiring that a disciplinary hearing be recorded does not impute a federal constitutional protection).

Second, Plaintiff's argument that Defendant Frederick lacked authority/jurisdiction to restart his Hearing purportedly in violation of state regulations, does not allege a cognizable due process violation. *See A'Gard v. Perez,* 919 F.Supp.2d 394, 403 (S.D.N.Y.2013) (citing *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990), for the proposition that "[a]ny alleged violations of prison directives or regulations do not give rise to a federal claim, because federal constitutional standards rather than state law define the requirements of procedural due process.") (internal alterations and quotation marks omitted); *Johnson v. Goord,* 487 F.Supp.2d 377, 400 (S.D.N.Y.2007) (quoting *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) for the proposition that "a § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulations or state law").

**\*16** As such, we recommend **granting** Defendants' Motion as it pertains to purported due process violations stemming from Defendant Frederick's failure to record the entire Hearing and restarting the Hearing.

### 5. Defendant Facteau

Plaintiff alleges that Defendant Facteau lacked authority to order or advise Defendant Frederick to restart the Hearing. Compl. at ¶¶ 6–61 through 6–64, 6–95, 6–96, 7–22, & 7–23. Plaintiff also claims that Defendant Facteau was aware of, yet failed to remedy, the fact that Plaintiff did not receive twenty-four hours notice of the disciplinary rehearing. *Id.* at ¶¶ 7–10 & 7–11. Plaintiff's theories of liability against Defendant Facteau are diametrically opposed. On the one hand, he appears to question Defendant Facteau's authority to authorize a rehearing, while at the same time, he criticizes Defendant Facteau's failure to remedy purported due process violations committed by Defendant Frederick. Based upon the

factual allegations of the Complaint, it appears, to some extent, that Plaintiff seeks to hold Defendant Facteau liable based upon a theory of supervisory liability.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannotbe applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at \*2 (S.D.N.Y. Sept.15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if he: (1) directly participated in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; or (4) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted). Pointedly, "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)); *see also Wright v. Smith,* 21 F.3d at 501 (defendant may not be held liable simply because he holds a high position of authority).

As noted above, no due process violation occurred when Defendant Frederick restarted Plaintiff's Hearing, thus, Plaintiff cannot maintain an action against Defendant Facteau based on the fact that he authorized or advised Defendant Frederick to re-record the Disciplinary Hearing or for his failure to remedy that alleged violation. *See Wesolowski v. Harvey,* 784 F.Supp.2d 231, 234 (W.D.N.Y.2011) (citing *Campo v. Keane,* 913 F.Supp. 814, 826 (S.D.N.Y.1996), for the proposition that "plaintiff cannot state a claim [against a supervisory official] for

personal involvement in a constitutional violation, where no underlying constitutional violation occurred").

**\*17** Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Plaintiff's claims against Defendant Facteau and that Defendant Facteau be **DISMISSED** from this action.

### 6. Defendant Prack

Aside from a slew of wholly conclusory allegations in his wherefore clause, Plaintiff's sole allegation against Defendant Prack is that he affirmed Defendant Frederick's disciplinary determination. Compl. at ¶ 6–114. Courts within the Second Circuit are split over whether such an allegation is sufficient to establish personal liability for supervisory officials. We subscribe to the affirmance-plus standard, which holds that the mere rubber-stamping of a disciplinary determination is insufficient to plausibly allege personal involvement. *See Brown v. Brun,* 2010 WL 5072125, at \*2 (W.D.N.Y. Dec.7, 2010) (noting that courts within the Second Circuit are split with regard to whether the act of affirming a disciplinary hearing is sufficient to allege personal involvement of a supervisory official, and concluding that the distinction appears to hinge upon whether the official proactively participated in reviewing the administrative appeal or merely rubber-stamped the results). Here, Plaintiff fails to allege a single fact from which it could plausibly be inferred that Defendant Prack did anything other than rubber-stamp his disciplinary determination. *See generally* Compl. Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Defendant Prack and that he be **DISMISSED** from this action. **However,** the Second Circuit has cautioned courts in this District from dismissing *pro se* complaints "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Thompson v. Carter,* 284 F.3d 411, 416 (2d Cir.2002) (quoting *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991)); *see also Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999) ("Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the [ *pro se* ] complaint gives any indication that a valid claim might be stated."). Therefore, in light of the Second Circuit's directive and the fact that some of Plaintiff's other claims are proceeding, we recommend

that Plaintiff be **GRANTED LEAVE TO AMEND** his Complaint in order to further specify, how, if at all, Defendant Prack proactively participated in reviewing Plaintiff's administrative appeal.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion to Dismiss (Dkt. No. 15) be **GRANTED** in part and **DENIED** in part as follows:

1. **GRANTED** as to Plaintiff's claims against Defendants Aiken, Facteau, and Nichols and each of these Defendants should be **DISMISSED** from this action;

2. **GRANTED without prejudice** as to Plaintiff's claim against Defendant Prack, with the caveat that Plaintiff be granted leave to amend his Complaint in accordance with the above;

**\*18** 3. **GRANTED** with respect to Plaintiff's claims that Defendant Frederick violated his due process rights by failing to provide sufficient notice of the Re-hearing, failing to record the entire Hearing, and improperly re-starting the Hearing; and

4. **DENIED** with respect to Plaintiff's claims that Defendant Frederick denied him the opportunity to present a defense and for being biased; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

Date: August 28, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 127864

Footnotes

1    In their Memorandum of Law, Defendants state that "Plaintiff quotes extensively from segments of the Tier hearing record and had clearly relied upon that record in the course of drafting the Complaint." Dkt. No. 15–1, Defs.' Mem. of Law, at p. 4 n. 2. They argue, therefore, that documents they submit in support of their Motion should be deemed to be part of Plaintiff's Complaint and considered for purposes of the instant Motion. *Id.* Plaintiff counters that any references in his Complaint were made from his own personal handwritten notes and not the documents Defendants offer and, moreover, Defendants failed to provide the Court with a full record. Dkt. No. 19, Pl.'s Mem. of Law, at pp. 2–4. Given Plaintiff's objections, we decline Defendants' invitation. Accordingly, we do not consider the documents offered by Defendants for purposes of deciding the instant Motion. *See Sira v. Morton,* 380 F.3d 57, 67 (2d Cir.2004) (citing *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989), for the proposition that "[l]imited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint.").

2    In his Complaint, Plaintiff references a New York State Regulation that requires that certain documentation be attached to a misbehavior report. Compl. at ¶ 6–9 (referencing N.Y. Comp.Codes R. & Regs. tit. 7, § 1020.4(e)(1)(iv), which deals with the requisite paperwork that must accompany a misbehavior report issued to an inmate who refuses to submit a urine sample). Although Plaintiff does not cite to the correct section of the pertinent Regulation, the Court takes judicial notice that pursuant to New York State Regulation, when a positive result is obtained from a urine specimen a misbehavior report shall be issued and

     shall be accompanied by the request for urinalysis test form, the inmate's test report from the laboratory or facility, a copy of the methods and procedures used by the testing laboratory or facility, and a statement of the scientific principles and validity of the testing apparatus used by the laboratory or facility.

     N.Y. COMP.CODES R. & REGS. tit. 7, § 1020.4(f)(2)(iii).

3    Superintendent Thomas La Valley was dismissed as a Defendant from this action. *See* Dkt. No. 4, Dec. & Order, dated July 18, 2013.

4    It is unclear when Plaintiff's cell assignment was changed to D–3–8.

5    It is unclear which Defendant reversed the disposition.

6    The full text of the relevant Regulations states as follows:

     The assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate. He **may** assist the inmate in obtaining documentary evidence or written statements which may be necessary. The assistant may be required by the hearing officer to be present at the disciplinary or superintendent's hearing.

     N.Y. COMP.CODES R. & REGS. tit. 7, § 251–4.2

7    Alternatively, given that Defendant Frederick considered each of Plaintiff's requests and ultimately determined that many of the documents Plaintiff requested from Defendant Aiken were irrelevant, Defendant Aiken's failure to provide Plaintiff with those documents should be dismissed as harmless error. *See Louis v. Ricks,* 2002 WL 31051633, at *15 (S.D.N.Y. Sept.13, 2002) (applying harmless error to plaintiff's claim that his right to due process was violated where he was provided with inadequate assistance prior to his prison disciplinary hearing).

8    In his Complaint, Plaintiff attributes due process violations to Defendant Nichols based upon the actions of other Defendants. For example, Plaintiff claims that Defendant Nichols violated Plaintiff's due process rights by denying him constitutionally adequate pre-hearing assistance and for preventing him from introducing certain documents during the Hearing. Compl. at ¶¶ 7–6 & 7–8. Plaintiff does not, however, assert that Defendant Nichols had a position of authority over any of the other Defendants. And, aside from alleging that Nichols testified falsely, Plaintiff fails to allege any facts from which it would be plausible to infer that Defendant Nichols was somehow personally involved in any other constitutional wrongdoing. *See generally* Compl. We therefore only consider those allegations of due process violations for which Plaintiff provides allegations of fact attributing Defendant Nichols's personal involvement. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (noting that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983").

Case 9:14-cv-01389-TJM-TWD    Document 35    Filed 06/13/17    Page 134 of 151
Scott v. Frederick, Not Reported in F.Supp.3d (2015)
2015 WL 127864

9  As with his allegations against Defendant Nichols, Plaintiff attributes wrongdoing to Defendant Frederick without alleging concomitant factual allegations supporting Defendant Frederick's personal involvement. For example, Plaintiff accuses Defendant Frederick violated his constitutional rights when Defendant Aiken failed to provide adequate pre-hearing assistance. Compl. at ¶ 7–2. We only consider here, as we must, those claims against Defendant Frederick that are supported by factual allegations regarding his personal involvement in alleged wrongdoing.

10  It does not appear that any of Plaintiff's factual allegations regarding purported due process violations fall within this category, therefore, we do not discuss this constitutional protection. In any event, it is uncontested that Plaintiff received a written disposition from Defendant Frederick explaining the reasons for his disciplinary determination. Compl. at ¶ 6–83.

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1103467
Only the Westlaw citation is currently available.
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE
32.1 AND THIS COURT'S LOCAL RULE 32.1.1.
WHEN CITING A SUMMARY ORDER IN A
DOCUMENT FILED WITH THIS COURT, A PARTY
MUST CITE EITHER THE FEDERAL APPENDIX
OR AN ELECTRONIC DATABASE (WITH THE
NOTATION "SUMMARY ORDER"). A PARTY CITING
A SUMMARY ORDER MUST SERVE A COPY OF IT
ON ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals,
Second Circuit.

Lawrence SMITH, Plaintiff-Appellant,
v.
Harold D. GRAHAM, Superintendent; Auburn
Correctional Facility, T. McCarthy, Captain;
Auburn Correctional Facility, Richard Roy,
Deputy Commissioner of Albany DOC and
Inspector General, Brian Fischer, Commissioner,
Vernon Fonda, Director of Operations, Norman
R. Bezio, Former Director of Special Housing,
Albert Prack, Director of Special Housing,
Karen Bellamy, Director of Inmate Grievances,
Elizabeth O'meara, Deputy Superintendent of
Admin., James Festa, F.O.I.L. Officer of Auburn
Correctional Facility, B. Chuttey, Koziol, Lt.;
Auburn Correctional Facility, Oleksin, Lieut.;
Auburn Correctional Facility, Vanfleet, V. Rizzo,
Sargent, Christopher Rogofsky, Sargent, Harry
Brundage, Auburn Correctional Facility, Adams,
C.o, R. Martin, C.o., S. Pyke, C.o., Howell, C.o.,
R. Burdick, C.o., Walters, C.o., M. Parish, C.o., D.
Vitale, C.o., E. Van Ness, C.o., Abbott, Librarian,
Hess, C.o., M. Mogavero, Program Committee
Chairperson, Fka DOE, Defendants-Appellees.

No. 15-3414
|

March 22, 2017

Appeal from a judgment of the United States District
Court for the Northern District of New York (Glenn T.
Suddaby, *Chief Judge*).

**\*1 UPON DUE CONSIDERATION WHEREOF, IT IS
HEREBY ORDERED, ADJUDGED, AND DECREED**
that the judgment of the District Court be and hereby is
**AFFIRMED**.

**Attorneys and Law Firms**

FOR PLAINTIFF-APPELLANT: Lawrence Smith, pro
se, Pine City, NY.

FOR DEFENDANTS-APPELLEES: Barbara D.
Underwood, Solicitor General, Andrew D. Bing, Deputy
Solicitor General, Jeffrey W. Lang, Assistant Solicitor
General, for Eric T. Schneiderman, Attorney General of
the State of New York, Albany, NY.

PRESENT: José A. Cabranes, Richard C. Wesley, Circuit
Judges. William K. Sessions III, [*] District Judge.

**SUMMARY ORDER**

Appellant Lawrence Smith, proceeding *pro se*, appeals
from a judgment in favor of Appellees, various
prison officials, in his suit under 42 U.S.C. § 1983
raising claims for violations of his First, Eighth, and
Fourteenth Amendment Rights. The District Court
*sua sponte* dismissed Smith's claims against Corrections
Officer Walters, but allowed Smith's due process claims
against Captain Chuttey to proceed. A magistrate judge
subsequently recommended granting summary judgment
in favor of Chuttey. Smith failed to object to the report
and recommendation, which the District Court adopted.
We assume the parties' familiarity with the underlying
facts, the procedural history of the case, and the issues on
appeal.

**I. Summary Judgment**
Smith waived appellate review of his due process claim
against Chuttey by failing to object to the magistrate
judge's report and recommendation despite being clearly
notified of the consequences of his failure to do so. [1] Even
if we were to excuse Smith's failure to object, the District
Court properly granted summary judgment on this claim.

We review de novo a district court's grant of summary judgment. *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 126 (2d Cir. 2013) (per curiam). Summary judgment must be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When determining whether a genuine dispute exists, we must "resolve all ambiguities and draw all inferences against the moving party." *Garcia*, 706 F.3d at 127.

Due process requires that prison disciplinary hearings be conducted by a "fair and impartial hearing officer." *Kalwasinski v. Morse*, 201 F.3d 103, 108 (2d Cir. 1999). However, "[prison] adjudicators are presumed to be unbiased" and "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996). In addition, due process requires that the findings of a prison disciplinary hearing officer be based on some "reliable evidence of the inmate's guilt." *Luna v. Pico*, 356 F.3d 481, 488 (2d Cir. 2004) (internal quotation marks omitted).

**\*2** Smith raises three challenges to his 2012 disciplinary hearing, over which Chuttey presided. First, he argues that, because the statement in his grievance did not communicate an intent to inflict harm, it was insufficient to establish that he had made a threat. However, a prisoner's statement need not threaten violence to be considered a threat under disciplinary rule 102.10. *See Vasquez v. Senkowski*, 251 A.D.2d 832, 833, 675 N.Y.S.2d 156 (3d Dep't 1998). Second, he argues that Chuttey demonstrated bias by allowing Walters to present false testimony. However, false testimony given during a disciplinary proceeding does not establish a denial of due process. *See Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997); *see also Phelps v. Kapnolas*, 123 F.3d 91, 92–93 (2d Cir. 1997) (affirming dismissal of a § 1983 claim alleging that corrections officer provided false testimony at a disciplinary hearing). Third, Smith argues that Chuttey demonstrated bias by not calling as a witness an inmate to testify that Walters put Smith on keeplock on February 20, 2012, two days before Walters filed the misbehavior report against Smith. However, three witness had already testified that Smith was on keeplock on February 20, and "[t]he refusal to call witnesses whose testimony would be redundant is not a violation of any established due process right." *See Holland v. Goord*, 758 F.3d 215, 225 (2d

Cir. 2014). Moreover, the inmate had submitted a form stating that he refused to testify because he had not seen anything.[2] *See Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993) (holding that if witness "will not testify if called, it cannot be a 'necessity' to call him," and that prison official who "reasonably concludes that it would be futile to call a witness to testify" does not violate inmate's constitutional rights).

## II. Sua Sponte Dismissal of Claims Against Walters

We review *de novo* a district court's *sua sponte* dismissal of claims under 28 U.S.C. §§ 1915(e)(2) and 1915A. *See Giano v. Goord*, 250 F.3d 146, 149–50 (2d Cir. 2001); *see also Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003) (per curiam). To avoid dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). We afford a *pro se* litigant "special solicitude" by interpreting a complaint filed *pro se* "to raise the strongest claims that it suggests." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (internal alterations and quotation marks omitted).

Liberally construed, Smith's brief raises three challenges to the District Court's *sua sponte* dismissal of his claims against Walters. First, he reiterates his allegations that Walters planted a metal spoon in his cell and then stole his legal documents while Smith was in solitary confinement. However, both of these allegations occurred in 2008, and any claim based on them was therefore barred by New York's three-year statute of limitations. *See Milan v. Wertheimer*, 808 F.3d 961, 963–64 (2d Cir. 2015) (per curiam) (affirming *sua sponte* dismissal of claims based on statute of limitations). Second, Smith alleges that Walters "stalked" him for a period of four years. This general allegation of harassment failed to state a claim because he did not allege any "appreciable injury." *See Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986). Third, Smith argues that Walters "illegally" placed him on keeplock in February 2012. To the extent that Smith intended this to be a claim of retaliation, he failed to allege any specific grievance that would give rise to an inference of retaliatory animus based on the temporal proximity between that

grievance and being placed on keeplock; he specifically alleged that Walters did not yet know of grievances Smith had filed in early 2012. *See, e.g.*, *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (observing that temporal proximity constitutes circumstantial evidence of retaliation). To the extent Smith intended this to be a due process claim, Smith failed to allege any facts that demonstrated an "atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009) (internal quotation marks omitted).

## CONCLUSION

**\*3** We have reviewed all of the remaining arguments raised by Smith on appeal and find them to be without merit. For the foregoing reasons, we **AFFIRM** the judgment of the District Court.

## All Citations

--- Fed.Appx. ----, 2017 WL 1103467 (Mem)

## Footnotes

\*   William K. Sessions III, Judge of the United States District Court for the District of Vermont, sitting by designation.

1   We have held that failure to timely object to a report and recommendation generally constitutes a waiver of the defaulting party's right to appeal, provided the party received clear notice of the consequences of a failure to object. *See Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003). Notice is sufficient if it informs the litigant that the failure to timely object will result in the waiver of further judicial review and cites pertinent statutory and civil rules authority. *See Frank v. Johnson*, 968 F.2d 298, 299 (2d Cir. 1992). We may nevertheless excuse the waiver "in the interests of justice." *Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Cephas*, 328 F.3d at 107. "Such discretion is exercised based on, among other factors, whether the defaulted argument has substantial merit or, put otherwise, whether the magistrate judge committed plain error in ruling against the defaulting party." *Spence v. Superintendent, Great Meadow Corr. Facility*, 219 F.3d 162, 174 (2d Cir. 2000).

2   To the extent Smith sought to call the third inmate to testify that it was Walters specifically who had placed Smith on keeplock on February 20, this evidence would have been irrelevant to whether Smith committed the offenses of which he was charged, which occurred before February 20.

---

**End of Document**                                                          © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 3324049
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Victor SOWELL, Plaintiff,
v.
Paul H. WEED, T. Harris, D. Flynn, Donald Selsky,
J. Escrow, M. Sheahan, F. Bigit, Defendants.

No. 07–CV–6355(MAT).
|
July 1, 2013.

**Attorneys and Law Firms**

Paul L. Leclair, Leclair Korona Giordano Cole LLP,
Rochester, NY, for Plaintiff.

**DECISION AND ORDER**

MICHAEL A. TELESCA, District Judge.

**I. Introduction**

*1 Victor Sowell, an inmate in the custody of New
York State Department of Corrections and Community
Supervision ("DOCCS"), commenced this action *pro se*
pursuant to 42 U.S.C. § 1983, alleging that Defendants
violated his constitutional rights in connection with (1)
a disciplinary hearing finding him guilty on March 8,
2006, of impersonation, possession and distribution of
a departmental document without authorization, and
unauthorized correspondence with a parolee; and (2) a
use-of-force ("UOF") incident on June 18, 2006, which
resulted in Sowell sustaining significant injuries and being
found guilty of assaulting several correction officers.

**II. Background**

**A. The Parties**

At all relevant times, Correction Officer Paul H. Weed
("CO Weed"), Timothy Harris ("CO Harris"), and Daniel
Flynn ("CO Flynn") were employed at Southport and
were involved in the June 18, 2006 UOF incident.
Captain M. Sheahan ("Capt.Sheahan") presided over the
disciplinary hearing dealing with the assault charges filed
against Sowell after the UOF incident.

Civilian Hearing Officer James Esgrow ("CHO Esgrow")
was assigned to Southport to conduct the disciplinary
hearing involving the fraud charges. Senior Investigator
Frank Bigit ("Inv.Bigit") of DOCCS' Office of the
Inspector General conducted the investigation into the
fraud charges.

Donald Selsky, DOCCS' Director of Inmate Discipline
and Special Housing Units ("Director Selsky") reviewed
both disciplinary hearings.

**B. Factual Summary**

The following facts—viewed in the light most favorable
to Plaintiff—are gleaned from the pleadings and from
the parties' submissions in conjunction with Defendants'
summary judgment motion. *See, e.g., Lipton v. Nature
Co.,* 71 F.3d 464, 471 (2d Cir.1995) ("For the purposes of
a summary judgment motion, courts are required to view
the facts in the light most favorable to the parties opposing
the motion and to suspend judgments on credibility.").

**1. The 2006 Disciplinary Hearing on Charges of
Fraud** [1]

On March 24, 2003, the Inspector General's Office
("IGO") received a complaint stating that a correction
officer employed at Great Meadow Correctional Facility
had found an unexplained charge on one of his credit
accounts. Other correction officers also began having
difficulties in refinancing mortgages and obtaining loans.

Inv. Bigit was assigned to the matter on May 1, 2003,
and over the course of two years, he conducted an
investigation which revealed that Sowell had obtained
a mistakenly unredacted UOF report through a March
2000 Freedom of Information Law request. The report
pertained to a UOF incident on May 15, 1999, which
Sowell was challenging, and report contained the Social
Security numbers of the correction officers who had
been involved. With the assistance of a confidential
informant, Inv. Bigit determined that Sowell had sent
this information to a parolee, Shammell Ayatollah
("Ayatollah"), [2] with instructions on how to obtain
fraudulent credit cards in the names of the officers
whose personal information was contained in the report.
Once Inv. Bigit completed his investigation, he filed a
misbehavior report on October 7, 2005, charging Sowell
with violations of Rule 111.10 (Impersonation), Rule

Sowell v. Weed, Not Reported in F.Supp.2d (2013)
Case 9:14-cv-01389-TJM-TWD     Document 35     Filed 06/13/17     Page 139 of 151
2013 WL 3324049

113.26 (Possession of Employee Personal Information); Rule 116.12 (Distribution of a Facility Document); and Rule 180.11 (Corresponding with a Parolee).

**\*2** A disciplinary hearing was held which resulted in a finding of guilty on all charges. However, this hearing was reversed by CHO Esgrow because CO Hibbard, the employee legal assistant assigned to Sowell, failed to provide adequate assistance. CHO Esgrow assigned Sergeant McKehan ("Sgt.McKehan"), from whom Sowell refused assistance. Nevertheless, Sgt. McKehan provided Sowell with the non-confidential information he had requested from his first legal assistant but not received. Throughout the hearing there were multiple adjournments to allow for Sowell to receive additional legal assistance.

In a disposition dated March 8, 2006, CHO Esgrow found Sowell guilty of all the charges set forth in the misbehavior report and imposed a penalty of 18 months in SHU. The violation of Rule 113.26 did not result in any additional SHU time or loss of privileges. On administrative appeal, Director Selsky modified the disposition by dismissing the conviction for Rule 113.26, because Sowell had not had adequate notice of it. The SHU sentence was undisturbed.

Sowell filed a petition pursuant to Article 78 of New York's Civil Practice Law and Rules, which was denied on the merits by the Appellate Division, Third Department, of New York State Supreme Court. *Matter of Sowell v. Selsky,* 43 A.D.3d 1226, 1226, 841 N.Y.S.2d 418, 2007 N .Y. Slip. Op. 06606 (3d Dep't 2007) (citations omitted).

### 2. The June 18, 2006 Use–Of–Force Incident

On the morning of Sunday, June 18, 2006, Sowell headed out of his cell to go to recreation. As per the usual procedure, his hands were cuffed in the front of his body. When he stopped for a security wanding and pat-frisk, Sowell placed his hands on the wall to be frisked. CO Weed conducted the pat-frisk and, according to Sowell, "ran his hand over [Sowell's] private part and he squeezed[ .]" *See* VS1.38:9–14; 40:1–8. [3] Although he knew he was not supposed to turn away from the wall or take his hands off the wall during the wanding or pat-frisk, Sowell turned to right, bringing his head and shoulder away from the wall. Sowell said, "[W]hat are you doing, man, what are you doing [?]" *Id.*

CO Weed "jumped back" and Sowell tried to put his hands back on the wall. However, CO Weed "rushed [him] and grabbed [him] around the waist[.]" Sowell stated that he "didn't resist at all" and "fell to the ground." Sowell related that one of the officers activated an alarm, bringing numerous other officers to the scene. Sowell testified that they were "was allover [him]" while he was face-down on the floor handcuffed. The officers "smashed [his] face to the ground" and were "doing all kinds of stuff to [him]." Sowell testified that CO Weed was "sitting on his butt" with "his legs out" and he "had [Sowell's] hand." VS1.40:16–25; 41:1–5. Sowell was "able to see [Weed] sitting there holding [his] hands," and "breaking [his] fingers, dislocating [his] fingers[.]" CO Weed tried to stop Sowell from yelling by "smash[ing][his] face to the ground," almost "choking [him] [.]" VS1.42:21–25; 43:1–3. Sowell explained that CO Weed was "[s]napping [his finger] one by one, pulling them, trying to close [his] hand, pulling it back and snapping." Specifically, CO Weed was "[p]ulling them backwards, almost like in an upwards and backwards direction[.]". CO Weed started with Sowell's pointer (index) finger. Throughout the whole incident, Sowell was screaming, "He is breaking my fingers." VS1.58:11–23.

**\*3** Sowell stated that "[s]omebody had their knee on [his] face or elbow or arm on [his] face[.]" With regard to CO Harris, Sowell testified, "Harris hit me in the back of the head, because I seen him behind me, right, and I see he was like punching me, like this, like trying to hide himself from punching me in my face." VS1.51:4–9; 55:1–8 (testifying that CO Harris hit him in the back of the head with a baton); VS1.53:24–25; 54:1–4 ("I was hit in the back of my head. Hit in the side of my face, my ear, everywhere, kicked in the back, everywhere, ribs."). To keep Sowell from yelling and screaming, the officers "smashed [his] face down and he continued doing it while they had [his] face smashed down."

Two of Sowell's fellow inmates on the gallery, Michael Ramirez ("Ramirez") and Alexander Screahben ("Screahben"), were in cells near the location of the incident. Because he was a porter, Ramirez had a mirror, which he stuck outside his cell once he heard Sowell screaming. Ramirez testified that he only saw "glimpses of [Sowell's] body parts, because there was so many C.O.s on him." MR .32. [4] Ramirez testified that he saw the correction officer searching Sowell in the genital area and he said, "[H]ey, what are you doing?" MR.13.

At that point, "the other officers just brang [sic] him down." MR.14. Ramirez could see "Sowell on the floor, and he was screaming ... that his fingers was broke." MR.18. According to Ramirez, Sowell said this "quite a few times". Sowell was "[v]ery loud" and "[e]verybody heard him." MR. 18, 23–24. Upon hearing Sowell crying out that his fingers were being broken, all the other inmates started screaming, "[L]eave him alone[!] MR. 19. Ramirez estimated that the incident lasted about five minutes.

Screahben did not see the incident, but was able to hear it. AS.11. He heard someone say, " 'What are you doing?' " This was followed by "a lot rumbling" and the person started "screaming[,]" " 'Yo, you breaking my finger.' " AS.11, 13–15. Screahben said that the person was "real loud, especially because he was crying[,] .... saying, 'They broke my fingers. They broke my fingers.' And he was bawling." AS.14–15, 22, 23. Screahben estimated that the incident lasted about four minutes. AS.18.

After the incident, the correction officers hauled Sowell into the shower area. CO Weed issued misbehavior report with regard to the events from the pat-frisk to placing Sowell in the shower, charging him with 106.10 (refusing a direct order); 115.10 (refusing frisk or search procedures); 102.10 (threats); 107.10 (interference with employee); 104.13 (conduct which disturbs order of facility); and 100.11 (assault on staff).

Sowell stated that when he "got in the shower, all of my fingers were pointed back this way and pointing to the side[,]" VS1.56:14–25, so he started trying to pop them back into place. CO Robinson, who was watching Sowell, observed him doing this and gave him a direct order to stop, which Sowell ignored. Sgt. McKeon then came and talked to Sowell for a few minutes. Then, according to CO Robinson's misbehavior report, threw himself to the floor, hitting the back of his head and rolling around "violently rolling back and forth banging his hands, head and feet on and against the shower floor and shower ledge." Both CO Robinson and Sgt. McKean ordered him to stop, and after about 30 seconds, Sowell complied. CO Robinson wrote up a misbehavior report charging Sowell with violating Rule 106.10 (Refusing a Direct Order) and 123.10 (An Inmate Shall Not Inflict or Attempt to Inflict Bodily Harm Upon Himself).

**\*4** Facility nurse Karen Weaver ("Nurse Weaver") examined Sowell in the shower and saw that his second through fifth fingers (index through pinkie) were "grossly deformed" and he had a quarter-sized hematoma (black and blue mark) on the back of his head, which grew to three and one-half inches in size. KW.23–24. His left pupil was sluggish, and the right pupil was within normal limits. KW.25.

Plaintiff was transported to the Arnot–Ogden Medical Center ("AOMC") where he was treated by orthopedic surgeon, Mark Gibson, M.D. ("Dr.Gibson"). Sowell had "pretty significant swelling" around the fingers of his left hand, consistent with dislocations of those digits. X-rays confirmed that he had a small avulsion fracture on his fourth (ring) finger along with a dislocation of that finger. The main injury appeared to have been sustained by the third and fourth digits. Because of the difficult nature of the reduction, Dr. Gibson injected an anesthetic before moving the joint back into place. Following the reduction, Dr. Gibson "buddy-taped" the third and fourth fingers together and instructed Plaintiff on the importance of beginning a passive and active range of motion program so that he would not lose motion at the proximal interphalangeal joints of the affected fingers. Plaintiff was discharged from AOMC and was seen in follow-up by Dr. Gibson on several occasions. [5]

Captain Michael Sheahan ("Capt.Sheahan") presided over a Tier III hearing on July 4–5, 2006, based on CO Weed's misbehavior report. Sowell was found guilty of all charges, although on the disposition sheet, Capt. Sheahan indicated that he found Sowell guilty of violating Rule 104.11 (Violent Conduct) instead of Rule 104.13, which had been charged in the misbehavior report. Sowell was sentenced to 12 months (6 months suspended and 6 months deferred) in the Special Housing Unit, to begin on April 27, 2007.

On August 25, 2006, Director Selsky modified the hearing disposition to the extent that the conviction of Rule 104.11 was dismissed because that charge had not been listed on the misbehavior report. There was no change in penalties. *See* Defs' Ex. W.

A Tier II hearing was held on July 17, 2006, based upon CO Robinson's misbehavior report charging Sowell with refusing a direct order while he was waiting in the shower area after the UOF incident, and with inflicting bodily

2013 WL 3324049

harm upon himself. Lieutenant Donahue, the hearing officer, found Sowell guilty of refusing a direct order and not guilty of self-inflicted bodily harm, and sentenced him to 25 days of keeplock. On administrative appeal, Captain Sullivan reversed the decision in a memorandum dated July 20, 2006. This disciplinary hearing is not at issue in the present lawsuit.

Sowell commenced an Article 78 proceeding in New York Supreme Court, Albany County on October 3, 2006, challenging both hearings stemming from the UOF incident. In a Decision and Order dated April 21, 2008, Associate Justice Judith A. Hard denied Sowell's petition on the merits.

**\*5** This timely § 1983 action followed. *Pro bono* counsel was appointed to assist Sowell, and extensive discovery was conducted. Presently before the Court is a Motion for Summary Judgment (Dkt # 169) pursuant to Federal Rule of Civil Procedure ("F.R.C.P.") 56(c) by defendants Timothy Harris, Daniel Flynn, James Esgrow, Donald Selsky, Michael Sheahan, and Frank Bigit seeking to dismiss a number of claims in Plaintiff's Second Amended Complaint (Dkt # 167). Defendant Paul Weed has not joined in the Motion for Summary Judgment. Plaintiff's *pro bono* counsel has opposed the motion (Dkt # 192).

## III. General Legal Principles

### A. Section 1983

Section 1983 authorizes an individual who has been deprived of a federal right under the color of state law to seek relief through "an action at law, suit in equity, or other proper proceeding for redress." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 707, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999). Two essential elements comprise a Section 1983 claim: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of his federal statutory rights, or his constitutional rights or privileges. *Annis v. County of Westchester,* 136 F.3d 239, 245 (2d Cir.1998) (citation omitted).

To bring a § 1983 claim against a prison official, a plaintiff must allege that individual's personal involvement; it is not enough to simply assert that the defendant is a "link in the prison chain of command." *McKenna v. Wright,* 386 F.3d 432, 437 (2d Cir.2004) (quotation omitted). "[S]upervisor liability in a § 1983 action depends on a showing of some

personal responsibility, and cannot rest on respondeat superior." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citation omitted); *accord Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

### B. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Initially, the moving party must show that there is "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has carried its burden, the opposing party must set forth "specific facts showing that there is a genuine issue for trial[,]" FED. R. CIV. P. 56(e), and must introduce evidence beyond the mere pleadings to show that there is an issue of material fact concerning "an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The reviewing court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992) (citation omitted). Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.) (citing *Anderson,* 477 U.S. at 250–51), *cert. denied,* 502 U.S. 849 (1991). If, "as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.,* 391 F.3d 77, 83 (2d Cir.2004) (quotation omitted).

## IV. Discussion

### A. Official Capacity Claims

**\*6** Defendants argue that to the extent that Sowell seeks monetary damages against them in their official capacities, such claims are barred by the Eleventh Amendment. *See Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988). Sowell agrees that money damages are not recoverable against Defendants in their official capacities. He maintains, however, that he also seeks prospective injunctive or equitable relief, and that such claims are not barred by the Eleventh Amendment.

In Paragraph 4 of the Second Amended Complaint, Plaintiff seeks "[a]n order expunging Department of Corrections findings of guilt in regard to the Misbehavior Reports." Second Amend. Compl., at 34, ¶ 4 (Dkt # 167). Plaintiff is correct that the relief sought in this paragraph is not barred by the Eleventh Amendment. *See Nevarez v. Hunt,* 770 F.Supp.2d 565, 568 (W.D.N.Y.2011) (holding that official-capacity claim for equitable relief in form of expungement of various disciplinary is not barred by Eleventh Amendment) (citation omitted). However, as discussed further below, the Court is dismissing the claims stemming from the two disciplinary hearings, and thus Sowell's requests for equitable relief in the form of expungement are denied.

In Paragraph 5 of the Second Amended Complaint, Sowell requests "[a] declaratory judgment or injunction preventing any retaliation for prosecuting this action[.]" Second Amend. Compl., at 34, ¶ 5 (Dkt # 167). Injunctive relief is an equitable remedy, appropriate in cases where the plaintiff can show he will suffer a "likelihood of substantial and immediate irreparable injury" if an injunction is not granted. *City of Los Angeles v. Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (quotation omitted). Sowell's request for prospective injunctive relief thus is not barred, *per se,* by the Eleventh Amendment. At this juncture, the Court will not dismiss Sowell's claim against Defendants in their official capacities for prospective injunctive relief. However, Sowell is advised that under the Prison Litigation Reform Act, "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a).

**B. Excessive Force Claims Arising from the June 18, 2006 Incident**

**1. Overview**

In his first cause of action, Sowell asserts that CO Weed utilized excessive force during the June 18, 2006 incident, in violation of the Eighth Amendment, and that CO Harris and CO Flynn failed to intervene in the assault or otherwise prevent CO Weed from harming him. Defendants CO Harris and CO Flynn move for summary judgment dismissing this cause of action, arguing Sowell has not raised a triable issue of fact as to their personal involvement in the allegedly excessive use of force. Notably, CO Weed has not moved to dismiss the excessive force claim. Defendants CO Harris and CO Flynn urge that their actions in restraining Plaintiff after he came off the wall "were a rational and calculated response to a perceived threat of inmate resistance." Defendants' Memorandum of Law ("Defs' Mem.") at 13 (citation omitted)).

**2. The Law on Excessive Force**

**\*7** The Supreme Court has held that "the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury." *Hudson v. McMillian,* 503 U.S. 1, 4, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *accord Wilkins v. Gaddy,* 559 U.S. 34, 130 S.Ct. 1175, 1177, 1178, 175 L.Ed.2d 995 (2010) (*per curiam* ) ("In requiring what amounts to a showing of significant injury in order to state an excessive force claim, the Fourth Circuit has strayed from the clear holding of this Court in *Hudson."* ). The "core judicial inquiry" is "not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Wilkins,* 130 S.Ct. at (quoting *Hudson,* 503 U.S. at 7; citing *Whitley v. Albers,* 475 U.S. 312, 319–21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)). Thus, while relevant to the question of maliciousness, the absence of serious injury does not end the inquiry. *Hudson,* 503 U.S. at 7. In addition to the extent of injury suffered by an inmate, other proper factors for consideration are the need for the use of force, the relationship between that need and the amount of force used, the threat "reasonably perceived" by the officers, and any efforts the officers made to moderate the severity of the force used. *Id.* (citing *Whitley,* 475 U.S. at 321).

**3. Failure to Intercede to Prevent an Eighth Amendment Violation**

When a correction officer observes another officer using excessive force, or has reason to know that excessive force will be or is being used, he can be liable under the Eighth Amendment if he fails to intercede. *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) (citing *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.") (collecting cases)). For liability to attach, the correction officer must have had a "realistic opportunity" to prevent the harm from occurring. *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988); *see also Curley,* 268 F.3d at 72. In general, the question of whether a correction officer had adequate time to intervene or was capable of preventing the assault is an issue of fact for the jury "unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *O'Neill,* 839 F.2d at 12; *accord Anderson,* 17 F.3d at 557.

With this legal backdrop, the Court turns to the question of whether CO Harris and CO Flynn may be liable for failing to intercede to prevent CO Weed from harming Plaintiff. As noted above, CO Weed has not moved for summary judgment on the Eighth Amendment claim against him, tacitly conceding that there are genuine issues of material fact as to whether he used excessive force against Sowell. Indeed, the Court has no difficulty concluding that Plaintiff has raised a genuine issue of material fact as to whether CO Weed applied force maliciously and sadistically to cause harm rather than in a good-faith effort to maintain or restore discipline in light of (1) Plaintiff's testimony that CO Weed broke his second through fifth fingers, one by one; (2) Dr. Gibson's assessment of the severity of Plaintiff's injuries; (3) the relatively lengthy duration (approximately six minutes) [6] of the incident; and (4) the fact that Plaintiff was handcuffed in the front of his body and was lying face down on the floor restrained by several other officers while CO Weed was breaking his fingers. *See* VS1.38, 40–42, 46, 49, 51, 59, 60–64.

**\*8** With the excessive force element of a failure-to-intercede claim adequately established for purposes of defeating summary judgment, the Court must examine whether there are genuine issues of material fact regarding whether CO Harris and CO Flynn had a "realistic opportunity" to prevent the harm from occurring. Sowell

testified that during the incident, which lasted about six minutes, he was screaming that his fingers were being broken. VS1.42, 58. Both of the inmates who gave depositions in this matter confirmed that Sowell was crying out and loudly yelling, "They are breaking my fingers!" *E.g.,* MR.18, AS.14–15. These inmates also testified they heard Sowell say repeatedly, "I'm not resisting!" Given the duration of the incident, and the testimony from non-party witnesses Ramirez and Screahben, the Court find that Sowell has raised a genuine issue of material fact as to whether CO Harris and CO Flynn could be liable for failing to intercede. Viewing the evidence in the light most favorable to Sowell, two individuals who were not directly involved in the incident testified they heard Sowell screaming that his fingers were being broken and that he was not resisting. This, coupled with the duration of the incident (six minutes), the fact that Sowell was on his stomach and handcuffed, and the number of other officers who participated in the incident, raises an issue of fact as to whether CO Harris and CO Flynn, who were actually involved, had reason to know excessive force was being used by CO Weed and had a realistic opportunity to intervene to prevent its use. *Cf. O'Neill,* 839 F.2d at 11–12 ("Even when the evidence is viewed in the light most favorable to the plaintiff, there is insufficient evidence to permit a jury reasonably to conclude that [the officers'] failure to intercede was a proximate cause of the beating. The three blows were struck in such rapid succession that [the officer] had no realistic opportunity to attempt to prevent them. This was not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator.").

### 4. CO Harris' Direct Liability Under the Eighth Amendment

Sowell argues that CO Harris should be held liable as a principal under the Eighth Amendment because CO Harris allegedly struck him in the back of the head while Sowell was being restrained. *See* VS1 .54–55. Sowell's medical records indicate that he sustained a round hematoma approximately 3½ inches in diameter on the back of his skull. *See* Defs' Ex. S. Defendants argue that this assertion is not supported by the videotape evidence, and therefore the Court should deem it incredible as a matter of law.

At his deposition, Sowell testified as follows:

2013 WL 3324049

Harris hit me in the back of the head, because I seen him behind me, right, and I see he was like punching me, like this, like trying to hide himself from punching me in my face.

**\*9** VS1.51. Later in his deposition, however, Sowell testified that CO Harris hit him with a baton. CO Harris has denied striking Sowell with a baton or with his fists. TS.66. [7]

Inmate Ramirez testified that he did not observe any person hitting another person during this incident because "[t]he only thing [he] could observe" was "a whole bunch of [officers] on top of him...." MR.21. Later in his deposition, Ramirez clarified that he could observe Plaintiff from the knee up to his head, and although he could not see him completely, he "could make out [Plaintiff's] body[.]" MR.23. When asked if Plaintiff was being struck in any way, Ramirez replied, "No, not that I seen." MR.23.

Defendants also note that although the videotape is not perfectly clear, it is clear enough to determine that there was not a baton being used at any time. Defs' Mem. at 13. Defendants also argue that it is implausible for Plaintiff to simultaneously claim that he was struck with a baton on the back of his head and that he was turned so that he could see who was hitting him. *See* Defs' Mem. at 13.

Plaintiff did not address Defendants' arguments in his memorandum of law and indeed, does not mention the Eighth Amendment claim against CO Harris as a principal beyond stating that he "punched Sowell in the back of the head...." Pl's Mem. at 2. "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994) (citation omitted). The Court finds that Defendants have adequately demonstrated, by reference to pertinent portions of the record, that no genuine issue of material fact exists with regard to this claim. Summary judgment therefore is granted in favor of CO Harris with regard to the claim that he personally used excessive force in violation of the Eighth Amendment against Plaintiff.

## C. The Due Process Claims Related to the Disciplinary Hearings

Sowell raises a number of claims concerning alleged violations of his procedural due process rights in connection with the fraud disciplinary hearing and the assault disciplinary hearing. Defendants have asserted that some of these claims are barred by collateral estoppel (issue preclusion) and the *Rooker–Feldman* doctrine [8] because Plaintiff raised them in the Article 78 petitions in state court challenging each disciplinary hearing. Based upon its review of the record and relevant caselaw, the Court agrees that Defendants' argument is persuasive. However, Plaintiff has asserted that Director Selsky should be held liable for failing to correct the constitutional errors at the disciplinary hearings, which requires the Court to consider the merits of those same claims that are barred by collateral estoppel and/or *Rooker–Feldman.* Accordingly, in the interest of judicial economy, the Court will consider the substance of Plaintiff's underlying due process claims, which are easily resolved on the merits.

**\*10** To award damages under 42 U.S.C. § 1983 for an alleged violation of procedural due process, the reviewing court must find that, as the result of conduct performed under color of state law, the inmate was deprived of life, liberty, or property without due process of law. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). It is undisputed that CHO Esgrow and Capt. Sheahan acted under color of state law. The remaining inquiry comprises two prongs: (1) whether Sowell had a protected liberty interest in not being confined pursuant to the respective SHU sentences he served; and, if so, (2) whether the deprivations of those liberty interests occurred without due process of law. *Id.* at 351–52 (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460–61, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). Defendant has assumed *arguendo* that Plaintiff had protectible liberty interests in being free from the SHU sentences he served as a result of the disciplinary hearings. The Court has done the same. The alleged due process violations are addressed in turn below.

### 1. The Disciplinary Hearing on Fraud Charges

#### a. Delay in Filing the Misbehavior Report
Plaintiff asserts that the time that elapsed between the conduct underlying the disciplinary charges and the filing of the misbehavior report violated the DOCCS' regulation

requiring that all misbehavior reports must be "reported in writing as soon as practicable." N.Y. COMP.CODE R. & REGS. tit. 7, § 253–3.1(a). "State procedural requirements do not establish federal constitutional rights." *Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.), *cert. denied,* 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987). It is unnecessary for the Court to determine if CHO Esgrow violated any applicable state law because such a violation is not cognizable under § 1983. *Pollnow v. Glennon,* 757 F.2d 496, 501 (2d Cir.1985). *See, e.g., Davidson v. Capuano,* No. 78 CIV. 5724(RLC), 1988 WL 68189, at *18 n. 5 (S.D.N.Y. June 16, 1988) (dismissing as not cognizable plaintiff's claim that defendants violated specific state regulations governing prison disciplinary proceedings) (citations omitted).

**b. Denial of Access to Evidence**

Sowell contends that CHO Esgrow violated his right to due process by denying his requests to view certain documentary evidence and to submit witnesses to cross-examination. As a matter of federal constitutional law, an inmate does not have a right to cross-examine adverse witnesses at a disciplinary hearing, and the hearing officer may rely upon evidence not presented at the hearing. *E.g., Bolden,* 810 F.2d at 358 (citing *Baxter v. Palmigiano,* 425 U.S. 308, 322–23 & n. 5, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)). Consistent with this underlying principle, courts have held that confidential information may be considered even through the inmate has not been permitted access to it. *Matter of Abdur–Raheem v. Mann,* 85 N.Y.2d 113, 119, 623 N.Y.S.2d 758, 647 N.E.2d 1266 (N.Y.1995) (citation omitted). Such decisions are reviewable only for abuse of discretion. *See Wolff,* 418 U.S. at 566–67 (prison officials, having "responsibility for the safety of inmates and staff ... must have the necessary discretion without being subject to unduly crippling constitutional impediments").

**\*11** On the present record, the Court finds as a matter of law that CHO Esgrow did not abuse his discretion in finding that release of the evidence and testimony requested by Sowell would divulge identifying information that, given the nature of the charges involved, could jeopardize individuals' privacy rights and security. The disclosure, especially of the confidential informant's testimony, also could adversely affect institutional safety and security. *See Matter of Abdur–Raheem,* 85 N.Y.2d at 123, 623 N.Y.S.2d 758, 647 N.E.2d 1266 (rejecting contention that hearing officer erred in denying inmate's request for redacted copy of confidential material on

which determination was based because source's identity was evident from substance of information conveyed and meaningful redaction was not possible) (citation omitted). The Court discerns no due process violation in this regard.

**c. Failure to Meet the "Some Evidence" Standard, Failure to Assess the Informant's Reliability, and Lack of Corroborating Evidence**

Sowell argues that CHO Esgrow was not able to properly ascertain the confidential informant's reliability and, relatedly, that the confidential evidence was not sufficiently corroborated. Sowell also contends that there was insufficient evidence to support CHO Esgrow's finding of guilty.

Where a prisoner claims he was denied due process in a prison disciplinary hearing because he was found guilty based on insufficient evidence, the claim must be rejected if there was "some evidence" to support the decision. *Superintendent, Mass. Corr. Inst. v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). The Supreme Court in *Hill* stated that

> [a]scertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is *any evidence in the record that could support the conclusion reached by the disciplinary board.*

*Id.* at 455–56 (emphasis supplied). Where the disciplinary finding is based in part on evidence from confidential informants, the Second Circuit has held that the hearing officer must independently assess the credibility of the informants, considering the totality of the circumstances. *Sira v. Morton,* 380 F.3d 57, 78 (2d Cir.2004); *see also Luna v. Pico,* 356 F.3d 481, 488 (2d Cir.2004). Even if the sole evidence was supplied by a confidential informant, the "some evidence" standard may be satisfied, "as long as there has been some examination of indicia relevant to [the confidential informant's] credibility." *Giakoumelos v. Coughlin,* 88 F.3d 56, 61 (2d Cir.1996) (internal quotation marks omitted).

An independent assessment of the informant's credibility "would not entail more than *some examination* of indicia relevant to credibility ...." *Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1993) (emphasis supplied). Plaintiff asserts that CHO Esgrow "offered no indication on the record that he ascertained where or how the confidential witness obtained the information, and the evidence was not independently assessed for reliability." Pl's Mem. at 20. Contrary to Plaintiff's contention, at the disciplinary hearing, CHO Esgrow did make state on the record that he received "[c]ertain confidential document and confidential testimony" into evidence and that he had "made an independent assessment" of the confidential evidence, finding that it "provide[d] details and specifics and d[id] not appear to be motivated by a desire to harm [Sowell]." Defs' Ex. I. This satisfies the not-very-demanding standard of *Russell* that the hearing officer provide "some examination" of indicia relevant to the informant's credibility. Plaintiff has provided no authority for the proposition that the hearing officer was required to explicitly state that he "ascertained where or how the confidential witness obtained the information[,]" Pl's Mem. at 20.

**\*12** It bears emphasizing that as a matter of Federal law and New York State law, the hearing officer is *not* required to personally interview or question the confidential informant, and may rely solely on the informants' hearsay statements. *See Abdur–Raheem,* 85 N.Y.2d at 117, 623 N.Y.S.2d 758, 647 N.E.2d 1266 ("[A] personal meeting between the Hearing Officer and the confidential informants is not required and that the informants' hearsay statements can constitute 'substantial evidence' as long as there are objective circumstances demonstrating the informants' reliability and, based on those circumstances, the Hearing Officer makes an independent finding that the informants' evidence is, in fact, reliable."); *Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1993) (*as modified on reh'g* ) ("Neither due process nor applicable precedent compels that a hearing officer ... conduct personal interviews of confidential informants."). Here, however, CHO Esgrow took testimony from the confidential informant and was able to observe that individual's demeanor first-hand. CHO Esgrow thus exceeded the applicable due process requirements. *Cf. Campo v. Keane,* 913 F.Supp. 814, 825 (S.D.N.Y.1996) ("[B]y questioning both Lt. Finn and Sgt. Leghorn about the reliability of the informants, defendant [hearing officer] Pico satisfied the *Russell* requirement that he in

some manner assess the credibility of the confidential informants.").

Plaintiff also argues that the Court should reject CHO Esgrow's Declaration, submitted in support of Defendants' summary judgment motion, as an impermissible *post hoc* justification of his decision to credit the confidential informant's testimony. In his Declaration, CHO Esgrow elaborated on his statement at the hearing that the confidential informant's information provided sufficient details and specifics to establish its reliability. For instance, two investigators were present when the informant provided the statements, and each investigator testified in detail, consistently with each other, about what the informant had stated. The informant underwent two interviews and provided the same story on both occasions. In addition, the informant made two written statements after being provided with *Miranda* warnings, and the statements were sworn to under the penalty of perjury. After hearing the informant's testimony, CHO Esgrow determined that the informant was not motivated by an intent to harm Sowell.

Again, Plaintiff has cited no legal authority for his proposition that CHO Esgrow's Declaration is improper or may not be considered. The Supreme Court has held that a hearing officer need not explain his decision to refuse to call at witness at the hearing, but may do so any time, including in defense of a lawsuit. *Ponte v. Real,* 471 U.S. 491, 497–98, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985). This Court sees no reason why *Ponte* would not apply to a hearing officer's explanation with regard to his credibility assessment of a confidential informant.

**\*13** Finally, with regard to the quantum of evidence presented, the Court notes that the Appellate Division determined that the disciplinary finding was supported by "substantial evidence" and thus met the New York State standard for evidentiary sufficiency at a disciplinary hearing. *See Foster v. Coughlin,* 76 N.Y.2d 964, 563 N.Y.S.2d 728, 565 N.E.2d 477, 478 (1990) (New York State law requires prison disciplinary rulings to be supported by "sufficiently relevant and probative" information "to constitute substantial evidence"). This standard is considerably stricter than the Federal "some evidence" standard. *See Friedl v. City of N.Y.,* 210 F.3d 79, 85 (2d Cir.2000). As the Appellate Division noted, CHO Esgrow had before him Inv. Bigit's detailed misbehavior report, along with the testimony of Inv. Bigit,

Case 9:14-cv-01389-TJM-TWD    Document 35    Filed 06/13/17    Page 147 of 151
Sowell v. Weed, Not Reported in F.Supp.2d (2013)
2013 WL 3324049

Inv. Mercada, and Deputy Superintendent of Security Chappius, all of which corroborated the misbehavior report. In addition, CHO Esgrow relied on confidential documents and the confidential informant's testimony explaining how Sowell communicated Social Security numbers to his now-deceased accomplice with instructions on how to use the victims' personal information to fraudulently obtain credit cards. The Assistant Attorney General who inadvertently provided the unredacted UOF report to Sowell testified confidentially, as did the correction officers who were victimized by the fraudulent scheme. The evidence submitted at the disciplinary hearing certainly was sufficient to meet *Hill* 's undemanding "some evidence" standard.

### d. Inadequate Legal Assistance

New York's regulations entitle a prisoner to an employee assistant to help him prepare for a disciplinary hearing. *See* N .Y. COMP.CODES R. & REGS. tit. 7, §§ 251–4.1, 251–4.2. The United States Supreme Court has held that institutional concerns implicated in prison administration would not be furthered by entitling inmates to legal counsel in the form of a retained or assigned attorney, and therefore a prisoner's right to assistance as a matter of federal constitutional law is more limited. *Wolff,* 418 U.S. at 570.

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). Sowell's claim founders on this basis because he has failed to sue either of his legal assistants, CO Hibbard and Sgt. McKehan. To the extent that he claims that CHO Esgrow failed to ensure that he received adequate legal assistance, this claim is belied by the record. CHO Esgrow exhaustively reviewed all the requests Plaintiff made of his previous legal assistant, and overturned the first hearing because CO Hibbard had failed to provide adequate assistance. After assigning Sgt. McKehan, CHO Esgrow and remained involved in the process so as to facilitate Plaintiff obtaining all of the materials to which he was entitled. Plaintiff clearly received all of the legal assistance to which he constitutionally entitled.

### e. Partiality of the Hearing Officer

**\*14**  Sowell asserts in a conclusory fashion that CHO Esgrow was not impartial. It is "improper for prison

officials to decide the disposition of a case before it [i]s heard," although given the "special characteristics of the prison environment, it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process." *Francis v. Coughlin,* 891 F.2d 43, 47 (2d Cir.1989) (citation omitted). The Court has reviewed the transcripts of the hearing, which reveal that CHO Esgrow presided over the hearing in a fair manner, demonstrated commendable patience, and afforded Plaintiff ample opportunity to be heard. There is no indication that CHO Esgrow was anything but an neutral and impartial arbiter, even measured against the heightened standard applicable to judges generally.

### f. Erroneous Conviction of Rule 113.26

Sowell asserts that he was wrongfully convicted of violating a rule that was not in effect at the time he was charged, namely, Rule 113.26. Sowell is correct that he cannot be disciplined for violating an unpublished rule that was never served upon him. However, Sowell suffered no prejudice as a result because he ultimately served no SHU time on the Rule 113.26 conviction, which was dismissed on administrative appeal by Director Selsky. *See Ayers v. Selsky,* No. 07–CV–466, 2010 WL 408442, at *7 (N.D.N.Y. Jan.27, 2010) ("Any alleged constitutional violation as to that charge was vitiated by the dismissal. Moreover, as the appeal did not affect the sentence of 140 days in SHU, Ayers suffered no cognizable deprivation with regard to the first charge.").

### g. Retaliation by Inv. Bigit

Plaintiff asserts that Inv. Bigit filed the misbehavior report charging him with fraud solely in retaliation for declining to become an informant and assist him in his investigation. Inv. Bigit is entitled to qualified immunity with regard to this claim, which is, in any event, purely speculative.

In general, public officials are shielded from suit by the doctrine of qualified immunity if their conduct does not violate the plaintiff's clearly established constitutional rights, or it was objectively reasonable for the officials to believe their acts or omissions did not violate those rights. *Holcome v. Lykens,* 337 F.3d 217, 220 (2d Cir.2003) (citations omitted). Even assuming that an inmate has a constitutional right not to become an informant, it was not "clearly established" at the time when the challenged conduct occurred in 2003. *Allah v. Juchenwioz,* 176 F.

App'x 187, 189 (2d Cir.2006) ( "Neither the Supreme Court nor this Court has ever held that a prisoner enjoys a constitutional right not to become an informant."). Because Inv. Bigit's conduct did not violate any clearly established constitutional right, he is entitled to qualified immunity. *Id.*

In any event, Sowell's allegations concerning Inv. Bigit's allegedly retaliatory motive are wholly conclusory and speculative. *See Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001). They are plainly insufficient to state a colorable constitutional claim. *E.g., Mitchell v. Senkowski,* 158 F. App'x 346, 349–50 (2d Cir.2005) (inmate's conclusory allegations and speculation that various corrections officers and prison officials acted with retaliatory animus in disciplinary proceedings against him were insufficient to defeat summary judgment in favor of officers and officials, in inmate's action alleging violation of his due process rights during disciplinary proceedings).

### h. Failure to Correct Errors on Appeal

**\*15** According to Sowell, Director Selsky, in reviewing his appeal, failed to correct the errors CHO Esgrow made at the hearing level. Since, as discussed above, Sowell has failed to show that his rights were violated during the disciplinary proceeding conducted by CHO Esgrow, there is no legal basis for his claim against Director Selsky. *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 439 (W.D.N.Y.2010) (citing, *inter alia, Black v. Selsky,* 15 F.Supp.2d 311, 318 (W.D.N.Y.1998)).

Plaintiff also accuses Director Selsky of vacating the first hearing to cover up the fact that the first hearing officer allegedly erased documents from the record. Plaintiff has not alleged that CHO Esgrow committed such misdeeds at the second hearing. An inmate is not deprived of due process where, as here, an administrative appeal has cured a hearing's procedural defects. *Russell v. Scully,* 15 F.3d 219, 222 (2d Cir.1993) (citing *Young v. Hoffman,* 970 F.2d 1154, 1156 (2d Cir.1992) (*per curiam* )).

### 2. The Due Process Claims Related to the Disciplinary Hearing on the Assault Charges

### a. Insufficiency of the Evidence and Falseness of the Allegations

"Ground I" in the Second Amended Complaint asserts that "[t]he Misbehavior Report (MR) and staff testimony

Lacked Substantial or Some Evidence to support the guilty determination" and "[t]he charges of assault were brought ... to cover up the assault upon [him][.]" Dkt # 167. Defendants argue that these claims are unexhausted.

A prisoner seeking relief pursuant to § 1983 must, at a minimum, exhaust "such administrative remedies as are available." 42 U.S.C. § 1997e(a). Under New York law, in order to preserve an issue stemming from a disciplinary hearing, the inmate must raise the particular objections regarding the disciplinary hearing either during the hearing itself or on administrative appeal. *E.g., Tavarez v. Goord,* 237 A.D.2d 837, 838, 655 N.Y.S.2d 189 (3d Dept.1997) (citation omitted). Here, the claims regarding evidentiary insufficiency of the guilty finding and falsity of the misbehavior report were not raised on Plaintiff's administrative appeal or in his Article 78 proceeding. *See* Plaintiff's Article 78 Brief dated 10/03/06, ¶ 14 (indicating that the claims set forth in the brief were raised on administrative appeal) (Dkt # 173–3). Accordingly, Sowell has not exhausted "such administrative remedies as are available" within the meaning of 42 U.S.C. § 1997e(a). *See, e.g., Khalid v. Reda,* No. 00 Civ. 7691(LAK) (GWG), 2003 WL 421145, at \*5 (S.D.N.Y. Jan. 23, 2003) (finding that prisoner had not fulfilled § 1997e's exhaustion requirement where "administrative appeal did not raise or even allude to his current claim" and he had not brought a collateral proceeding in state court).

The Second Circuit has held that a rule of total exhaustion is not required by the PLRA, and that exhausted claims may be allowed to proceed while unexhausted claims are dismissed. *Johnson v. Testman,* 380 F.3d 691, 695 n. 4 (2d Cir.2004); *Ortiz v. McBride,* 380 F.3d 649, 663 (2d Cir.2004). The Court accordingly dismisses without prejudice Plaintiff's unexhausted claims that his finding of guilt at the disciplinary hearing are unsupported by "some evidence" or "substantial evidence" and that CO Weed's misbehavior report was false.

### b. Inadequate Misbehavior Report

**\*16** As Ground II of the Second Amended Complaint, Plaintiff asserts that pursuant to 7 N.Y.C.R.R. § 251–3.1(C)(1), (C)(2), the allegations in the Misbehavior Report "do not match the rule-book violations or provide adequate notice for the alleged violations" of the rules charged. A misbehavior report that includes the date, time, and location of his alleged violation; the rule allegedly violated along with a brief description of that

2013 WL 3324049

rule; and a summary of the incident meets the standards set forth in 7 N.Y.C.R.R. § 251–3.1(c)(1), (2) and provides an inmate with sufficient notice. *Omaro v. Goord,* No. 06–CV–6141–CJS, 2009 WL 2163102, at \*4 (W.D.N.Y. July 17, 2009) (citing *Johnson v. Goord,* 305 F. App'x 815, 817 (2d Cir.2009)). CO Weed's misbehavior report included all of these details, and it therefore provided Plaintiff with sufficient notice of the charges.

With regard to whether there was adequate notice of Rule 104.10, it is well settled that under the Due Process Clause an inmate facing disciplinary proceedings must be accorded advance notice of the charges made against him. *Wolff,* 418 U.S. at 566. Here, CO Weed indicated that he was charging Plaintiff with Rule 104.13. Capt. Sheahan, the hearing officer, found Sowell guilty violating Rule 104.10, and did not consider the violation of Rule 104.13.

On administrative appeal, Director Selsky reversed the finding of guilt under Rule 104.10 because Sowell had not been charged with violation that rule and thus did not have proper notice of it. Director Selsky's reversal thus remedied the due process violation that occurred when Capt. Sheahan found Sowell guilty of a charge of which he did not have advance notice. *Ayers v. Selsky,* No. 07–CV–466, 2010 WL 408442, at \*7 (N.D.N.Y. Jan.27, 2010) ("[T]he first charge in the misbehavior report dismissed on administrative appeal by Selsky. Any alleged constitutional violation as to that charge was vitiated by the dismissal. Moreover, as the appeal did not affect the sentence of 140 days in SHU, Ayers suffered no cognizable deprivation with regard to the first charge.").

### c. Spillover Prejudice

Plaintiff asserts that the inclusion of an uncharged violation, i .e., Rule 104.10, "tainted the entire proceeding". This claim is based on pure speculation and does not merit relief.

### d. Inadequate Legal Assistance

Plaintiff contends that his assigned employee legal assistant, Sgt. Morse, failed to provide adequate assistance when he failed to interview witnesses as requested pursuant to 7 N.Y.C.R.R. § 251–4.1 and failed to secure relevant documentary evidence pursuant to 7.N.Y .C.R.R. § 254.6(a)(3). The Second Circuit has held that prison authorities have a constitutional obligation to provide "substantive assistance" to an

inmate in marshaling evidence and presenting a defense. *Eng v. Coughlin,* 858 F.2d 889, 897 (2d Cir.1988). At a minimum, an employee legal assistant "should perform the investigatory tasks which the inmate were he able, could perform for himself." *Id.* at 897–98.

 **\*17** Contrary to Plaintiff's contentions, Sgt. Morse did contact the requested inmate witnesses, who agreed to testify but declined to give written or oral statements in advance of the disciplinary hearing. Even if Sgt. Morse failed to obtain certain documentary evidence before the hearing, Plaintiff was afforded the opportunity during the hearing to review the requested logs and redacted reports. In sum, Plaintiff cannot demonstrate that he was prejudiced by Sgt. Morse's alleged shortcomings.

### e. Untimeliness of the Disciplinary Hearing

Plaintiff alleges that Capt. Sheahan inappropriately restarted the hearing after Plaintiff had already made various objections, the hearing was untimely pursuant to 7 N.Y.C.R.R. § 251–5.1(b), which provides that a disciplinary hearing must be completed within 14 days following the writing of the misbehavior report unless otherwise authorized. This claim raises a question of state procedural law only. As such, it is not cognizable in this § 1983 proceeding. *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009) (collecting cases). Any claim of undue delay is subject to Federal constitutional standards, which require only that the disciplinary hearing be held within a "reasonable time" and not within any prescribed number of days. *Russell v. Coughlin,* 910 F.2d at 78 n. 1 ("Federal constitutional standards rather than state law define the requirements of procedural due process."). The "reasonable time" standard clearly was met in Sowell's case.

### f. Denial of the Right to Call Witnesses

Plaintiff asserts that he was denied his fundamental due process right to call witness because Capt. Sheahan failed to allow the inmate in cell A–10–16 to testify. [9] According to Sowell, the inmate in cell A–10–16 would have testified concerning what he overheard Sowell say after the UOF incident, when he was placed by the officers in the shower. Sowell opined that perhaps the inmate heard things that Sowell himself did not remember saying. Capt. Sheahan denied the request as redundant.

All four of the inmates who appeared testified concerning what they heard during and after the UOF incident, including the time during which Sowell was in the shower area. Thus, Capt. Sheahan did not abuse his discretion in determining that the inmate in A–10–16 would have offered redundant testimony. Furthermore, as Capt. Sheahan observed, the period covered by the disciplinary hearing concerned the time up until Sowell's being placed in the shower. Arguably, then, the uncalled inmate's testimony was not relevant to the hearing.

### g. Failure to Correct Errors on Appeal

Sowell has failed to show that his rights were violated during the disciplinary proceeding conducted by Capt. Sheahan. Consequently, his claim against Director Selsky for failing to correct the alleged errors at the disciplinary proceeding lacks a basis in law. *Clyde v. Schoellkopf, 714 F.Supp.2d at 439* (citing, *inter alia, Black v. Selsky, 15 F.Supp.2d at 318).*

### V. Conclusion

**\*18** For the foregoing reasons, Defendants' Motion for Summary Judgment (Dkt # 169) is **granted in part** and **denied in part**. All claims against CHO Esgrow, Inv. Bigit, Capt. Sheahan, and Director Selsky are dismissed with prejudice. The Eighth Amendment claim against CO Harris as a principal is dismissed with prejudice. The claims against CO Harris and CO Flynn for failure to intervene to prevent an Eighth Amendment violation by CO Weed may proceed. The Eighth Amendment claim

against CO Weed as a principal was not a subject of Defendants' summary judgment motion and may proceed.

### VI. Orders

It is hereby

**ORDERED** that Defendants' Motion for Summary Judgment is **granted** to the extent that all claims against CHO Esgrow, Inv. Bigit, and Director Selsky are dismissed with prejudice. It is further

**ORDERED** that Defendants' Motion for Summary Judgment is **granted** to the extent that the Eighth Amendment claim against CO Harris as a principal is dismissed with prejudice. It is further

**ORDERED** that Defendants' Motion for Summary Judgment is **denied** to the extent that the Eighth Amendment claim based on the failure of CO Harris and CO Flynn to intervene to prevent an excessive use of force may proceed. It is further

**ORDERED** that **Frank Bigit, Donald Selsky, Michael Sheahan,** and **James Esgrow** are **terminated** as parties to this action. The Clerk of Court is requested to modify the docket accordingly.

### ALL OF THE ABOVE IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 3324049

### Footnotes

1   The Court has taken judicial notice of the appellate brief filed by the State in connection with Plaintiff's administrative proceeding challenging the outcome of the fraud disciplinary hearing. *See, e.g., Ford v. Krusen,* No. 9:06–CV–0890 (GTS/DEP), 2009 WL 959534, at *3 n. 2. (N.D.N.Y. Apr.6, 2009) (citing *Waldman v. Village of Kiryas Joel,* 39 F.Supp.2d 370, 372–73 (S.D.N.Y.1999), *aff'd,* 207 F.3d 105 (2d Cir.2000)).

2   Apparently, Shammell Ayatollah died in 2001, prior to the commencement of Inv. Bigit's investigation.

3   Numbers preceded by "VS1." refer to pages from the first transcript of Sowell's deposition (Defendants' Exhibit ("Defs' Ex.") A, attached to the Declaration of Gary Levine Esq. ("Levine Decl."), Dkt # 173). Numbers preceded by "VS2." refer to pages from the second transcript of Sowell's deposition (Defs' Ex. B).

4   Numbers preceded by "MR." refer to pages from the deposition transcript of Michael Ramirez, a/k/a Michael Delgado. Numbers preceded by "AS." refer to pages from the deposition transcript of Alexander Screahben.

5   Photographs submitted by Sowell show that his fingers remain permanently bent. He asserts that he has what is known as a "Boutonnière Deformity," where an injury to the tendons in the fingers prevents the fingers from fully straightening. He asserts that he now suffers from stiffness and a severe case of arthritis in the fingers that were dislocated.

2013 WL 3324049

6    The transcript of the disciplinary hearing indicates that the videotape recorded by the surveillance system monitor of the incident covers the time-period from 9:47 a.m. to 9:53 a.m. on June 18, 2006. *See* Defs' Ex. CCC (Dkt # 173–3).

7    Numbers preceded by "TS." refer to pages from the deposition transcript of Timothy Harris.

8    The *Rooker–Feldman* doctrine is named for *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), and *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983).

9    Four inmates appeared and testified at the hearing. Alexander Screahben and Michael Ramirez testified in sum and substance as they did in their deposition testimony, which has been summarized above in this Decision and Order. William Jacobs and Albert Lawson also testified, and their testimony was consistent with that offered by Ramirez and Screahben. *See generally* Transcript of Disciplinary Hearing, Defs' Ex. CCC (Dkt # 173–3).

---

End of Document

© 2017 Thomson Reuters. No claim to original U.S. Government Works.